**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**BALTIMORE DIVISION**

National Association of Diversity Officers in
Higher Education;

American Association of University Professors;

Restaurant Opportunities Centers United;

Mayor and City Council of Baltimore, Maryland;          Civil Action No. _____

                Plaintiffs,

    v.

Donald J. Trump, in his official capacity as
President of the United States;

Department of Health and Human Services;
Dorothy Fink, in her official capacity as Acting
Secretary of Health and Human Services;

Department of Education; Denise Carter, in her
official capacity as Acting Secretary of Education;

Department of Labor; Vincent Micone, in his
official capacity as Acting Secretary of Labor;

Department of Interior; Doug Burgum, in his
official capacity as Secretary of the Interior;

Department of Commerce; Jeremy Pelter, in his
official capacity as Acting Secretary of
Commerce;

Department of Agriculture; Gary Washington, in
his official capacity as Acting Secretary of
Agriculture;

Department of Energy; Ingrid Kolb, in her official
capacity as Acting Secretary of Energy;

Department of Transportation; Sean Duffy, in his
official capacity as Secretary of Transportation;

Department of Justice; James McHenry, in his
official capacity as Acting Attorney General;

National Science Foundation; Sethuraman
Panchanathan, in his official capacity as Director
of the National Science Foundation;

Office of Management and Budget; Matthew
Vaeth, in his official capacity as Acting Director of
the Office of Management and Budget,

                Defendants.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

"*If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein.*"
*West Virginia Board of Education v. Barnett*, 319 U.S. 624 (1943).

To protect their rights under the United States Constitution, Plaintiffs National Association of Diversity Officers in Higher Education, American Association of University Professors, Restaurant Opportunities Centers United, and the Mayor and City Council of Baltimore, Maryland bring this action on their own behalf and on behalf of their members against Defendants President Donald J. Trump and the other Defendants identified below.

## INTRODUCTION

1.      In the United States, there is no king. The President can exercise only those powers the Constitution grants to the executive, and only in ways that do not violate the rights the Constitution grants to the American people. In his crusade to erase diversity, equity, inclusion, and accessibility from our country, President Trump cannot usurp Congress's exclusive power of the purse, nor can he silence those who disagree with him by threatening them with the loss of federal funds and other enforcement actions.

2.      On January 20, 2025, the President signed Executive Order 14151 titled, "*Ending Radical Government DEI Programs and Preferencing*" (the "J20 Order"). The order directed the Attorney General and the Director of the Office of Management and Budget ("OMB") to engage in sweeping efforts to remove "DEI," "DEIA," and "environmental justice" programs and professionals from executive branch agencies. J20 Order § 2(a). The terms "DEI," "DEIA," and "environmental justice" are undefined. That order also required each federal agency to

1

"terminate, to the maximum extent allowed by law, all . . . 'equity-related' grants or contracts" within sixty days. *Id.* § 2(b)(i). The term "equity-related" is undefined.

3.      The next day, the President signed Executive Order 14173 titled, "*Ending Illegal Discrimination and Restoring Merit-Based Opportunity*," (the "J21 Order"). The J21 Order seeks to suppress free speech on diversity, equity, and inclusion ("DEI"), or diversity, equity, inclusion, and accessibility ("DEIA") principles.

4.      The J21 Order threatens civil investigations and loss of funding "to deter DEI programs or principles (whether specifically denominated 'DEI' or otherwise)." J21 Order § 3(b)(iv), 4(b)(iii). Again, the President failed to define any material terms, including "DEI," "illegal DEI," "DEI programs or principles," or "illegal discrimination or preferences."

5.      Ordinary citizens bear the brunt. Plaintiffs and their members receive federal funds to support educators, academics, students, workers, and communities across the country. As federal agencies make arbitrary decisions about whether grants are "equity-related," Plaintiffs are left in limbo. Some have received notifications to cease all work on federally funded programs with connections to DEIA.

6.      The OMB added to Plaintiffs' fear when it ordered a nationwide freeze on all federal financial assistance, only to rescind that order two days later. Yet the White House Press Secretary persisted: "This is NOT a rescission of the federal funding freeze."[1] And even after a court enjoined enforcement of the freeze, the Department of Justice continued to press that the court order does not "enjoi[n] the President's Executive Orders, which are plainly lawful and unchallenged in this case."[2]

---

[1] Karoline Leavitt (@PressSec), X (Jan. 29, 2025, 1:40 PM ET), https://x.com/PressSec/status/1884672871944901034.
[2] Notice of Compliance with Court's TRO, at 2, *New York. v. Trump,* 1:25-cv-39 (D.R.I. Feb. 3, 2025), ECF No. 51.

7.     Because of the vagueness of President Trump's two executive orders, Plaintiffs are left to wonder whether, and for how long, they can rely on the federal funding that Congress appropriated using its exclusive power of the purse.

8.     As part of the mandate to "deter DEI," the J21 Order attempts to bypass the standard processes for amending government contracts and grant awards, and instructs each agency to include "in every contract or grant award," a term that the contractor or grantee "certify that it does not operate any programs *promoting DEI*" that would violate federal antidiscrimination laws. *Id.* § 3(b)(iv)(B) (emphasis added). Another provision instructs that compliance is "material to the government's payment decisions for purposes of" the False Claims Act ("FCA")," *id.* 3(b)(iv)(A), a clear threat of civil enforcement.

9.     President Trump's history and explicit call to dismantle anything connected to DEIA presses the question of which "programs promoting DEI" President Trump views as "illegal." If lawful DEI programs are suddenly deemed unlawful by presidential fiat, Plaintiffs must either risk prosecution for making a false claim, or censor promotion of their values. Our Constitution does not tolerate that result.

10.     Moreover, the J21 Order directs the Attorney General to deter voluntary DEI programs or principles in the private sector, even for those who do not receive federal grants or contracts. The Attorney General must provide a "plan [with] specific steps or measures to deter DEI programs or principles (whether specifically denominated 'DEI' or otherwise) that constitute illegal discrimination or preferences." *Id.* 4(b)(iii). As a part of this plan, each agency must "identify up to nine potential civil compliance investigations" in various sectors including "institutions of higher education with endowments over 1 billion dollars." *Id.*

11.    Any potential target of a civil compliance investigation, like some of the largest institutional members of Plaintiff National Association of Diversity Officers in Higher Education, is left with an untenable choice: continue to promote their lawful diversity, equity, inclusion, and accessibility programs, or suppress their own speech by ending programs or policies that the President may consider "illegal DEI."

12.    The J21 Order is designed to, and does, chill free speech on matters of substantial political import, solely because the President disagrees with that speech. The President has made clear—during both his campaign and his previous administration—that his goal is to punish those who recognize or choose to speak out about this country's history on issues of enslavement, racial exclusion, health disparities, gender inequality, treatment of individuals with disabilities, and discrimination. President Trump wishes to see the end of all diversity, equity, inclusion, and accessibility programs of any kind whatsoever.

13.    The J21 Order's chilling effect is amplified by its vagueness. The undefined terms leave  potential targets with no anchor as to what speech or which actions the order encompasses. They also give executive branch officials like the Attorney General carte blanche authority to implement the order discriminatorily. The order thus commits the twin evils of chilling speech beyond the scope of what may be legally regulated, and granting unfettered discretion to executive branch officials who will implement the President's orders.

14.    The President can have his own views about these matters. He can try to make his views into policy. But he cannot seize Congress's power of the purse. He cannot deny due process to millions of Americans. And he cannot abridge or disrupt the free speech of those who disagree. Those are the constitutional and legal transgressions of the J20 and J21 Orders. To remedy these harms, and to defend core Constitutional rights, Plaintiffs bring this suit.

## JURISDICTION AND VENUE

15.    This Court has subject matter jurisdiction over this matter because the claims arise under the Constitution and laws of the United States, *see* 28 U.S.C. § 1331, and because the Defendants are United States officials. 28 U.S.C. § 1346(a)(2).

16.    This Court has the authority to enter a declaratory judgment and to provide preliminary and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure, under Title 28, Sections 2201 and 2202 of the United States Code, and under the All Writs Act.

17.    Venue lies in this District because Plaintiff Mayor and City Council of Baltimore, Maryland resides in this judicial district and each defendant is an agency of the United States or an officer of the United States sued in his or her official capacity. 28 U.S.C. § 1391(e)(1).

## PARTIES

### A. Plaintiffs

18.    Plaintiff **National Association of Diversity Officers in Higher Education** ("NADOHE") is the nation's leading association for chief diversity officers and professionals with over 2,200 members. NADOHE's members include diversity, equity, inclusion, and accessibility professionals who work at institutions of higher education, as well as institutions of higher education themselves. Many of NADOHE's institutional members receive grants from the federal government and/or hold federal contracts, and several institutional members have endowments exceeding $1 billion. Some of NADOHE's institutional members offer educational programming or degrees or certificates in diversity, equity, and inclusion leadership and similar subject matters.

19. Plaintiff the **American Association of University Professors** ("AAUP") is a membership association and labor union of faculty and academic professionals with chapters at colleges and universities throughout the country. Many AAUP members are employees of institutions of higher learning with endowments exceeding $1 billion. AAUP is committed to advancing academic freedom and shared governance, defining fundamental professional values and standards for higher education, promoting the economic security of academic workers, and ensuring higher education's contribution to the common good.

20. Plaintiff **Restaurant Opportunities Centers United** ("ROC United") is a national membership organization of thousands of restaurant workers across the United States. Its mission is to improve restaurant workers' lives by building worker power and uniting workers of various backgrounds around shared goals and values, including racial and gender equity. ROC United receives grants from the federal government.

21. Plaintiff **Mayor and City Council of Baltimore, Maryland** ("Baltimore") is a municipal corporation, organized pursuant to Articles XI and XI-A of the Maryland Constitution, entrusted with all the powers of local self-government and home rule afforded by those articles. Baltimore is the largest city in Maryland and the thirtieth largest city in the United States.

**B. Defendants**

22. Defendant **Donald J. Trump** ("President Trump") is the President of the United States.  He issued the J20 and J21 Orders (the "Executive Orders"). He is sued in his official capacity.

23. Defendant **Department of Health and Human Services** ("HHS") oversees the U.S. Public Health Services, the Centers for Disease Control and Prevention ("CDC"), the Centers for Medicare & Medicaid Services, the Food and Drug Administration ("FDA"), and the

National Institutes of Health ("NIH"). NIH is itself the umbrella organization for an institute with an express focus on equity in health care: the National Institute on Minority Health and Health Disparities. HHS is directed to implement the Executive Orders in various ways, which HHS has proceeded to do. HHS provides grant funding to one or more Plaintiffs.

24.     Defendant **Dorothy Fink** is the Acting Secretary of Health and Human Services. She is sued in her official capacity. On information and belief, Acting Secretary Fink and the department she leads have begun implementing the Executive Orders.

25.     Defendant **Department of Education** ("Education Department") is directed to implement the Executive Orders in various ways, which the Education Department has proceeded to do. The Education Department provides grant funding to one or more Plaintiffs.

26.     Defendant **Denise Carter** is the Acting Secretary of Education. She is sued in her official capacity. On information and belief, Acting Secretary Carter and the department she leads have begun implementing the Executive Orders.

27.     Defendant **Department of Labor** ("DOL") is directed to implement the Executive Orders in various ways, which DOL has proceeded to do. DOL provides grant funding to one or more Plaintiffs.

28.     Defendant **Vincent Micone** is the Acting Secretary of Labor. He is sued in his official capacity. On information and belief, Acting Secretary Micone and the department he leads have begun implementing the Executive Orders.

29.     Defendant **Department of Interior** ("DOI") is directed to implement the Executive Orders in various ways, which DOI has proceeded to do. DOI provides grant funding to one or more Plaintiffs.

30.     Defendant **Douglas Burgum** is the Secretary of the Interior. He is sued in his official capacity. On information and belief, Secretary Burgum and the department he leads have begun implementing the Executive Orders.

31.     Defendant **Department of Commerce** ("Commerce") is directed to implement the Executive Orders in various ways, which Commerce has proceeded to do. Commerce provides grant funding to one or more Plaintiffs.

32.     Defendant **Jeremy Pelter** is the Acting Secretary of Commerce. He is sued in his official capacity. On information and belief, Acting Secretary Pelter and the department he leads have begun implementing the Executive Orders.

33.     Defendant **Department of Agriculture** ("USDA") is directed to implement the Executive Orders in various ways, which USDA has proceeded to do. USDA provides grant funding to one or more Plaintiffs.

34.     Defendant **Gary Washington** is the Acting Secretary of the USDA. He is sued in his official capacity. On information and belief, Acting Secretary Washington and the department he leads have begun implementing the Executive Orders.

35.     Defendant **Department of Energy** ("Energy") is directed to implement the Executive Orders in various ways, which Energy has proceeded to do. Energy provides grant funding to one or more Plaintiffs.

36.     Defendant **Ingrid Kolb** is the Acting Secretary of Energy. She is sued in her official capacity. On information and belief, Acting Secretary Kolb and the department she leads have begun implementing the Executive Orders.

37.    Defendant **Department of Transportation** ("DOT") is directed to implement the Executive Orders in various ways, which DOT has proceeded to do. DOT provides grant funding to one or more Plaintiffs.

38.    Defendant **Sean Duffy** is the Secretary of Transportation. He is sued in his official capacity. On information and belief, Secretary Duffy and the department he leads have begun implementing the Executive Orders.

39.    Defendant **Department of Justice** ("DOJ") is directed to implement the Executive Orders in various ways, which DOJ has proceeded to do. DOJ provides grant funding to one or more Plaintiffs.

40.    Defendant **James McHenry** is the Acting Attorney General. He is sued in his official capacity. On information and belief, Acting Attorney General McHenry and the department he leads have begun implementing the Executive Orders.

41.    Defendant **National Science Foundation** ("NSF") is directed to implement the Executive Orders in various ways, which NSF has proceeded to do. NSF provides grant funding to one or more Plaintiffs.

42.    Defendant **Sethuraman Panchanathan** is the Director of NSF. He is sued in his official capacity. On information and belief, Director Panchanathan and the department he leads have begun implementing the Executive Orders.

43.    Defendant **Office of Management and Budget** ("OMB") is directed to implement the Executive Orders in various ways, which OMB has proceeded to do.

44.    Defendant **Matthew Vaeth** is the Acting OMB Director. He is sued in his official capacity. On information and belief, Acting Director Vaeth and the office he leads have begun implementing the Executive Orders.

## LEGAL BACKGROUND

45.     The First Amendment provides all Americans with essential freedoms, including the freedom of speech, the right to assemble, and the right to petition the government for a redress of grievances. James Madison recognized: "the people shall not be deprived or abridged of their right to speak, to write, or to publish their sentiments; and the freedom of the press, as one of the great bulwarks of liberty, shall be inviolable."[3]

46.     The First Amendment protects the freedom of expression of all Americans, no matter their point of view. The government may not censor, discriminate, or apply rules inconsistently based on viewpoint. The Constitution protects the right of scholars, teachers, and researchers to think, speak, and teach without governmental interference. The "essentiality of freedom in the community of American universities is almost self-evident" and educators play a "vital role in a democracy." *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957).

47.     And freedom of speech is not just for academics, scholars, and educators.  It protects Americans working wage and shift jobs in communities across the nation. The law requires us all to "do equal right to the poor and to the rich." 28 U.S.C. § 453.

48.     Throughout our nation's history, courts have consistently prevented various state actors, including executive branch officials, from trampling the protections afforded by the First Amendment. *See, e.g.*, *Int'l Dev. v. All. for Open Soc'y*, 570 U.S. 205 (2013) (Roberts, J.) (striking down requirement that nonprofits express opposition to disfavored policies before receiving federal funds); *West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943) (finding the government cannot force students to recite the pledge of allegiance).

---

[3] 1 *Annals of Cong.* 434 (1789).

49.    Indeed, nothing in the Constitution's text, or in more than two centuries of judicial decisions interpreting the Constitution, confers on the President or the executive branch any power to dictate government spending or to place conditions on the spending power, especially conditions that are themselves constitutionally suspect. Any power to impose lawful conditions rests solely with Congress. *See* U.S. Const. art. I, § 1, 8.

50.    Finally, the Constitution protects people from being deprived of their rights without due process. U.S. Const. amend. V. A federal enactment, like an executive order, is unconstitutionally vague when it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). In other words, the Constitution demands clarity and consistency.

## FACTUAL ALLEGATIONS

### A.  Diversity, Equity, Inclusion, and Accessibility Principles Are Critical to Plaintiffs.

51.    Diversity, equity, inclusion, and accessibility principles seek to promote the fair treatment and full participation of all people, particularly groups who have historically been underrepresented or subject to discrimination on the basis of identity or disability. While DEIA is a relatively new acronym, the work it refers to—ensuring that all have equal opportunity—is not.

52.    Principles of diversity, equity, inclusion, and accessibility are foundational to the nation's promise of equality for all and equal justice under the law and are deeply embedded in Plaintiffs' missions, programs, and work in service of students, research and academic inquiry, restaurant workers, and everyday citizens.

*Diversity, Equity, Inclusion, and Accessibility Are Essential in Higher Education.*

53.    In higher education, DEIA principles and initiatives contribute to ensuring an inclusive, supportive environment for all students and staff, enhancing academic freedom, and promoting academic exploration, all of which drive innovation well beyond academic settings.

54.    Plaintiff NADOHE's core values include excellence, diversity, equity, inclusivity, and scholarship. NADOHE pursues its mission by, among other things, offering its members resources that support professional development, informal career counseling, and other support that aids diversity professionals in ensuring the competent delivery of critical activities within an institution.

55.    On campuses, the impactful initiatives spearheaded by diversity professionals include strategies designed to provide access, support, and resources to a diverse student body, including low-income students, first-generation students, students from historically underrepresented racial identities and marginalized groups, veterans, women, and persons with disabilities, and to ensure that the institution is recruiting from a diverse applicant pool as it makes hiring and other personnel decisions.

56.    In recent years, some states have enacted legislation restricting use of public funds to support DEIA in higher education. As a result, NADOHE's mission has become even more important as students, faculty, and staff, particularly from underrepresented backgrounds, increasingly feel isolated and unsupported on campuses.

57.    NADOHE's members include Chief Diversity Officers at institutions of higher education who serve as principal administrators with duties including leading, facilitating, and evaluating diversity, equity, inclusion, and accessibility efforts for the institution, and supporting

core functions including curriculum, recruitment, retention, and success of students, faculty, and staff.

58.    In addition, Chief Diversity Officers are responsible for strategic planning and accountability for outcomes and nondiscrimination, which may include serving as the institution's designated Equal Employment Opportunity coordinators, Americans with Disabilities Act coordinators, and Title IX coordinators, along with ensuring that diversity, equity, inclusion, and accessibility efforts are consistent with applicable laws.

59.    NADOHE established Standards of Professional Practice for Chief Diversity Officers in higher education to inform its work and support its members. These standards of practice are based on empirically validated research that demonstrates the pursuit of inclusive excellence is essential to the strength of our institutions and the realization of an equitable society. NADOHE also jointly publishes the peer-reviewed *Journal of Diversity in Higher Education* to make available multidisciplinary research on evidence-based practices for the pursuit of inclusive excellence.

60.    Plaintiff AAUP is dedicated to protecting and advancing academic freedom, which is indispensable to the advancement of research and academic inquiry to further the search for truth and free expression. It was founded by John Dewey and other preeminent scholars to defend the ability of scholars, researchers, and educators to teach, write, and research without political and economic retaliation based on their viewpoints.

61.    AAUP has long advocated for diversity in higher education, including a diverse faculty and student body. For AAUP, diversity is tied to academic freedom and shared governance, and it believes that broad representation of faculty members—in terms of gender, race, and ethnicity—is essential to fulfill the promise of academic freedom, to deepen existing disciplinary

13

approaches, and to open new disciplinary paths, including the study of inequality and discrimination.

62.     One of AAUP's core beliefs is that diversity results in better knowledge production, which is critical to expanding areas of inquiry and exposing, correcting, and filling gaps in our understanding.  In a 2024 statement, AAUP reaffirmed this belief, noting that faculty diversity is important to move towards ensuring inclusion and equality in higher education.

63.     AAUP's membership includes a large number of academic professionals whose work focuses on topics related to diversity, including faculty that teach courses focused on specific racial or ethnic identities (e.g., Black studies, Latino studies, Asian studies, etc.), faculty whose teaching focuses on a range of gender or sexual orientation identities, and faculty whose teaching focuses on environmental justice and other subject matter targeted by the Executive Orders. Furthermore, some AAUP members teach students participating in graduate programs that focus on diversity, equity, and inclusion specifically.

64.     AAUP's membership also includes a large number of faculty members whose research focuses on equity-related topics, including many who rely on federal grants to support their work. This is particularly true at medical schools, where AAUP represents a significant number of members who focus on medical and other scientific research related to whether and how race and ethnicity affect health outcomes.

***Diversity, Equity, Inclusion, and Accessibility are Essential for Working Americans.***

65.     In addition to our nation's higher education institutions, workplaces with blue collar, shift workers promote the principles of DEIA too.

66.     Plaintiff ROC United envisions a society that treats restaurant workers with dignity and respect, including prioritizing racial and gender equity and increasing the standard of living for all working-class people.

67.     ROC United is deeply invested in ensuring the principles of diversity, equity, inclusion, and accessibility are realized across the restaurant industry. ROC United partners with restaurant workers to overcome the obstacles racism and sexism place in their way.

68.     Launched in 2007, ROC United's Culinary Hospitality Opportunities for Workers (CHOW) workforce development program directly addresses the racial segregation that is deeply embedded in the restaurant industry. ROC United's students, who are overwhelmingly people of color and women, build their confidence as leaders in the industry and gain access to the livable-wage jobs historically held by white men in the industry.

69.     By building career pathways so that people of color, women, and young restaurant workers can achieve livable-wage employment, ROC United significantly improves quality-of-life outcomes for CHOW graduates, their families, and their communities.

70.     In addition, ROC United provides sexual harassment training to protect and empower women who make up most of the restaurant workforce.

***Diversity, Equity, Inclusion, and Accessibility Are Critical to Community Life.***

71.     Since 1729, the City of Baltimore has been a crossroads of peoples and ideas. It has gained prominence in myriad ways including fostering the arts, sparking innovation in medicine, and pushing the vanguard of civil rights.

72.     Plaintiff Baltimore is a city of nearly 600,000 Americans of all backgrounds. According to the 2020 Census, 60 percent of Baltimore's population is Black, 27 percent is

White, 8 percent is Hispanic or Latino, and 2.5 percent is Asian. Five percent of the city was identified by the Census as two or more races.

73.    The diversity of the city is its strength, and Baltimore has made significant efforts to embrace people from all backgrounds to strengthen itself economically and socially. The city has an Office of Equity and Civil Rights devoted to "activities to eliminate inequity, inequality, and discrimination," and works to advance "equity and [uphold] the federal and local civil rights laws, the local living and prevailing wage laws ensuring access and equal opportunities for persons with disabilities, and providing oversight of local law enforcement."[4]

74.    Baltimore's Warm Welcome program—an initiative that provides free diversity, equity, inclusion, and accessibility training to Baltimore businesses—has enhanced the city's tourism industry through the participation of over one hundred businesses, and garnered attention from national tourism publications. Baltimore is committed to building a more equitable city for families to thrive.

### B. President Trump's 2025 Anti-DEIA Executive Orders.

75.    Within 48 hours of taking office, President Trump issued executive orders seeking to eliminate any trace of diversity, equity, inclusion, and accessibility from our nation, and to punish those who support and promote the principles of diversity, equity, inclusion, and accessibility. Those executive orders included the J20 Order and the J21 Order.

76.    As soon as the executive orders were announced, the White House Press Secretary noted: "President Trump campaigned on ending the scourge of DEI from our federal

---

[4] *Office of Equity and Civil Rights*, City of Baltimore, https://civilrights.baltimorecity.gov/ (last visited Feb. 3, 2025).

government and returning America to a merit based society . . . . Promises made, promises kept."[5]

77.     The J20 Order directs government officials to eliminate "DEI," "DEIA," and "environmental justice" from the federal government, including by shuttering all "DEI," "DEIA," and "environmental justice" offices, positions, and functions. J20 Order § 2(b)(i).

78.     It also directs "each agency, department, or commission head, in consultation with the Attorney General, the Director of OMB, and the Director of OPM . . . [to] terminate, to the maximum extent allowed by law, all . . . 'equity related' grants or contracts" within 60 days. *Id.*

79.     Also, within 60 days, agencies must provide the OMB Director with lists of federal contractors who have provided DEIA training to the government and federal grantees who received funding "to provide or advance DEI, DEIA, or 'environmental justice' programs, services, or activities." *Id.* § 2(b)(ii).

80.     The J20 Order does not define "equity-related," does not explain what it means to advance "DEI, DEIA, or 'environmental justice' programs, services, or activities," or even what it means by "DEI," "DEIA," or "environmental justice." *Id.* § 2.

81.     The same day the executive order was issued, Defendants began targeting individuals within the federal government who are perceived to support diversity, inclusion, equity, and accessibility.

82.     That day, the Acting OPM Director issued a memo instructing all agencies to close all offices "focusing exclusively on DEIA initiatives and programs," without even evaluating the legality of those initiatives and programs and suggested agencies threaten

---

[5] Zoë Richards & Caroline Kenny *Trump orders all federal diversity, equity and inclusion employees placed on paid leave starting Wednesday*, NBC News (Jan. 22, 2025, 10:50 AM). https://www.nbcnews.com/politics/white-house/trump-orders-federal-diversity-equity-inclusion-employees-placed-paid-rcna188679.

employees with "adverse consequences" if they failed to report changes intended "to obscure the connection to "DEIA or similar ideologies . . . ." OPM did not explain what "ideologies" might be "similar" to DEIA.

83.     The J21 Order states President Trump's intent to end "illegal preferences and discrimination," referring to "illegal DEI and DEIA policies," and, under the guise of promoting "equal opportunity," rescinds orders and policies that have been critical in mitigating the harmful effects of centuries of discrimination in the United States. J21 Order § 1, 3.

84.     The J21 Order targets those in the private sector—including corporations, large nonprofits, medical entities, and institutions of higher education—that have allegedly "adopted and actively use[d] dangerous, demeaning, and immoral race- and sex- based preferences under the guise of so-called 'diversity, equity, and inclusion' (DEI) or 'diversity, equity, inclusion, and accessibility' (DEIA) that can violate the civil-rights laws of this Nation." J21 Order § 1.

85.     The J21 Order instructs agency heads to "include in every contract or grant award" a "term requiring such counterparty or recipient to certify that it does not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws." *Id.* § 3(b)(iv)(B) (the "Certification Requirement"). The order does not lay out a timeline for implementing these instructions, thus they must be presumed to take effect immediately. Nor does the order define what it means to "promot[e] DEI" or the types of "programs promoting DEI" that would violate "applicable Federal anti-discrimination laws."

86.     A certification, found to be materially false, may result in treble damages, penalties, and potentially attorneys' fees under the FCA. *See Id.* § 3(b)(iv)(A); 31 U.S.C. §§ 3729(a) & 3730(d). Penalties currently range as high as $27,894 per violation, *see* 28 C.F.R.

§ 85.5, and FCA cases often involve many violations. *See U.S. ex rel. Kozak v. Chabad-Lubavitch Inc.*, No. 2:10-CV-01056-MCE, 2015 WL 2235389, at *7 (E.D. Cal. May 11, 2015).

87.     Moreover, the J21 Order promises swift enforcement to "deter" those in the private sector from engaging in "Illegal DEI Discrimination and Preferences." *Id.* § 4(b). Within 120 days, it calls on the Attorney General and other administration officials to issue a "strategic enforcement plan" that identifies "the most egregious and discriminatory DEI practitioners in each sector of concern," and recommends litigation "that would be potentially appropriate for Federal lawsuits, intervention, or statements of interest." *Id.* 4(b)(ii) and (v). To aid the Attorney General, each agency is required to "identify up to nine potential civil compliance investigations of" certain types of organizations, including "institutions of higher education with endowments over 1 billion dollars." *Id.* 4(b)(iii).

88.     The J21 Order makes no effort to consider the specifics of a particular program, declaring instead that "DEI programs or principles (whether specifically denominated 'DEI' or otherwise) . . . constitute illegal discrimination or preferences." *Id.*

89.     On information and belief, there are over 120 institutions of higher education with endowments over $1 billion in the United States. The order offers no criteria for which of these institutions should be served up for investigations, nor does it explain what they can do to stay off the target list. In other words, none of the approximately 120 institutions of higher education that could be subject to civil compliance investigations know what, if any, action they can take to avoid being named on the Attorney General's target list.

90.     The J21 Order does not define "DEI" or "illegal DEI and DEIA programs" at all, nor does it recognize that the question of a program's legality is a fact-intensive exercise left to

19

courts and other adjudicatory bodies that are well-equipped to apply the facts to existing antidiscrimination laws.

91.    To Defendants, DEIA is an ideology that they do not define but nonetheless want to crush, whether it manifests itself through lawful speech and actions or through actual violations of law. Ultimately, the President's position on DEIA was made clearest by his Deputy Chief of Staff Stephen Miller when he stated: "[a]ll DEI must be abolished nationwide."[6]

**C. President Trump's Crusade to Eliminate All DEIA Is Not New.**

92.    During the years leading up to these Executive Orders, President Trump has repeatedly and publicly made his disdain for DEIA initiatives clear—though what he imagines "DEIA" to be is inconsistent.

93.    Indeed, at the end of his last term, President Trump attempted (unsuccessfully) to silence those who promote diversity, equity, inclusion, and accessibility by banning what he decreed to be "divisive concepts" in Executive Order 13950.[7]

94.    To identify and eliminate these "divisive concepts," agencies were instructed to review diversity and inclusion training materials to identify banned ideas including by searching for terms like "intersectionality," "unconscious bias," and "systemic racism," among others. Off. of Mgmt. & Budget, Exec. Off. of the President, M-20-37, Ending Employee Trainings that Use Divisive Propaganda to Undermine the Principle of Fair and Equal Treatment for All (Sept. 28, 2020).

---

[6] Stephen Miller (@StephenM), X (January 12, 2025, 9:36 AM ET), https://x.com/StephenM/status/1878450912621994410.

[7] Executive Order 13950 was challenged, and the Northern District of California issued a preliminary injunction on the basis of the First and Fifth Amendment claims brought by individuals and organizations who received federal funds. *Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d 521 (N.D. Cal. 2020) (enjoining sections of Executive Order 13950 pertaining to federal contractors and grantees).

95.     President Trump defended his crusade, claiming the government was "paying people hundreds of thousands of dollars to teach very bad ideas and frankly, very sick ideas" like "teaching people to hate our country."[8]

96.     President Trump's allies—now members of his administration—have echoed his call to abolish DEIA.

97.     Shortly before he joined President Trump's campaign, then-Senator J.D. Vance introduced the Dismantle DEI Act to eliminate DEIA programs in the federal government and prevent the awarding of federal contracts and grants to entities that employ DEIA practices.

98.     Then-Senator Vance stated: "The DEI agenda is a destructive ideology that breeds hatred and racial division," and "Americans' tax dollars should not be co-opted to spread this radical and divisive ideology—this bill would ensure they are not."[9]

99.     Elon Musk, head of President Trump's Department of Government Efficiency ("DOGE") said: "DEI is just another word for racism. Shame on anyone who uses it."[10] Musk criticized the NSF, calling the increase in NSF grants with DEIA components "insane."[11]

100.     An administration insider familiar with President Trump's plans for DOGE said, "[a]nything having to do with DEI will be gone," and that "[e]veryone is committed to working together and rooting it out."[12]

---

[8] ABC News (@ABC), X (Sept. 29, 2020, 10:06 PM ET), https://x.com/ABC/status/1311125196829609984.
[9] Press Release, *JD Vance and Michael Cloud introduce bill to eliminate DEI programs in federal government*, Office of Rep. Michael Cloud, Jun. 12, 2024, https://cloud.house.gov/posts/jd-vance-and-michael-cloud-introduce-bill-to-eliminate-dei-programs-in-federal-government.
[10] Elon Musk (@elonmusk), X (Jan. 3, 2025, 4:05 PM ET), https://x.com/elonmusk/status/1742653436393406618.
[11] Elon Musk (@elonmusk), X (Dec. 3, 2024, 11:30 AM ET), https://x.com/elonmusk/status/1863984151705120806.
[12] Rene Marsh & Pamela Brown, *DOGE vs. DEI: Republicans' Promise to Purge Government Diversity Initiatives Could be Wide-ranging, and Hard to Pull Off*, CNN, Dec. 19, 2024, https://www.cnn.com/2024/12/19/politics/doge-government-diversity-initatives/index.html

101.     On January 29, 2025, President Trump finally said the quiet part out loud. Although the J21 Order does not define "illegal DEI" or the "equity" principles that the OMB is directed to target and to "terminate," eight days later President Trump signed Executive Order 14190, titled "*Ending Radical Indoctrination in K-12 Schooling*," that sheds some light on his intent.  Executive Order 14190 defines "discriminatory equity ideology" as holding beliefs that are almost identical to the so-called "divisive concepts" list in Executive Order 13950—the same executive order that was already enjoined because it violated the First Amendment.

**D. The Implementation of the Executive Orders Confirms Their Unlawful Reach.**

102.     Executive branch agencies are already implementing the Executive Orders, making liberal use of the unfettered discretion granted and often using the same vague and vitriolic language that gives the Executive Orders their chilling effect.

103.     On January 21, 2025, the Acting Director of the U.S. Office of Personnel Management ("OPM") issued OPM's "Initial Guidance Regarding DEIA Executive Orders." Memorandum from Acting Director of OPM Charles Ezell to Heads and Acting Heads of Departments and Agencies (Jan. 21, 2025) (the "OPM Memo"). The OPM Memo told agencies how to notify employees about the closure of DEI offices, and how to intimidate employees into informing the agency of purported attempts to evade the OPM Memo's terms.

104.     Citing the J20 Order, the OPM Memo instructed agencies to ask all employees, by the end of January 22, 2025, "if they know of any efforts to disguise these programs by using coded or imprecise language." OPM Memo, at 1.

105.     OPM shared template emails for agency heads to use in carrying out OPM's instructions. These templates assert that DEIA programs "divided Americans by race, wasted taxpayer dollars, and resulted in shameful discrimination" and warned that OPM was "aware of

efforts by some in government to disguise these programs by using coded or imprecise language." OPM Memo, App'x 1. Employees were instructed to expose any "change in any contract description or personnel position description since November 5, 2024 to obscure the connection between the contract and DEIA or similar ideologies," and that "all facts and circumstances" must be reported to "DEIAtruth@opm.gov within 10 days." *Id.* OPM's template email did not explain what kind of "ideologies" might be "similar" to DEIA. OPM further warned that "failure to report this information within 10 days may result in adverse consequences." *Id.* It did not delineate the "adverse consequences" that might be in store for employees who fail to expose their colleagues who engage with DEIA or "similar ideologies."

106.    Some federal agencies have sent versions of OPM's template email to their employees.[13] On information and belief, these letters included the language characterizing "DEIA offices" and "DEIA-related" contracts. They also included the language threatening "adverse consequences" to employees who failed to report the required information.

107.    On information and belief, DOL, the National Aeronautics and Space Administration ("NASA"), NIH, the United States Agency for International Development ("USAID"), the Defense Intelligence Agency ("DIA"), and the Internal Revenue Service (IRS) have already started relying on one or both of the Executive Orders, or the OPM Memo, to instruct federal grantees to cease activities related to DEIA.

108.    Citing the Executive Orders, the NSF informed grantees that they must cease "all non-compliant grant and award activities."[14] Specifically, this includes "conferences, trainings, workshops, considerations for staffing and participant selection, and any other grant activity that

---

[13] *See* Kayla Epstein & Brajesh Upadhyay, *US Government Workers Told to Report DEI Efforts or Face 'Consequences,'* BBC, (Jan. 23, 2025), https://www.bbc.com/news/articles/c78wn5qg3nyo.
[14] U.S. Nat'l Sci. Found., *Message to the NSF Principal Investigator Community*, https://new.nsf.gov/executive-orders (Feb. 3, 2025).

uses or promotes the use of diversity, equity, inclusion, and accessibility (DEIA) principles and frameworks or violates federal anti-discrimination laws."[15]

109.    On information and belief, the CDC has relied on the J20 Order to instruct grant recipients to terminate programs, personnel, activities, or contracts promoting DEI that are supported with funds from grants the agency administers.

110.    On information and belief, the DIA issued a memorandum on January 28, 2025, indicating that in order to "implement the [J20] Executive Order[] . . . DIA will pause all activities and events related to Agency Special Emphasis Programs effective immediately." The memorandum also paused "Special Observances" including Martin Luther King Jr. Day, Black History Month, Women's History Month, and Holocaust Remembrance Day.

111.    On information and belief, the IRS removed all mentions of "equity" and "inclusion" from its Internal Revenue Manual, regardless of context, and without any assessment of legality. One deleted section mentioned the potential "inequity" of holding on to a taxpayer's money and described the "inclusion" of a taxpayer identification number on a form.

112.    On January 27, 2025, the Acting OMB Director issued a memorandum to the heads of executive departments and agencies declaring that "the use of Federal resources to advance Marxist equity, transgenderism, and green new deal social engineering policies is a waste of taxpayer dollars." M-25-13 "Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Programs" (the "OMB Freeze Memo").

113.    The OMB Freeze Memo instructed that, effective at 5:00 PM on January 28, 2025, all federal agencies must "temporarily pause all activities related to obligation or disbursement of all Federal financial assistance, and other relevant agency activities that may be

---

[15] *Id.*

implicated by the executive orders, including, but not limited to, financial assistance for foreign aid, nongovernmental organizations, DEI, woke gender ideology, and the green new deal."

114.    On January 28, 2025, a district court ordered an administrative stay prohibiting OMB from "implementing [the OMB Freeze Memo] with respect to disbursement of Federal funds under all open awards" until February 3, 2025.[16]

115.    Around 12:30pm ET on January 29, 2025, the Acting OMB Director issued a memo announcing that the OMB Freeze Memo "is rescinded."  Jan. 29, 2025 Memo, "Rescission of M-25-13," M-25-14.

116.    "This is NOT a rescission of the federal funding freeze," announced White House Press Secretary Karoline Leavitt, about an hour later.[17] Instead, the Press Secretary claimed, it was "simply a rescission of the OMB memo," intended to "end any confusion created by the court's injunction."[18] She asserted that the "President's EO's [*sic*] on federal funding remain in full force and effect, and will be rigorously implemented."[19]

117.    Consistent with the Press Secretary's announcement, in a separate action challenging the OMB Freeze Memo and its implementation, the Department of Justice pressed that the court's temporary restraining order does not "enjoi[n] the President's Executive Orders, which are plainly lawful and unchallenged in this case."[20]

---

[16] Order, *Nat'l Council of Nonprofits, et al. v. Off. of Mgmt. & Budget*, No. 1:25-cv-00239-LLA (D.D.C. Jan. 28, 2025), ECF No. 13 (ordering administrative stay of OMB's federal financial assistance freeze).
[17] Karoline Leavitt (@PressSec), X (Jan. 29, 2025, 1:40 PM ET), https://x.com/PressSec/status/1884672871944901034.
[18] *Id.*
[19] *Id.*
[20] Notice of Compliance with Court's TRO, at 2, *New York. v. Trump,* 1:25-cv-39 (D.R.I. Feb. 3, 2025), ECF No. 51.

**E.  Plaintiffs Rely on Federal Support to Advance their Critical Work and Missions.**

118.    Plaintiffs, or their members and constituents, receive federal funds, either as grantees or contractors. Their federal grants and contracts currently require compliance with federal antidiscrimination laws.

119.    NADOHE has hundreds of active institutional members, including public and private colleges and universities. These institutional members receive federal grants and contracts from several different federal agencies, and plan to seek more federal grants and contracts in the future.

120.    Those grants include active and ongoing grants awarded by several agencies and sub-agencies including but not limited to the Education Department, Interior, Commerce, Energy, Transportation, USDA, NSF, HHS, and DOJ.

121.    The grants cover a wide variety of projects ranging from advancing STEM education, to pursuing more equitable health outcomes for underserved communities, to reducing disparities in juvenile justice, to improving public transit for communities, to promoting the development of clean energy technology, and many more.

122.    Likewise, academic professionals who are members of AAUP receive federal grants from agencies across the federal government, including NIH, NSF, NEA, and HHS, among many others. Many of these grants fund the salaries of medical school faculty, graduate students, and other researchers who focus on health equity. Others focus on the impact of climate change and other environmental risks on diverse communities.

123.    ROC United similarly has been awarded federal grants. For example, in 2023, ROC United received a grant from the Fostering Access, Rights and Equity ("FARE") grant program within DOL's Women's Bureau. Public Law No. 259 of June 5, 1920, 29 U.S.C. § 11-

16, which established the Women's Bureau within DOL, provides the statutory authority for this grant. Congress gave the Women's Bureau the "authority to formulate standards and policies which shall promote the welfare of wage-earning women, improve their working conditions, increase their efficiency, and advance their opportunities for profitable employment." 29 U.S.C. § 13.

124.    Established in 2021, the FARE grant program was designed to help women workers learn about and access their employment rights and benefits. Starting in 2023, the FARE grant program began focusing on addressing gender-based violence and harassment in the workplace.

125.    The FARE grant program has allowed ROC United to expand several of its sexual harassment training initiatives. It has also enabled ROC United to establish a referral network to connect survivors with support services, such as the EEOC and local equivalents, the Office of Human Rights, and the Occupational Safety and Health Administration ("OSHA").

126.    Without this grant, ROC United would not have been able to expand or support its efforts to end gender-based violence and sexual harassment in the restaurant industry.

127.    ROC United also has a grant award from OSHA under the Susan Harwood Training Grant Program, which it uses to provide heat-safety training to over 600 workers in the restaurant industry, including youth, those who are hard to reach, and limited English proficiency workers.

128.    Baltimore is both a contractor and grantee of the federal government. Federal funding supports a range of services and programs for which Baltimore is accountable, including public safety, housing, the environment, the local economy, infrastructure, and accessibility for

rural, low-income, elderly, and disabled populations. Baltimore relies on federal funds to serve the needs of its residents, including food, infrastructure, energy, and weather resilience.

129.    Baltimore receives $250 million in federal funds under the Justice40 Initiative intended to benefit disadvantaged communities. The programs were developed, in part, pursuant to Executive Order 14008, which President Trump rescinded on January 20, 2025, by Executive Order 14148, "*Initial Rescissions of Harmful Executive Orders and Actions*." By design, many of the Justice40 grants provide targeted support for historically underserved groups. As such, many of Baltimore's grants touch on themes of equity and inclusion.

130.    Baltimore receives $500,000 from Energy through the Weatherization Assistance Program to improve the energy efficiency of homes in Baltimore.  The Secretary of Energy is authorized to administer this grant program "for the purpose of providing financial assistance with regard to projects designed to provide for the weatherization of dwelling units, particularly those where elderly or handicapped low-income persons reside, occupied by low-income families." 42 U.S.C. § 6863(a).

131.    These are only a few examples of the federal support on which Plaintiffs rely to provide economic stability, entrepreneurial opportunity, and environmental health.

**F.  Absent Court Intervention, the EOs and Their Implementation Will Cause Irreparable Harm to Plaintiffs.**

132.    The Executive Orders, which broadly characterize DEIA efforts as "illegal and immoral discrimination programs," directly undermine the missions and needs of Plaintiffs and their communities.

133.    The sixty-day mandate for "terminat[ing] … all … 'equity-related' grants or contracts" under the J20 Order is not a running clock leading up to the termination. Rather, sixty

days is a deadline by which the terminations must occur; grant and contract terminations may occur any day up to and including the 60th day after the issuance of the J20 Order.

134.    Many of NADOHE's institutional members have active federal grants that include the term "equity" in the title, the grant proposal submitted for funding, or in other public-facing documentation. Further, many of NADOHE's institutional members have federal grants that include other terms arguably related to the concept of "equity," including terms such as "diversity," "inclusion," "accessibility," and "belonging."

135.    The Executive Orders' vagueness threatens NADOHE's members with termination of federal grants. DOL has already relied on both Executive Orders to instruct at least one of NADOHE's institutional members that receives federal funding to cease certain activities connected to DEIA.

136.    If such terminations occur, NADOHE fears that the result will be eradication of critical support for students, staff, and faculty, and research on campuses of higher education.

137.    The J21 Order likewise harms NADOHE. Within 120 days, the Attorney General must provide a report that identifies "up to nine" targets from each agency for civil compliance investigations, all designed to "deter DEI." Again the 120 days provision is a deadline and the report could be produced any day between now and May 21, 2025.

138.    NADOHE's institutional members with endowments greater than $1 billion and those institutions' diversity officers are under threat from the J21 Order's requirement for agencies to identify targets for civil compliance investigations. They cannot wait to be named to prevent the injuries an investigation would cause. Those NADOHE members have a responsibility to their trustees and students to avoid the fiscal and reputational harms that would flow from any such investigation.

139.    However, because the J21 Order fails to define material terms, NADOHE's institutional members who fit the parameters of the potential target list are left with only fear to guide their determinations of what activities, programs, and principles will render them a target. The only way NADOHE's relevant institutional members can ensure they are *not* on the civil compliance investigation list would be to end *all* DEIA programs and cease voicing support for any DEIA principles, or similar principles, that could even possibly concern this administration. More simply, the only sure way to avoid unwarranted harm is for Plaintiff NADOHE's relevant institutional members to censor their own speech.

140.    Likewise, the J21 Order leaves NADOHE's members who are Chief Diversity Officers to guess whether and which of their duties might put their institutions in the crosshairs of an investigation. In accordance with NADOHE's Standards of Professional Practice, NADOHE's members who are Chief Diversity Officers "have ethical, legal, and practical obligations to frame their work from comprehensive definitions of equity, diversity, and inclusion."[21] Further, the standards call for them to be "committed to drawing from existing scholarship and using evidence-based practices to provide intellectual leadership in advancing equity, diversity, and inclusion." The J21 Order suggests that these and all other DEIA principles and activities are "illegal."

141.    Many of AAUP's members have active federal grants with "equity" in the title, description, request for grant proposals, or other public facing documentation. Still other AAUP members have active federal grants that address topics related to equity, including diversity, anti-racism, inclusion, accessibility, and belonging.

---

[21] NADOHE, Standard of Professional Practice for Chief Diversity Officers in Higher Education 2.0 (March 2020), https://nadohe.memberclicks.net/assets/2020SPPI/__NADOHE%20SPP2.0_200131_FinalFormatted.pdf.

142.    Many of AAUP's members fear that their federal grants may be terminated because of the vagueness of the Executive Orders. On information and belief, AAUP members have already been told that they must cease certain activities that are arguably related to DEIA.

143.    AAUP is concerned that terminating federal funding for its members will undermine academic excellence and make academic institutions less inclusive and equitable.

144.    Similarly, for those AAUP members whose teaching or research focuses on topics related to diversity or equity, there is concern that their work—whether teaching or research—might endanger their own institutions and lead to adverse employment consequences.

145.    ROC United relies on federal grant support, including the FARE and Harwood grants, to realize its vision of a society that treats restaurant workers with dignity and respect, including prioritizing racial and gender equity.

146.    ROC United received e-mail notices from DOL's Women's Bureau and OSHA to "cease all activities related to [DEI] or [DEIA] under their federal awards, consistent with the requirements of" the Executive Orders. The notices did not define what constitutes DEI or DEIA.

147.    In addition, OSHA instructed grant recipients to: "effective immediately! Cease collecting and reporting trainees DEI information."

148.    The notices explained that DOL "is reviewing all active federal awards and will take appropriate action, including terminating the award, consistent with the requirements of" the Executive Orders. The notices have no timelines or standards for such a review.

149.    When it received these notices, ROC United stopped all work funded by the FARE grant and the Harwood Grant. ROC United is experiencing significant disruption to its operations as it considers whether it can continue its programs and under what parameters.

150.    For example, ROC United has several scheduled upcoming training programs connected to the FARE and Harwood grants. Due to the Executive Orders, ROC United is in limbo: it must either seek other sources of funding and remove any reference to the two grants, or it will have to cancel the trainings altogether. As a last resort, it will operate at a deficit to continue to fulfill its mission until its funds are depleted.

151.    And Baltimore, accountable for a wide range of services supported by federal funding that could be considered "equity-related," faces a quandary. The uncertainty of federal funding leaves the city wondering whether it needs to start reallocating resources—and likely reduce support for other programs—just to sustain its critical municipal functions.

152.    Finally, the J21 Order's Certification Requirement chills Plaintiffs' and their members' speech. The Certification Requirement does not delineate which "programs promoting DEI" President Trump purports to prohibit. Without clarity, Plaintiffs and their members fear they may have to abandon their lawful efforts and speech related to diversity, equity, inclusion, and accessibility, or else lose federal funds that support their valuable programs.

153.    Further chilling, the Certification Requirement includes no timetable for its implementation. Plaintiffs and their members cannot know whether the agencies overseeing their grant programs feel authorized to insert the required certifications into active grants that Plaintiffs and their members have already been awarded.

## LEGAL CLAIMS

**COUNT ONE:**
**ULTRA VIRES (SPENDING CLAUSE)**
**REGARDING SECTION 2 OF THE J20 ORDER**

154.    The preceding allegations are incorporated herein as if repeated fully.

155.    Plaintiffs state this cause of action against all Defendants.

156.    The Constitution vests spending powers exclusively in the hands of Congress. *See* U.S. Const. art. I, § 1, 8.

157.    "When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952).

158.    The J20 Order purports to direct subordinate executive branch officials to unilaterally "terminate, to the maximum extent allowed by law, all . . . 'equity-related' grants or contracts." J20 Order § 2(b)(i).

159.    The Constitution gives neither the President nor his subordinate executive branch officials authority to unilaterally terminate "'equity-related' grants and contracts" without express statutory authority.

160.    Though the J20 Order purports to limit terminations "to the maximum extent allowed by law," President Trump and his subordinate agencies have already acted contrary to that limitation.

161.    A general statement about nominal adherence to the law does not suffice to evade judicial review.

162.    Accordingly, the J20 Order was issued without legal authority and is *ultra vires*.

**COUNT TWO:**
**FIFTH AMENDMENT DUE PROCESS (VAGUENESS)**
**REGARDING SECTION 2 OF THE J20 ORDER**

163.    The preceding allegations are incorporated herein as if repeated fully.

164.    Plaintiffs state this cause of action against all Defendants.

165.    Under the Fifth Amendment to the United States Constitution, a governmental enactment, like an executive order, is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Williams*, 553 U.S. at 304.

166.    The J20 Order "fails to provide a person of ordinary intelligence fair notice of what is prohibited" and "is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Id.*

167.    The J20 Order does not define key terms, including "DEI," "DEIA," "equity" or "equity-related" and fails to satisfy the constitutional minimum.

168.    Plaintiffs are left to guess whether their federal grants or contracts will be terminated within the sixty-day period proscribed by the J20 Order.

169.    Furthermore, the J20 Order lends itself to subjective interpretation and discriminatory enforcement. Each agency head is authorized to exercise unfettered discretion to determine whether a federal grant is "equity-related."

170.    Accordingly, the J20 Order is unconstitutionally vague in violation of the Fifth Amendment's Due Process Clause.

## COUNT THREE:
### FIFTH AMENDMENT DUE PROCESS (VAGUENESS) REGARDING SECTION 4 OF THE J21 ORDER

171.    The preceding allegations are incorporated herein as if repeated fully.

172.    Plaintiffs NADOHE and AAUP state this cause of action against all Defendants.

173.    The J21 Order "fails to provide a person of ordinary intelligence fair notice of what is prohibited" and "is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Williams*, 553 U.S. at 304.

174.    The J21 Order fails to define material terms that determine whether Plaintiffs NADOHE, particularly its members at institutions with endowments over $1 billion, and AAUP, will be subject to civil investigation, civil enforcement, claw back of funding, or other enforcement actions by the federal government.

175.    The J21 Order does not define the term "illegal DEIA and DEIA policies" in Section 1; "illegal private-sector DEI preferences, mandates, policies, programs, and activities" in Section 2; nor "illegal DEI discrimination and preferences" in Section 4.

176.    The lack of definitions necessarily requires people of common intelligence to guess as to what is prohibited. Given the vagueness of the material terms, the Attorney General and each agency head charged with identifying the "up to nine" investigation targets are "encourage[d]" to engage in "discriminatory enforcement."

177.    The J21 Order provides no rubric or clear criteria for how the "up to nine" entities will be selected by each agency, nor does the order define "DEI programs or principles" or "illegal discrimination or preferences." Without any definitive criteria or information, any of the over 130 colleges and universities in the United States with endowments over $1 billion, including NADOHE's institutional members, are potentially in the crosshairs of the order.

178.    Plaintiff NADOHE's members, including "institutions of higher education with endowments over 1 billion dollars," are at risk of being identified for "civil compliance investigations" to "deter [their] DEI programs or principles (whether specifically denominated 'DEI' or otherwise)." J21 Order § 4(b)(iii).

179.    Many of AAUP's members, along with NADOHE's institutional members and the diversity professionals they employ, use equity-centered principles and policies in their work.

180.    Plaintiffs NADOHE and AAUP and their members cannot determine what is prohibited and what is permissible under the J21 Order, especially given admissions by the President and his representatives about their desire to end *all* DEI programs and principles.

181.    The enforcement of the J21 Order, and related executive orders, by the executive agencies further demonstrates its vagueness and arbitrary enforcement.

182.    Accordingly, the J21 Order is unconstitutionally vague in violation of the Fifth Amendment's Due Process Clause.

**COUNT FOUR:**
**FIRST AMENDMENT (FREE SPEECH CLAUSE)**
**REGARDING SECTION 4 OF THE J21 ORDER**

183.    The preceding allegations are incorporated herein as if repeated fully.

184.    Plaintiffs NADOHE and AAUP state this cause of action against all Defendants.

185.    The J21 Order violates the Free Speech Clause of the First Amendment because Section 4(b)(iii)'s threat of "civil compliance investigations" impermissibly restricts the exercise of NADOHE's and AAUP's constitutionally protected speech based on its content and viewpoint.

186.    For example, the J21 Order penalizes the protected speech of NADOHE's institutional members with endowments over $1 billion by threatening to bring enforcement actions against them to "deter" "DEI programs or principles." J21 Order § 4(b)(iii).

187.    The President makes threats of civil investigation and undefined "deterrence" against anyone who expresses support for what he imprecisely defines as "illegal DEI."

188.    Indeed, merely being listed for a civil compliance investigation carries its own consequences for institutions of higher education, including the costs of conducting investigations, the potential costs of litigation, and the need to redirect dedicated resources from

other purposes to engage with the civil compliance investigation. Those harms are separate and apart from the reputational harm that besets an institution of higher education identified for a civil compliance investigation, including the risk of loss of student applicants, donors, and prestige that will likely result from such an investigation.

189.    The freedom of speech of individual Chief Diversity Officers and other academic faculty at such institutions is likewise impinged due to the threats of investigation of their institutions.

190.    A general statement about nominal adherence to the law does not suffice to evade judicial review.

191.    These First Amendment violations have injured and continue to injure Plaintiffs NADOHE, AAUP, and their members.

192.    Accordingly, the J21 Order violates the First Amendment.

**COUNT FIVE:**
**FIRST AMENDMENT (FREE SPEECH CLAUSE)**
**REGARDING SECTION 3 OF THE J21 ORDER**

193.    The preceding allegations are incorporated herein as if repeated fully.

194.    Plaintiffs state this cause of action against all Defendants.

195.    The J21 Order violates the Free Speech Clause of the First Amendment because it impermissibly restricts Plaintiffs constitutionally protected speech based on its content and viewpoint, and because it fails to define what "programs promoting DEI" are or why such programs might violate anti-discrimination laws.

196.    Section 3(b)(iv)(B) requires federal contractors and grantees to "certify that they do not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws."

197.    This Certification Provision—contained in an executive order characterizing DEIA as "illegal" and "violat[ions of] the text and spirit of our longstanding Federal civil-rights laws, *id.* § 1—is designed to chill federal contractors' and grantees' speech related to diversity, equity, inclusion, and accessibility. Through this provision, President Trump brandishes the threat of FCA enforcement to quiet federal contractors' and grantees' dissenting views.

198.    The President does not define any of the key terms of these prohibitions. It is not clear what "so-called 'diversity, equity, and inclusion' (DEI)" means, *see* J21 Order, § 1; nor does it provide any guidance on how such programs or initiatives can be considered to "violate the text and spirit of our longstanding Federal civil-rights laws." *Id.*

199.    As a result, Plaintiffs are chilled from expressing or participating in anything that might draw the ire of the President or his administration when it comes to DEI.

200.    A general statement about nominal adherence to the law does not suffice to evade judicial review, particularly in the face of real-world facts as detailed elsewhere in this Complaint that the President is attempting to ban *all* DEI, legal or otherwise.

201.    Accordingly, the J21 Order violates the First Amendment.

**COUNT SIX:**
**VIOLATION OF SEPARATION OF POWERS**
**REGARDING SECTION THREE OF THE J21 ORDER**

202.    The preceding allegations are incorporated herein as if repeated fully.

203.    The J21 Order violates the separation of powers enshrined in the Constitution.

204.    The President and the executive branch have no authority to dictate government spending or place conditions on the spending power that is vested in the legislative branch.

205.    The Constitution vests spending powers exclusively in the hands of Congress. *See* U.S. Const. art. I, § 1, 8.

206.    The J21 Order purports to impose a condition on the receipt of federal funds by requiring recipients of contracts or grants to certify that they "do[] not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws." J21 Order § 3(b)(iv)(B).

207.    While the Certification Requirement claims to limit itself to "programs promoting DEI" that violate "any applicable Federal anti-discrimination laws," those limitations are undefined and conflict with the rest of the order. *Id.*

208.    A general statement about nominal adherence to the law does not suffice to evade judicial review.

209.    No delegation of Congress's power under the Spending Clause is constitutionally permitted, nor did Congress delegate any spending power to the President with respect to the particular federal programs and funds at issue here.

210.    Accordingly, the J21 Order is unconstitutional because it violates the constitutional separation of powers.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully requests that this Court:

   a. Enter a declaratory judgment that Executive Order 14151 is unlawful and unconstitutional;

   b. Enter a declaratory judgment that Executive Order 14173 is unlawful and unconstitutional;

   c. Enter a preliminary and permanent injunction enjoining Defendants other than the President from enforcing Executive Order 14151;

d.  Enter a preliminary and permanent injunction enjoining Defendants other than the President from enforcing Executive Order 14173;

e.  Award Plaintiffs reasonable costs and attorney's fees; and

f.  Issue such other relief as the Court deems proper.

The Plaintiffs request a trial by jury on all issues so triable.


February 3, 2025                                         Respectfully submitted,


                                                        /s/ Victoria S. Nugent
Niyati Shah*                                            Victoria S. Nugent (Bar No. 15039)
Noah Baron*                                             Aleshadye Getachew+
Alizeh Ahmad*                                           Ananda V. Burra+
**Asian Americans Advancing Justice |**                Audrey Wiggins*
**AAJC**                                                Brooke Menschel*
1620 L Street NW, Suite 1050,                           J. Sterling Moore*
Washington, DC 20036                                    Orlando Economos*
(202) 296-2300                                          Skye Perryman*
nshah@advancingjustice-aajc.org                         **Democracy Forward Foundation**
nbaron@advancingjustice-aajc.org                        P.O. Box 34553
aahmad@advancingjustice-aajc.org                        Washington, D.C. 20043
                                                        (202) 448-9090
                                                        vnugent@democracyforward.org
                                                        agetachew@democracyforward.org
                                                        aburra@democracyforward.org
                                                        awiggins@democracyforward.org
                                                        bmenschel@democracyforward.org
                                                        smoore@democracyforward.org
                                                        oeconomos@democracyforward.org
                                                        sperryman@democracyforward.org
                                                        * motion to appear *pro hac vice*
                                                        forthcoming
                                                        +admission pending

40