# EXHIBIT 19

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
BALTIMORE DIVISION

| | |
|---|---|
| National Association of Diversity Officers in Higher Education, et al., <br><br> Plaintiffs, <br><br> v. <br><br> Donald J. Trump, in his official capacity as President of the United States, et al., <br><br> Defendants. | Civil Action No. 1:25-cv-333-ABA |

## DECLARATION OF PRESIDENT AND CHIEF EXECUTIVE OFFICER OF THE NATIONAL ASSOCIATION OF DIVERSITY OFFICERS IN HIGHER EDUCATION

I, Paulette Granberry Russell, hereby attest:

*Background*

1. I am over eighteen years old, of sound mind, and fully competent to make this declaration. I also have personal knowledge of the factual statements contained herein.

2. I am the current President and Chief Executive Officer of the National Association of Diversity Officers in Higher Education ("NADOHE").

3. Prior to my role with NADOHE, I served for twenty-two years as a senior diversity officer at a large, research-intensive public university. The work I performed in that role is representative of the work that many of NADOHE's individual diversity officer members perform in their own roles.

4. NADOHE is the nation's leading association for chief diversity officers and professionals in postsecondary education, with over 2,200 members, as of the date of this Declaration. NADOHE's members include diversity, equity, inclusion, and accessibility

Declaration. NADOHE's members include diversity, equity, inclusion, and accessibility professionals who work at institutions of higher education, as well as institutions of higher education themselves, both public and private.

5. NADOHE counts among its institutional members several institutions of higher education with endowments exceeding $1 billion in assets.

6. NADOHE was incorporated in 2006, but the foundation for the organization was laid in 2003 after several chief diversity officers met and concluded there was a need to create a national forum to discuss professional standards and guide the nascent diversity profession.

7. The organization serves as the leading voice for current and aspiring diversity leaders in higher education. NADOHE strives to equip diversity professionals and institutions of higher education with the necessary tools to be successful in their roles and to advance equity, inclusion, and the value of belonging within their campus communities, using evidence-based practices. Through embracing the value of inclusive excellence, NADOHE's members seek to enhance academic freedom and exploration.

8. NADOHE is a not-for-profit 501(c)(3) organization based in Washington, D.C.

*Diversity, Equity, Inclusion, and Scholarship*

9. NADOHE's core values include excellence, diversity, equity, inclusivity, and scholarship. NADOHE pursues its mission by, among other things, offering its members resources that support professional development, informal career counseling, and other support that aids diversity professionals in ensuring the competent delivery of critical activities within an institution.

10. Diversity professionals and diversity offices in higher education have wide ranging duties, which may include leading diversity, equity, inclusion efforts for the institution,

with Disabilities Act coordinators and Title IX coordinators, and ensuring that diversity, equity, and inclusion efforts are consistent with applicable antidiscrimination laws.

11. The initiatives our members are responsible for at their respective institutions include strategies designed to provide access, support, and resources to a diverse student body, including low-income students, first-generation students, students from historically underrepresented groups, international students, veterans, women, and persons with disabilities; and to ensure that the institution is recruiting from a diverse applicant pool as it makes nondiscriminatory hiring and other personnel decisions. For example, NADOHE's individual professional members typically lead or influence outreach, recruitment, and admission programs, including pre-college programs that introduce students from diverse backgrounds to the college experience. "Diverse backgrounds" is a broad umbrella term and includes nontraditional students, such as veterans and students with families. NADOHE members also ensure that the needs of students with disabilities are accommodated in accordance with the institution's policies and the law. Diversity professionals are expected to understand the varied levels of preparation of admitted students, identify barriers to student retention and graduation, and monitor outcomes. They also examine policies and practices to ensure that academic and social support programs, including career services, address the different lived experiences of students that may impact students' abilities to achieve their career and workforce goals (such as, identifying supports for students who have aged out of foster care and have no home to return to during college breaks or after graduation).

12. Typically, NADOHE members also monitor hiring and promotion efforts to assure compliance with institutional hiring and progression policies and state and federal nondiscrimination laws. Because campus culture and climate can also impact student and

3

employee retention, diversity professionals monitor, respond to, and design interventions necessary to address incidents involving bias, discrimination, or harassment of students and employees, and often conduct trainings that may be required or recommended to comply with federal and state laws prohibiting harassment and discrimination. NADOHE members also design, promote, and implement inclusive education and professional development programs to foster student and employee success and engagement. NADOHE members understand that this work is valuable not only because it advances inclusive excellence, but also because it establishes campus cultures that protect against violations of antidiscrimination laws.

13. NADOHE established the *Standards of Professional Practice for Chief Diversity Officers in Higher Education* to inform its work and support its members. These standards of practice are based on empirically validated research that demonstrate that the pursuit of inclusive excellence is essential to the strength of our educational institutions and the realization of an equitable society. NADOHE's *Standards of Professional Practice* provide, for example, that Chief Diversity Officers "have ethical, legal, and practical obligations to frame their work from comprehensive definitions of equity, diversity, and inclusion." Further, the *Standards* call for them to be "committed to drawing from existing scholarship and using evidence-based practices to provide intellectual leadership in advancing equity, diversity, and inclusion."

14. NADOHE also jointly publishes the peer-reviewed *Journal of Diversity in Higher Education* to make available multidisciplinary research on evidence-based practices for the pursuit of inclusive excellence.

15. NADOHE's mission has become particularly important in recent years as backlash against DEI on higher education campuses, due in part to some state legislative measures, has caused many students, faculty, and staff from diverse and underrepresented

4

backgrounds to feel unsupported. Now, more than ever, it is critical for NADOHE to support its members in their critical work of fostering inclusive academic environments.

*Importance of Federal Grants and Contracts*

16. Many of NADOHE's institutional members have active federal grants and contracts from several different federal agencies and sub-agencies, including the Department of Interior, Department of Commerce, Department of Energy, Department of Transportation, Department of Agriculture, Department of Education, Department of Justice, Department of Health and Human Services, and National Science Foundation. NADOHE's members plan to seek more federal grants and contracts in the future.

17. The grants cover a wide variety of projects ranging from advancing education in science, technology, engineering, and mathematics (STEM), to pursuing more equitable health outcomes for underserved communities, to reducing disparities in juvenile justice, to improving public transit for communities, to promoting the development of clean energy technology, and many more.

18. Without the grants they receive, many of NADOHE's institutional members would have to shut down the programs funded by those grants.

*Consequences of President Trump's Executive Order 14151 (Section 2)*

19. I understand that President Trump's Executive Order 14151 titled, *"Ending Radical Government DEI Programs and Preferencing"* that he signed on January 20, 2025 (the "J20 Order") requires all federal agencies to terminate all "equity-related grants or contracts" to the maximum extent allowable by law within sixty days of the date President Trump signed the J20 Order.

5

20. The vague language in the J20 Order's description of prohibited activities will leave many of our institutional members guessing as to which activities are prohibited under the J20 Order. Specifically, the term "equity-related," which is not defined, could mean a multitude of activities, some of which the J20 Order may not have intended to capture.

21. Many of our member institutions have federal grants that include the term "equity" in the title of the grant, the grant proposal submitted for the grant, or in other public-facing documentation related to the grant.

22. One of NADOHE's institutional members, Institutional Member A, in light of the J20 Order, cancelled a conference on alternate models of education at HBCUs because the program was funded in part by a grant from the Department of Labor. The institutional member was informed by the panel participants for the conference that they had been barred from participation by their own organizations on account of the J20 Order. Citing a lack of funding and a lack of participation, the institution cancelled the conference.

23. Further, many of our member institutions have federal grants that include other terms arguably related to the concept of "equity," including terms such as "diversity," "inclusion," "belonging," "access," "accessibility," and "success."

24. Given the ambiguity in the J20 Order, our member institutions, including Institutional Member A, fear that those grant funds will be terminated, and are already taking steps to mitigate harms that might flow from the termination of those funds.

25. Those grants that may be terminated include grants from the following federal agencies: the Departments of Interior, Commerce, Energy, Transportation, Agriculture, Education, Health and Human Services, and Justice; and the National Science Foundation.

26. If the grants that may be impacted by the J20 Order are terminated, NADOHE fears the J20 Order will lead to the eradication of critical support for students, staff, and faculty on campuses of higher education; the elimination of many of our members' jobs; and will ultimately threaten NADOHE's existence.

*Consequences of President Trump's Executive Order 14173 (Section 3)*

27. I also understand that President Trump's Executive Order 14173 titled, "*Ending Illegal Discrimination and Restoring Merit-Based Opportunity*," that he signed on January 21, 2025 (the "J21 Order") provides that all federal grants and contracts must include terms requiring the recipient or contractor "to certify that [they] do[] not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws" and to acknowledge that compliance is "material to the government's payment decisions for purposes of" the False Claims Act ("FCA")."

28. Because the Executive Order does not define key terms, NADOHE's institutional members are left with a difficult choice: risk civil enforcement for violation of the FCA by certifying that they do not operate any DEI programs without knowing what that means; lose funding by failing to certify; or else censor themselves and cancel programs to avoid drawing the ire of the President and the Department of Justice.

29. For example, at least six of NADOHE's current institutional members, Institutional Members B-G, are subject to a recently issued university system-wide announcement that, in accordance with Section 3 of the J21 Order, any curricular programs or requirements that relate to the prohibited topics listed in the J21 Order might prevent the certification now required of federal contractors and grantees. Citing the J21 Order, the announcement explained that even with a compliance certification made in good faith by an institution, such curricular and program requirements might still be deemed noncompliant and

7

trigger adverse consequences from federal agencies. The announcement further explained that the risk of jeopardizing significant sources of critical federal research funding for the system's institutions was too great to defer action, and that, as a result, all such programs and requirements mandating completion of courses related to diversity, equity, and inclusion would be suspended immediately. These institutional members have yet to submit renewals of their memberships, and, given this announcement, I have reason to believe that they will decide not to continue as dues-paying members of NADOHE. Even if these institutional members cease to be NADOHE members, many other current institutional members of NADOHE who already renewed their NADOHE memberships are contending with the same fears of loss of critical federal research funding.

*Consequences of President Trump's Executive Order 14173 (Section 4)*

30. I further understand that the J21 Order requires all agencies to transmit a report to the Attorney General within sixty days of the signing of the Order and to "identify up to nine potential civil compliance investigations of" certain types of organizations, including "institutions of higher education with endowments over 1 billion dollars" in order to "deter DEI."

31. NADOHE's institutional members with endowments greater than $1 billion, including Institutional Member H, are subject to inclusion in the reports that agencies must produce under the J21 order. Since the J21 Order fails to define material terms, NADOHE's institutional members that fit the parameters of the potential target list fear they may be targeted for investigation but lack clarity about how to avoid the financial, reputational, and organizational costs of such an investigation. As a result of the President's directive and mission to "deter" institutions with endowments over $1 billion from promoting or condoning "DEI programs or principles," those members' protected speech is penalized and chilled. Moreover,

8

simply being named for investigation under the J21 Order would carry consequences including the costs of investigations and litigation, and the need to redirect dedicated resources from other purposes to engage with the civil compliance investigation, even if the investigation ultimately establishes no legal violation by the investigation target. Finally, those harms are compounded by the reputational harm that an institution of higher education identified for a civil compliance investigation would inevitably suffer, such as the loss of student applicants, donors, and prestige that will likely result from such an investigation.

### *Harms to NADOHE's Individual Members and to NADOHE Itself*

32. NADOHE is also concerned for its individual diversity professional members, given the February 5, 2025, memorandum from Attorney General Bondi that calls for proposals for criminal investigations in implementing the J21 Order. That memorandum raises the possibility that NADOHE's individual diversity professional members may be targeted for criminal prosecution if they continue to carry out their jobs consistent with their professional obligations and values, even though they conduct themselves in a way that they in good faith believe is lawful and fully consistent with antidiscrimination laws – and, indeed, believe are part of carrying out their compliance roles.

33. NADOHE's individual diversity professional members have suffered and will continue to suffer both direct and downstream effects of these threats. Individual Member A, who provides services to a university as a consultant, has had contracts terminated by the university client because the J20 Order threatens the termination of the grant funding from the National Science Foundation that funded Individual Member A's contract. Over 50% of Individual Member A's business is based on National Science Foundation grants that are at risk of termination under the J20 Order.

9

34. NADOHE's individual members fear that as institutions of higher education seek to escape the crosshairs of criminal and civil compliance investigations, or as the institutions seek to comply with the J21 Order's certification requirement, the jobs held by those diversity professionals will be terminated or resources allocated to their work and departments will be diminished and reallocated. Our members' fears are not unfounded. Prior efforts to dismantle DEI initiatives at colleges and universities—such as state-level legislation and the Supreme Court's ruling in *Students for Fair Admissions, Inc. v. President and Fellows of Harvard College*, 600 U.S. 181 (2023)—have already had a negative impact on our members. They reasonably expect the effect of this renewed effort under the J20 and J21 Orders to have similar negative impacts.

35. Already, our individual members have suffered threats to their employment status and careers. In states where anti-DEI legislation has been introduced and passed or tabled, our members have faced severe professional and personal consequences, including, for some, lost jobs, reorganized offices, transfer into other departments, and health consequences, such as stress related illnesses. The J20 and J21 Orders exacerbate these harms, compounding a problem that already exists for NADOHE members in some jurisdictions with the more broadly sweeping threat of federal legal consequences for both those individuals and the institutions they serve. When institutions are forced to decide between, on the one hand, risking investigations and potential violations of grant and contract requirements by continuing to employ and support the work of individual diversity officers and, on the other, dropping those programs, the individual diversity officers that are responsible for these programs are caught in the middle.

36. For example, in Florida and Texas, where diversity offices at public institutions of higher education were outlawed, various NADOHE members initially understood as a result of

10

guidance from their institutions or university systems that necessary adjustments needed to be made to bring their offices and programs into compliance with the provisions of the legislation, and that there might be changes in titles, or programs and activities; however, they were led to believe that they would remain employed. Despite these initial assurances from institutions in Florida and Texas, I am aware of members in those states who lost their jobs, felt isolated, and suffered repeated attacks to their personal and professional reputations, including vicious and clearly intended attacks to impugn the reputation of highly skilled and educated professionals.

37. In the case of at least one of our individual members, her photo was included in published stories by anti-diversity activists with what appeared to be the professional headshots of three diversity administrators marked with the word "FIRED" in enlarged red font. In that individual's case, it was not represented to her that the passage of the legislation would result in the elimination of her role and office.

38. Moreover, these injuries to NADOHE's members raise harms for NADOHE itself. NADOHE's members are the heart of our organization.

39. In response to the J20 and J21 Orders, NADOHE has reallocated resources away from its planned, mission-driven work to respond to its members' needs concerning the uncertainty created by the J20 and J21 Orders.

40. Because of the J20 and J21 Orders, I am spending over 50% of my time focused on the J20 and J21 Orders, including responding to media and directing the work of staff to respond to requests for information related to the orders. That work includes quickly developing webinars that address the current events and strategies for our members to respond to the impact on their departments and their institutions overall. These efforts have required redirecting my

11

time from the day-to-day operations of the association and from supporting planning for NADOHE's usual programmatic work.

41. Our communications team has been redirected to field media requests, develop talking points, develop FAQs regarding our efforts, and, along with our association management team, monitor our membership data, respond to requests for information, and provide support to our board and members related to the impact of the orders.

42. But for the J20 and J21 Orders, my time and NADOHE resources would have been spent pursuing our previously planned programmatic goals.

43. Over the last 16 months, NADOHE has been closely tracking the impact of the "anti-DEI" state legislation on our membership count. Our organization's membership has declined in states where anti-DEI bills have been introduced, passed, or tabled.

44. Some NADOHE members have stopped attending events and publicly participating in the organization due to the backlash from state-level anti-DEI laws. Other members have decided they could no longer be members of the organization because of their state's anti-DEI legislation and/or the chilling effect of being associated with DEI efforts in those states. Due to the J20 and J21 Orders, and based on conversations with NADOHE members, NADOHE expects that more of our current members will determine they cannot or should not renew their membership or that they cannot or should not attend our conferences and events. I also expect that, due to the J20 and J21 Orders, NADOHE will lose opportunities to recruit prospective members who would otherwise have been interested in joining our association.

45. NADOHE's annual conference and membership dues are our largest sources of revenue. We have experienced a near total loss of members and revenues from public colleges and universities in Florida and Texas, where anti-DEI legislation has been enacted, and

significant or noticeable losses in other states where such bills have been introduced or tabled, and we do not anticipate growth in membership in those states, particularly among state-funded colleges and universities. We have had to increase our dues and implement an aggressive and strategic membership drive targeting states and institutions for the first time in the existence of the organization to replace this lost revenue.

46. Due to the J21 Order's vague and ambiguous language regarding both the certification requirement and the potential investigations, NADOHE has had to address questions about the viability of the future of the organization—how do we survive and continue our mission to advocate for inclusive campus communities locally, regionally, and nationally when our members are unsure whether their work is proscribed? How can our members continue to practice their profession without clarity as to which types of programs and policies will subject their institutions' federal contracts to termination? How do we as an organization highlight exemplars of practice in higher education, now that we have to concern ourselves with how such exemplars may become targets for derision or adverse employment actions? I worry that the J21 Order will cause irreparable harm to our members and our organization, and my worries reflect those that NADOHE's members have also shared with me.

47. In the wake of the J20 and J21 Orders, I personally have experienced personal insults, verbal attacks, and received threatening communications based on NADOHE's professional mission, with messages similar in tone to the J21 Order's mischaracterization of diversity, equity, and inclusion efforts as "dangerous," "demeaning," "immoral," "corrosive" and "pernicious" pretexts for an "identity-based spoils system" that undermines "traditional American values." NADOHE members have expressed concerns that they may be similarly

targeted for threats and personal attacks. NADOHE has had to hire increased security for its events, as a result.

48. I understand that the J20 Order directed federal agencies to terminate, to the maximum extent allowable by law, all "'Chief Diversity Officer' positions" and "all DEI....offices and positions" within the federal government. I fear that, in combination, the J20 Order and the J21 Order, if implemented, will result in the elimination of those offices at many higher education institutions and that the J20 and J21 Orders represent an existential threat to the profession of NADOHE's individual members – and therefore to the continued viability and existence of NADOHE itself.

Under 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: February 12, 2025

*Paulette Granberry Russell* (signature)
Paulette Granberry Russell, J.D.

4919-3793-0266