# EXHIBIT 20

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
BALTIMORE DIVISION

| | |
|---|---|
| National Association of Diversity Officers in Higher Education, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>Donald J. Trump, in his official capacity as President of the United States, et al.,<br><br>Defendants. | Civil Action No. 1:25-cv-333-ABA |

## DECLARATION OF TODD WOLFSON

I, Todd Wolfson, declare as follows:

### *Background*

1. I am over eighteen years old, of sound mind, and fully competent to make this declaration. I also have personal knowledge of the factual statements contained herein.

2. I have a Ph.D. in Anthropology and Social and Cultural Foundations of Education from the University of Pennsylvania.

3. I am the President of the American Association of University Professors ("AAUP"). I was elected to this role in October 2024. I have held various leadership roles in the Rutgers chapter of AAUP, AAUP-AFT, including as its President and Vice President.

4. AAUP is a membership association and labor union of faculty and academic professionals with chapters at colleges and universities throughout the country.

2

5. Many AAUP members are employees of institutions of higher learning with endowments exceeding $1 billion.

6. AAUP is a 501(c)(6) organization headquartered in Washington, D.C.

7. The mission of AAUP is to advance academic freedom and shared governance, define fundamental professional values and standards for higher education, promote the economic security of academic workers, and ensure higher education's contribution to the common good.

8. AAUP was founded by John Dewey and other preeminent scholars in 1915 to defend the ability of scholars, researchers, and educators to teach, write, and research without political and economic retaliation based on their viewpoints.

9. Over one century later, AAUP finds itself revisiting several of the core issues that prompted its founding.

***Diversity, Equity, Inclusion, and Accessibility***

10. AAUP has long advocated for diversity in higher education, including a diverse student body and faculty.

11. For AAUP, diversity is tied to academic freedom and shared governance, and it believes that broad representation of faculty members—in terms of gender, race, and ethnicity—is essential to fulfill the promise of academic freedom, to deepen existing disciplinary approaches, and to open new disciplinary paths, including the study of inequality and discrimination.

12. One of AAUP's core beliefs is that diversity results in better knowledge production, which is critical to expanding areas of inquiry and exposing, correcting, and filling gaps in our understanding.

13. AAUP's members include several academic professionals whose work focuses on topics related to diversity, including faculty that teach courses focused on specific racial or ethnic identities (e.g., Black studies, Latino studies, Asian studies, etc.), faculty whose teaching focuses on a range of gender or sexual orientation identities, and faculty whose teaching focuses on environmental justice and other subject matter targeted by the President's anti-DEIA executive orders. Furthermore, some AAUP members teach students participating in graduate programs that focus on diversity, equity, and inclusion specifically.

### *Importance of Federal Grants and Contracts*

14. AAUP's membership includes faculty members whose research focuses on equity-related topics, including many who rely on federal grants to support their work. This is particularly true at medical schools, where AAUP represents a significant number of members who focus on medical and other scientific research related to whether and how race and ethnicity affect health outcomes. For example, Rutgers New Jersey Medical School faculty, including AAUP members, received a National Science Foundation grant to study environmental and cultural influences on substance abuse issues in Black and Latinx Youth.

15. Likewise, academic professionals who are members of AAUP receive federal grants from agencies across the federal government, including the National Institutes of Health, the National Science Foundation, National Endowment for the Arts, and Department of Health and Human Services, among many others. Many of these grants fund the salaries of medical school faculty, graduate students, and other researchers who focus on health equity. Others focus on the impact of climate change and other environmental risks on diverse communities.

16. Many of AAUP's members have active federal grants with "equity" in the title, description, request for grant proposals, or other public facing documentation. Still other AAUP

members have active federal grants that address topics related to equity, including diversity, anti-racism, inclusion, accessibility, and belonging. And AAUP members have active federal grants unrelated to diversity, equity, and inclusion, but are separately involved in diversity, equity, and inclusion-related activities outside of the scope of their work pursuant to federal grants.

17. One NSF grant that several AAUP members receive is the "Historically Black Colleges and Universities – Excellence in Research (HBCU-EiR)" program, which was founded in 2018. This program was founded in response to a report from the Senate Committee on Appropriations Subcommittee on Commerce, Justice, Science, and Related Agencies, and prior and continuing efforts by NSF to strengthen research capacity at Historically Black Colleges and Universities.

18. Another AAUP member won an NSF grant called the "ADVANCE: Organizational Change for Gender Equity in STEM Academic Professions" program, which contributes to the NSF's goal of a more diverse and capable science and engineering workforce. The program's website expresses that when policies do not aim to reduce implicit bias in employment-related decisions in the academy, it both perpetuates underrepresentation of marginalized populations in STEM academia and reduces inclusivity.

*Consequences of President Trump's Executive Order 14151 (Section 2)*

19. I understand that President Trump's Executive Order 14151 titled, "Ending Radical Government DEI Programs and Preferencing" (the "J20 Order") requires all federal agencies to terminate all "equity-related grants or contracts" to the maximum extent allowable by law within sixty days.

20. This J20 Order does not define "equity-related grants or contracts," nor does it describe the reasons for eliminating such grants or contracts.

21. Several AAUP members and/or the institutions for which they work have grants and/or contracts from federal entities, including but not limited to:

    a. Rutgers-New Brunswick

        1. One federal grantee, a professor, supports postdoctoral students and trains them to teach research through the NIH's Institutional Research and Academic Career Development Award (IRACDA). Some IRACDA-funded programs allow the postdoctoral fellows to shadow faculty at schools with underrepresented populations and to teach the students at those schools. The IRACDA website has been disabled. This professor is concerned that they will imminently lose one of their postdoctoral fellows, whose work on female reproductive health is funded by the grant. In short, they will lose both research staff and the funding they bring.

    b. University of Cincinnati

        i. A science professor at the University of Cincinnati has had one NSF grant paused and expects it to be terminated entirely. The grant was for broadening diversity in the STEM workforce via mentoring and provision of professional development opportunities to undergraduate science, technology, engineering, and math (STEM) majors at the University of Cincinnati.

    c. Northern Michigan University (NMU)

       i. NMU gets funding for the McNair Scholars Program, which provides funding to low-income students from marginalized populations; specifically, the funding helps students pay their rent and get paid research internships. A science professor at NMU mentors these students and helps recipients get paid internships, including by interning for this professor. Without the McNair Scholars Program, this professor risks losing the labor they expected from hiring these students, whom she mentors, as interns.

d. University of Rhode Island

       i. A science professor at the University of Rhode Island states that 70% of their work is based on contracted research. They have received grants that the J21 Order could implicate. For example, the professor is a grantee of NSF BIO LEAPS, a program supporting diversity, equity, and inclusion in the biological sciences. The website has been archived. Specifically, the professor participated in the Inclusive Leadership Program under BIO LEAPS.

      ii. This professor has pending proposals for federal funding, including but not limited to:

          1. Three proposals before the National Oceanic and Atmospheric Administration (NOAA) for research on offshore wind.

          2. Two proposals pending before the NSF program Confronting Hazards, Impacts, and Risks for a Resilient Planet (CHIRRP) on coastal resilience in underrepresented communities.

   iii. This professor received an email from NOAA instructing them to remove their pronouns from emails.

22. Many of AAUP's members fear that their federal grants may be terminated because of the President's J20 Order. Indeed, AAUP members have already been told that they must cease certain activities that are arguably related to diversity, equity, inclusion, and accessibility ("DEIA").

23. Faculty members affiliated with AAUP are concerned about their job security and ability to provide for their families, as well as that of the graduate students and postgrad fellows they work closely with because they may have to terminate them because of losses in federal grant funding.

24. AAUP is concerned that terminating federal funding for its members will undermine academic excellence and make academic institutions less inclusive and equitable.

25. Similarly, for those AAUP members whose teaching or research focuses on topics related to diversity or equity, they fear that their work—whether teaching or research—might endanger their own institutions and lead to adverse employment consequences.

***Consequences of President Trump's Executive Order 14173 (Section 3)***

26. I also understand that President Trump's Executive Order 14173 titled, "Ending Illegal Discrimination and Restoring Merit-Based Opportunity," (the "J21 Order") provides that all federal grant recipients and contractors must "certify that [they] do[] not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws," and that compliance is "material to the government's payment decisions for purposes of" the False Claims Act ("FCA")."

27. The J21 Order does not define what it means to "promot[e] DEI" nor does it identify, or describe, which "programs promoting DEI" may violate existing antidiscrimination laws.

28. AAUP and its members affirmatively promote DEI principles and programs in several ways, all of which they, in good faith, believe to be lawful. However, AAUP and its members remain unclear whether their activities "promot[e] DEI" within the meaning of the J21 Order and whether the J21 Order, nonetheless, would deem those activities unlawful. For example, AAUP appoints standing committees on topics relevant to higher education, including the Committee on Historically Black Institutions and Scholars of Color and the Committee on Gender and Sexuality in the Academic Profession.

29. Many of AAUP's members receive federal grants to do work that is inextricable from, focuses on, or simply mentions concepts or terms related to diversity, equity, and inclusion.

30. Many of AAUP's members have degrees, publications, and recognition as experts in areas of study that Executive Order 14173 might implicate. For example, I received the Scholar Activist Award from the National Communications Association's Critical and Cultural Studies Division. That award was based on my research on the digital divide and co-authored "Poverty, Literacy, and Social Transformation: An Interdisciplinary Exploration of the Digital Divide."

31. Because of the vague language of the J21 Order, AAUP's members fear they may have to limit how they choose to participate in DEIA programs in order to meet the certification requirements and to avoid facing penalties under the FCA or be unable to sign the certification requirement and lose their funding altogether.

***Consequences of President Trump's Executive Order 14173 (Section 4)***

32. I further understand that the J21 Order requires all agencies to transmit a report within sixty days to the Attorney General and to "identify up to nine potential civil compliance investigations of" certain types of organizations, including "institutions of higher education with endowments over 1 billion dollars" in order to "deter DEI."

33. None of the key terms in the J21 Order are defined including "DEI," "illegal DEI," "DEI programs or principles," or "illegal discrimination or preferences."

34. The J21 Order does not define what constitutes compliance or noncompliance.

35. AAUP and its members remain unsure as to the potential scope of the terms "DEI", "illegal DEI", "DEI programs or principles", or "illegal discrimination or preferences."

36. The Administration's actions since the issuance of the J21 Order have not provided additional clarity to AAUP and its members; rather, those actions have only heightened anxiety.

37. On February 5, 2025, Attorney General Pamela Bondi sent a memorandum to all Department of Justice employees detailing the agency's enforcement priorities under Executive Order 14173.

38. The memorandum requires the Department of Justice's Civil Rights Division and Office of Legal Policy to submit a report by March 1, 2025, to Attorney General Bondi recommending how to enforce Executive Order 14173 against diversity, equity and inclusion measures in the private sector, including but not limited to "proposals for criminal investigations . . ."

39. The memorandum also states without explanation that "the Department of Justice will work with the Department of Education to issue directions, and the Civil Rights Division will pursue action, regarding the measures and practices required to comply with" *Students for*

*Fair Admissions v. Harvard*. The memorandum does not explain what those "measures and practices" may be.

40. Several AAUP members work at institutions of higher education with endowments exceeding 1 billion dollars. As discussed above, those AAUP members whose teaching or research focuses on topics related to diversity or equity, fear that their work—whether teaching or research—might endanger their own institutions and lead to adverse employment consequences.

41. For example, to avoid potentially limitless civil and criminal penalties from this Administration, these large endowment institutions may choose to discipline, terminate, or otherwise silence AAUP members who center the principles of DEIA in their work, or even more broadly in their personal lives.

42. Moreover, nothing in the J21 Order prevents the Attorney General, the Administration, or members of the public from targeting individual faculty members at these large endowment universities once the target list of purported DEI offenders is made known. The looming March 1, 2025 deadline in the Attorney General's memorandum has only added to the distress that AAUP members are experiencing as a result of the J21 Order.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 12 , 2025

By: *Todd Wolfson*
Todd Wolfson (Feb 12, 2025 11:46 EST)

Todd Wolfson

# Wolfson Declaration (AAUP) Signed Adobe

Final Audit Report                                                           2025-02-12

| | |
|---|---|
| Created: | 2025-02-12 |
| By: | Alizeh Ahmad (aahmad@advancingjustice-aajc.org) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAmmGbS-mcm4wDeI7gpIXSi9R0IzFQTIiA |

## "Wolfson Declaration (AAUP) Signed Adobe" History

- Document created by Alizeh Ahmad (aahmad@advancingjustice-aajc.org)
  2025-02-12 - 3:33:44 PM GMT

- Document emailed to wolfsont@gmail.com for signature
  2025-02-12 - 3:35:25 PM GMT

- Email viewed by wolfsont@gmail.com
  2025-02-12 - 4:46:02 PM GMT

- Signer wolfsont@gmail.com entered name at signing as Todd Wolfson
  2025-02-12 - 4:46:51 PM GMT

- Document e-signed by Todd Wolfson (wolfsont@gmail.com)
  Signature Date: 2025-02-12 - 4:46:53 PM GMT - Time Source: server

- Agreement completed.
  2025-02-12 - 4:46:53 PM GMT

