# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| National Association of Diversity Officers in Higher Education, et al., | Case No. 25-cv-333 (ABA) |
| Plaintiffs, | |
| v. | |
| Donald J. Trump, in his official capacity as President of the United States, et al., | |
| Defendants. | |

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND .............................................................................................................. 4

ARGUMENT ................................................................................................................... 5

I.   PLAINTIFFS ARE NOT LIKELY TO ESTABLISH ARTICLE III JURISDICTION. ........................... 6

    A.   Plaintiffs lack standing. ........................................................................... 6

    B.   Plaintiffs' claims are not ripe for review. ............................................. 10

II.   PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIM. ................... 11

    A.   The Termination Provision and the Certification Requirement do not violate separation of powers. ...................................................................... 12

    B.   The Certification Requirement and Investigation Provision do not violate the First Amendment .................................................................... 14

    C.   The Termination and Investigation Provisions do not violate the Due Process Clause. ..................................................................................... 19

III.   THE REMAINING FACTORS COUNSEL AGAINST GRANTING THE REQUESTED RELIEF. ........ 22

    A.   Plaintiffs have not shown irreparable injury attributable to the EOs. ................... 22

    B.   The public interest weighs squarely against relief. ................................. 26

IV.   ANY INJUNCTIVE RELIEF SHOULD BE NARROWLY TAILORED AND PERMIT LAWFUL AGENCY ACTIVITY. ............................................................................................. 27

    A.   Injunctive relief should be limited to Plaintiffs and agency defendants only. ....................................................................................................... 27

    B.   Injunctive relief should be limited to the Challenged Provisions. ......................... 28

    C.   Relief should clarify that it preserves the Executive's discretionary authority. ............................................................................................... 29

V.   ANY INJUNCTIVE RELIEF SHOULD BE STAYED PENDING APPEAL AND ACCOMPANY A BOND. ...................................................................................................................... 30

CONCLUSION ................................................................................................................ 30

## INTRODUCTION

In his first days in office, the President announced that his administration would neither fund nor tolerate diversity, equity, and inclusion (DEI) programs that violate federal civil rights laws. To that end, the President issued two Executive Orders (EOs), which, among other things, directed federal agencies to terminate—to the extent "allowed by law"—"equity-related" grants or contracts (the Termination Provision), directed the Attorney General to coordinate with other federal agencies to produce a report recommending a plan of action for deterring DEI programs that constitute "illegal discrimination or preferences" (the Investigation Provision), and required agencies to ensure that their grantees/contractors certify that they do not operate any DEI programs that "violate any applicable Federal antidiscrimination laws" (the Certification Requirement). Thus, in directing implementation of this new policy initiate, the Executive has expressly confined its actions to the extent permitted by federal law.

Without alleging that the Executive has issued any credible threat of enforcement action against them, cancelled any of their contracts/grants, or requested that they certify any particular language, Plaintiffs bring this suit because the mere pronouncement of this policy initiative has purportedly struck them with fear that the Executive may enforce antidiscrimination laws incorrectly, thereby harming their otherwise lawful DEI programs. In support of their claims, Plaintiffs submit declarations riddled with speculations about the consequences of future yet-unknown implementation by the Executive. But Plaintiffs do not claim that their contracts or grants have been terminated, and, in fact, Plaintiffs' contracts or grants may never be terminated. Put simply, Plaintiffs do not yet have a ripe claim. If the Executive takes any future action against Plaintiffs, they may, of course, bring a claim arguing that the Government is misapplying the law. But until then, they cannot—as they seek to do here—categorically halt the Executive from implementing its otherwise facially valid policy initiative via a sweeping "prophylactic" TRO

application. This Court should deny Plaintiffs' requested relief for the below reasons.

As an initial matter, Plaintiffs lack standing to bring their claims. Of the four Plaintiffs, two—NADOHE and AAUP—attempt to assert associational standing but fail to do so because they do not expressly identify at least one member who is alleged to have suffered injury. NADOHE also attempts (and fails) to establish organizational standing because it alleges nothing more than diversion of resources and potential loss of membership, which are too speculative under Article III. While ROC and the City of Baltimore do allege that they directly receive government funds and contracts, they fail to sufficiently establish that any of those funds/contracts are in imminent danger of termination, or that any future termination would be the result of the EOs. Plaintiffs also fail to show that any relief by this Court would prevent any termination. For similar reasons, Plaintiffs' claims are not ripe for review. At bottom, their claims depend on a series of future Executive actions that "may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (citation omitted).

Plaintiffs' claims also fail on merits. Their claim that the Termination Provision and Certification Requirement violate separation of powers fails due to the facial nature of the challenge. It is clear that, at least in some instances, the Executive may terminate or add conditions on contracts and grants for its own convenience. Doing so here—as the Executive has done for decades in innumerate contexts—does not violate the separation of powers. *See Construction Trades Department, AFL-CIO v. Allbaugh*, 295 F.3d 28, 33 (D.C. Cir. 2002).

Plaintiffs' First Amendment challenge to the Certification Requirement and the Investigation Provision also fail for the simple reason that neither targets a constitutionally protected speech—they both expressly target only illegal conduct. *See Rice v. Paladin Enterprises, Inc.*, 128 F.3d 233, 243-44 (4th Cir. 1997). Moreover, when it comes to what the Government

affirmatively chooses to fund, a "decision not to subsidize the exercise of a fundamental right does not infringe the right." *Rust v. Sullivan*, 500 U.S. 173, 193 (1991). And to the extent that Plaintiffs are "chilling" their own constitutionally protected speech in anticipation of bad-faith future enforcement by the Government, any such self-censorship is objectively unreasonable, and therefore fails to form a valid basis for a First Amendment claim.

Plaintiffs' facial vagueness challenge to the Termination and Investigation Provisions under the Due Process Clause are categorically unripe for review. *See United States v. Sun*, 278 F.3d 302, 309 (4th Cir. 2002) (a facial vagueness challenge cannot arise under the Due Process Clause). Furthermore, it is unclear whether any of Plaintiffs' contracts/funds are protected by the Due Process Clause in the first place. The Due Process Clause generally does not apply to federal contracts/grants, which can often be terminated at the Government's discretion. Lastly, even assuming that the Due Process Clause is applicable here, the federal agencies are still in the process of evaluating and implementing the President's EOs, and have already issued additional guidance. The Court should not "assume that the [Government] will take no further steps to minimize the dangers of arbitrary enforcement." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 504 (1982). Instead, it should give the Government the opportunity to "sufficiently narrow potentially vague or arbitrary interpretations of the [directives]." *Id.*

Plaintiffs also fail to satisfy the irreparable-harm prong needed to obtain preliminary injunctive relief. Although they purport to suffer imminent financial and reputational harm, their declarations illustrate that those claims are purely speculative. As for Plaintiffs' purported injury surrounding regulatory "uncertainty," that harm is categorically insufficient as it accompanies almost any new policy initiative. Lastly, Plaintiffs' claim of current injury in the form of "chilled" speech fails because it is based on an unreasonable assumption of bad-faith enforcement.

Moreover, Plaintiffs' requested relief is neither in the public interest nor equitable. The public would suffer harm if the Government is enjoined from following the President's directive to enforce and effectuate antidiscrimination laws. And the Government itself suffers an irreparable harm if it "is enjoined by a court from effectuating [the law]." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers).

Lastly, if the Court is inclined to grant Plaintiffs' requested relief, Defendants respectfully request that it be appropriately narrowed to Plaintiffs and the three challenged provisions, and to preserve the Executive's discretionary authority to enforce federal antidiscrimination laws.

## BACKGROUND

On January 20, 2025, the President issued Executive Order 14,151, 90 FR 8339, entitled *Ending Radical and Wasteful Government DEI Program and Preferencin*g (J20). J20 sought to eliminate "illegal and immoral discrimination programs, going by the name 'diversity, equity, and inclusion' (DEI)," in the Government. J20 § 1. As is relevant here, J20 includes a Termination Provision, which directs that within 60 days of its issuance, "[e]ach Each agency, department, or commission head, in consultation with the Attorney General, the Director of OMB, and the Director of OPM … terminate, *to the maximum extent allowed by law, . . .* 'equity-related' grants or contracts." *Id.* § 2(b)(i) (emphasis added).

On January 21, 2025, the President issued Executive Order 14,173, 90 FR 8633, entitled *Ending Illegal Discrimination and Restoring Merit-Based Opportunity* (J21). J21 sought to "enforce[e] our civil-rights laws" by "ending illegal preferences and discrimination." J21 § 1. As is relevant here, J21 includes a Certification Requirement, which provides that "[t]he head of each agency shall include in every contract or grant award … [a] term requiring such counterparty or recipient to certify that it does not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws." *Id.* § 3(b)(iv)(B). That certification is material to the

4

Government's payment decisions. *Id.* § 3(b)(iv)(A). J21 also includes an Investigation Provision, which directs the Attorney General, in consultation with federal agencies, to write a report that will identify "[t]he most egregious and discriminatory DEI practitioners" and outline a plan of action to "deter DEI programs or principles … that constitute illegal discrimination or preferences," including through "[l]itigation," "[p]otential regulatory action and sub-regulatory guidance," and "[o]ther strategies." *Id.* § 4(b). J21 made clear, however, that it did not restrict recipients "from engaging in First Amendment-protected speech." *Id.* § 7(b).

On February 3, 2025, Plaintiffs brought the instant action, challenging (1) the Termination Provision and Certification Requirement as *ultra vires* in violation of the separation of powers; (2) the Certification Requirement and the Investigation Provision as infringing on Free Speech in violation of the First Amendment; and, (3) the Termination Provision and the Investigation Provision as void for vagueness under the Due Process Clause of the Fifth Amendment. *See* Compl. ¶¶ 154-210, ECF 1. Plaintiffs sought Preliminary and Permanent Injunctions enjoining the Defendants other than the President from enforcing J20 or J21, as well as Declaratory Judgment that both J20 and J21 are unlawful and unconstitutional. *See id.* Prayer for Relief. Ten days after filing their Complaint, Plaintiffs filed a Joint Motion for a Temporary Restraining Order and/or a Preliminary Injunction. *See* TRO Mot. at 1, ECF 27.

## ARGUMENT

"A [TRO or] preliminary injunction is 'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief' and may never be awarded 'as of right.'" *Mountain Valley Pipeline, LLC v. W. Pocahontas Properties Ltd. P'ship*, 918 F.3d 353, 366 (4th Cir. 2019) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22, 24 (2008)). "A party seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities

tips in his favor, and that an injunction is in the public interest." *Roe v. Dep't of Def.*, 947 F.3d 207, 219 (4th Cir. 2020), *as amended* (Jan. 14, 2020) (citation omitted).

## I.    PLAINTIFFS ARE NOT LIKELY TO ESTABLISH ARTICLE III JURISDICTION.

Multiple jurisdictional defects plague Plaintiffs' claims and make clear that Plaintiffs cannot reach—let alone succeed on—the merits. First, Plaintiffs lack standing because they fail to allege that the agency defendants have implemented the challenged portions of EOs in any way that concretely or imminently impacts Plaintiffs. For similar reasons, their claims are unripe.

### A.    Plaintiffs lack standing.

Plaintiffs lack standing to challenge the EOs in their entirety. "[A] plaintiff must establish that he has standing to challenge each provision . . . by showing that he was injured by application of those provisions." *Covenant Media of SC, LLC v. N. Charleston*, 493 F.3d 421, 430 (4th Cir. 2007). Plaintiffs only bring substantive challenges to three provisions: the Certification Requirement, the Termination Provision, and the Investigation Provision ("Challenged Provisions"). As such, they lack standing to challenge the portions of the EOs that they do not claim affects them—*e.g.,* provisions directing agencies to gather information, advise the President, and review and revise Government-wide guidance and directives.

Even with respect to the Challenged Provisions, Plaintiffs fail to sufficiently establish the required elements of Article III standing. To establish standing, a plaintiff must show: (1) an "injury in fact," that is, a violation of a legally protected interest that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical"; (2) a causal connection between the injury and the defendant's conduct such that the injury is "fairly . . . traceable to the challenged action"; and (3) that it is "likely, as opposed to merely speculative that the injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).

"The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements," and therefore "must clearly . . . allege facts demonstrating each element." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citation omitted).

To establish injury in fact, a plaintiff must show that the defendant's action affects him or her in a "personal and individual way," *Lujan*, 504 U.S. at 560 n.1, rather than being a "generalized grievance," *Food & Drug Admin. v. Alliance for Hippocratic Med.*, 602 U.S. 367, 381 (2024). A plaintiff must show more than a "possible future injury"; he or she must show that harm has actually occurred or is "certainly impending." *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) (citations omitted). The Supreme Court has emphasized that "threatened injury must be *certainly impending* to constitute injury in fact, and that allegations of *possible* future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citations omitted).

Here, Plaintiffs raise several different theories of injury, none of which is sufficient under Article III. First, NADOHE and AAUP seem to assert associational standing by asserting the rights of their members, claiming that such members' grants and contracts may be terminated by future government action. *See* TRO Mem. at 6, ECF 27-1 (TRO) (alleging that NADOHE's institutional members have grants and contracts awarded by agency defendants); *id.* at 7 ("Likewise, the members of [AAUP] rely on federal grants."). Yet they fail to specifically identify any such members of their organizations. This is inadequate to establish standing. Indeed, "[w]hen a petitioner claims associational standing, it is not enough to aver that unidentified members have been injured." *Chamber of Commerce of U.S. v. EPA*, 642 F.3d 192, 199 (D.C. Cir. 2011). "Rather, the petitioner must specifically identify members who have suffered the requisite harm." *Id.* (citation omitted); *see also Am. Chemistry Council v. Dep't of Transp.*, 468 F.3d 810, 820 (D.C. Cir. 2006) ("[A]n organization bringing a claim based on associational standing must show that at

least one specifically-identified member has suffered an injury-in-fact … . At the very least, the identity of the party suffering an injury in fact must be firmly established.").[1] Without knowing the identity of their members and the specific features of their purported federal funds/contracts, Plaintiffs' allegation that those funds/contracts may be terminated is inherently speculative.

Moreover, to the extent that NADOHE attempts to establish standing based on harm to itself, *i.e.*, organizational standing, it cannot do so. NADOHE cannot establish injury by claiming that "NADOHE itself is harmed as it grapples with how to square its core values with the Orders." TRO at 7. Plaintiffs "must show far more than simply a setback to the organization's abstract social interests." *Food & Drug Admin.*, 602 U.S. at 394. NADOHE also cannot establish injury by claiming that it must divert its resources in response to EOs' directive. *Id.* at 395 (explaining that "divert[ing] … resources in response to a defendant's actions" does not amount to Article III injury). And while NADOHE claims that it will suffer reduction in members because of the EOs, that, too, is speculative. *See AFGE v. Ezell*, 2025 WL 470459, * 2 (D. Mass. Feb. 12, 2025) (concluding that the employee union's claim that it will lose membership due to the January 2025 Government Deferred Resignation Plan was too speculative to satisfy standing). Because NADOHE and AAUP have failed to establish either associational or organizational standing, they lack Article III standing.

At most, the only Plaintiffs potentially with standing would be entities that directly receive federal financial assistance, or have identified specific members that receive such funds—which here appears to be ROC and the City of Baltimore. TRO at 8–9. Even as to those Plaintiffs,

---

[1] While Defendants take no position on whether Plaintiffs' members can proceed anonymously, without knowing the identity of those members—or, more importantly, the specific features of the grants or contracts at issue—Defendants and the Court cannot evaluate whether such contracts or grants have features allowing them to be terminated consistent with the law.

however, it is speculative whether they would actually be harmed by any action taken by the defendant agencies in an attempt to implement the EOs. The declarations that Plaintiffs provide fail to identify imminent disruption to any particular fund/contract; instead, they merely speculate that the nature of some of their funds might subject them to future agency actions. *See, e.g*., Pls. Ex. 21, ROC Decl. ¶ 16; Pls. Ex. 22, Baltimore Decl. ¶ 26. In the absence of any concrete or particularized harm to a specific fund, any injury stemming from the defendants' actions are purely "hypothetical," as opposed to "actual or imminent." *Defs. of Wildlife*, 504 U.S. at 560.

In addition to failing to show injury in fact, Plaintiffs' alleged injuries are not "fairly . . . traceable to the challenged action." *Id*. The EOs did not terminate any particular fund or program; rather, they merely provided policy directives to federal agencies. Any alleged future harm necessarily depends on future action by federal agencies that plaintiffs have not adequately alleged has occurred and impacted them. *See Louisiana v. Biden*, 64 F.4th 674, 681 (5th Cir. 2023) (holding that plaintiffs lacked standing to challenge an executive order that required agencies to "exercise discretion in conducting their cost-benefit analyses and deciding to use the Interim Estimates as 'appropriate and consistent with applicable law,'" because "the mere 'possibility of regulation' fails to satisfy injury in fact"); *see also Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1254 (11th Cir. 2020) (plaintiff failed to demonstrate standing where "a different, independent official" had control over the action which allegedly harmed the plaintiff).

Importantly, even if this Court granted relief against the EOs and their implementation, that would not prevent defendant agencies from exercising their own independent authorities to determine whether, consistent with law, any termination of fund or contract is warranted because of the same animating policy or antidiscrimination concerns. Consequently, neither Plaintiffs nor this Court can "begin to predict on this record what impact," if any, invalidating the EOs would

have. *Freedom Republicans, Inc. v. Fed. Election Comm'n*, 13 F.3d 412, 419 (D.C. Cir. 1994). Plaintiffs have accordingly failed to allege facts which show that any injuries are traceable to the challenged actions, or that their requested relief will remedy any such claimed injuries.

> **B.    Plaintiffs' claims are not ripe for review.**

Even assuming Plaintiffs have standing, their claims based on potential termination of their contracts or grants are not ripe for review because it is speculative as to whether those contracts or grants will ever be terminated, and even if so, on what basis. "A case is fit for adjudication when the action in controversy is final and not dependent on future uncertainties." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967) (citation omitted).

First, Plaintiffs' entire suit is based on speculation regarding intervening actions that the agencies *might* take to implement the EOs. Indeed, Plaintiffs fail to allege any specific actions taken by any agency defendant (as opposed to Plaintiffs' *own* conduct in anticipation of hypothetical future action), that renders the termination of Plaintiffs' contracts or funds "imminent." For instance, while Plaintiffs' brief alleges "that DOL has already instructed at least one of NADOHE's members to cease certain activities that are, in the agency's view, connected to DEIA," *see* TRO at 23, the cited paragraph in NADOHE's declaration does not support the allegation. To the contrary, it states that the panel participants "had been barred from participation by their own organizations." *See* Pls. Ex. 19, NADOHE Decl. ¶ 22. Similarly, while AAUP alleges that "AAUP members have already been told that they must cease certain activities that are arguably related to diversity, equity, inclusion, and accessibility ('DEIA')," the declaration does not identify *who* asked the AAUP members to cease such conduct—much less a government official at one of the defendant agencies. Pls. Ex. 20, Wolfson Decl. ¶ 22. To the extent that Plaintiffs identify any conduct by defendant agencies, none of them show that concrete action

directed at Plaintiffs is imminent. For instance, while Plaintiffs cite to a January 29, 2025, email from HHS, which states that certain programs must be "immediately terminate[d]," they admit that they do not know whether that generic directive will impact them at all. *See* TRO at 6. Indeed, in response to a TRO entered in another suit, HHS rescinded that email on February 11, 2025—two days prior to the filing of Plaintiffs' TRO/PI Motion. *See* HHS February 11, 2025, email (Ex. A).

Moreover, by their own terms, the EOs provide that when an agency takes steps to implement the EOs' directives, it must only take appropriate actions "allowed by law." J20 § 2(b)(i); *see also* J21 § 4 (targeting "[i]llegal DEI [d]iscrimination"). Plaintiffs' claims, therefore, are contingent upon several layers of future actions that are not only hypothetical but also contradictory: Plaintiffs' claims assume that agencies will not only take actions that will directly impact Plaintiffs but will do so both in service of the EOs' directive to deprioritize DEI *and* in violation of the EOs' directive to stay within the confines of the law. Surely, these "contingent future events . . . may not occur as anticipated, or indeed may not occur at all," rendering Plaintiffs' claims unripe for review. *Texas*, 523 U.S. at 300 (citation omitted).

Ultimately, Plaintiffs' suit is nothing more than a broad challenge to a change in the Executive's policy priorities, which is not ripe for review. *See Scoggins v. Lee's Crossing Homeowners Ass'n*, 718 F.3d 262, 270 (4th Cir. 2013) (the ripeness doctrine "require[s] courts to avoid taking premature judicial action, thereby preventing them from becoming entangled in abstract disagreements" (citation omitted)).

## II.    PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIM.

Even if this Court reaches the merits of Plaintiffs' claims, it should reject them. Because Plaintiffs cannot bring their claim under the APA, all of their claims depend on this Court's inherent equitable powers to provide a cause of action to strike down *ultra vires* executive conduct. But

"review under the *ultra vires* standard is necessarily narrow." *Ancient Coin Collectors Guild v. U.S. Customs & Border Prot., Dep't of Homeland Sec.*, 698 F.3d 171, 179 (4th Cir. 2012). Plaintiffs have failed to meet their burden to show equitable relief is warranted.

### A. The Termination Provision and the Certification Requirement do not violate separation of powers.

Plaintiffs argue that the Termination Provision and Certification Requirement violate separation of powers by exceeding the President's Article II powers and improperly infringing on Congress' spending powers. Plaintiffs' argument fails for several reasons.

At the outset, Plaintiffs' challenge is a facial one as they do not challenge the Termination Provision or Certification Requirement with respect to any particular grant or contract; rather, they challenge the Executive's authority to terminate or add a certification requirement to *any* federal grant or contract, before obtaining specific Congressional authorization. *See* TRO at 11-14. This is a remarkable theory—and it has no basis in the law.[2]

Undisputably, there are instances where federal agencies may terminate contracts or grants for convenience—*i.e.*, change in policy priorities. *See, e.g.,* 2 C.F.R. § 200.340(a)(4) ("The Federal award may be terminated in part or its entirety … to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities."); *Northrop Grumman v. United States*, 46 Fed. Cl. 622, 626 (2000) ("The Government's right to terminate a contract for convenience is broad."). Indeed, courts have long recognized instances where the Executive may—consistent with new policy directives—terminate or add conditions on contracts and funds without violating the separation of powers. The D.C. Circuit's decision in *Allbaugh* is particularly

---

[2] In support of this argument, Plaintiffs grossly overread a number of cases that apply in materially different contexts. *See, e.g., Commonwealth v. Biden*, 57 F.4th 545, 547 (6th Cir. 2023) (pertaining to a mandate that every government contractor—without exceptions or limitation by federal law—enforce a vaccine mandate on its workforce).

instructive. There, Plaintiffs challenged an executive order that provided that "to the extent permitted by law," no federal agency and no entity that receives federal assistance for a construction product could require or prohibit bidders or contractors from entering into a project labor agreement. *Allbaugh*, 295 F.3d at 29. Plaintiffs sued, claiming that the executive order exceeded the President's constitutional authority. *See id.* at 31-32. The D.C. Circuit rejected this argument, pointing out that the executive order "directs [agencies] how to proceed in administering federally funded projects, but only '[t]o the extent permitted by law.'" *Id.* at 33. "Thus, if an executive agency, such as the FEMA, may lawfully implement the Executive Order, then it must do so; if the agency is prohibited, by statute or other law, from implementing the Executive Order, then the Executive Order itself instructs the agency to follow the law." *Id.*  The court concluded that "[t]he mere possibility that some agency might make a legally suspect decision to award a contract or to deny funding for a project does not justify an injunction against enforcement of a policy that . . . is above suspicion in the ordinary course of administration."  *Id.* (citing *Reno v. Flores*, 507 U.S. 292, 301 (1993)); *see also Common Cause v. Trump*, 506 F. Supp. 3d 39, 47 (D.D.C. 2020) ("We cannot ignore these repeated and unambiguous qualifiers imposing lawfulness and feasibility constraints on implementing the memorandum.").

Similarly, here, the President's directive is limited to the "extent allowed by law." J20 § 2(b)(i). In doing so, the directive is a well-recognized "exercise of the President's supervisory authority over the Executive Branch." *Allbaugh*, 295 F.3d at 33. Plaintiffs, however, rely on a single decision from the Ninth Circuit in *City & Cty. of San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018), to urge this Court to discard the EOs' limitation to confine the Executive's actions to those permitted by law. *City & Cty. of San Francisco*, however, does not stand for the broad proposition that such limitation clauses should be ignored altogether. To the contrary, the Ninth

13

Circuit emphasized that "[s]avings clauses are read in their context." *Id.* at 1239. There, the court held that because the Executive Order's directive to withhold funds from sanctuary cities was unconstitutional on its face (*i.e.*, there were no instances where withholding funds from sanctuary cities would not violate the constitution), the "savings clause does not and cannot override its meaning." *Id.* at 1240. Here, by contrast, the EOs' directives are not unconstitutional on their face—as outlined above, there may be instances in which agencies can add certification requirements to or terminate contracts and grants without violating the law. Thus, unlike *City & Cty. of San Francisco*, here, the savings clause materially restricts the Executive's ability to terminate contracts and funds in violation of existing laws.

As such, "[t]he mere possibility that some agency might make a legally suspect decision" in enforcing the EOs' directive "does not justify an injunction against enforcement of [the] policy." *Allbaugh*, 295 F.3d at 33. Ultimately, if Plaintiffs are dissatisfied in a specific instance in the future, their remedy is to sue over *that* determination under applicable legal process at some future time—not to enjoin the entire directive at the outset with respect to every federal contact and fund.

## B.    The Certification Requirement and Investigation Provision do not violate the First Amendment

***Certification Requirement.*** Plaintiffs' First Amendment challenge to the Certification Requirement suffers from a fatal flaw: Plaintiffs have no First Amendment right to violate federal antidiscrimination laws in the first place. As such, the Certification Requirement—which merely requires Plaintiffs to certify that they do not operate any DEI programs that "violate any applicable Federal antidiscrimination laws," J21 § 3(b)(iv)(B)—cannot violate the First Amendment. *See Cutter v. Wilkinson*, 423 F.3d 579, 588 (6th Cir. 2005) (holding that the Government did not run afoul of the First Amendment when it conditioned federal funds to state prison officials on compliance with the Religious Land Use and Institutionalized Persons Act because recipients had

"no constitutional right, much less a fundamental constitutional right, to limit the exercise of religion by inmates" in the first instance). The Court should reject Plaintiffs' First Amendment challenge to the Certification Requirement on this basis alone.

The Court should also reject Plaintiffs' challenge on the separate and independent ground that the Certification Requirement falls within the Executive's authority to fund its policy priorities. "The Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program which seeks to deal with the problem in another way. In so doing, the Government has not discriminated on the basis of viewpoint; it has merely chosen to fund one activity to the exclusion of the other." *Rust*, 500 U.S. at 193.[3]

Through the Certification Requirement, the Government is promoting its policy priority against discriminatory DEI programs that violate federal antidiscrimination laws. To the extent Plaintiffs do not wish to sign such certification, they may forgo contracting with the Government or receiving federal funds. "As a general matter, if a party objects to a condition on the receipt of federal funding, its recourse is to decline the funds. This remains true when the objection is that a condition may affect the recipient's exercise of its First Amendment rights." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.* (*AID*), 570 U.S. 205, 213 (2013). In *AID*, certain funding recipients were required to "have a policy explicitly opposing prostitution and sex trafficking" as a condition of any federal funding, even that outside the scope of a grant, *i.e.*, "to pledge allegiance to the Government's policy of eradicating prostitution," a condition that did not accord with the First

---

[3] In asserting this challenge, Plaintiffs rely on the doctrine of unconstitutional view-point and content-based discrimination. But that is not the correct legal standard; it is well-established that Government spending is not subject to traditional First Amendment scrutiny. *See Rust*, 500 U.S. at 193. The Government can, and does, choose a viewpoint it favors or disfavors.

Amendment. *Id.* at 210, 220. Here, unlike in *AID*, the Certification Requirement does not limit plaintiffs' Free Speech by compelling or restricting their speech: they remain free to espouse any viewpoint they want, including advocating for whatever DEI activities they prefer. *See* J21 § 7(b). It simply restricts their ability to engage in illegal discrimination while also securing federal funding.

At bottom, the Government is permitted to have policy priorities, and it does not violate the First Amendment by not funding programs that do not align with those policies. The Supreme Court has held time and again that the Government does not penalize, prohibit, restrict, or otherwise infringe on speech simply because it chooses not to pay for it. *See, e.g., Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 358 (2009) (explaining that government "is not required to assist others in funding the expression of particular ideas"); *Leathers v. Medlock*, 499 U.S. 439, 450 (1991) (government "is not required to subsidize First Amendment rights").

Lastly, the Certification Requirement does not purport to require that the relevant contracts/grants include the language in J21 § 3(b)(iv)(B) verbatim. Rather, this provision is simply a directive from the President to the agencies to include such certification provisions in *substance*. Until Plaintiffs are asked to certify the yet-unknown express language in any such provision, a challenge to the certification directive is not ripe for review.

***Investigation Provision.*** Plaintiffs also launch a First Amendment challenge against the Investigation Provision, which directs the Attorney General, in consultation with other federal agencies, to write a report that will identify "[t]he most egregious and discriminatory DEI practitioners" in "[k]ey sectors of concern" and outline a plan of action to "deter DEI programs or principles … that constitute illegal discrimination or preferences," including through "[l]itigation," "[p]otential regulatory action and sub-regulatory guidance," and "[o]ther strategies." J21 § 4(b).

16

Of course, an order to write a report does not pose the sort of imminent harm that can support a TRO. But anyway, Plaintiffs lack standing to bring this claim, which also fails on the merits.

Firstly, the Investigation Provision does not target a First Amendment right to begin with. After all, Plaintiffs have no First Amendment right to engage in "illegal discrimination." *See Rice*, 128 F.3d at 243-44. Plaintiffs' only lifeline, therefore, is to assume that the Government's as-of-yet inchoate enforcement will erroneously cover even legal activities. Simply put, Plaintiffs' First-Amendment injury is based on a presumption of bad-faith execution by the Government. Indeed, Plaintiffs acknowledge this remarkable presumption. *See* TRO 20 ("The chilling effect of the threatened enforcement action is profound: the only way for any potential target to escape that threat is to discard any principle or program that the President might consider 'illegal DEI and DEIA,' whether lawful under existing antidiscrimination laws or not."). This theory of standing fails to withstand scrutiny.

Although a plaintiff may rely on a "chilling effect" to establish Article III standing, "'[s]ubjective' or speculative accounts of … a chilling effect … are not sufficient." *Benham v. City of Charlotte, N.C.*, 635 F.3d 129, 135 (4th Cir. 2011). "Any chilling effect ... must be objectively reasonable." *Id.* (citation omitted). Here, Plaintiffs' allegation of "chilled" speech is wholly subjective because it relies on the unfavored presumption that the Government will execute the EOs' directive in bad faith and ignore its own declaration to only target illegal conduct. Plaintiffs provide no factual basis for this assumption, and in any event, such an assumption would be contrary to the presumption of good faith that courts routinely accord the Government. *See, e.g.*, *Am. Cargo Transp., Inc. v. United States*, 625 F.3d 1176, 1180 (9th Cir. 2010) ("[U]nlike in the case of a private party, [the courts] presume the government is acting in good faith."); *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 325 (5th Cir. 2009) ("[G]overnment actors … are

accorded a presumption of good faith because they are public servants, not self-interested private parties."). So, to the extent that Plaintiffs allege that they "engaged in self-censorship, it could not be said—in light of the plain language of the Executive Order[s]—to be based on an 'actual and well-founded fear' that the Order would be enforced in the manner [they] believe[] it will." *Ali v. Hogan*, 496 F. Supp. 3d 917, 930 (D. Md. 2020), *aff'd as modified*, 26 F.4th 587 (4th Cir. 2022).

Without the presumption of bad-faith execution, Plaintiffs' argument falls apart. After all, "[u]nder Article II, the Executive Branch possesses authority to decide 'how to prioritize and how aggressively to pursue legal actions against defendants who violate the law." *United States v. Texas*, 599 U.S. 670, 678 (2023) (citation omitted). Plaintiffs cannot challenge the Executive's pronouncement of its enforcement priorities based on their fear that the Executive *might* not stick to its word when it says that it will only pursue illegal actions. More fundamentally, Plaintiffs' theory would kneecap the Executive' enforcement authority. Under Plaintiffs' theory, even when the Executive claims that its enforcement priorities will target only illegal conduct, Plaintiffs could nevertheless preemptively halt any investigation and enforcement by speculating that the Executive may also impressibility target legal conduct. The Court should reject Plaintiffs' invitation to encroach on the Executive's Article II authority to set its enforcement priorities.[4]

Besides, even if the Court concludes that Plaintiffs' assumption of bad-faith execution is objectively reasonable, Plaintiffs nevertheless still fail to establish standing because they have failed to identify a "credible threat that the policy will be enforced against them." *Abbott v. Pastides*, 900 F.3d 160, 176 (4th Cir. 2018) (citation omitted); *id.* ("Without [a credible threat], a putative plaintiff can establish neither a realistic threat of legal sanction if he engages in the speech

---

[4] In any potential individual enforcement action, Plaintiffs would have the opportunity to argue their conduct did not violate the law. But they cannot halt any potential investigation at the outset based on the possibility that a hypothetical future enforcement may target legal conduct.

in question, nor an objectively good reason for refraining from speaking and self-censoring instead." (citation omitted)). In *Kenny v. Wilson*, for instance, the court found a credible threat of future enforcement because plaintiff had faced past enforcement for the same conduct. 885 F.3d 280, 288-89 (4th Cir. 2018). In *Cooksey v. Futrell*, the court found a credible threat because the State Board had sent a specific and "explicit warning" regarding the content on plaintiff's website, had asked plaintiff to alter the content, and stated that it will "continue to monitor" plaintiff's website. 721 F.3d 226, 237 (4th Cir. 2013). By contrast, Plaintiffs here have not received any credible threat of enforcement. Indeed, the Attorney General has not yet neared the end of the 120-day internal deadline (May 21, 2025) to submit her written report to the President—let alone launch credible threats of enforcement against Plaintiffs. At bottom, Plaintiffs' fears of enforcement stem from the announcement of the enforcement priority itself (through the issuance of the EOs and subsequent mass-emails from defendant agencies). "But the 'policies' themselves are insufficient to establish the credible threat of a sanction." *Menders v. Loudoun Cnty. Sch. Bd.*, 700 F. Supp. 3d 428, 437 (E.D. Va. 2023).

### C.    The Termination and Investigation Provisions do not violate the Due Process Clause.

Plaintiffs challenge the Termination and Investigation Provisions as unconstitutionally vague under the Due Process Clause. They argue that these Provisions allow defendant agencies to enforce the EOs in a "seriously discriminatory manner" and fail to give fair notice to Plaintiffs regarding the conduct that falls within the scope of the EOs' directives. This challenge also fails.

To begin with, Plaintiffs' Due Process challenge is categorically unripe for review. A facial vagueness challenge is only ripe for review if it implicates the First Amendment. *See United States v. Mazurie*, 419 U.S. 544, 550 (1975) ("It is well established that vagueness challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the

case at hand."). In other words, a vagueness challenge premised on Plaintiffs' fears that a yet-to-be-taken action by the Executive *might* be arbitrary and/or *might* lack fair notice is inherently speculative, and therefore not ripe for review. *See Sun*, 278 F.3d at 309 (a facial vagueness challenge cannot be asserted under the Due Process Clause); *see also Berry v. City of Portsmouth*, 562 F.2d 307, 312 (4th Cir. 1977) (rejecting a facial challenge for vagueness under the Due Process Clause as "premature"); *United States v. Cline*, 286 F. App'x 817, 820 (4th Cir. 2008) (because Cline could not assert a facial vagueness challenge under the Due Process Clause, "the court's review is . . . limited to whether Cline herself had fair notice that the statute proscribed her conduct"). Consistent with established Supreme Court and Fourth Circuit precedent, which provide that facial vagueness challenges under the Due Process Clause are categorically not ripe for review, this Court should dismiss Plaintiffs' Due Process challenge as premature. But even if the Court reaches the merits of Plaintiffs' Due Process challenge, it should reject it.

At the outset, it is far from clear that Plaintiffs' purported government contracts or grants are protected by the Due Process Clause. "The procedural component of the Due Process Clause does not protect everything that might be described as a 'benefit': 'To have a property interest in a benefit, a person clearly must have more than an abstract need or desire" and "more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Town of Castle Rock, Colorado v. Gonzalez*, 545 U.S. 748, 756 (2005) (citations omitted). Courts have regularly held that persons lack a constitutionally protected entitlement to issued government contracts. *See, e.g.*, *Gizzo v. Ben-Habib*, 44 F. Supp. 3d 374, 385 (S.D.N.Y. 2014) ("'ordinary' or 'routine' government contracts do not, by themselves, give rise to such an interest"). To the extent that constitutional protections may apply, courts have held they apply in only two contexts: "protected status due to extreme dependence, as is the case with welfare benefits, or permanence,

as is the case with tenure," or where the "contract itself contains a provision that the governmental entity can terminate the contract only for cause." *Promise Pub. Sch., Inc. v. San Jose Unified Sch. Dist.*, 2021 WL 916903, at *9 (N.D. Cal. Mar. 10, 2021) (citations omitted).

Here, Plaintiffs do not allege that their contracts/grants categorically (or at all) fall into either category. And government contracts generally allow for termination "at the convenience of the government," *i.e.*, without cause, as do many government grants. *See supra* A.II. That is the antithesis of a constitutionally protected entitlement. And, again, to the extent that Plaintiffs believe that a specific grant/contract of theirs is, indeed, protected by the Due Process Clause, they can assert that interest in the context of a specific termination (should termination even occur).

But even assuming that the Due Process Clause applies, it has not been violated.  The Due Process Clause requires that laws "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly" and "provide explicit standards for those who apply them." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). Plaintiffs have no legitimate concern that they will not be given a "reasonable opportunity to know what is prohibited." After all, the EOs are clear about their limits: federal law. *See* J21 § 4(b) ("End[ing] [i]llegal DEI [d]iscrimination and [p]references"); *See* J20 § 2(a) ("termination of all discriminatory programs, including illegal DEI"). The vagueness of the EOs rise and fall with that of federal civil rights laws. To the extent that Plaintiffs complain of the lack of clarity regarding the targeted conduct, their qualm is with the federal civil rights laws—not the EOs. And the logical (but stunning) consequence of Plaintiffs' position would be that the federal civil rights laws themselves are void for vagueness under the Due Process Clause.

But more fundamentally, the EOs do not impose any rights or obligations on Plaintiffs. Rather, they direct *agencies* to implement their directives, to the extent consistent with federal

law. Notably, the Termination Provision provides federal agencies with 60 days from the issuance of the EO to implement its directive (March 21, 2025), while the Investigations Provision provides the Attorney General with 120 days to submit her report to the President (May 21, 2025). In these intervening months, federal agencies will have the opportunity to further define the scope of the directives. The court must not "assume that the [Government] will take no further steps to minimize the dangers of arbitrary enforcement." *Vill. of Hoffman Ests.*, 455 U.S. at 504. To the contrary, the court must consider the possibility that, prior to enforcement, the Government "will sufficiently narrow potentially vague or arbitrary interpretations of the [directives]." *Id.*

Indeed, federal agencies have already began providing guidance on the scope of the EOs. For instance, on February 5, 2025, OPM issued Further Guidance Regarding Ending DEIA Offices, Programs and Initiatives. *See* OPM Guidance at 1 (Ex. B). In this Guidance, issued to all federal agencies, OPM expanded on the type of activity that constitutes "unlawful discrimination related to DEI." *Id.*[5] This Court should reject Plaintiffs' invitation to enjoin the Government before it has had the opportunity to further "narrow potentially vague or arbitrary interpretations of the [directives]," prior to enforcement. *Vill. of Hoffman Ests.*, 455 U.S. at 504.

**III.    THE REMAINING FACTORS COUNSEL AGAINST GRANTING THE REQUESTED RELIEF.**

**A.    Plaintiffs have not shown irreparable injury attributable to the EOs.**

The Supreme Court's "frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555

---

[5] The Guidance provides that "[u]nlawful discrimination related to DEI includes taking action motivated, in whole or in part, by protected characteristics. To be unlawful, a protected characteristic does not need to be the sole or exclusive reason for an agency's action. Among other practices, this includes ending unlawful diversity requirements for the composition of hiring panels, as well as for the composition of candidate pools (also referred to as 'diverse slate' policies)." Ex. B at 1.

U.S. at 22 (emphasis added). Conclusory or speculative allegations do not establish a likelihood of irreparable harm. *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991). The Court may deny Plaintiffs' motion solely based on their failure to show irreparable harm. *See Mountain Valley Pipeline*, 918 F.3d at 366.[6]

Plaintiffs assert four types of irreparable harm: (1) threat of loss of funds, (2) uncertainty regarding future operations, (3) loss of reputation, and (4) chilled speech. None of them meet the demanding standard of irreparable harm.

***Threat of loss of funds.*** As explained above, *see supra* I.A, Plaintiffs have failed to show that the loss of funds is "certain and great and of such imminence that there is a clear and present need for equitable relief." *Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 895 (8th Cir. 2013). But regardless, "it is beyond dispute that economic losses generally do not constitute irreparable harm … [because] economic losses are recoverable." *N. Carolina Growers' Ass'n, Inc. v. Solis*, 644 F. Supp. 2d 664, 671 (M.D.N.C. 2009), *as amended* (July 1, 2009). Here, economic losses, if any, may be recoverable because if any of Plaintiffs' funds or contracts are terminated, Plaintiffs

---

[6] As an initial matter, Plaintiffs' own delay in filing for preliminary relief weighs against finding irreparable harm. *See Huron Mountain Club v. U.S. Army Corps of Eng'rs*, 545 F. App'x 390, 397 (6th Cir. 2013) (finding district court did not err in considering delay as a factor weighing against injunction). The EOs were issued on January 20, 2025, and January 21, 2025. Yet, Plaintiffs waited until February 13 to file their TRO/PI Motion. During the Scheduling Conference on February 14, Plaintiffs attempted to justify this delay by claiming that since the issuance of the EOs, Defendants have escalated their enforcement, which has rendered immediate relief necessary. But that claim does not withstand scrutiny. To the extent that Plaintiffs assert an ongoing "chilling" injury, any such injury began when the EOs were issued. *See, e.g.*, ROC Decl. ¶ 40 ("Because of the J21 Order . . . we fear we may have to stop addressing racial and gender equity"); Wolfson Decl. ¶ 22 ("Many of AAUP's members fear that their federal grants may be terminated because of the President's J20 Order"). Such "an unreasonable delay in filing for injunctive relief . . . weigh[s] against a finding of irreparable harm." *Allied Erecting & Dismantling Co. v. Genesis Equip. & Mfg., Inc.*, 511 F. App'x 398, 405 (6th Cir. 2013).

will have the opportunity to dispute the termination, and, if successful, might retain the funds.[7] As

such, to demonstrate irreparable financial harm, Plaintiffs' injury must be more than "substantial,

in terms of money, time and energy." *Sampson v. Murray*, 415 U.S. 61, 90 (1974). This is a high

bar. Any such financial loss must "threaten[] the very existence of the [Plaintiffs'] business[es]."

*Packard Elevator v. ICC*, 782 F.2d 112, 115 (8th Cir. 1986). Plaintiffs only attempt to meet that

standard with respect to one Plaintiff—ROC. According to Plaintiffs, as a result of potential future

termination of funds, ROC "may be forced to operate at a deficit" and doing so would "push[]

ROC towards insolvency and jeopardize[] its existence." TRO at 23. But—once again—close

scrutiny of the cited declaration illuminates the speculative nature of the brief's allegation. In its

declaration, ROC does not claim to be *currently* operating at a deficit, nor does it claim that it will

*likely* have to operate at a deficit in the future—it simply speculates about a world in which it *may*

have to operate at a deficit. *See* ROC Decl. ¶ 35. Such doomsday-like speculations do not establish

the type of imminent, existential financial loss needed to satisfy irreparable harm.

    ***Regulatory uncertainty.*** Plaintiffs' fallback argument that they will suffer irreparable harm

as a result of "uncertainty" around any future termination of contracts/grants is similarly flawed.

For instance, Plaintiffs allege that "[t]he City [of Baltimore] is uncertain which of its programs and

personnel federal grants may support, and wonders whether it needs to reallocate resources and

reduce support for other programs—or shutter them altogether—just to sustain its critical

municipal functions." TRO at 24. But regulatory uncertainty inevitably follows many new policy

announcements. A preliminary injunction "should not issue merely to calm the imaginings of the

movant." *Matos ex rel. Matos v. Clinton Sch. Dist.*, 367 F.3d 68, 73 (1st Cir. 2004).

---

[7] Notably, a contractual termination for convenience provides for cost and, oftentimes, reasonable profit recovery. *See* 48 C.F.R. § 31.305-42.

***Loss of reputation***. Plaintiffs' argument that they will suffer irreparable harm as a result of "reputational harm that threatens their very existence," TRO at 25, is also speculative. Plaintiffs cite to various exhibits, but none provides anything more than conclusory statements in support of this purported harm, let alone explains how a preliminary injunction would meaningfully redress such harm. The kinds of speculative and conclusory allegations in Plaintiffs' cited declarations do "not provide the requisite facts and affidavits [in support of their] theory of reputational harm." *Tennessee v. Becerra*, 117 F.4th 348, 369 (6th Cir. 2024); *see also Toxco Inc. v. Chu*, 724 F. Supp. 2d 16, 30–31 (D.D.C. 2010) (where plaintiff "d[id] not point to a single concrete manifestation of the reputational injury it is purportedly suffering . . . the court concludes that the plaintiff's claims of reputational harm are far too vague, speculative and uncorroborated to support a finding of irreparable harm").

***Chilled speech***. Plaintiffs' reliance on "chilled" speech as irreparable harm is also futile. To begin with, chilled speech only amounts to irreparable harm if the speech that is being chilled is constitutionally protected in the first instance. *See Abbott*, 900 F.3d at 176. But Plaintiffs' allegations are not limited to constitutionally protected speech. For instance, Plaintiffs assert that "compliance with the Certification Requirement would entail the dismantling of entire offices at the institutions where they work." TRO at 25. But this allegation would only be true if the offices in question promoted DEI in a way that "violate federal antidiscrimination laws." J21 § 3(b)(iv)(B). Similarly, Plaintiffs who "stay their current course," only "risk federal prosecution and investigation," TRO at 26, if they are engaged in "[i]llegal DEI," J21 § 4(b). Illegal conduct is not protected under the First Amendment. *See Rice*, 128 F.3d at 243–44. To the extent that Plaintiffs allege chilling of constitutionally protected speech (*i.e.*, expressions not pertaining to illegal discrimination), they are self-censoring based on an objectively unreasonable assumption

of bad-faith enforcement, and they are doing so without any credible threat of enforcement in the first place. *See supra* II.B. Any such self-inflicted harm cannot satisfy the irreparable-harm prong.

Ultimately, even if Plaintiffs can claim some threat of harm, there is no reason why they cannot vindicate that threatened harm through individualized, specific lawsuits challenging particular funding denials, contract terminations, or enforcement actions. Their declarations do not establish the need for broad relief in a single lawsuit, rather than proceeding in the ordinary course of APA review over discrete, specific funding decisions.

**B.     The public interest weighs squarely against relief.**

Lastly, Plaintiffs cannot establish that the balance of equities and the public interest favor granting the extraordinary remedy of a temporary restraining order and/or a preliminary injunction. These final two factors merge in cases where relief is sought from the government. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

In arguing that the public interest weighs in their favor, Plaintiffs rely on the notion that eliminating infringement of the First Amendment is in the public interest. TRO at 28–29. But that is just a repackaged version of their First Amendment argument, which lacks merit. *See supra* II.B.

Meanwhile, on the other end of the balancing test, there is no question that eradicating discrimination is in the interest of the public. *See Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 206 (2023). Moreover, any injunction here would effectively disable almost a dozen federal agencies, as well as the President himself, from implementing the President's priorities consistent with their legal authorities. "Any time [the Government] is enjoined by a court from effectuating [laws], it suffers a form of irreparable injury." *King*, 567 U.S. at 1303 (2012).

Additionally, where the Government is legally entitled to make decisions about the

disbursement or allocation of federal funds and contracts but is nonetheless enjoined from doing so, such funds may not be retrievable afterwards. By contrast, if Plaintiffs' or their members' contracts are terminated in accordance with their terms, they may be entitled to recovery of costs, or even reasonable profits, *see supra* III.A. Relatedly, a broad preliminary injunction would have a significant chilling effect on the President's and his advisors' ability to lawfully direct and guide Government spending decisions and enforcement priorities. Agencies may feel obligated to forgo pursuing legally permissible actions in furtherance of the President's policy priorities—independent of the EOs—for fear of risking contempt. Thus, the balance of equities weighs in favor of the Government and relief should be denied.

## IV.    ANY INJUNCTIVE RELIEF SHOULD BE NARROWLY TAILORED AND PERMIT LAWFUL AGENCY ACTIVITY.

It is a bedrock principle of equity that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). Additionally, "preliminary relief may never be granted that addresses matters which in no circumstances can be dealt with in any final injunction that may be entered." *In re Microsoft Corp. Antitrust Litig*, 333 F.3d 517, 525 (4th Cir. 2003) (citation omitted). In line with these principles, to the extent the Court intends to grant Plaintiffs' request for a preliminary injunction, such relief should be narrowly tailored to apply only to Plaintiffs and the Challenged Provisions, and to leave intact the Executive's discretion to engage in further consideration of the topic at hand and implement new policies consistent with law.

### A.    Injunctive relief should be limited to the Plaintiffs and agency defendants only.

Any preliminary relief should be limited to address any established harms of the present Plaintiffs, their members, and their specific grants and contracts. There is no basis for extending relief to non-parties in this suit (or to Plaintiffs that have failed to articulate any imminent,

irreparable harm). And Plaintiffs make no effort at even trying to make that showing—insisting, without more, that those "similarly situated" should share the benefit of a lawsuit they never filed.

Accordingly, any preliminary injunction should confirm that all obligations in the injunctive order apply only with respect to any grants or contracts involving Plaintiffs specifically. *See Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) ("The purpose of a preliminary injunction is merely to preserve the relative positions *of the parties* until a trial on the merits can be held." (emphasis added)); *see also Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring) ("Universal injunctions have little basis in traditional equitable practice."); *Florida v. Dep't of Health & Human Servs.*, 19 F.4th 1271, 1282 (11th Cir. 2021) (noting that the "appropriate circumstances" for issuing a nationwide injunction "are rare").

Moreover, the relief should be limited to agency defendants. Although Plaintiffs name the President as a defendant, they refrain from seeking any relief against the President directly—rightly so. The Supreme Court has long recognized that courts have no authority to second-guess "discretion[ary]" acts taken by the President "in the performance of his official duties." *Mississippi v. Johnson*, 71 U.S. 475, 499, 501 (1866); *see also Dellinger v. Bessent,* 25-5028, Denial of Emergency Motion to Stay, 4 (D.C. Cir. Feb. 15, 2025) (Katsas, J., dissenting) (outlining the President's immunity from judicial encroachment). Moreover, any injunctive relief should be limited to the agency defendants as opposed to the Executive Branch in its entirety. *See Defs. of Wildlife*, 504 U.S. at 569 & n.4 (holding that resolution of a disputed legal issue "would not have been binding upon the agencies" that "were not parties to the suit").

**B.      Injunctive relief should be limited to the Challenged Provisions.**

It would contravene bedrock principles of equity to stay provisions of the EOs beyond those which Plaintiffs have substantively challenged. *See Gill v. Whitford*, 585 U.S. 48, 73 (2018);

*see also Labrador v. Poe*, 144 S. Ct. 921, 923 (2024) (mem.) (Gorsuch J., concurring in the grant of stay) ("the district court clearly strayed from equity's traditional bounds" in enjoining provisions of a law that plaintiffs "failed to 'engage' with" and that "don't presently affect them").

Here, although Plaintiffs request that the Court enjoin the EOs and any agency actions implementing them altogether, *see* Compl. Prayer for Relief, they only raise substantive challenges the three Challenged Provisions: Certification Requirement, Investigation Provision, and Termination Provision. Plaintiffs make no attempt to rebut the strong presumption of severability, which not only "reflects the confined role of the Judiciary in our system of separated powers" but also "recognizes that plaintiffs who successfully challenge one provision of a law may lack standing to challenge *other* provisions of that law." *Barr v. Am. Ass'n of Pol. Consultants, Inc*., 591 U.S. 610, 626-27 (2020). This presumption is buttered by the EOs' explicit severability provisions. *See* J20 § 3; J21 § 6. Thus, even if the Court is inclined to grant injunctive relief, the Court should only limit the relief to the Challenged Provisions.

### C.    Relief should clarify that it preserves the Executive's discretionary authority.

If the Court enters Plaintiffs' proposed request for relief, that order should be limited to mitigate (albeit not eliminate) the significant harms it would cause to the Executive's abilities to exercise its lawful statutory authority and discretion. To that end, Defendants respectfully request that any preliminary relief clarify that it does not prohibit the President from reissuing a different directive and/or Executive Order or limit the defendant agencies from taking actions pursuant to their legal authority to regulate in furtherance of this substantive policy priority.

Moreover, Defendants respectfully request that any preliminary relief be appropriately narrowly tailored to preserve the Executive's authority to enforce federal antidiscrimination laws. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 429 (2021) ("[T]he choice of how to prioritize and

how aggressively to pursue legal actions against defendants who violate the law falls within the discretion of the Executive Branch."). That is the normal equitable remedy, and anything broader would constitute a significant intrusion on the separation of powers. *See Ancient Coin Collectors Guild*, 698 F.3d at 179 (explaining under the *ultra vires* review standard, the court "may not dictate how government goes about its business but [rules] only [on] whether a public entity has acted within the bounds of its authority or overstepped them" (citation omitted)).

## V.    ANY INJUNCTIVE RELIEF SHOULD BE STAYED PENDING APPEAL AND ACCOMPANY A BOND.

To the extent the Court issues any injunctive relief, Defendants respectfully request that such relief be stayed pending the disposition of any appeal that is authorized by the Solicitor General, or at a minimum that such relief be administratively stayed for a period of seven days to allow the United States to seek an emergency, expedited stay from the court of appeals if an appeal is authorized. Defendants also request that injunctive relief be entered as a preliminary injunction.[8]

The Defendants also respectfully request that any injunctive relief accompany a bond under FED. R. CIV. P. 65(c), which provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." A bond is appropriate here given that any preliminary relief would potentially mandate that the Executive spend money that may not be recouped once distributed.

## CONCLUSION

For these reasons, this Court should deny Plaintiffs' Motion for a Temporary Restraining Order and/or Preliminary Injunction.

---

[8] The Court should exercise its discretion to convert Plaintiffs' Joint TRO/PI Motion to a PI Motion because Defendants have "had a fair opportunity to oppose it." *U.S. Dep't of Lab. v. Wolf Run Mining Co.*, 452 F.3d 275, 283 (4th Cir. 2006).

Respectfully submitted,

BRETT A. SHUMATE
Acting Assistant Attorney General
Civil Division

JOSEPH E. BORSON
Assistant Branch Director


*/s/ Pardis Gheibi*
PARDIS GHEIBI (D.C. Bar No. 90004767)
Trial Attorney, U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Tel.: (202) 305-3246
Email: pardis.gheibi@usdoj.gov

*Attorneys for Government Defendants*

31

**CERTIFICATE OF SERVICE**

I hereby certify that on February 18, 2025, I electronically filed this document with the Court by using the CM/ECF system, and that this document was distributed via the Court's CM/ECF system.


*/s/ Pardis Gheibi*