IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
BALTIMORE DIVISION

| | |
|---|---|
| National Association of Diversity Officers in Higher Education, et al., <br><br> Plaintiffs, <br><br> v. <br><br> Donald J. Trump, in his official capacity as President of the United States, et al., <br><br> Defendants. | Civil Action No. 1:25-cv-333-ABA |

**PLAINTIFFS' REPLY IN FURTHER SUPPORT OF THEIR
MOTION FOR A TEMPORARY RESTRAINING ORDER
AND/OR PRELIMINARY INJUNCTION**

## **TABLE OF CONTENTS**

Page

ARGUMENT ..................................................................................................................................1

I.    The Challenged Provisions Are Unconstitutional ...................................................................1

a.    The President lacks authority to impose the Termination Provision and the Certification Requirement. ..............................................................................................................................1

b.    The Orders are also viewpoint discriminatory. ....................................................................2

c.    The Orders are unconstitutionally vague. .............................................................................4

II.    Savings Clauses do not rescue unconstitutional and illegal Executive Orders ........................5

III.    Plaintiffs Have Standing ............................................................................................................8

IV.    Plaintiffs are suffering irreparable harm, and an injunction is in the public interest .............12

V.    A nationwide injunction, without need for a bond, is appropriate .........................................14

CONCLUSION ..............................................................................................................................16

The President may not accomplish his policy objectives by usurping congressional authority and violating Plaintiffs' constitutional rights. The Government has nearly no defense of the merits of the President's unlawful Executive Orders.[1] Instead, the Government asks this Court to refuse the requested emergency relief on grounds that are addressed in Plaintiffs' pleadings and declarations, or otherwise unsupported by case law. *First*, Plaintiffs are right on the merits. The President lacks the authority to direct federal agencies to terminate grants and contracts merely because those awards are "equity-related." Nor does the President have the authority to unilaterally add vague certification requirements to grants and contracts, or chill Plaintiffs' speech with vague threats of investigation. *Second*, controlling precedent in this Circuit forecloses the Government's claim that the savings clauses in the Executive Orders can save those Orders from their unlawfulness. *Third*, Plaintiffs have satisfied Article III standing requirements to challenge each of the three challenged provisions across the two Executive Orders. *Finally*, the scope of relief requested here is consistent with precedent and substantiated by Plaintiffs' claims.

## ARGUMENT

I. **The Challenged Provisions Are Unconstitutional**

    a. **The President lacks authority to impose the Termination Provision and the Certification Requirement.**

The President does not have the authority to unilaterally create or modify conditions on federal funding that Congress did not itself impose, or terminate grants or contracts merely for being "equity-related." Opening Brief, ECF No. 27-1, 11-14. Agency Defendants exclusively rely on the Orders in their attempt to freeze or rescind grant funds and impose certification requirements. Menschel Decl., Exs. 6, 8, 9, 17; Menschel Suppl. Decl. Exs. 25-31. "Not only has

---

[1] Plaintiffs refer to the J20 Order (Exec. Order 14,151, 90 Fed. Reg. 8339 (Jan. 20, 2025) and the J21 Order (Exec. Order 14,173, 90 Fed. Reg. 8633 (Jan. 21, 2025)) collectively as "Orders" or "Executive Orders."

the Administration claimed for itself Congress's exclusive spending power, it has also attempted to coopt Congress's power to legislate." *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1234 (9th Cir. 2018) ("*San Francisco*"); *see also In re Aiken Cnty.*, 725 F.3d 255, 260 (D.C. Cir. 2013) (Kavanaugh, J.) ("[T]he President and federal agencies may not ignore statutory mandates or prohibitions merely because of policy disagreement[s] with Congress."). Other courts, including Judge Hurson just days ago, enjoined similar executive orders. *See PFLAG v. Trump*, No. CV 25-337-BAH, 2025 WL 510050, at *17 (D. Md. Feb. 14, 2025) ("Federal law specifies how the Executive should act if it believes that appropriations are inconsistent with the President's priorities–it must ask Congress, not act unilaterally." (internal citation omitted)) ("*PFLAG*"); *see also, e.g.*, *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, No. 25-239 (LLA), 2025 WL 368852 (D.D.C. Feb. 3, 2025) (similarly enjoining a blanket funding freeze). This Court should do the same and give immediate relief to Plaintiffs and those similarly situated.

      **b. The Orders are also viewpoint discriminatory.**

Since Plaintiffs filed their Motion, Defendants' conduct has demonstrated that their implementation of certification requirements and grant terminations is based on grant and contract recipients' position on DEIA practices. The J21 Order promises to "deter" those in the private sector from engaging in "Illegal DEI Discrimination and Preferences," § 4(b), and Defendants have not contested that the government is treating funding recipients differently based on the viewpoint they express on DEIA. Defendants claim, instead, that they are not subject to the First Amendment's constraints in implementing the Executive Orders.

That is not true: the First Amendment "prohibits the government from telling people what they must say," whether by coercion or by threats to funding. *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 213 (2013) ("*AID*") (quotation marks omitted); *id.* at 214 ("[T]he Government 'may not deny a benefit to a person on a basis that infringes his constitutionally

2

protected . . . freedom of speech even if he has no entitlement to that benefit.'") (quoting *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 59 (2006)). This is a principle repeatedly affirmed both by the Supreme Court and courts in this Circuit. *Sons of Confederate Veterans, Inc. ex rel. Griffin v. Comm'r of Virginia Dep't of Motor Vehicles*, 288 F.3d 610, 622 (4th Cir. 2002) ("Where the government is not expressing its own policy, either directly or, as in *Rust*, through an intermediary, it presumptively violates the First Amendment when it discriminates on the basis of views expressed by private speakers."); *see also Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 541 (2001) (*Rust v. Sullivan*, 500 U.S. 133 (1991) has been limited to situations in which the subsidized activities "amounted to governmental speech.").

Contrary to Defendants' assertion based on *Rust*, this rule applies both to direct prohibitions on speech and to speech-related conditions imposed on benefits that would otherwise be available. In particular, conditions on federal funding "that seek to leverage funding to regulate speech outside the contours of the federal program itself"—that is, conditions that do more than simply define the kinds of activities Congress wants to subsidize—are regulated by the First Amendment. *AID*, 570 U.S. at 206; *Legal Servs. Corp*, 531 U.S. at 547-49 (striking down unconstitutional conditions on funding); *FCC v. League of Women Voters of Cal.*, 468 U.S. 364, 399-400 (1984) (same); *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 790 (1985) (exclusion from funding opportunities can be a violation of the First Amendment if the exclusion is due to the government's disagreement with viewpoints). Defendants are thus flatly wrong in claiming that Plaintiffs lack protected constitutional rights in their contracts and grants.

Nor can the government threaten investigation and litigation as a cudgel to get private companies and individuals to comply with its preferred viewpoint. *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 187 (2024) (government official "could not wield her power . . . to threaten

3

enforcement actions against [entities] in order to punish or suppress" a disfavored viewpoint). To be sure, "the Executive Branch possesses authority to decide how to prioritize and how aggressively to pursue legal actions against defendants who violate the law," *United States v. Texas*, 599 U.S. 670, 678 (2023) (quotation marks omitted), but prosecutorial discretion is not a free pass to violate the Constitution. Rather, "the law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out," *Gonzalez v. Trevino*, 602 U.S. 653, 662 (2024) (Alito, J., concurring) (quoting *Hartman v. Moore*, 547 U.S. 250, 256 (2006)), particularly when, as here, the government has undertaken an official policy of retaliation for First Amendment expression. *See Lozman v. Riviera Beach*, 585 U.S. 87, 99-100 (2018).

### c. The Orders are unconstitutionally vague.

Defendants' defense against Plaintiffs' vagueness challenge is two-fold, and both arguments fail. *First*, Defendants claim that no due process claim lies at all because Plaintiffs have no protected interest. That is not true. Plaintiffs brought a First Amendment free speech claim and facial vagueness challenges are commonplace in that context. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014); *see also Kolender v. Lawson*, 461 U.S. 352, 353 (1983) (facial challenges to non-free speech restricting statutes). Nor are Defendants correct when they claim Plaintiffs lack a protected property interest in contracts that they already hold. *See Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 576-77 (1972) (collecting cases). *Second*, Defendants claim that any due process vagueness challenge is premature before the provisions are enforced. As Plaintiffs have shown, the provisions of the Executive Orders have been enforced, and continue to be enforced, and Plaintiffs and their members are losing access to funds on an ongoing basis. Ex. 19, NADOHE Decl., ECF No. 27-23 ¶ 22; Ex. 20, AAUP Decl., ECF No. 27-24 ¶ 21; Ex. 21, ROC Decl., ECF No. 27-25 ¶¶ 25-35; NADOHE Supp. Decl. ¶¶ 4, 6; AAUP Supp. Decl. ¶¶ 4-7. The

4

varied nature of this enforcement and the confused signals sent by the administration of its enforcement are precisely evidence of the unconstitutional vagueness of the Executive Orders.[2] *Johnson v. United States*, 576 U.S. 591, 601 (2015) (law is unconstitutionally vague when there is "pervasive disagreement about the nature of the inquiry one is supposed to conduct and the kinds of factors one is supposed to consider").

**II.     Savings Clauses do not rescue unconstitutional and illegal Executive Orders**

Savings clauses—like the ones in the J20 and J21 Orders—do not automatically save otherwise unconstitutional orders. Defendants cannot "immunize [the President's] Order[s] from scrutiny," *HIAS, Inc. v. Trump*, 985 F.3d 309, 325 (4th Cir. 2021), by hiding behind language in the Orders purporting to limit their implementation to that "consistent with applicable law," J20 §4(b); J21 §8(b), or supposedly excepting "First Amendment-protected speech." J21 § 7(b). Nor, in a context in which the Orders themselves claim undefined "DEI and DEIA policies" are "illegal" under federal civil rights law, can the Executive escape constitutional scrutiny on the basis that the Orders only target "illegal preferences and discrimination," J21 §1. The President cannot with one hand punish First Amendment-protected speech and then, with the other, claim that his actions do not apply to First Amendment-protected speech; he cannot direct agencies to violate the law, then caution that the directive applies only to the extent "consistent with applicable law." Controlling Fourth Circuit authority precludes this attempt to insulate unconstitutional action through nominal carveouts. In *HIAS v. Trump*, the Fourth Circuit struck down an executive order issued in President Trump's first term purporting to give states and municipalities "veto" rights over the resettlement of refugees into their communities while giving the Secretary of State authority to override the

---

[2] Defendants argue that there is no vagueness at all to the Orders because they are cabined by boilerplate references to "federal civil rights laws." Opp. Br. at 21, ECF No. 35. This is nothing more than a repackaging of Defendants' savings clause argument addressed *infra*.

5

executive order if compliance would be "inconsistent with the policies and strategies established under" the Refugee Act or other applicable laws. *HIAS*, 985 F.3d at 317. The Refugee Act listed a specific procedure for the resettlement of refugees, and did not provide for such a veto. The Fourth Circuit "reject[ed] the government's attempt to immunize the Order from review through a savings clause which, if operational, would nullify the 'clear and specific' substantive provisions of the Order." *Id.* at 325 (quoting *San Francisco*, 897 F.3d at 1239).

The saving clauses in the J20 and J21 Orders are even less defensible than the one in *HIAS*. Whereas the *HIAS* executive order listed a specific circumstance where the Secretary of State could override the strictures of the executive order and referenced specific statutes, here the savings clause says, simply, that agencies are to enforce the Orders "to the extent consistent with applicable law." This is "a purely theoretical savings clause, with no method or standard for invoking it, the application of which would undermine the [substantive provisions of the Executive Orders]." *HIAS*, 985 F.3d at 325; *accord San Francisco*, 897 F.3d at 1233 (executive order *ultra vires* despite a savings clause that stated the order was to be enforced "consistent with applicable law and subject to the availability of appropriations").

In addition to failing to save the Orders with a generic savings clause, neither the Orders themselves nor the Defendants in their opposition, refer to any specific statutory authority conferred by Congress to the President to either terminate or condition federal funding already appropriated. At most, Defendants suggest that 2 C.F.R. § 200.340(a)(4) provides federal funding may be terminated for policy priorities. Opp. Br. at 12, ECF No. 35. But that is a misreading of the regulation at best—which only allows termination "pursuant to the terms and conditions of the Federal award[.]" 2 C.F.R. § 200.340(a)(4). That regulation then no more supports Defendants' argument than does the case law. To the extent Defendants argue that the Certification Provision,

6

Termination Provision, or Section 7(b) of the J21 Order have additional restrictions that serve as savings clauses, *e.g.*, "applicable antidiscrimination laws" in Section 3(b)(iv)(B) in the J21 Order, these clauses are akin to those in *HIAS*, in that they would "nullify the 'clear and specific' substantive provisions of the Order" and provide "no method or standard for invoking it[.]" 985 F.3d. at 325. As *San Francisco* noted, such savings clauses "simply lead us into an intellectual cul-de-sac. If [a savings clause] precludes a court from examining whether the Executive Order is consistent with law, judicial review is a meaningless exercise." 897 F.3d at 1240.

The Orders, both in their language and in their implementation, make clear that they are intended to stamp out references to diversity, equity, inclusion, and accessibility throughout the country, irrespective (or, rather, because) of their effects on speech, and notwithstanding purported carveouts. Efforts to foster inclusion have been widespread and uncontroversially legal for decades and are now often colloquially known as DEI or DEIA policies. The Supreme Court has acknowledged the importance and continued validity of efforts to recognize longstanding inequities in accessing opportunity. *See Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 230 (2023) ("[N]othing in this opinion should be construed as prohibiting universities from considering an applicant's discussion of how race affected his or her life, be it through discrimination, inspiration, or otherwise"); *see also Coal. for TJ v. Fairfax Cnty. Sch. Bd.*, 68 F.4th 864, 887 (4th Cir. 2023) (race-neutral admissions policies that recognize racial disparities and seek to "to foster diversity of all stripes" are constitutional). Yet, the J21 Order claims such policies are "dangerous, demeaning, and immoral race- and sex-based preferences" and directs agencies to root them out across the country, J21 §1, echoing President Trump's 2020 Executive Order 13950 that sought to outlaw the promotion of so-called "divisive concept." *Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d 521, 542 (N.D. Cal. 2020) (finding

EO 13950 was unconstitutional viewpoint discriminatory and vague).

Executive branch departments have operationalized and applied the President's orders to entirely legal activities such as providing supportive services to homebound seniors, Baltimore Supp. Decl. ¶ 6, stating on a corporate website that promoting DEI is a core value of its business, Menschel Suppl. Decl., Ex. 25, and even listing words like "inclusive" or "pronoun" on government websites or related concepts in government publications, Menschel Suppl. Decl., Exs. 32-33. In public rhetoric, executive officials have characterized diversity, equity, and inclusion efforts as "invidious, "radical and wasteful." Menschel Suppl. Decl., Exs. 25, 27. Claiming that the Orders' effects only extend to "illegal DEI and DEIA policies" only begs the question of the scope of the executive branch's intent to shut down previously widespread and uncontroversially legal employment practices. C*f. Building & Constr. Trades Dep't v. Allbaugh*, 295 F.3d 28 (D.C. Cir. 2002) (giving credence to a savings clause in a non-self-executing executive order that did not direct agencies to take any particular action, and where there was no evidence of illegal agency action); *see also Honeyfund.com, Inc. v. DeSantis*, 622 F. Supp. 3d 1159, 1179 (N.D. Fla. 2022) (holding a similar state law that banned DEI in the private sector must be understood to go beyond traditional civil rights anti-discrimination provisions). The J21 Order's reference to compliance with "anti-discrimination laws" must thus be understood in light of the President's—incorrect—description of the scope of such laws and does nothing to save the constitutional validity of the Orders. Moreover, the fact that it is unclear whether practices widely known as DEI are or are not encompassed by the Orders is sufficient to find that these Orders violate the Fifth Amendment due to their vagueness.

### III. Plaintiffs Have Standing

Plaintiffs, on behalf of themselves and/or their members, establish standing for each claim in the Complaint. Although "only one plaintiff needs to have standing for [this] court to hear the

case," *Outdoor Amusement Bus. Assn., Inc.*, 983 F.3d at 681 (citing *Bowsher v. Synar*, 478 U.S. 714, 721 (1986)), every Plaintiff has shown that it (1) has "suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical;" "(2) the injury is fairly traceable to the challenged action of the defendant;" and (3) "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000). Baltimore, ROC, and NADOHE[3] have shown that they have suffered both monetary and constitutional injury. And NADOHE and AAUP have shown that their members have suffered monetary and constitutional injuries that are traceable to the Orders and are redressable through an injunction.

**(1) Injury.** Plaintiffs and/or their members are injured by the three challenged provisions. All Plaintiffs are injured by the Termination Provision because they or their members have contracts or grants that are under threat because agency Defendants do or will likely consider those contracts or grants to be "equity-related." NADOHE Decl. ¶¶ 21-25; AAUP Decl. ¶¶ 21-25; ROC Decl. ¶¶ 25-35; Ex. 22, Baltimore Decl., ECF No. 27-26 ¶¶ 25-30; NADOHE Supp. Decl. ¶¶ 4, 6; AAUP Supp. Decl. ¶¶ 4-7; Baltimore Supp. Decl. ¶¶ 6-8. And Plaintiffs point to the precise "imminent disruptions" caused by the Termination Provision that the Government confusingly

---

[3] NADOHE too has explained how the Orders threaten its very existence and target its "core mission." NADOHE Decl. ¶¶ 26, 39-42, 44-46; NADOHE Supp. Decl. ¶¶ 6-8; *Cf. generally FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 395 (2024) (recognizing that organizations suffer injury when government action "perceptibly impair[s]" their ability to carry out their core mission or "directly affect[s] and interfer[s] with [their] core business activities"). It need only show the traditional standing requirements for its claim to organizational standing, "an injury-in-fact, caused by the defendant, that can be redressed by a favorable decision from the court," *Republican Nat'l. Comm. v. North Carolina State Bd. Of Elec.*, 120 F.4th 390, 395-98 (4th Cir. 2024), and it has done so here. To the extent Defendants discount this harm because it was visited on NADOHE through the actions of third parties—its members who lost their jobs—"where the plaintiff suffers an injury that is produced by the determinative or coercive effect of the defendant's conduct upon the action of someone else, the traceability requirement is satisfied." *Mayor & City Council of Baltimore v. Trump*, 416 F. Supp. 3d 452, 486 (D. Md. 2019) (cleaned up).

claims are missing. AAUP Decl. ¶ 21; AAUP Suppl. Decl. ¶ 4-7; ROC United Decl. ¶¶ 16, 22, 26-27; Menschel Decl., Ex. 9, ECF No. 27-13; NADOHE Decl. ¶¶ 38-46; NADOHE Suppl. Decl. ¶¶ 6-8. And they explain how they are injured by these disruptions. ROC United Decl. ¶ 30; Baltimore Decl. ¶¶ 24-30; Baltimore Suppl. Decl. ¶ 12.

Defendants' claim that NADOHE and AAUP "fail to specifically identify … members of their organizations" for purposes of associational standing as to the Termination Provision and thus cannot sustain associational standing. This is just factually wrong and legally baseless. Opp. Br. at 7, ECF No. 35. To make this associational harm showing, NADOHE and AAUP need only demonstrate that (1) "at least one of their identified members would otherwise have standing to sue in their own right," (2) "the interests at stake are germane to the organization's purpose," and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Outdoor Amusement Bus. Ass'n., Inc. v. Dep't. of Homeland Security*, 983 F.3d 671, 683 (4th Cir. 2020) (cleaned up). The Government does not contest the second or third prongs of associational standing. *See* Opp. Br. 7-8. And for the first prong for associational standing, NADOHE and AAUP must meet the same standing requirements as any other plaintiff. *See Sierra Club v. U.S. Dep't. of the Interior*, 899 F.3d 260, 283 (4th Cir. 2018).

NADOHE and AAUP have made that showing. The Government simply fails to read NADOHE's and AAUP's declarations. ECF Nos. 27-23, 27-24. NADOHE's Declaration asserts that Institutional Member A and other institutional members have grants that may be subject to the Termination Provision, NADOHE Decl. ¶¶ 24-25, and that Institutional Member A in fact cancelled a conference partially funded by a DOL grant because of the J20 Order. NADOHE Decl. ¶ 22; NADOHE Supplemental Decl ¶ 4; *see also* Compl. ¶ 134, ECF No. 1 (alleging that "many" NADOHE members have active federal grants that either include "equity" in the title or proposal,

10

or are arguably related to such concepts). Likewise, AAUP provides details about four members who receive federal grants that may be canceled pursuant to the Termination Provision, AAUP Decl. ¶ 21, and many more members "fear that their federal grants may be terminated" or "that they must cease certain activities" because of the J20 Order. *Id.* ¶ 22; *see also id.* ¶¶ 15-18 (describing grants that AAUP members receive); *Id.* ¶ 23-25 (noting that concern related to termination of grants undermines "job security" and "academic excellence" and may "endanger" higher education institutions and "lead to adverse employment consequences").

The Certification Requirement and Investigation Provision chill Plaintiffs' First Amendment rights. *See, e.g.*, Mem. ISO Mot. for TRO, Dkt. No. 27-1 at 24-25. Plaintiffs are injured by the Certification Requirement because they reasonably expect that they will be forced to either restrict their activities and expression that are arguably related to diversity, equity, inclusion, and accessibility, or give up critical federal funding altogether. NADOHE Decl. ¶¶ 27-29; AAUP Decl.; Ex. 21, ROC Decl., ¶¶ 36-42; Baltimore Decl. ¶¶ 32-42. The Government does not even attempt to contest NADOHE or AAUP's associational standing as to the Certification Provision or the Investigation Provision. Opp. at 9-10. For good reason. NADOHE specifically identified Institutional Members B-G, which have already been forced to cut "curricular programs or requirements" because of the Certification Requirement because "the risk of jeopardizing significant sources of critical federal research funding… was too great to defer action." NADOHE Decl. ¶ 29; *see also* AAUP Decl. ¶ 28, 31 (describing harm to AAUP members). And, NADOHE specifically identified Institutional Member H, who is in the crosshairs of the Investigation Provision because it is an institution of higher education with an endowment over $1 billion and is concerned that its protected speech will be penalized. NADOHE Decl. ¶ 31. Because a constitutional injury "constitutes irreparable injury," *Elrod v. Burns*, 427 U.S. 347, 373-74 (1976),

11

it is more than sufficient to establish standing, and the Court need inquire no further. *New York v. Trump*, No. 25-CV-39-JJM-PAS, 2025 WL 357368, at *4 (D.R.I. Jan. 31, 2025) ("Liberty is always at stake when one or more of the branches seek to transgress the separation of powers.") (quoting *Clinton v. City of New York*, 524 U.S. 417, 449–50 (1998) (Kennedy, J. concurring).[4]

**(2) Causation and Redressability.** The Orders are the direct cause of the harms suffered by Plaintiffs and are in fact cited as the justification for many of the actions Plaintiffs have seen so far. As Plaintiffs' injuries stem directly from the Orders, enjoining the relevant provisions will mitigate the harms: Enjoining the Termination Provision will prevent agency Defendants from terminating Plaintiffs' grant and contract funding sources merely because Defendants believe those grants and contracts are "equity-related."; enjoining agency Defendants from imposing and enforcing the Certification Requirement will prevent the chilling effect caused by that requirement and its unlawful imposition; and enjoining agency Defendants from relying on the Investigation Provision will prevent the chilling effect that flows from that provision.

## IV. Plaintiffs are suffering irreparable harm, and an injunction is in the public interest

The Supreme Court, the Fourth Circuit, and this Court as recently as last week have held that a plaintiff who makes a showing of likely success on the merits of a constitutional claim has shown irreparable harm sufficient to justify a preliminary injunction or temporary restraining order. *Newsom ex rel. Newsom v. Albemarle Cnty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003) ("the Supreme Court has explained that 'loss of First Amendment freedoms, for even minimal

---

[4] The Government fails to discuss any of NADOHE's and AAUP's identified members. Furthermore, the Government acknowledges that member anonymity is not a barrier to standing. *See* Opp. Br. at 8 n.1, ECF No. 35. To the extent the Government claims that it needs more information to know whether the "grants have features allowing them to be terminated consistent with law," Opp. Br. at 8 n.1, that is a red herring as the government has not identified a single statute or regulatory provision among any of its agency Defendants that would allow for the unilateral termination of a grant because it is "equity-related" as the Termination Provision commands. That is not surprising; there is none.

12

periods of time, unquestionably constitutes irreparable injury'") (quoting *Elrod v. Burns,* 427 U.S. 347, 373 (1976)); *PFLAG*, 2025 WL 510050, at *22 ("[B]ecause Plaintiffs have shown a strong likelihood of success on their constitutional claims, the irreparable harm factor is satisfied."). Nor must Plaintiffs show that the constitutional harm has already taken place: preliminary relief is appropriate where "the party seeking it can demonstrate that First Amendment interests are either threatened or in fact being impaired at the time relief is sought." *Nat'l Treasury Emps. Union v. United States*, 927 F.2d 1253, 1254 (D.C. Cir. 1991) (Thomas, J.) (cleaned up). For the reasons listed *supra* Section I, Plaintiffs have shown that they are entitled to a preliminary injunction.

Even monetary harm of the kind Plaintiffs are likely to suffer can be irreparable. "[E]conomic loss can constitute irreparable injury . . . where monetary loss . . . threatens the very existence of the movant's business or where the claimed economic loss is unrecoverable (*e.g.*, when the defendant is entitled to sovereign immunity)." *AmSurg EC Washington, Inc. v. MGG Grp. Co., Inc.*, No. 23-cv-2416, 2024 WL 2405822, at *2 (D.D.C. Apr. 26, 2024). Here, the economic loss Plaintiffs would suffer from enforcement of the Executive Orders would be irreparable for both reasons: it is unrecoverable due to the federal government's sovereign immunity, outside of narrow exceptions. And it threatens the livelihoods of numerous of Plaintiffs' members and NADOHE's very existence. Baltimore Decl. ¶ 28-30; AAUP Decl. ¶ 20-25; NADOHE Decl. ¶¶ 26, 39-42, 44-46; NADOHE Suppl. Decl. ¶¶ 6-8.

Courts in this district have previously found similar kinds of economic harm and risk of harm irreparable for the purpose of granting preliminary relief. In *Mayor and City Council of Baltimore v. Azar*, Judge Bennett enjoined an HHS rule regarding how abortion funds were to be spent after finding it was likely illegal under the Affordable Care Act and other statutes. 392 F. Supp. 3d 602, 618 (D. Md. 2019). As is the case here, the HHS rule put Baltimore into an

13

impossible position: choosing between betraying some of its core principles or losing access to vital funds. The court agreed with Baltimore that "[e]ither choice results in irreparable harm," even in a context where the amount of money at issue was small in comparison to the City's overall budget. *Id.* (loss of $1.43 million). In this case, the costs to Baltimore of losing access to federal funds because it is unwilling to let go of its commitment to equity could be an order of magnitude larger. *See* Baltimore Decl. ¶¶ 18-21, 25-30, 39, 42; Baltimore Suppl. Decl. ¶¶ 11-12. Similarly, NADOHE—an organization whose mission is to promote equity and inclusion in higher education—risks losing all or most of its members and revenue if the Executive Orders are enforced. NADOHE Decl. ¶¶ 26, 45-46, 48; NADOHE Suppl. Decl. ¶¶ 6-8.

The harm to Plaintiffs need not be ongoing at the commencement of this suit, though it has started. "Damocles's sword does not have to actually fall on all [Plaintiffs] before the court will issue an injunction." *League of Women Voters v. Newby*, 838 F.3d 1, 75 (D.C. Cir. 2016). Where harm is likely and is not routinely compensable through money damages because of the government's sovereign immunity, it is irreparable. *Azar*, 392 F. Supp. 3d at 618; *see also AIDS Vaccine Advoc. Coal. v. United States Dep't of State*, No. CV 25-00400 (AHA), 2025 WL 485324, at *4 (D.D.C. Feb. 13, 2025) (finding irreparable harm in the context of an escalating series of grant freezes and cancellations). And, as the Fourth Circuit has held repeatedly, there is no public interest in enforcing illegal laws to counterbalance that harm. *Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021).

**V.      A nationwide injunction, without need for a bond, is appropriate**

Defendants argue that any equitable relief should be limited to grant awards and contracts for Plaintiffs alone. Opp. Br. at 27. It is well-established that "district courts have broad discretion when fashioning injunctive relief." *Ostergren v. Cuccinelli*, 615 F.3d 263, 288 (4th Cir. 2010). Here, complete relief for a facially unconstitutional government action requires nationwide relief.

14

*See PFLAG*, 2025 WL 510050 ("[W]here a law is unconstitutional on its face, and not simply in its application to certain plaintiffs, a nationwide injunction is appropriate."). Limiting relief to Plaintiffs and their specific grants and contracts would not cure the constitutional infirmity in Defendants' far-reaching actions, and would "cause confusion about which companies or providers are subject to a rule and which are not"—a result that would contradict this Court's instruction that "instead, a court order must be clear and definite." *Ass'n of Cmty. Cancer Ctrs. v. Azar*, 509 F. Supp. 3d 482, 504 (D. Md. 2020); *accord CASA, Inc. v. Trump*, No. CV DLB-25-201, 2025 WL 408636, at *17 (D. Md. Feb. 2, 2025) ("a nationwide injunction may be appropriate when the government relies on a 'categorical policy'") (quoting *HIAS*, 985 F.3d at 326). Indeed, "When associations prevail in obtaining injunctive relief, 'it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured.'" *PFLAG*, 2025 WL 510050, at *24 (quoting *Warth v. Seldin*, 422 U.S. 490, 515 (1975)).

Second, Defendants argue that should the Court issue any injunctive relief, that it stay such relief pending appeal and that Plaintiffs be required to give security in the form of a bond to offset "money that may not be recouped once distributed" by the Federal government, under Fed. R. Civ. Pro. 65(c). Opp. Br. at 30, ECF No. 35. That would, apparently, require Plaintiffs to post bond sufficient to cover all payments on open grants the government makes while any injunction is in effect. Defendants point to no example of a court ordering a bond in analogous circumstances. *But cf. Powelton Civic Home Owners Ass'n v. Dep't of Hous. and Urban Dev.*, 284 F. Supp. 809, 840–41 (E.D. Pa. 1968) (rejecting "proposition that Rule 65(c) was intended to raise virtually insuperable financial barriers insulating the agency's decision from effective judicial scrutiny"). Nor is there any basis to seek a preemptive stay of any Court order, as any such order would be issued only after finding that Plaintiffs were at risk of irreparable harm.

## CONCLUSION

For the foregoing reason, Plaintiffs respectfully request that this Court grant its motion for a temporary restraining order and/or preliminary injunction.

Niyati Shah*
Noah Baron*
Alizeh Ahmad*
**Asian Americans Advancing Justice | AAJC**
1620 L Street NW, Suite 1050
Washington, DC 20036
(202) 296-2300
nshah@advancingjustice-aajc.org
nbaron@advancingjustice-aajc.org
aahmad@advancingjustice-aajc.org

/s/ Aleshadye Getachew
Aleshadye Getachew (Bar No. 31439)
Victoria S. Nugent (Bar No. 15039)
Ananda V. Burra (Bar No. 31438)
Audrey Wiggins*
Brooke Menschel*
J. Sterling Moore*
Orlando Economos*
Skye Perryman*
**Democracy Forward Foundation**
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
agetachew@democracyforward.org
vnugent@democracyforward.org
aburra@democracyforward.org
awiggins@democracyforward.org
bmenschel@democracyforward.org
smoore@democracyforward.org
oeconomos@democracyforward.org
sperryman@democracyforward.org

* admitted *pro hac vice*

16

## CERTIFICATION OF SERVICE

I hereby certify that this document filed through the ECF system and all attachments will be sent electronically on February 19, 2025, to the registered participants as identified on the Notice of Electronic Filing (NEF).

/s/  Aleshadye Getachew
Aleshadye Getachew (Bar No. 31439)
**Democracy Forward Foundation**
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
agetachew@democracyforward.org