```
 1               IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF MARYLAND
 2                        NORTHERN DIVISION

 3   PFLAG, Inc., et al.,     )
              Plaintiffs,     )
 4                            )
              vs.             )   CIVIL CASE NO. 8:25-cv-00337-BAH
 5                            )
     DONALD J. TRUMP, et al., )
 6            Defendants.     )
     _____)
 7

                    THURSDAY, FEBRUARY 13, 2025
 8                        Courtroom 1A
                       Baltimore, Maryland
 9
                         MOTIONS HEARING
10
              BEFORE:  THE HONORABLE BRENDAN A. HURSON
11
     On Behalf of the Plaintiffs:
12        JOSHUA BLOCK, ESQUIRE
          American Civil Liberties Union
13        125 Broad Street, 18th Floor
          New York, NY 10004
14
          OMAR GONZALEZ-PAGAN, ESQUIRE
15        Lambda Legal Defense & Education Fund, Inc.
          120 Wall Street, 19th Floor
16        New York, NY 10005

17        LAURA EDELSTEIN, ESQUIRE
          Jenner & Block, LLP
18        525 Market Street, Suite 29th Floor
          San Francisco, CA 94105
19
     On Behalf of the Defendants:
20        HARRY GRAVER, ESQUIRE
          Jones Day
21        51 Louisiana Avenue, N.W.
          Washington, D.C. 20001
22
          MOLISSA FARBER, ESQUIRE
23        S. NICOLE NARDONE, ESQUIRE
          36 South Charles Street, 4th Floor
24        Baltimore, MD 21201

25        (Computer-aided transcription of stenotype notes.)
```

```
 1                    P R O C E E D I N G
                         1:04 p.m.
 2

 3          THE CLERK:  The matter now pending before this Court

 4   is Civil Action number BAH-25-00337, PFLAG, Inc., et al., versus

 5   Donald J. Trump, et al.  This matter comes before this Court for

 6   the purposes of a motions hearing.

 7      Counsel for the record starting with the Plaintiffs.

 8          MR. BLOCK:  Good morning, Your Honor.  Joshua Block

 9   from the ACLU on behalf of the Plaintiffs.  And I'm -- with me

10   is my co-counsel Mr. Gonzalez-Pagan.

11          THE COURT:  Nice to see you.

12          MR. GONZALEZ-PAGAN:  Good morning, Your Honor, Omar

13   Gonzalez-Pagan on behalf of the ACLU for the Plaintiffs.

14          THE COURT:  Nice to see you.

15          MS. EDELSTEIN:  Good afternoon, Your Honor.  Laura

16   Edelstein from Jenner & Block on behalf of the Plaintiffs.

17          THE COURT:  All right.  Nice to see you.

18      The Government?

19          MR. GRAVER:  Hi, Your Honor.  Harry Graver for the

20   United States.

21          THE COURT:  Nice to see you.

22          MS. FARBER:  Good afternoon, Your Honor.  Molissa

23   Farber for the Defendants.

24          THE COURT:  Nice to see you.

25          MS. NARDONE:  Hi, Nicole Nardone for the Defendants.
```

1           THE COURT:  All right.  Nice to see you as well.

2       All right.  I brought a lot of paper down here so give me a

3   second to get this -- I probably won't look at any of it, but...

4       First and foremost, I want to thank everybody for being

5   here.  This is obviously on a bit of an accelerated tract and

6   it's not easy to pick everything up.  And I'm sure there's a lot

7   of writing done at night and a lot of conversations, a lot of

8   meetings, a lot of Googling -- me and others.  It's hard,

9   regardless of what side you're on, so I really appreciate the

10  effort that everyone has taken to get us here today.

11      And for the folks in the audience, welcome.  More people

12  will be flooding in, and unfortunately the courtroom is a little

13  bit difficult to access, but thank you for being here.

14      I know some people were out front earlier exercising their

15  First Amendment rights, that's fantastic.  And welcome here to

16  the U.S. District Court for the District of Maryland, the third

17  branch of Government.  For some of you, you probably haven't

18  been here before, maybe some of you have.  But a couple ground

19  rules.  One, no cell phones allowed.  They should have been

20  taken outside, but no filming or recording or anything like that

21  is permitted.

22      Second, it is completely fine and normal to be affected by

23  what's being argued today.  We all know the issue at stake here

24  today and it's very personal to some people here.  Watching that

25  is completely not just fine but acceptable, if not normal, to

 1  have a reaction to it.  But what we can't have in the courtroom

 2  is any outbursts or audible reactions.  We have to decide this

 3  case and argue this case on the papers and the arguments that

 4  the lawyers make.  So I trust that everyone will, despite their

 5  feelings one way or the other, do their best to keep those

 6  feelings inside for now.  And when the case is over and you head

 7  outside, feel free to talk about it, say whatever you want, but

 8  certainly I appreciate your efforts to maintain the decorum in

 9  the courtroom.

10       And if you need to leave at any time, that's completely

11  fine.  I think only this door is open (indicating), so please

12  come down this way.

13       If you have anything here that -- anything in the courtroom

14  that's making you uncomfortable or you need the assistance of

15  any of the staff here, we have our U.S. Marshals who are here

16  wearing clothing that generally identifies them, or our CSOs.

17  If you have any complaints or issues, or you're feeling

18  uncomfortable or intimidated, feel free to go talk to the

19  courtroom security or the U.S. Marshals.

20       That does not apply to the lawyers.  If you're feeling

21  uncomfortable or intimidated, there's nothing I can do to help

22  you.

23       (Laughter.)

24            THE COURT:  Finally, we have a press room where the

25  proceedings are essentially being simulcast so press can take

 1  notes and use their laptops.  I'm assuming that connection is
 2  working.  If for some reason it isn't --
 3          It is working?  Okay.  Our deputy has it.
 4          So without further ado, let me get into where we are and
 5  why we're here.
 6          On January 20th, 2025, President Trump issued Executive
 7  Order 14,168, which is entitled "Defending Women from Gender
 8  Ideology Extremism and Restoring Biological Truth to the
 9  Federal Government."  I'll generally refer to it as the Gender
10  Identity Order.
11          To achieve the stated objective in that order, which is
12  essentially eradicating gender ideology, section 3(g) of the
13  Gender Identity Order declares, "Federal funds shall not be used
14  to promote gender ideology."
15          The gender ideology order directs that, "Each agency shall
16  assess grant conditions and grantee preferences and ensure grant
17  funds do not promote gender ideology."
18          The Gender Identity Order cites, "The Constitution and laws
19  of the United States of America, including section 7301 of Title
20  5 of the United States Code as the authority by which the
21  President promulgated this order." Now, so we're clear, 5
22  U.S.C., section 7301 permits the President to, "Prescribes
23  regulations for the conduct of employees in the Executive
24  branch."
25          On January 28th, 2025, President Trump issued Executive

1  Order 14,187 entitled "Protecting Children From Chemical and

2  Surgical Mutilation," which I'm going to generally call the

3  Denial of Care Order or Protecting Children, or depending on how

4  the questioning goes we'll call it one or the other.  But either

5  way, that order directs all federal agencies to, quote,

6  "Immediately take appropriate steps to ensure that institutions

7  receiving federal research or education grants, and the chemical

8  and surgical mutilation of children."

9      That order cites, quote, "The authority vested in the

10  President by the Constitution and the Laws of the United States

11  as the authority by which the President has promulgated this

12  Executive Order."

13      Now, according to the Plaintiffs, and this is a quote from

14  their pleadings, "President Trump unilaterally directs that all

15  federal medical and research grants be stripped from medical

16  institutions, medical schools, and hospitals that provide

17  medically necessary gender-affirming medical care to patients

18  under 19 for the purpose of gender transition regardless of

19  whether funds are used for or related to that care."

20      Now the Defendants contend, "That the Executive Orders do

21  not purport to withhold all federal funding if an institution

22  promotes gender ideology or provides the referenced treatment,

23  but instead only instructs agencies to implement the President's

24  policy preference to the extent permitted by applicable law."

25  And that's a quote from their response to the temporary

1   restraining order motion.

2       Now Plaintiffs allege that the Defendant Health Resources

3   and Services Administration, HRSA, immediately after these

4   orders were implemented or published, immediately went about

5   enacting the order by sending an email warning the institutions

6   receiving government funds cannot use them for gender-affirming

7   care for people under the age of 19.

8       Now apparently, I've learned from the reply brief that the

9   Plaintiffs have filed, that the CDC has followed suit with a

10  directive of its own.  The result, the Plaintiffs have alleged,

11  is essentially a ban on gender-affirming care for minors that

12  has essentially spread across the nation; admittedly sort of

13  haphazardly from institution to institution to institution.  And

14  that this has impacted both the named Plaintiffs in this case

15  and the associations that are represented as Plaintiffs here.

16      Now today we're really here talking about three of the

17  Plaintiffs' claims.  One is an ultra vires allegation that the

18  President has acted in excess of the President's authority by

19  usurping the legislative function and violating bicameralism and

20  presentment clauses essentially by doing on his own what

21  Congress is supposed to do.

22      The second and third allegations relate to discrimination.

23  Specifically, one, that these orders are ultra vires in that

24  they direct agencies to implement these orders that conflict

25  with antidiscrimination statutes, both the Affordable Care Act

1   or the ACA, and the Public Health Services Act or the PHSA.

2   Both of these acts have their own antidiscrimination provisions

3   that the Plaintiffs allege the Executive Orders require

4   hospitals and other institutions to violate.

5      And finally, there's an allegation that the Executive

6   Orders essentially violate equal protection by discriminating,

7   both on the basis of transgender identity and on the basis of

8   sex.

9      The reason we're here today is not to try this case

10   entirely.  It's not to present witnesses testimony.  It's to

11   decide the question of a temporary restraining order.  We'll

12   talk a little bit more about logistics, but to achieve a

13   temporary restraining order, to attain one, the Plaintiffs have

14   to establish four factors.

15      First, they have to establish that they are likely to

16   succeed on the merits of just one of their claims.

17      Second, they have to show that they are likely to suffer

18   irreparable harm if the relief they're asking for is not

19   granted.

20      Third, they have to show that the balance of equities

21   favors them.

22      And fourth, that the injunction is in the public interest.

23      However, it is clear in the case law, and no one seems to

24   dispute, that when a government entity, as is the case here, is

25   a party, those last two factors merge.

1        So this motion is the Plaintiffs' motion, and they have

2   requested, and I have approved, that they will split up the

3   arguments, with Mr. Block sort of handling the question of

4   separation of powers and Mr. Gonzalez-Pagan handling the

5   question of equal protection and the violation of the statutory

6   laws.

7        Government, I never inquired as to whether you're splitting

8   up the response.  No?  You're just going to handle it all.

9   Okay.  No issues there.

10       So I think the best way to do it would more than likely be

11  to have Mr. Block begin, and then you respond to the Separation

12  of Powers arguments and then move onto the second.

13       Some of these things tend to fall on each other and we may

14  end up talking about everything at once.  But the important

15  thing here is that you get your arguments out, not that you

16  please me in the order and manner that you do it.

17       So why don't we start here.  You're welcome to come to the

18  podium or argue from there, whatever is easier for you.  I will

19  cut you off with questions; I generally do that.

20            MR. BLOCK:  Thank you, Your Honor.

21       I'll also be addressing the Threshold Issues of

22  Justiciability and the Scope of Relief.

23            THE COURT:  Sure.

24            MR. BLOCK:  So I'll begin with the Threshold Issues of

25  Justiciability.

1    President Trump, as Your Honor noted, issued the Denial of

2  Care Order to instruct federal agencies to, quote, "Immediately

3  take appropriate steps to ensure that institutions receiving

4  federal research or education grants, and gender-affirming care

5  for people under 19."

6    And that order had immediate consequences.  That night,

7  according to the declaration of Dr. Pogue that we have in our

8  reply, Childrens Hospital, within hours, sent a notice to

9  medical staff to end providing care.

10    The following day our Plaintiffs, whose separations are in

11  the records, received phone calls from Childrens Hospitals in

12  D.C., in Boston, and elsewhere cancelling their appointments.

13  New York is elsewhere.  Since that day more and more hospitals

14  have responded with closures.

15    The Governor of Virginia, noting that the Executive Order

16  went into effect immediately, has instructed all hospitals in

17  Virginia to cease care, and they have done so.  We have clients

18  who traveled to Maryland in order to escape state laws banning

19  gender-affirming care, only to have their care canceled here.

20  And when they tried to make alternate arrangements to go to a

21  Childrens Hospital in L.A., were told that because of this very

22  same order Childrens Hospital L.A. is not accepting new clients.

23    If there were any doubt that this order was intended to

24  have immediate effects, it's been removed by the actions of the

25  Government, both in the termination notices they sent and in the

1   President's press release celebrating the closure of these
2   hospitals.
3        Now the Government responds to the reality of what happened
4   by pointing to a boilerplate statement in the Executive Order
5   saying that they should only be implemented consistent with
6   applicable law.
7        The Fourth Circuit has directly on-point precedent from the
8   HIAS case saying that when the text of an order is itself
9   facially and plainly unlawful, that sort of boilerplate
10  statement can't allow the Executive to evade judicial review.
11            THE COURT:  Have you ever seen an order that says
12  please implement this by violating the law?
13            MR. BLOCK:  I have not, Your Honor.  We might see one
14  but I have not yet.
15            THE COURT:  I certainly hope not.  But my point is
16  simply to say that this language seems to be fairly standard in
17  Executive Orders regardless of what they are.
18            MR. BLOCK:  And the context here is also important.
19  At the same time that this Executive Order went out the
20  Administration had a general pause issued by OMB that was
21  halting payments left and right.  So I think it was a very
22  credible threat, and understandable for certain hospitals to
23  fear that what the President was ordering was that payments be
24  cut off immediately outside of the appropriate channels of
25  administrative law.  And that is precisely what happened when

1   HRSA issued it's notice and when CDC issued their notice.

2       The text of these notices are important.  They don't say we

3   are initiating the process of cutting off your grant, they say

4   you must immediately halt using any funds in a way that

5   conflicts with the Executive Orders.  And, you know, the CDC

6   notice, at the very end, I think eliminates any doubt about

7   whether this is ripe or whether there's, you know, quote, "Final

8   agency action here."  Because at the very end it says -- it says

9   -- it says, "Any vestige, remnant, or remaining piece of any

10  gender ideology programs funded by the US Government under this

11  award are immediately, completely, and permanently terminated."

12  Which sounds like, you know, final agency action to me if such a

13  requirement applied here.

14          THE COURT:  So I guess it might beg the question then,

15  why isn't there an APA claim?  And now there's an amended

16  complaint.  No one has really raised the idea that there is an

17  amended complaint.  I was curious what impact that has, if any,

18  on today.  But more so, why is there not an APA claim based on

19  the HRSA email and the CDC -- what are we calling that, a

20  letter?

21          MR. BLOCK:  I would call it a notice.

22          THE COURT:  Okay.

23          MR. BLOCK:  Well, Your Honor, to answer the first

24  question about the amended complaint, we did have a plaintiff

25  who wished to not proceed in their individual capacity.  And so

 1  their declaration is still there as a member of PFLAG but we

 2  wanted to amend the complaint as soon as possible to address

 3  that.

 4      We'd be happy, Your Honor, to have in the alternative an

 5  APA claim.  Of course, you know, here the only cited authority

 6  for any of the actions are the President's Executive Orders that

 7  say you may not take any action inconsistent with the

 8  President's orders.  They don't purport to be applying any

 9  statute, any delegated power to the agency.  And, of course, you

10  know, not every agency -- we don't know the extent of the

11  activities of every branch of HHS or every branch of the

12  government that's issuing notices or terminating grants for

13  other reasons.

14      So we think that the granting of equitable relief is a

15  completely appropriate and well-settled means for this Court to

16  stop lower executive branch officials from carrying out unlawful

17  orders.  But in the alternative, if the Court wants to construe

18  it as an APA claim we wouldn't object to that either.

19          THE COURT:  And you'd be essentially saying it's

20  arbitrary and capricious because it violates the law.

21          MR. BLOCK:  Yeah, it would be.  It's contrary to law

22  and also that it's arbitrary and capricious.  It doesn't -- of

23  course, under arbitrary and capricious review the agency has to

24  consider important aspects of the problem.  This notice is

25  consider nothing other than the fact that they ostensibly

1   conflict with the President's orders.

2       That segues into the ultra vires claim, unless Your Honor

3   has more questions.

4           THE COURT:  No.  I think all of these things layer a

5   little bit, but I'll certainly ask the Government a little bit

6   about the argument that nothing has happened because I can't

7   support that.  Based on this record it seems clear that this

8   order has had immediate effects.

9       I do want to ask one question, and I'm going to ask the

10   Government too.  In the Government's brief they note that the

11   HRSA email has been rescinded.  What does that mean to you?  Was

12   there a follow-up email?  Was there a public announcement?  What

13   was there?

14           MR. BLOCK:  I believe that there was an email sometime

15   last week.  It might have been after our status conference

16   actually, or thereabouts.  There's an email saying please

17   disregard the previous message, and that was it.

18       I will note that that HRSA initial termination notice, it

19   cites several reasons that grants were being terminated.  Some

20   of them were the Gender Identity and Denial of Care orders but

21   one of them was also the OMB pause memo.  And so it seems likely

22   to us that it was rescinded, or I would say temporarily

23   withdrawn, to comply with the injunction from the District Court

24   in Rhode Island.

25       Of course, the Government, you know, is appealing that

1    injunction and seeking, you know, immediate stays of it.  And so

2    we don't think that that injunction, you know, provides us the

3    necessary protection we need here.  But I think that is probably

4    the likely reason.

5            THE COURT:  But it's clear that that rescission, such

6    as it is, did not say you may continue providing

7    gender-affirming care to minors, we are simply in the process of

8    investigating potential policies or regulations that will bring

9    about the President's desired result, but it didn't say anything

10   like that.

11           MR. BLOCK:  NO.  No, absolutely not.

12       And I think it's very telling here that at no point, either

13   in the Executive Orders or any communications from the agencies,

14   has anyone cited the actual statute pursuant to which agencies

15   are authorizing these grants in the first place.  You know, of

16   course grant statutes, they have specific criteria; they award

17   grants for specific purposes.  There's been no attempt by the

18   Government in their opposition to cite any grant statute as

19   authorizing what they've done.

20       This is an across the board, you know, cut-off or

21   declaration that funds will be withheld across all grants,

22   across all programs simply because an entity provides

23   gender-affirming medical care to people under 19.

24           THE COURT:  Well, to be fair to the Government, I

25   didn't see much of a cite to specific funding streams from your

1  side either and I was wondering if that matters.  I mean, on my

2  own I saw the Affordable Care Act provided, in very vague terms,

3  blanket funding that I think is at this point 5 billion?  I got

4  lost in the zeros.  But it was sort of ratcheting up every year.

5  I didn't follow the funding in the other law.  But, in essence,

6  does it matter if we don't know the specific stream?

7          MR. BLOCK:  I don't think so, Your Honor, because I

8  think we're responding to the order that's been executed.  And

9  that order is an across the board order.

10         If an agency wants to initiate rulemaking or go through the

11 regular procedures for saying that statute X authorizes us to

12 withhold funds based on Y conditions, or even that statute X

13 delegates to us discretion to consider this issue, then that

14 would be another matter.  We would look at the actual statute.

15 We would see whether, you know, the express or implied will of

16 Congress precluded the Government from imposing this criterion

17 on the grants.

18         I do have to say that I can't envision a world in which

19 this criteria of don't provide gender-affirming medical care to

20 minors, even with your own funds, has any rational relationship

21 to the Congressional purposes in enacting these grants.  It's

22 significant.  This goes even beyond the Hyde Amendment which

23 prohibits use of federal funds to provide abortion care.  That

24 is still limited to any use of their own funds.  This is

25 incredibly sweeping.

 1            THE COURT:  Okay.  Please continue.

 2            MR. BLOCK:  So in terms of how that relates to the

 3    Separation of Powers argument, all power to, you know, enact

 4    legislation has to come from Congress and be signed by the

 5    President.  That also includes grant authorizing statutes and

 6    appropriations bills.  Congress has shown that it is completely

 7    able to attach conditions to that funding, like the Hyde

 8    Amendment that I mentioned.  Its Omnibus Appropriations Act has

 9    pages and pages of grant conditions that are enacted by Congress

10    and signed by the President.

11        What's happened here is that without citing any

12    congressional authority, except as Your Honor noted, statutes

13    allowing the President to control their own employees, the

14    President has inserted his policy priorities onto that statutory

15    scheme.

16        The President -- that power has not been delegated by

17    Congress, so if it comes from anywhere it has to come from

18    Article II.  And we know from Youngstown that Article II does

19    not give the President the power to make laws.  And we know from

20    Clinton versus New York that it also doesn't give the President

21    power to alter or rescind laws by saying the President won't

22    spend money that Congress has authorized.

23            THE COURT:  This seems a little closer to that

24    scenario, I would think.  That it's almost a line item on the

25    funding, at least as you are arguing it.

1       I do have -- one point that no one, I don't think, and I

2   may have missed it, drew attention to the fact that Congress has

3   repeatedly attempted -- well, I shouldn't say Congress because

4   it didn't pass.  But certain people in Congress have proposed a

5   number of Bills.  I found HB10075, the Stopping Mutilation of

6   Children Act of 2024, did not pass.  HB1276 Protecting Minors

7   from Medical Malpractice Act of 2023, this also did not pass.

8       The City and County of San Francisco versus Trump case from

9   the Ninth Circuit makes reference to the fact that Congress

10  frequently considered, and has thus far rejected, legislation

11  accomplishing the goals of the Executive Order in that case

12  which had to do with, quote/unquote, sanctuary cities.

13      But it seems like pretty strong evidence that the Executive

14  Order is attempting to do what Congress is supposed to do; that

15  Congress has tried to do it and has not yet succeeded.

16          MR. BLOCK:  Your Honor, I think that's right.  I would

17  just add one note of caution from one of my favorite cases,

18  Bostock, which does note that attempt -- the fact that prior

19  legislative proposals have not passed isn't evidence that

20  changes the meaning of the statute that has passed.

21      So I would just -- I think those two concepts are

22  compatible here, and that this is evidence that everyone

23  understood that this would primarily be the responsibility of

24  Congress.  And, in fact, this is not an intervention that has

25  been passed through democratic means.

And I think that is one thing that fundamentally distinguishes this case from cases like Skrmetti at the Supreme Court. Where in those cases actual laws were passed by the state legislature, you know, banning the provision of medical care. And, of course, we believe that those laws are unconstitutional, but the argument on the other side of those cases was that you should defer to the democratic process. And the court should, you know, step in to overrule what the democratic process has decided.

And I think that this case is the opposite. The democratic process has not decided to impose these restrictions. This is the President imposing these restrictions in defiance of the democratic process. If he wants to propose a Bill to Congress and have Congress debate the Bill, then that's how the system of separation of powers works. But there's no democratic legitimacy to this unilateral Executive Order.

THE COURT: Now, this may be about the right time to ask you about the -- there are many cases called Albaugh, but the one that the Government cites to regarding the labor contract provision, and that's a D.C. circuit case, obviously not binding. But how do you distinguish Albaugh? There is an Executive Order that essentially puts some strings on congressional action. Now, obviously, I think in that case the President was claiming authority under particular statutes to do what the President did. But how do you distinguish that case?

1    MR. BLOCK:  Well, Your Honor, I would say that in that

2   case the agencies were going to implement the order with the

3   normal administrative processes.  And when people were affected

4   by the agency action they would have an opportunity to bring a

5   lawsuit to challenge it, to bring all of their appropriate

6   remedies to that.

7    That is not what happened here.  And I think I would just

8   underline, we're not seeking a TRO against the entire Executive

9   Order.  There are all sorts of unlawful directions in here.  The

10  reason why there's a crisis right now is because this paragraph

11  of the order tells agencies to act immediately.  And that

12  actually distinguishes that paragraph of the order from all

13  other provisions in the order.

14   You know, they want to change the conditions of

15  participation in Medicare and Medicaid, presumably there will be

16  the rulemaking process to attempt to do that, and then people

17  will file notice on rulemaking and follow the appropriate

18  procedures.

19   What happened here was that there has been a threat from

20  the administration and that they've carried out to withhold

21  funds without following the proper administrative procedures.

22  And for a hospital that's just a disastrous consequence.  They

23  can't have their entire funding yanked temporarily.  You know,

24  they need, you know, at least by -- the Government has been

25  pitting this vulnerable minority against the welfare of all the

1  other hospital patients in putting them to impossible choices.

2        THE COURT:  Yeah.  Because the order speaks in terms

3  of cutting off.  They shall assess grant and grantee and ensure

4  funds do not promote gender ideology.  But I think what you're

5  implying is there's an or else in there which is, or you lose

6  all of it because no one is going to parse out what's going to

7  what treatment and what's going to another?

8        MR. BLOCK:  Well, actually, I think it's more than

9  that.  Because it says -- you might be quoting from the HRSA

10  email.

11        THE COURT:  Well, I was quoting from section G of the

12  Defending Women from Gender Ideology.  It says, Ensure grant

13  funds do not promote gender ideology.  And then we go to section

14  4 that describes as, Ensure the institution's receiving federal

15  research and education grants and the practice.

16     It seems like the Government may say well, we're just

17  trying to sort of carve out this particular procedure.  And that

18  may not be.  I mean, I think your argument would be well,

19  Congress has to do that.

20        MR. BLOCK:  Right.

21        THE COURT:  But I think what's implicit in these

22  orders, and the way that the hospitals are at least receiving

23  them is, we're going to lose everything if we don't stop doing

24  this one care.

25        MR. BLOCK:  And, Your Honor, I do think that the first

 1  order says you can't fund gender ideology, whatever that is.

 2  But I do think the plain text of the second order says that if

 3  you are a hospital receiving federal funds you cannot provide

 4  this medical care.  And I think that reading is supported by the

 5  fact that that same order -- I mentioned the conditions of

 6  participation in Medicaid and Medicare.  Those are the rules

 7  that a hospital has to follow in order to participate in the

 8  Medicare program.

 9       Saying that they want to change the conditions of

10  participation means they want to change Medicare to say that if

11  you are a hospital that provides gender-affirming surgery, you

12  are not allowed to be in the Medicare program at all.

13       So I do think that someone reading the text of this order,

14  reading the other actions the order's directing, I think very,

15  you know, reasonably could understand this as saying that we're

16  going to hold all your funding hostage if you provide -- even if

17  you provide surgery to people fully with private funds, without

18  a federal penny because President Trump doesn't want to

19  cross-subsidize it.

20            THE COURT:  And, I mean, you're agreeing that there

21  are portions of this order that are lawful.  Like, for example,

22  instructing -- I was looking at it this morning and trying to

23  pick out some things that I thought wouldn't be problematic.

24  Like, for example, telling the assistant for Legislative Affairs

25  to propose bills that codify some of the President's objectives.

1    You'd agree that's entirely appropriate.  Maybe not.

2    Appropriate may not be the word because you don't agree with the

3    substance of it, but that that would be constitutional.

4          MR. BLOCK:  If we're talking about proposing bills to

5    Congress, yes, I don't see a constitutional problem.

6          THE COURT:  And there's other provisions in these

7    orders that ask, you know, or demand the removal of certain

8    reading material or pamphlets or ways that the Government goes

9    about managing its own employees.  They may -- those directives

10   may run afoul, in your view, of other laws and -- but at least

11   as it pertains to your Separation of Power argument, you'd agree

12   those are okay, too, at least under that, that standard.

13         MR. BLOCK:  Especially the Separation of Power

14   argument at issue in this TRO, yes.  I think that, for example,

15   you know, the Government taking down CDC websites as ordered by

16   the Executive.  You know, there has been an EPA claim in another

17   case brought against that, talking about it being arbitrary and

18   capricious.  So I don't want to say that any of the other

19   provisions, you know, would be, you know, constitutional,

20   especially if they're motivated by animus.  But I don't see --

21   we don't need a TRO on them.

22         THE COURT:  I have some animus questions but I think

23   they'll go to you because there's -- at the core of these orders

24   I'm sort of interested in what is really being said here.

25         All right.  So you've -- we're talking about Albaugh,

1  distinguishing Albaugh.  Are there any other cases that you

2  think are sort of on-point for you other than Youngstown and the

3  sort of original ones?

4          MR. BLOCK:  Youngstown and Chadha and --

5          THE COURT:  Uh-huh.

6          MR. BLOCK:  -- of New York.  But I think the HIAS case

7  from the Fourth Circuit.  The, you know, San Francisco case that

8  the HIAS case cites.

9       And then I do think, as we noted, you know, in our reply,

10  that to the extent that they are -- want the agencies to do

11  something that conflicts with section 5054 of the Affordable

12  Care Act, which prohibits HHS from interfering with the

13  provisions of medical care, I do think that's also evidence of

14  Congress's purpose in how an Executive Order like this conflicts

15  with that.

16          THE COURT:  Yeah.  On HIAS -- now HIAS is binding.

17  And HIAS -- I mean, to the extent that it's very specific.  But

18  that was talking about an Executive Order that sort of upended

19  the refugee resettlement, if I remember correctly, and

20  essentially took it from a system where the Executive had final

21  say to one where either states or localities or both, I can't

22  remember, but they had sort of veto power.

23       And I noticed in that, the Fourth Circuit didn't seem to be

24  troubled at all that there are clocks on the imposition of some

25  of those conditions such that they hadn't happened yet.  And

 1    that didn't seem to take up any of the space of the opinion;

 2    they just plowed right ahead and dealt with it.

 3         I'm going to ask the Government the same thing.  Is that

 4    just an oversight or does that speak to what we have here?

 5              MR. BLOCK:  I think it speaks to what we have here.

 6    And I think the Iraq versus Trump cases are another example of

 7    that.  Where I think that, you know, when an order just facially

 8    conflicts with the statutes that Congress has passed, I don't

 9    think that you need to await specific enforcement for a

10    re-enforcement challenge to be ripe.  And I think that's

11    especially true here.

12         Where I think what makes these orders so pernicious is the

13    terrorizing effect they have on hospitals.  And that as a result

14    of those terrorizing effects it's our clients, the third

15    parties, that are being harmed by holding a gun to the

16    hospital's head.

17         There is a case I wanted to make sure to explain in detail

18    on this, the causation issue, which is the Department of

19    Commerce case, you know, which we cite in our brief.  It talks

20    about how actions that result from the predictable effect of

21    Government action on third parties, you know, satisfied

22    traceability and redressability.

23         But another important part of that case is, you know, what

24    happened was the undocumented immigrants were concerned that if

25    they answer a citizenship question they would be targeted by

1    ICE.  And the government's response in that case was, there are

2    privacy laws prohibiting the government from doing that.

3        So the government's argument was that this fear of the

4    undocumented immigrants was legally incorrect because there was

5    a statute prohibiting that action.  And the Supreme Court still

6    said that it didn't matter whether that was actually authorized,

7    what mattered is that studies had shown that there was a fear

8    that that would happen.  And all you needed was de facto

9    causation.

10       So, you know, it doesn't really matter in terms of showing

11   this is ripe and redressable.  You know, whether or not there's

12   a boilerplate, you know, sentence in the order.  What matters is

13   that the predictable and intended effects of the order was to

14   prompt immediate compliance.  And I don't think you have any

15   better proof of that than the President's press release saying

16   this is the intended --

17       THE COURT:  Well, it also strikes me -- it leads --

18   and I'll ask the Government again -- you're hearing that a lot.

19   But the -- there could be a scenario where no one's funding is

20   ever cut because they choose to stop providing the care.  So you

21   would never have the funding cut to initiate the litigation

22   because everyone just fell in-line.  Which, to me, raises the

23   issue of well, when could you.  when could you challenge this.

24       I will say it seems -- again, the record is rapidly

25   developing, obviously, but are there some hospitals that receive

1    federal funds that are continuing to provide gender-affirming

2    care to people under the age of 19?

3             MR. BLOCK:  Yes, Your Honor.

4             THE COURT:  Okay.

5             MR. BLOCK:  And I think that, you know, the fact that,

6    you know, some hospitals have, you know, given into the threat

7    and other hospitals have so far not done so, I don't think

8    changes the fact that the threat is what caused the care to stop

9    at those particular hospitals.

10            THE COURT:  Okay.  All right.  Well, on that point,

11   let me check and see if I have any more questions for you.  None

12   at this time.  I'll go ahead and --

13            MR. BLOCK:  Should I -- sorry.  Should I address the

14   Scope of Relief now or wait?

15            THE COURT:  Maybe we'll do that later.

16            MR. BLOCK:  Sure thing.

17            THE COURT:  If I forget, I don't think I will, but if

18   I do just raise your hand.

19            MR. BLOCK:  I will.  Thank you, Your Honor.

20            THE COURT:  Thank you.

21       Mr. Graver, come on up.  And take your time to get settled.

22            MR. GRAVER:  I appreciate it.  I tried to write down

23   various questions you flagged.

24            THE COURT:  There's a lot.  I may ask them again.

25            MR. GRAVER:  That would be very helpful.

 1      If I may, just at the start, what I want to provide to you
 2  is level-set a little bit about what the orders are at issue.  I
 3  think the way in which my friend is portraying it is that it is
 4  an overnight, nationwide ban on certain medical procedures.
 5  That is not the case.  It's not a nationwide ban; it is not a
 6  categorical funding freeze.  It is very easy to write an
 7  Executive Order that looks like that.

 8      This Executive Order is a general policy directive that
 9  charges executive agencies, implementing a goal from the
10  President consistent with law.  And I understand, even putting
11  aside the consistent with law piece, I think the key text of the
12  order is not stop everything right now, overnight, so long as
13  it's cool with the law.  Instead, look at the exact command that
14  runs towards the agencies.

15          THE COURT:  But it says immediately take appropriate
16  steps.

17          MR. GRAVER:  The appropriate steps is the key piece of
18  this.

19          THE COURT:  Not immediately?

20          MR. GRAVER:  Well, its immediately start to explore
21  this policy situation.  Let me give a parallel, sort of the way
22  in which I'm starting to think about it.  People are
23  paraphrasing a little bit from some things that's issued, I
24  think, from the last administration.

25      Imagine President Biden says I would like federal grants to

1  be awarded consistent with goals of racial justice and on the

2  basis of race consistent with the law.  Now, executive agencies,

3  please go out and do that.  There is a lot of legal work for

4  those executive agencies to do, especially after the Supreme

5  Court's decision in Harvard.

6       And what the Executive Order says is not blow past all of

7  that, not that get rid of grants or award grants at all costs,

8  but this is my general policy.  This is what I would like to

9  accomplish at a big picture level.  Now go out, collect facts,

10  and develop that policy on the ground on a case by case basis.

11  I think that's --

12             THE COURT:  I don't know that -- I mean, it's a

13  hypothetical so maybe I missed a part of it.  I'm not

14  disagreeing with you that that would be lawful because you're

15  essentially telling your agencies to follow the law.  The issue

16  here, is it seems clear, is that these orders say federal funds

17  cannot promote gender ideology and that OMB must immediately

18  take steps to ensure that institutions receiving federal

19  research or education grants and the chemical and surgical

20  mutilation of children.

21       You've got to do a little bit of juggling, but when you get

22  to the definitions it's clear this means gender-affirming care.

23  And it's clear that the hospitals at least are taking this to

24  mean something.  Which I can see the debate there except for the

25  email.

1          MR. GRAVER:  Right.

2          THE COURT:  The email from HRSA and the CDC saying

3   stop it.  I don't know how anyone can credibly argue that this

4   is not an immediate command to cease providing that care.  It

5   seems -- and it's a strong word, but seems almost disingenuous

6   to argue otherwise.  It's just ignoring the reality of what's

7   happened with this order.  And add to that the press release

8   saying -- and it -- I think it's a quote, "These orders have had

9   the intended effect.  Look at all the care that's been stopped."

10         Again, I'm not taking a position on the issue at all, I'm

11  just saying it's hard not to view all that and say that these

12  orders were intended to immediately stop that care.  And that

13  that -- and more importantly, these orders were intended to

14  immediately stop federal funding and that's Congress's job.

15         MR. GRAVER:  Uh-huh.  So two points.  One more

16  threshold and the other more fundamental.

17         The threshold point, I just want to make a flag for maybe

18  the Scope of Relief point.  As I understand my friend's TRO,

19  especially if it runs towards protecting any EO, those relate to

20  grant programs that have nothing to do with medicine.  You're in

21  context where it's about the Government choosing what messages

22  or initiatives itself wants to subsidize.  So I just want to put

23  that on the side for a moment.  The TRO, which is a categorical

24  facial challenge to those two provisions in any application,

25  reaches well beyond the context of medical procedures and

1  medical treatment.  So I just want to flag that at the start.

2           THE COURT:  I mean, I hear that but I'm -- how so?

3  Because right now it seems the only -- the only area that they

4  appear to be reaching is gender-affirming care for minors.

5           MR. GRAVER:  So I --

6           THE COURT:  Those provisions.  Like I said, there's

7  some other provisions that they're not even challenging, and

8  rightfully so because they're totally within the presence of --

9           MR. GRAVER:  Right.  Can I jump over and grab the

10 order quick?

11          THE COURT:  You can walk.

12          MR. GRAVER:  So -- and again, I want to get to the

13 more fundamental point, that I'm just flagging this for now.  Is

14 that at least as I understand for the proposed order and the

15 TRO, it bars any implementing, enforcing, applying the directive

16 in section 3(g) of the Defending Women EO.  That federal funds

17 shall not be used to promote gender ideology and then directing

18 grant conditions.

19     The only point I'm making at the jump is that that

20 stretches well, well, well beyond anything of medical space.

21 And I agree that my friend's have focused exclusively on that.

22 The issue there, for this Court, is that they're pressing a

23 categorical facial challenge which reaches well beyond other

24 members who are affected and the legal theories they press.  But

25 I want to get to the more fundamental --

 1             THE COURT:  But we could tailor -- I could tailor an

 2   order to address your concerns, right?

 3             MR. GRAVER:  I don't want to jump ahead too much, but

 4   I don't think so.

 5             THE COURT:  Okay.

 6             MR. GRAVER:  For party presentation reasons and very

 7   fundamental reasons about facial relief, but I'm just gonna --

 8             THE COURT:  No, that's fair.

 9             MR. GRAVER:  -- ignore all of that for a moment.

10             THE COURT:  We'll talk about that later.

11             MR. GRAVER:  So I think that the force of my friend's

12   argument is essentially, as I understand, like that the EO may

13   well be able to accomplish its ends without actually ever doing

14   anything and evading judicial review, and I understand the

15   concern.  The issue, I think -- the problem with the nature of

16   the challenge that they're pressing is not the fact that the EO

17   has had real-world effects, it is necessary but certainly not

18   sufficient condition.

19        You can imagine a circumstance; governmental officials all

20   the time have the ability to change events in the real world

21   without there being any formal action.  Imagine if President

22   Trump announced this policy in a speech.  Was able to move

23   markets, able to check things on the ground, able to change

24   regulated entities.  That wouldn't necessarily be the stuff of

25   judicial review.

1     The key point here that I want to make is not that they're

2  not real-world effects happening on the ground, it is that this

3  across the board categorical facial challenge is not the right

4  way to address them.  And the defect with it is that their

5  arguments are too abstract.  It isn't concertized into actual

6  grant programs where we know the terms and conditions of the

7  grant or the federal laws that actually apply, or even the

8  direction that's running towards the agencies.

9     THE COURT:  But that's because the order did.  They

10  said all funding.  Don't couch -- and I think your response

11  would be, well, that's the point, we have to take time to figure

12  out what funding streams we're talking about and all that.

13     MR. GRAVER:  So, Your Honor, this is how we read -- I

14  read the order at least.  If you combine my reading of the order

15  and you spot my friend's that they are 100 percent correct on

16  every jot and tittle of the law, what an agency should then go

17  back and go to President Trump and say there's nothing we can

18  do.  There's no directive in here that says blow past federal

19  laws no matter what they say, no matter what.

20     And again, the key piece is not, I guess, what you guys are

21  calling the boilerplate stuff at the end.  It is very easy to

22  issue a funding freeze that is nondiscretionary, that is --

23  removes the idea --

24     THE COURT:  No, I agree that it is and it could

25  perhaps be clearer.  I'm just really struggling because it says

1   immediately, and then these emails and -- or email and notice

2   went out.  I don't know --

3           MR. GRAVER:  Let me offer two points with this.  It's

4   immediately to take appropriate steps.  Putting that to the

5   side.

6           THE COURT:  So they said alright, the appropriate

7   steps is an email to every grant recipient, every funding

8   recipient; stop.  Stop this.

9           MR. GRAVER:  So here's the key point of it.  Is that

10  even to the extent the email was not rescinded, which my

11  understanding at least as --

12          THE COURT:  Yeah.  The idea of rescinding the email --

13  I would love to rescind a lot of texts and emails, if I could

14  just say it.  I don't know how that works absent like a more

15  pronounced, by the way, when we directed you to stop promoting

16  gender ideology we did not mean stop providing gender-affirming

17  care.  We're studying avenues for that.  That I can completely

18  understand.  And if at that point a grant recipient says we're

19  just going to stop because we see the writing on the wall or

20  something in the future, I could totally understand your

21  position there, but that's not what happened.

22          MR. GRAVER:  Right.  So I think my objection is not to

23  that intuition, but it's to shoehorning it into this case.  What

24  would be the proper way, as I understand it, to challenge an

25  Executive Order like this is not to offer the facial relief that

1  they proposed, but it's in instances.  And again, even before

2  funding is actually cut, what my friend was talking about is the

3  fodder of a pre-enforcement challenge.  And we're not taking any

4  issues with pre-enforcement challenges.  But the virtue of the

5  pre-enforcement challenge, the way you're describing recipients

6  of that email is that we actually have facts and law to apply.

7       In those circumstances we know the federal scheme at issue.

8  We know the relevant federal laws at play.  We know the terms

9  and conditions of the grant because of having that circumstance.

10 Is the grant recipient saying well, I'm being put up to this

11 impossible choice.  They're saber-rattling over here, I read the

12 EO like this, what am I to do.  That is the exact circumstances

13 that private parties all the time seek pre-enforcement relief

14 on.  The issue here is the scattershot.

15           THE COURT:  Yeah.

16           MR. GRAVER:  It is not the idea --

17           THE COURT:  It just seems difficult.  Because I'm

18 pretty bad with analogies, but I'm thinking if there's smoke

19 coming out your house, you don't know the room, you don't know

20 exactly where.  You don't wait to call 911 until you know the

21 exact location of the fire.

22      I think in this situation it is clear that these Plaintiffs

23 have received phone calls stopping their care; stopping their

24 appointments, stopping their everything.  And it's because

25 the hospitals have been told you've got to stop doing this.

1   I don't know.  What would it look like -- what would

2   literally the nuts and bolts of a claim that you think, in your

3   view, would be appropriate under these circumstances?  When

4   could they file a case?

5           MR. GRAVER:  Right.  So I think, Your Honor, it would

6   be very similar to what you see all the time from regulated

7   entities that receive guidance documents in the private sector.

8   And there's always a fight about sufficient ripeness and

9   whatever it is.  But like that is -- the key part to that, I

10  think, is that it confines a dispute to an actual case or

11  controversy.

12      The issue here -- and I just want to take one step back.

13  Is that it is not -- the question before this Court is not that

14  are there instances in the EOs affects in the real world that

15  confine to a case where a controversy may or may not be lawful.

16  And even if Your Honor thinks there might be instances, right

17  now where the parties are saying bring suits and stop the EO

18  from applying to them, that is not the issue currently before

19  this court.

20      The issue -- because my friends are pressing, again, a

21  facial challenge, which biased terms means no application of

22  this Executive Order can be lawful.  You need to --

23          THE COURT:  Well, those provisions.  And they're

24  saying those provisions can't be lawful because they are taking

25  -- essentially the President is taking Congress's place in

 1  directing how funds are to be spent when Congress didn't make

 2  those directions.  That is the gist of at least the Separation

 3  of Powers claims as far as I can tell.

 4          MR. GRAVER:  It's the gist of the Separation of Powers

 5  claim, but I think even as your question reveals it's awfully

 6  abstract.

 7          THE COURT:  I don't think it's very abstract.  It

 8  doesn't seem that abstract, and here's why.  Because what I'm

 9  hearing you say is we should wait for the rulemaking --

10          MR. GRAVER:  No.

11          THE COURT:  -- and for the -- okay, no.  All right.

12      Well, we should wait for some more guidance on exactly how

13  the President wishes to enact his policy goals that are set

14  forth in both of these, which I would totally be receptive to

15  except nobody waited to send the email and send the notice.  So

16  you can't necessarily -- you might get the benefit of the time

17  to develop all those things, and to allow the attack, if you

18  will, to be a little bit more surgical if you send the email and

19  send the notice that essentially nukes the entire nationwide

20  funding or threatens to take away funding everywhere if you

21  provide this care.  It's almost like you don't get the benefit

22  of what you're talking about if you go about it in the way that

23  the order writes it and then that happened.

24      I guess the question would be if the email hadn't gone

25  out -- or rather this.  If the email hadn't been rescinded do

 1   you think they would have the ability to be here where they are

 2   today?

 3              MR. GRAVER:  I don't think these Plaintiff would have

 4   that ability on the challenge they're pressing here.  Because

 5   again, even with those emails themselves, we're dealing with a

 6   subset of the conceivable grants here.  So, for instance, there

 7   are very different legal regimes that come with, let's say,

 8   grants and medical institutions that are performing medical

 9   procedures, which is the focus of the briefing.

10        As I understand it at a high level, different rules of the

11   road apply.  For instance, when you refer to subsidizing, say,

12   research, there's not a sort of discriminatory dynamic there,

13   that's about what the government wants to throw its own money

14   behind.

15        Then there's circumstances too, again, the EO stretches

16   well beyond the medical space.  But even in the medical space,

17   for in other examples that there are certain facilities that say

18   new grants that would go to an institution that's only

19   performing gender-affirming care.  That might not be something

20   the administration wants to do anymore.  That is -- the reason I

21   keep coming back to a facial challenge is that the broad brush

22   here sweeps all of that in.

23        The examples that you're giving, and I understand the focus

24   for it because of the real world effects.  So when you have

25   actual medical institutions and you can get -- we're narrowing

 1    the universe into an actual concrete dispute that's justiciable.

 2    You have medical institutions worried about a particular type of

 3    grant who, as my friend was saying, the standard for

 4    pre-enforcement challenge that he was mentioning, and this would

 5    be the standards.  Do they fear a credible threat enforcement.

 6    At which point they can go into court and we know the applicable

 7    law, we know the applicable grant, we know the terms.

 8         All I'm saying here is that the EOs direct agencies over

 9    federal grants as a whole which involve enumerable fact patterns

10    in very different legal regimes.  My objection to the facial

11    relief here is that this is knocking it all down in one fell

12    swoop before anything is meaningfully implemented in a whole

13    host of spaces.

14         THE COURT:  But, again, then that's where I keep

15    coming back to.  But that's the fault of the senders of the

16    email and the senders of the notice.  Because that notice

17    doesn't provide any granularity, it just says stop it or you

18    lose your funding.  It doesn't identify streams, it doesn't

19    identify specific programs, it just speaks in general terms.  So

20    I don't know what we're supposed to do here.

21         MR. GRAVER:  Well, certainly, I think the CDC email --

22    or the email from your regulator -- again, trying to confine the

23    universe here.  The people who are affected by an email from a

24    regulator are the regulated.  If I'm not regulated by CDC I

25    don't care too much about what CDC is saying.  I think that's

1    the key point here.  Is that even on these rescinded emails,

2    even on these rescinded emails they deal with a subsetting,

3    subset of how the EOs might be applied.  So that is the key

4    piece of this.

5         And again, if providers who are affected by those grants

6    want to come forward and bring a pre-enforcement challenge, that

7    is a fundamentally different dynamic.

8              THE COURT:  If the providers of the grants or the

9    recipients?

10             MR. GRAVER:  I'm sorry, the recipients.  I meant the

11   medical providers.

12             THE COURT:  Okay.  So that goes back to this question

13   of this intermediary issue which did jump out at me when I read

14   the complaint, which is a there is a step here.  But then I was

15   looking into some cases, and there's the one out of the Ninth

16   Circuit, the King County case.

17             MR. GRAVER:  Okay.

18             THE COURT:  You know the one I'm talking about, where

19   they directed that you couldn't have flights -- King County

20   passed an ordinance or something, some directive that said

21   essentially ICE can't fly out of our airport.

22             MR. GRAVER:  I'm vaguely familiar with it, yeah.

23             THE COURT:  And the issue was -- it was the airport

24   that was saying, okay, you can't fly here.  But at the end of

25   the day the Ninth Circuit simply said, you know, it's clear, the

 1    writing's on the wall, the government is behind this.  The

 2    government in King County in that instance.

 3         And here it seems the same, where the message is clear; you

 4    can't provide this care or you're going to lose your funding,

 5    and so the agencies go along with it.

 6         But like I said to the Plaintiff, what about the scenario

 7    where no one, they just cut off all the care, no one loses

 8    funding, how do you challenge it then?

 9              MR. GRAVER:  Again, I think the -- there's a few key

10    pieces of it.  The first is I just -- I do want to emphasize

11    that I think to underscore the immediacy of this everyone keeps

12    changing what the order actually says.  It is not as direct as

13    Your Honor portrayed, and I think that's intentional.

14              THE COURT:  I'm using the words of the order.  It says

15    immediately.  I understand there is language that you are

16    pointing to.  I mean, we know about the follow the law.  There's

17    also references to working in coordination with the director of

18    OMB.  But it does use the word immediately to take steps, and it

19    seems like those steps were taken.

20         And then the section G of the other order, and I'm speaking

21    specifically of the Defending Women order, just says Federal

22    funds shall not be used to promote gender ideology.  And it does

23    say that each agency shall assess grant conditions and grantee

24    preferences and ensure grant funds do not promote gender

25    ideology.  But again, I'm not seeing much of a clock on that

 1   either.  That seems rather immediate.  This language seems

 2   immediate to me.

 3             MR. GRAVER:  So I don't disagree that it's immediate,

 4   but the question is immediate as to what.  You can imagine an EO

 5   that is much more direct, only that it's been kind of --

 6   paraphrase this, immediately cut off funding, and ten paragraphs

 7   later, by the way, so long as it's consistent with law.

 8             THE COURT:  That would be flatly illegal, right?

 9             MR. GRAVER:  I think that across the board blanket any

10   grants no matter what, blah, blah, blah, would face a very

11   different legal standard.  The only reason I -- there are

12   enumerable grant programs; you see the terms and conditions, you

13   see what they are.  But I think an across the board thing, and

14   what my friend is describing too, is identifying a couple of fed

15   statutes that impose certain conditions and then measure it

16   against the backdrop of a hypothetical EO that tells agencies to

17   blow right through them no matter what.  Yeah, that's a legal

18   problem.

19             THE COURT:  Or you can see an EO that says the

20   President's authority is vested in this section.  You see these

21   a lot in the labor world, obviously.  A ton of these cases come

22   out in the labor world because the President often enacts

23   Executive Orders that he believes are rooted in some aspect of

24   the statute that gives, and then you find out whether or not

25   that's actually true.

1          Here, the only authority that the President cites to in the

2     Executive Orders is the Constitution, and then the provision

3     that allows the Executive to sort of police executive employees,

4     and this goes beyond that.  So what do we do there?

5               MR. GRAVER:  So, but --

6               THE COURT:  Again, no specificity so --

7               MR. GRAVER:  But that makes perfect sense in light of

8     the way that I'm reading the order.

9               THE COURT:  Uh-huh.

10              MR. GRAVER:  So again, I want to go back.  It's the

11    same thing as sort of like the racial justice grants, which I

12    realize this is kind of a -- this is different federal grants.

13    There's a million different policies, there's a million

14    different grants, there's all these overlapping laws.  Here's

15    what I would like to do.  Here's the X that I would like you to

16    work for.  Agencies, go out, gather facts, assess the law,

17    figure out how you might be able to implement this.

18         I think that is fundamentally what the circumstance is

19    here.  It is not sort -- I guess the part -- the reason the

20    Article II makes all the sense in the world as sort of the only

21    thing you need to cite is because the President is charging the

22    Executive branch with exploring a policy goal.  That is what the

23    intent is, as I understand it, within its four corners.

24         And again, I just -- especially as you compare it to maybe

25    sort of other freezes or other X statutes, or other -- there's

 1   ways in which you can write this more directly.  I do not want

 2   to --

 3            THE COURT:  And less directly.

 4            MR. GRAVER:  And less directly.

 5        But an order that says take appropriate -- that identifies

 6   a policy goal, says take appropriate steps towards it consistent

 7   with the law.  It simply cannot be unlawful for the President to

 8   tell the Executive branch, I want you to do X, consistent with

 9   applicable law, and come back to me with solutions.  And

10   that's --

11            THE COURT:  I don't think I disagree with you.  I feel

12   like in some ways we're both looking at the Mona Lisa and trying

13   to decide whether it's smiling or frowning or --

14            MR. GRAVER:  Sure.

15            THE COURT:  I'm just reading it differently at this

16   point, but I'm not disagreeing with your overall point.  Which

17   is if it said things the way you said them, like the proposed --

18   I don't know if that order you were referencing about racial

19   justice is a real one or it's a hypothetical.  But something

20   like that, sort of a vague pronouncement of a change in policy

21   or a desire to effectuate a certain policy, instructing agencies

22   to go out and look at ways to do this.  But I just think that

23   absolutely ignores the reality of why we're here today.

24            MR. GRAVER:  Yes.  Your Honor, take -- tweak then the

25   hypothetical.  Imagine an order that says I would like grants to

1  immediately be awarded consistent with goals of racial justice

2  consistent with applicable law.

3          THE COURT:  But that's not what this says.  This says

4  immediately funds.  It uses the word funds.  It doesn't say

5  explore the manner in which we can effectively promote our views

6  on gender ideology, it just says cut funds.

7      We've been going back and forth on this.  The question that

8  I have is with -- what I asked about the HIAS case, which is a

9  Fourth Circuit case.  Again, clocks are on that, no discussion.

10  I think one of the things I said I would ask you about is why

11  doesn't HIAS stand for the proposition that we can dive right in

12  and discuss this even though there's no what and when and how

13  something is going to be implemented.

14          MR. GRAVER:  Right.  I think that my answer to HIAS is

15  going to run into what we've been talking about before.  And

16  that, again, the key point -- and I don't mean to harp on it but

17  it I think it relates back to HIAS -- is that it is very hard --

18  at least as I read the term appropriate steps; appropriate steps

19  consistent with law of, you know, all holds barred approach to a

20  policy goal regardless of the cost.  I think that's very hard to

21  read that in the appropriate steps.  And I think that relates

22  back to HIAS.  Because I think HIAS in all are perfectly

23  consistent.  And what they reflect, essentially, is that there's

24  sort of a spectrum before federal courts can jump in to

25  reviewability.

 1         On one end of the spectrum you have an instance where the
 2    President has a broad policy directive, where agencies then put
 3    meat on the bone; they collect facts, they assess appropriate
 4    law, they then develop policies.  What you have in HIAS, and you
 5    have in some of these cases, is when have you a discrete
 6    governmental action that's contained within the four corners of
 7    the order, such that it is sufficiently concrete and ready for
 8    judicial review, that's, I think, the circumstance that HIAS
 9    applies to.
10         What I was explaining before, essentially, of like, you can
11    imagine a million different applications of these EOs, I don't
12    think anyone here is now contending that even on these --
13              THE COURT:  I don't have -- again, I don't have to
14    imagine anything because we have emails, we have directives, and
15    we have hospitals all around the country responding to it.  And
16    I suppose you could argue, well, that's them.  That's on them,
17    they're making that decision.  And you are, in fact, arguing
18    that.
19              MR. GRAVER:  Correct.
20              THE COURT:  But HIAS actually specifically -- I had
21    some of the text of it here.  It says, and I quote, "The intent
22    of the order is clear," when they're talking about the order.
23    So they're actually getting into the intent.  And again, that
24    order was one that even though it hadn't been implemented yet
25    was gonna turn upside down what -- I believe it was a statute.

1    And it essentially green lighted what I would view as sort of

2    the common sense review of what was happening in response to

3    that order.

4         So I don't -- and, of course, City and County's the same

5    way; City and County of San Francisco case.  Again, Ninth

6    Circuit but same thing.  A little bit more on the savings clause

7    or -- but same general idea, which is we don't wait around as

8    long as it sounds like the Government's asking if the intent of

9    the order is clear, the issues are fresh and easy to determine.

10   And in this instance -- I'm not even sure in that instance there

11   was necessarily the same harm, but just sort of standard, just

12   civility questions.  And we have that here.  We have a clear-cut

13   issue and we have Plaintiffs who are suffering because of it.

14   Now, again, how we decide this is a totally different question,

15   but just on the justiciability side it seems like a stretch.

16        MR. GRAVER:  I think the last point, and I don't want

17   to beat a dead horse with this.  Even in the circumstances that

18   you're going with, suppose that, you know, you disagree with the

19   lion share for us saying with respect to the agencies that had

20   issued those emails.  That is a fraction of the agencies and

21   applications of the two provisions at issue.  And I just -- what

22   I don't want to lose sight of is the nature of the challenge

23   that my friends have decided to put before the Court.

24        You can have an as applied challenge targeted towards those

25   agencies, who by the way are not the President, not the

1   Executive Order.  In that instance you're dealing with the

2   implementation of the Executive Order which is a much more

3   conventional way in which these things are reviewed.

4        The key point here, is I think that there is this shifting

5   a little bit to inverting the burden.  Where all I need to do to

6   strike this thing down in full, or enjoin it in full is to

7   identify one instance, or a handful of instances, where I think

8   it might be unlawful.  But that is the opposite of the actual

9   question before the Court.

10       In order to obtain the relief that my friends are seeking

11  the question is, is there a single application of this law,

12  conceivable application of this law that is lawful.  And when an

13  order directs agencies to take appropriate steps consistent with

14  law, even -- the easiest example of that is what all the other

15  agencies are doing.

16       Let's assume -- let's put aside the two agencies that sent

17  the now rescinded emails.  Everyone else is doing what I see in

18  this to be the command of the EO.

19            THE COURT:  Who is everyone else?

20            MR. GRAVER:  I don't know the full -- I mean, this is

21  a part two.

22            THE COURT:  Well, give me an example.

23            MR. GRAVER:  I think -- I mean, there's -- for the

24  Protecting Women EO that applies to every executive agency in

25  the Government that develops a grant.  So Department of

 1  Transportation, Department of Education.

 2          THE COURT:  Well, does the Department of

 3  Transportation fund gender-affirming care?

 4          MR. GRAVER:  Your Honor, look at the order.

 5          THE COURT:  I'm serious.  I don't know how you can

 6  credibly argue that this is somehow not commanding the cessation

 7  of funding for these treatments.  I'm just -- I'm struggling

 8  with that.  And I'm actually not struggling anymore.  I don't

 9  know how you can do it.  And you're doing a great job because

10  you are seizing on the language, and I understand that.  There

11  are some qualifying terms here.  But I think we ought to just

12  move on to something else, because you've made your point and

13  I'll consider it.  But I just don't know how that plus the

14  aftermath --

15          MR. GRAVER:  The piece I'll flag, and I think this

16  might be coming, you know, in reading the room a little, is that

17  that is not the order that is before this Court.  It reaches

18  well past the medical phase; it reaches across different sorts

19  of grants.  So even to the extent that that circumstance that

20  Your Honor is pressing, you know, you've kind of settled on

21  that.

22          THE COURT:  I think I see your point.  And again --

23          MR. GRAVER:  The scope of relief here, I think is a

24  very meaningful point, and it's not something that I think --

25          THE COURT:  So you're saying, for example, in the

1   Defending Women from Gender Ideology Order, section G, federal

2   funds shall not be used to promote gender ideology.  Each agency

3   shall assess grant conditions and grantee preferences and ensure

4   grant funds do not promote gender ideology.

5       So the Government, the National Endowment for the

6   Humanities had sponsored an exhibition of trans artists in Los

7   Angeles that was set to open next month.  You're saying that

8   their relief would make it such that the government couldn't

9   stop that funding even though it would have a legal right,

10  potentially, to do so?

11          MR. GRAVER:  Correct.  I mean, I've put it back over

12  there at this point.  But as I understand the order, the

13  proposed order is any implementation.

14          THE COURT:  Of section G and section 4.

15          MR. GRAVER:  Correct.  Which applies well beyond the

16  medical case.  None of that has been briefed.

17      And in general, too, if the government has a much freer

18  hand as to what messages or initiatives it wants to subsidize,

19  throw its own money behind, versus even in these circumstances

20  you're dealing with existing grants and all the minutia and

21  medical space.  All I mean to say is that I think the scope of

22  relief point is a very important one that we -- you know, space

23  limitations and the like is not a huge piece of the briefing.

24          THE COURT:  Yeah, I didn't flag it as a particularly

25  large issue.  But anyway.  All right.

Albaugh, you like, I assume.  You talked about it a little

bit.  But we were -- I talked about it with them.  If you want

to respond to Albaugh and how it applies here.

MR. GRAVER:  Yeah.  I think the point is that HIAS and

Albaugh, and the Ninth Circuit case that you mentioned all are

consistent.  And it was kind of the main point I was trying to

make before about -- I think there's spectrum of EOs.  On one

hand you have a discrete command, discrete policy command that

you can assess.  And there, if you look at HIAS and you ask the

court did they overlook anything.  No.  And there you had -- you

knew exactly the policy at issue.

You had the part of the INA.  You can see exactly what

they're commanded to do, there's very little discretion.  That's

a convertized dispute.  You know, the theme that we're kind of,

I think, pushing here is that a facial challenge here is too

abstract.  Even if you can conceive of confrontile

circumstances, a facial challenge is too abstract.

In Albaugh, I think we had a little bit more, something a

lot closer here.  Is where the President said like -- I think

there's a lot of EOs that fall in the category Albaugh is in,

which is like I would really like to do X.  The federal

government is massive, the federal laws are overlapping.  Let me

kick it to the agencies, the expert agencies which are supposed

to be the ones that handle this; do what you can about X

consistent with the law.

 1        I think what Chief Judge Ginsberg recognized there is that
 2   in those circumstances that is a core Article II prerogative.
 3   Essentially it's the research and development of a policy versus
 4   a discrete command.
 5            THE COURT:  Yeah.  But these are all pre-Loper Bright.
 6   I was thinking about the -- I mean now courts are being told
 7   that it's the court's job not the agency necessarily.  There's
 8   no more deference to the agencies.  It would seem to strengthen
 9   the Plaintiffs argument that, again it's, up to the court to
10   determine, you know, what this means over --
11            MR. GRAVER:  So I think that when you have an agency
12   action before you, and the government is saying hey, if you do
13   X, Y, and Z under this statute, but Loper Bright says you don't
14   give them the benefit of the doubt.  But I don't think that
15   necessarily cashes out to something like this.  Because, again,
16   the whole point of the EO, I think like this is the way that I
17   read it, is essentially you just have a goal in mind and you
18   kick it to the subordinates in the executive branch to flush
19   that out.  That is our fundamental reading of it.
20            THE COURT:  I understand.  All right.
21            MR. GRAVER:  Yeah.
22            THE COURT:  Well, do you want to talk about the equal
23   protection aspects?  Do you want to break there?
24            MR. GRAVER:  Should we switch?
25            THE COURT:  Yeah, probably.  And then we'll -- and

1    then I intend to take a break and come back and potentially rule

2    from the bench.  I should have said that at the outset.  My

3    intention is rule from the bench and then provide some written

4    opinion to follow.

5         But the floor's yours.

6              MR. GONZALEZ-PAGAN:  Thank you, Your Honor.

7         Your Honor, I'm going to start with the section 1557

8    argument specifically.  And I want to start because counsel on

9    the other side has spoken about the EO exploring applications

10   that would lead to this particular goal.

11        Ultimately, section 1557 is very explicit in that any

12   health program or activity that receives any type of federal

13   financial assistance, doesn't matter the funding stream, doesn't

14   matter what grant it is, doesn't matter the nature of the grant,

15   cannot discriminate on the basis of sex.  There is just no

16   universe for the agencies here to explore that would not violate

17   a main conflict with section 1557.

18             THE COURT:  Particularly in this circuit.

19             MR. GONZALEZ-PAGAN:  Particularly in this circuit

20   where Kadel is the controlling precedent.

21        Not only that, Your Honor, but counsel on the other side

22   makes it -- harps on the idea that this is an instruction as to

23   explore options.

24        I would like to distinguish section 4 from section 5 of the

25   healthcare order.  Section 5 of the healthcare order sets a

1    policy priority to end the improvision of gender-affirming

2    medical care for people under 19, and tells the agency, I want

3    you to explore those options, here's a list of the things that I

4    want you to explore.

5        That is very distinct from section 4, which tells the

6    agencies to take all appropriate steps to ensure that no medical

7    institution receiving research or education grants provides this

8    care.  Ensure and end are the keywords here, coupled with

9    immediately.

10       So this is a clear command by the Executive to its

11   sub-agencies to take this action.  And it has created havoc.  It

12   has created havoc with a perverse coercion of hospitals to

13   abandon a vulnerable minority population, otherwise risk the

14   ability to create doing a bit of research that provides health

15   innovations for all of us, or to reach all of the patients that

16   they provide care for.

17       HRSA in particular, all of that funding is intended to

18   reach vulnerable or hard to reach populations; whether they're

19   in rural parts of America or whether they're in socioeconomic

20   disadvantaged parts of America.  And it actually is pitting the

21   healthcare -- a subset of people against the healthcare of

22   everybody.  It's a perverse notion that should be rejected.

23       Because Kadel controls here -- and, Your Honor, I'm happy

24   to walk through all the possible ways in which this is sex

25   discrimination, but I think our brief does a good job of that.

1      THE COURT:  I mean, my reading of Kadel, and I don't

2  think you're going to tell me I'm wrong, but it seems to almost

3  tie my hands a little bit.  Kadel says that discrimination on

4  the basis of gender identity is discrimination on the basis of

5  sex.  And Grimm verse Gloucester County says the same thing.  So

6  I don't have any -- even if I were to disagree with that, that's

7  the law.

8      And in Kadel itself it said you cannot deny this

9  gender-affirming care because it is being done on the basis of

10  sex and that violates the Affordable Care Act.  And it literally

11  says that.  Now, admittedly, that was for care for everyone

12  under these two insurance schemes, a little bit broader than

13  what's at issue here.  I'm not even talking about equal

14  protection, I'm not talking about balancing, I'm not talking

15  about factors.  On the basis of sex says the Fourth Circuit

16  would seem to implicate this order.  I don't see any way around

17  it.

18      Now, it would be kind of silly for me to ask you to explain

19  how I'm wrong given that I just voiced what I think is your

20  position, but tell me if I'm missing something.

21      MR. GONZALEZ-PAGAN:  I don't believe so, Your Honor.

22  I think the command and the controlling precedent in this

23  circuit that the Affordable Care Act for this, the very

24  discrimination that this order is coercing hospitals to engage

25  in, makes clear and lucid that this is an order that is in

1    conflict with the very clear congressional mandate that has been

2    set forth.

3           Not only that, but there's a little bit of a conversation

4    that has happened here about well, agencies -- the regulated

5    entities bring a more ripe challenge when there's some type of

6    agency action.  But if that is asking the people who are losing

7    care right now to bear the harms of losing that care waiting for

8    that agency action.

9           We know that these are the foreseeable effects on third

10   parties of the order; the President touted that himself.  And

11   not only that, we know that the Plaintiffs here meet all of the

12   requirements of Stanley.  They have harm, it is traceable the

13   Executive Order as admitted by the President, and it can be

14   redressed by an order of this court temporarily enjoining

15   section 4 and section 3(g) as it pertains to the provision of

16   gender-affirming medical care for people under 19.  That is all

17   that is needed for a temporary restraining order at this moment

18   in time.

19           THE COURT:  And with respect to the equal protection

20   issue, even assuming Kadel -- and I think it's pretty clear on

21   this, that the transgender community is entitled to intermediate

22   scrutiny, it's a quasi-protected class, or it's on the basis of

23   sex, same thing.  But we are talking about an order that

24   addresses care for minors as opposed to everyone else.

25           Now, a couple things that the Government points out, I

1    think correctly, is that this may change the balancing.  It may

2    change the analysis.  And you saw that in Skrmetti, which is not

3    decided yet by the Supreme Court, but certainly a discussion as

4    to whether or not -- I don't think the question of whether we

5    just apply rational basis because it's medical care, because I

6    think Kadel probably answers that, that we don't.  But it may

7    not answer the question of whether the youth aspect needs to be

8    factored in to the intermediate scrutiny test.

9         Do you want to speak to that at all?

10             MR. GONZALEZ-PAGAN:  Well, two responses immediately

11   to that, Your Honor.

12        First, there is the question of whether this is actually on

13   all fours with care that has been instituted by other states,

14   slightly a question that has come up in Skrmetti.  And the

15   answer is no.  This also reaches young adults who are 18 year

16   olds like Lawrence Loe and Dylan Doe.

17             THE COURT:  No, it's 19.  Which I assume it's because

18   Alabama or some state, I was trying to figure out which states

19   classify a minor at 19 as opposed to 18.

20             MR. GONZALEZ-PAGAN:  I think they're trying to inject

21   the Alabama definition of majority, age of majority to the

22   entire country through this order.  But at the end of the day,

23   all of the justifications alluded to, with no evidence in the

24   response, does pertain to such a broad group of people.  And

25   their justifications that -- as set forth in our reply brief,

1   don't hold water.  When you look at the actual courts that have

2   gone to trial and looked at the evidence and listened to expert

3   testimony, like the court in Dekker and the court in Brant which

4   are cited in our briefs.  This is care that has been found

5   effective, the denial of which it would cause harm.  That there

6   is no evidence that there are alternative effective treatments

7   for gender dysphoria.  And that every sort of medical care

8   carries risk.  I think we all know that just from the human

9   experience.

10          THE COURT:  Now Dekker was -- was Dekker overruled?

11          MR. GONZALEZ-PAGAN:  No, Your Honor.

12          THE COURT:  It wasn't.

13          MR. GONZALEZ-PAGAN:  I just argued it in November and

14   it's still pending.

15          THE COURT:  All right.  All right.  Well, you would

16   know better than me.

17          MR. GONZALEZ-PAGAN:  So certainly that is still

18   binding.  Not binding, but that is persuasive authority and it

19   is a valid precedent that we point to.

20          THE COURT:  Is there room -- I want to ask the

21   Government this too.  But if I were to engage in this question,

22   if I didn't think that Kadel answered it fully for me, the

23   manner in which -- again, per your argument that this order does

24   nothing necessarily that commands an immediate response.  But

25   assuming that I think it does, the issue that I'm having, too,

1  is that the order immediately ends care.  Which regardless of

2  your view of whether gender-affirming care is necessary, or I

3  would use the terms real because I really have doubts that this

4  order even acknowledges it as a legitimate form of care.

5  Regardless, stopping care in the middle of receiving it, any

6  care, really casts doubt on whether, in fact, the goals are to

7  protect the recipients of the care.  And I'm curious as to

8  whether the manner in which an order reflects that it should be

9  enforced can be used in weighing the various factors that are

10 required under intermediate scrutiny.

11         MR. GONZALEZ-PAGAN:  Well, I think regardless of the

12 approach, ultimately it's the Government's burden to justify it

13 under Kadel, but whether it applies to minors or not.  And here

14 what we do know is the lack of studying and the lack of a

15 deliberative approach that has occurred indicates, right, that

16 this is more of a political position than it is about the

17 intricacies of this care and how to approach it and whether it

18 is properly tailored to the interests that would be set forth.

19 So that is not the case here.  And I think Your Honor is correct

20 that that is something that could be included there.

21      I would also add that that is a point that goes as to why a

22 TRO is needed today.  The whole point of preliminary injunctive

23 relief is to preserve the status quo.

24         THE COURT:  The status quo in this instance would be

25 the continued --

1          MR. GONZALEZ-PAGAN:   The continuance of care prior to

2    the issuance of the Executive Orders as it pertains to

3    gender-affirming medical under section 3(g) and section 4.

4          I would also posit that there was some conversation about

5    how far it was reaching with regards to our proposed order.   I

6    believe our proposed order is on point with regards to section 4

7    certainly.   We are -- our third paragraph could come first,

8    right.   What we're saying is that no care -- no funding should

9    be withhold or denied or terminated as it -- because an entity

10   is providing gender-affirming care, medical care, whether it's

11   being based on section 4 of the Healthcare Order or section 3(g)

12   of the Gender Order.

13         Your Honor, separate and apart from that, I would just add

14   that this is also an order that both of them put together, along

15   with the other executive actions that we've set forth in our

16   brief, that just drip with animus and reveal the true nature of

17   what's at play here.

18         Your Honor is correct that the order itself calls having a

19   gender identity consistent with ones' birth assigned sex to be a

20   false belief.   It questions the identity of Americans to be who

21   they are, and it erases -- or proceeds to erase their identity,

22   something that the Government cannot do.   And it is placing the

23   care of some of those people at risk by coercing institutions to

24   abandon them or otherwise risk their ability to serve anybody

25   else.   And because of that, this is an order that was adopted

1   not in spite of its effect but because of its effects on this

2   population, it warrants higher scrutiny separately and apart on

3   that basis.

4           And so, Your Honor, I would just posit there's no universe

5   where either the enforcement of section 4, the exploration of

6   section 4 or section 3(g) as it pertains to gender-affirming

7   medical care can survive.  Because the Affordable Care Act makes

8   clear that the receipt of any federal financial assistance

9   condition be non-discriminating.  Kadel controls when it comes

10  to the Affordable Care Act.

11          THE COURT:  And Bostock for the ACA.

12          MR. GONZALEZ-PAGAN:  And Bostock controls under the

13  ACA.  And both Kadel and Mauj (phonetic), I would point to Doe

14  v. Snyder in the Ninth Circuit certainly does the same.

15          And separate and apart from that, there's just clear

16  standing to challenge these orders because of their immediate

17  and intended effect on the healthcare of people under 19 right

18  now under the Aid Protection Clause as well.

19          And so I believe Your Honor started today's conversation

20  noting that we just need to prevail on one of these theories.  I

21  think we prevail on all of the ones that we have moved on under

22  the TRO, and certainly the one pertaining to the Affordable Care

23  Act, is just beyond peradventure, that there's just no way

24  around it.

25          THE COURT:  Thank you.

 1          MR. GONZALEZ-PAGAN:  Thank you, Your Honor.

 2          THE COURT:  All right, Mr. Graver.

 3          Might start with the point on animus.  Do you want to

 4   respond to that?

 5          MR. GRAVER:  I think -- I mean, what I would point to

 6   on the animus point, that I think is Chief Judge Sutton's

 7   opinion in the lower court of Skrmetti, is that in applying

 8   Trump versus Hawaii, its is that it's inexplicable but for

 9   animus.

10        And I think that when you're dealing with -- again, the

11   idea here, at least as we're reading the order, is to explore a

12   certain general policy directive consistent with law.  I think

13   it's hard to say --

14          THE COURT:  But the order, as your opposition

15   described it, and I'm reading it the same way, seems to deny

16   that this population even exists or has a right to exist.

17          MR. GRAVER:  I think --

18          THE COURT:  And I'm struggling with how that can't be

19   animus.

20          MR. GRAVER:  I think the basic -- the only thing I

21   would emphasize for present purposes is that the standard is

22   it's inexplicable for anything but animus policy command within

23   the order.  And if you can imagine how this is being applied on

24   the ground, you can see certain circumstances where a majority

25   of states have on the books restrictions in this space.  It's

1  happening across Europe in different countries in different

2  measures.

3      And again, I'm thinking about those in terms coming back to

4  our prior discussion, like what are the appropriate steps,

5  concrete policy things on the ground.  I think it's very hard to

6  say setting that course in action is inexplicable by anything by

7  animus.  Also, for an order tailored by age and use.

8          THE COURT:  Except in the age context, and this -- we

9  may not even get here, but I was thinking about the age context.

10  If you stop gender-affirming care for youth, presumably youth

11  goes through puberty, develops the sex characteristics that are

12  associated with their birth sex, and essentially you make it

13  such that the only way to in the future transition, if you

14  choose to do so, is much harder than if you had done it as a

15  young person.

16      So in many ways the fact that this order targets youth, it

17  sort of targets future adults.  And it sounds kind of silly the

18  way I'm saying it, but it's different than other things.  It

19  says hey, when you're at a certain age you're old enough to make

20  that decision.  When you're talking about the care that's at

21  issue here, it seems to me that at a certain age it's too late

22  to even make that decision.  So that's why I don't know how that

23  factors in.

24          MR. GRAVER:  I take the point.  I think the basic

25  part, and how these court's have grappled -- only two more.  One

 1   in direct response to that.  I think the basic point is usually

 2   the government has a little bit more of a say with respect

 3   minors.  And I think that's the play in the joints that's

 4   contemplated.

 5           THE COURT:  And regardless of what I said, it's just

 6   -- it's true, that certainly in the area of --

 7           MR. GRAVER:  From --

 8           THE COURT:  Then why is this 19 and not 18?

 9           MR. GRAVER:  As I understand it, I think we mentioned

10   it in the brief too.  It's a little bit about biological reality

11   with adolescence and the like, versus more of the age of consent

12   as a formal matter.

13           THE COURT:  But there are some places where the age --

14   some Plaintiffs who are legal adults who are being told they

15   can't get the care.

16           MR. GRAVER:  So can I -- I think my overarching answer

17   is going to be pretty similar to the first time I was up here,

18   in that I think -- I very much appreciate the force of my

19   friend's argument.  What he's mentioned, about what people have

20   been saying in the declarations, I think even with everything

21   Your Honor has said it puts the cart before the horse.

22       When we were talking about these cases, what's odd to me,

23   at least, about kind of importing hind scrutiny into this

24   context and, again splays it out on our reading of the order

25   which might differ.  But this sort of strikes me as step one.

1  All of those cases which involve lengthy records, disagreements

2  between legislatures and plaintiffs, have huge bodies of

3  evidence tailored around a specific governmental action.

4      I think this is just relating to what I was saying before.

5  Is that if you understand appropriate steps, as I do, which is

6  collect your record, come up with policy solutions, follow

7  applicable law, and then you can deal with concrete policy

8  actions.  Those are all the cases with this.  I think it's just

9  a little bit --

10      THE COURT:  How -- I mean, you said several times in

11  the brief, you may not have actually written it actually, but --

12      MR. GRAVER:  No.

13      THE COURT:  -- whoever wrote it --

14      MR. GRAVER:  Yeah.

15      THE COURT:  -- many times said, and I'm paraphrasing,

16  I know about Kadel but it was wrongly decided.

17      MR. GRAVER:  So, yeah.

18      THE COURT:  So tell me -- and I get it, you're stuck

19  with it.  But same question that I asked the Plaintiffs.  How do

20  I get around, particularly the ACA section of Kadel?  I

21  understand the equal protection situation and -- but I don't

22  think Skrmetti even includes an ACA challenge as far as I can

23  tell.  Because I recall during oral argument there were several

24  references to aren't you making a Bostock-like challenge to an

25  equal protection claim.  I don't know how on the ACA front I can

1   do anything other than what Kadel says.

2              MR. GRAVER:  Yeah.  So I don't think that on this --

3   and this is going to relate back to the nature of a facial

4   challenge.  I don't think on this posture Kadel is fatal at all.

5   I think it actually helps us in the in the equal protection

6   part.

7        Let me at least pause on the constitution piece and there's

8   a little more to unpack on the statute.  So let me start on the

9   constitution.

10       Is that I think the most important part for present

11  purposes with Kadel, is once -- Act 156, then Chief Judge

12  Gregory explains that governments combatting what they deem to

13  be ineffective treatments is legitimate governmental interest.

14  The problem in Kadel is that on that record with that specific

15  governmental action they did not marshal a sufficient

16  justification.  But Kadel left open the door that governments

17  can lawfully regulate in the space.  And again, details --

18             THE COURT:  So do I look at what's in the orders for

19  why the Executive is doing what they're doing?  Or do I look at

20  the universe of things that you're talking about, like studies

21  out of England and --

22             MR. GRAVER:  So there is no -- I think, again, this is

23  sort of the fundamental difference on how we're reading this

24  pretty differently.  I am not reading this as a categorical

25  policy, at which point --

 1           THE COURT:  I know that.  But let's say -- I mean, we
 2    wouldn't even be having this conversation.
 3           MR. GRAVER:  I know, Your Honor.  But that's why the
 4    odd part of importing it back in like this is the injunction to
 5    agencies to assemble the record.  All the --
 6           THE COURT:  I know.  But let's -- for purposes of this
 7    conversation we are assuming that the Executive Order is an
 8    order to stop funding for gender-affirming treatment.  There's
 9    no other way we can even be talking about it, so we're talking
10    about it.
11           MR. GRAVER:  Let me then -- I think this goes back to
12    scope of relief point, which I think is important.  And again,
13    just reading the proposed order, and I think there's parts that
14    we should just be cautious about accepting it.
15        Even if you agree, if you read it as that, you disagree
16    with everything I said before, we're talking about it on those
17    terms.  The first thing I would emphasize is that I think it's
18    like a little bit of an internal versus external dynamic.
19    Again, as I read the order, it's essentially asking agencies to
20    explore a certain policy action.  I don't --
21           THE COURT:  We're -- this -- I love records, and I
22    play them, but this one is going back.  And again, I don't --
23           MR. GRAVER:  Even if you don't think --
24           THE COURT:  My dad plays them, I don't.
25           MR. GRAVER:  Even if you don't think the order says

 1  that, all I mean to say is that their proposed order would cover

 2  that.  So the internal/external piece.

 3          THE COURT:  Okay.  Why don't I just change gears and

 4  ask you this question.  There's a section of your brief that

 5  says This is not discriminatory because -- and I'm paraphrasing

 6  but I want to get your response to it -- because the hospitals

 7  could choose to not provide this type of care to anyone and all.

 8      And when I talk about this type of care, I'm getting a

 9  little bit more into the details of gender-affirming care.  But,

10  for example, they could choose to not provide hysterectomies for

11  anyone.  They could choose to not provided hormone therapy or

12  puberty blockers for anyone.  Even for those patients who

13  receiving that is for a purpose that is consistent with their

14  biological birth sex.

15      Am I reading that right, that that's the argument?  Is that

16  they could choose to not provide care to anyone?

17          MR. GRAVER:  What I think the more -- I wouldn't say

18  entirely.  I think that -- as I understood my friends to be

19  saying, is that this kind of instruction --

20          THE COURT:  No.  I'm talking about what you're saying,

21  what you wrote.

22          MR. GRAVER:  No, no.

23          THE COURT:  Or your colleague wrote.

24          MR. GRAVER:  No, no.  I just want to walk back.  What

25  that was in response to, as I understand kind of the argument,

 1  is that asking agencies to ask this of providers or institutions

 2  is per se unlawful.  Because there is no possible way you can

 3  make that ask, consistent with a course of conduct, consistent

 4  with the law.

 5      I think the formal point there is just that it's

 6  technically not true.  But can I offer more, I think --

 7          THE COURT:  But am -- it's technically not true

 8  because of what I said, that you could choose to not.

 9          MR. GRAVER:  With any kind of grant you choose to --

10  whether comply with the conditions of the grant or forego

11  certain conduct.  And I think that's the only -- as a technical

12  matter that is a choice that's being --

13          THE COURT:  Because I was trying to think of an

14  example.  Like you can't serve women, but that's okay -- at your

15  restaurant -- because that's okay, you don't have to

16  discriminate you can serve no one.  It seems to be totally nuts.

17  And I was trying to figure out whether I was just reading it

18  wrong.

19          MR. GRAVER:  And I think the intuition there

20  essentially was just distinguishing the conditions between --

21  kind of affirmative restriction versus just what you want to

22  choose to subsidize or not from the Government's perspective.

23          THE COURT:  So you can see hospitals that are perhaps

24  religiously affiliated who are saying, you know what, we're not

25  going to provide this for anyone because it's the only way we

 1    can get around this.  But the problem I was having is these

 2    hospitals want to provide the care.  They don't want to make

 3    that choice.

 4          MR. GRAVER:  The hard part, again, is really -- I'm

 5    not going to keep scratching the record, but again, we're

 6    talking hyper in the abstract here.

 7          Let me just bring up one point, and I think this relates

 8    the scope of relief part on the statutes.  Is that even if you

 9    disagree with us on reading the statutes, and I actually think

10    there's more to that that's important.  But I don't see the

11    logic of Kadel in the statutes that are being discussed here.

12          As I understand it, again on a little bit of a higher

13    level, is that all those relate to the provision of treatment.

14    I'm not quite sure how that would apply to a standalone research

15    grant.  And I don't understand how statutes can necessarily

16    apply to that.

17          If you imagine an institution that's not giving medical

18    treatments at all but is just engaged in certain research --

19          THE COURT:  But that goes back to your argument that

20    this is sort of an overbroad request.  Because in this instance

21    these are institutions that do provide care, and they have to

22    provide care in line with the ACA, for example.  And the ACA

23    says you cannot discriminate.  The Fourth Circuit has said that

24    if you make that distinction on the basis of gender identity you

25    are discriminating.  And this order, according to Plaintiffs, is

1  saying you have to make that distinction.

2  　　　　MR. GRAVER:  I take the point.  We're sort of in the

3  somewhat middle position of like talking about how would you

4  like to lose.  And the point that I was --

5  　　　　THE COURT:  I've been there.  I understand.

6  　　　　MR. GRAVER:  The point that I'm sort of making here

7  again, is like, to the extent that we're thinking about relief,

8  I think it is grounding it in the case here.  And the key point,

9  too, the reason I'm harping on it is just I'm looking at the

10  order here from the perspective of the Government in the event

11  that this afternoon we need to start implementing something.

12  What I'm pushing for is essentially something tailored to what

13  my friends have been emphasizing.

14  　　And I think there are distinctions here.  Again, the

15  internal/external one that I was mentioning.  This has nothing

16  to do with medicine.  And also the distinction, perhaps, between

17  research and treatment.

18  　　　　THE COURT:  Okay.  So with respect to the equal

19  protection argument that I raised earlier, again, I'm not taking

20  a view on gender-affirming care; whether it's safe, whether it's

21  -- there's plenty of studies that have been cited by both sides.

22  Not just in this case but in other cases.  But what's really

23  difficult for me here is that this order, the second order in

24  any event, seems to speak, admittedly at a high level, of

25  protecting children; mostly, it seems, from later regretting

1   their transition, which I recall from Skrmetti was a hotly

2   debated number as to what the percentage is.

3              MR. GRAVER:  Yes.

4              THE COURT:  But this question of how this order has

5   been received to immediately stop care is -- and then that the

6   President, as they pointed out, says this is the intended

7   effect.

8       This is a population that no one is disputing statistically

9   is at a higher rate for suicide, poverty, bullying, a whole host

10  -- drug addiction, unemployment.  And then a number of them have

11  gone through what is dictated in these papers as this really

12  gut-wrenching process of meeting with healthcare providers,

13  their parents and everyone else.  Getting to the point where

14  they get the care, they start the care, and then it gets shut

15  down in the middle of it.

16      There has to be space to acknowledge just how horribly

17  dangerous that is for anyone, for any care, but particularly for

18  this extremely vulnerable population.  And I'm really having a

19  hard time with that.  Because if I do get into some sort of

20  balancing with respect to the factors under equal protection, it

21  seems very difficult to accept that the goal is protection when

22  the outcome, as described in some of these affidavits, seems to

23  put these children at extreme risk; an already vulnerable

24  population pushed closer.

25             MR. GRAVER:  I take your point.  If I could, the two

1  things I just want to say is, I think the first is if you read

2  it as a category -- I want to -- let's just take Skrmetti first.

3      THE COURT:  Don't worry -- I know what you're going to

4  say.  I think I know what you're going to say.  Hold on, let me

5  say it, because -- my point is, I'll accept your argument, for

6  purposes of this question, that this is not a command to do

7  anything.  I'm talking about what's happened.  And if it's not a

8  command why has there not been any sort of effort to roll it

9  back then if the goal is to ensure safety, I guess is the

10 question.  Is that a factor I would look at.

11     That if it's being misinterpreted as an immediate command

12 to halt treatment in a manner that regardless of your view of

13 the treatment -- because if I remember Skrmetti, some of those

14 -- the law actually rolled out over a couple years which gave

15 the recipients of gender-affirming care, particularly puberty

16 blockers and hormones, the opportunity to essentially wean off

17 or move.  None of that is here.

18     So I guess the question is, if it is being misinterpreted

19 as a directive I haven't heard any language saying no, no, no,

20 don't do this.

21     MR. GRAVER:  I think that it's to the point we kind of

22 talked about whenever it was, awhile back.  Is that to the

23 extent that there's specific directives or guidance documents

24 that convertized a dispute, that is sort of the traditional

25 fodder of a pre-enforcement challenge and a much more narrow

1    posture.  And I think, you know, we had that discussion before.

2         I think on the point of the absence of the record, I think

3    just the basic point we would say is that, again, if read like

4    -- I'll take -- just using the facts of Skrmetti, just for the

5    thrust of reading, this is kind of a categorical command.  I can

6    agree under the logic of Kadel.

7         Like let's say Tennessee had a restriction or ban.  Again,

8    we're not -- we're dealing with funding.  But had a restriction

9    or ban.  Court says, you know, why did you do it?  And they're

10   like, I don't know and we have no record.  Yeah, that's going to

11   be tough.  That's -- you know.

12        But the way in which we read it, and the parts -- at least

13   two parts of the EO that I would like to mention.  Again,

14   they're not being challenged but I think they inform the

15   meaning.  Is that there is a charge to the HHS secretary to take

16   90 days to research this area and return with best practices.

17   And that's coupled with, I think it was at section 9, was an

18   injunction to the agencies to get among themselves within the

19   next 60 days, come back with a report of like what you think the

20   next best steps are, and then we'll take it from there.

21             THE COURT:  That -- again, going back to my initial

22   point that I don't know that that's objectionable.  And, in

23   fact, I think maybe I concede that.

24             MR. GRAVER:  Yeah.  I think that just -- I think the

25   only thing I'll say here is that it sort of -- to sort of

1  explain sort of the mismatch here of trying to apply heightened

2  scrutiny to this, there's just very different readings of the

3  order versus whether they're starting a process or ending it.

4          THE COURT:  All right.  Well, on the scope of the

5  order issue, you have identified --

6      And you can sit down because I'll have them, and I think

7  it's Mr. Block who is going to address this.

8          MR. GRAVER:  Okay.

9          THE COURT:  Again, I don't think it's in the briefing

10  necessarily, and I'm happy to give more time to digest it if, in

11  fact, that's where we have to go.  But this question of the

12  requested relief is overbroad.  Do you want to speak to that?

13          MR. BLOCK:  Sure, Your Honor.  Our intention is to ask

14  for a TRO that is just about the context of withholding grants

15  and federal funds from entities because they provide

16  gender-affirming medical care.

17          THE COURT:  So gender-affirming care, that's the

18  limitation that you're talking about.

19          MR. BLOCK:  Yes.  Yes.  We'll have separate suits on

20  the DNEA grant stuff.

21          THE COURT:  I was just going to say, I think maybe

22  you're going to be flying around the country if it's going to be

23  piece by piece, but I see your point.  Which is you're

24  acknowledging that there may be areas where the President does

25  have the authority to use the language that's here.  Maybe.  But

1    you're not concerned with those today.

2            MR. BLOCK:  Yeah, yeah.  My point is not that he has

3    the authority, but that's not this lawsuit.  This lawsuit is

4    about the context of withholding funds because an entity

5    provides gender-affirming medical care.

6        And so if -- we're completely fine with having that, you

7    know, clause, you know, imported into the portions of the

8    proposed order referencing 3(g).  That's --

9            THE COURT:  Okay.

10           MR. BLOCK:  There was discussion in the brief about

11   the scope in terms of nationwide injunction.  And so I just

12   wanted to make sure to address that very clearly.

13       Judge Boardman, you know, just issued a nationwide

14   injunction in the birth right citizenship case.  I know there

15   are motions by the Government to stay that.  But I think in this

16   case it's especially appropriate, because the scope of the

17   injunction, no matter what, has to be enough to comply --

18   provide complete relief to the parties.

19       PFLAG and GLMA are nationwide organizations.  And the only

20   way to have an injunction that meets that scope of relief is to

21   have it be nationwide.  And I think that it's particularly

22   compelling to look at Judge -- Justice Kavanaugh's concurrence

23   in the, you know, the Pogue case which stayed a state-wide

24   injunction.

25       But Justice Kavanaugh specifically said that when you have

1  a membership organization with members across a state or across
2  a country, then the injunction is going to have to have de facto
3  nationwide effect in order to cover those members.

4      So binding Fourth Circuit -- excuse me, binding Fourth
5  Circuit precedent authorizes these injunctions, that's
6  particularly appropriate when you have a membership
7  organization.  And I think the only authority they had to the
8  contrary is a solo concurrence that was signed by the one
9  justice.

10     I want to make sure to answer any questions the Court had
11  on those issues.

12         THE COURT:  I mean, there's another case challenging
13  this, I think it's by attorney generals around the country, it's
14  out in Seattle.  Does that have any impact on what we're doing
15  here today in your view?

16         MR. BLOCK:  No, it doesn't.  I think that -- well,
17  first of all, you know, that's in another circuit; what happens
18  there doesn't necessarily control what happens here.  The
19  Whitman-Walker case from 2020 talks about how it's often
20  appropriate to issue follow-along injunctions.  This isn't a
21  follow-along injunction, this would be the first one.

22     I also did want to say the Defendants here are located in
23  this district.  So this isn't a matter -- so I think, to the
24  extent that there's an argument about which circuit's precedent
25  should be applying, the fact that all the Defendants are located

 1  here makes it particularly appropriate for them to have to

 2  conform their conduct to the law, you know, as interpreted by

 3  this circuit.  So it's not like we're off in San Francisco

 4  seeking an injunction.

 5          THE COURT:  Yeah.  And I noticed that your proposed

 6  order does not include the President of the United States, just

 7  the secretaries of the -- and directors of the various agencies.

 8  And that was by design?

 9          MR. BLOCK:  Yes.  In the Iraq versus Trump case the en

10  banc Fourth Circuit said that it was inappropriate for the court

11  to issue an injunction against the President.

12          THE COURT:  And you can essentially accomplish what

13  you think is appropriate here without doing that?

14          MR. BLOCK:  Yes.  Absolutely.

15          THE COURT:  Okay.  All right.  Why don't I hear from

16  you on this question of scope and -- well, scope and scope; two

17  types of scope.  But I'm very interested in whether the

18  limitation to gender-affirming care addresses some of the

19  concerns that you raised.

20          MR. GRAVER:  I think that it is certainly less

21  overbroad than we said before.  I think those are important

22  limitations to make clear.  And also, again, the idea that the

23  agencies internally can start thinking about this.  I read the

24  order as written to reach that.  That's the other part.

25          THE COURT:  Okay.  And what about the nationwide

 1  aspect?  Because, I mean, frankly, it seems difficult not to be
 2  because of, one, some of the factors they describe with respect
 3  to membership and some of the legal factors, but also just the
 4  confusion when we're talking about Plaintiffs who are at various
 5  health -- receiving care from various places.  It would seem to
 6  be almost chaotic to do it any other way.
 7          MR. GRAVER:  Yeah.
 8          THE COURT:  Talk to me about that.
 9          MR. GRAVER:  Yeah.  I think the points to balance
10  without relitigating any piece my friend mentioned, I think that
11  was actually the right intuition when you asked about the Ninth
12  Circuit Seattle case.  And he says what happens over there
13  doesn't control what happens over here.  Obviously they're
14  asking you to do just that and enjoin this nationwide in every
15  circuit with respect to parties that are present and not
16  present.  As I understand, nationwide relief is supposed to be
17  extraordinary.  I understand it's kind of, you know, more common
18  these days.
19          THE COURT:  Yeah.  But it doesn't make it any less
20  extraordinary.  I agree with you on that.
21          MR. GRAVER:  I think the point too, is that it's
22  supposed to be extraordinary and it's supposed to meet their
23  burden even if you find their arguments very persuasive.  As I
24  understand it they all run towards membership and the medical
25  institutions that they are a part of it.  I didn't see anything

1  in their briefing to explain why individuals who are not -- they

2  have standing to pursue relief for individuals who are not their

3  members, and institutions that their members are not a part of

4  or not related to at all.

5          THE COURT:  But the Government didn't really attack

6  the institutional aspect of the standing or the membership.  And

7  the argument is these PFLAG, significant membership, national

8  membership, no one took issue with that.

9          MR. GRAVER:  Yeah.  And I think there's a difference

10  between -- the point we were making is the difference between

11  party specific relief and not.  And even if there are a lot of

12  parties, there's still a very meaningful difference between

13  party specific relief and not.

14      So I think it can be nationwide in a colloquial sense, in

15  that their members are across the nation.  But that's different,

16  I think, than how we use nationwide injunction now, which is to

17  bind parties and nonparties.

18      And again, it's supposed to be a bit of a heavy burden to

19  reach into that second category.  I haven't seen any arguments

20  marshalled as to why nonmembers and institutions that their

21  members do not participate in need to be covered by the scope of

22  this TRO.

23      And the part --

24          THE COURT:  So what would it look like if -- it would

25  just be to these particular Plaintiffs and to -- and by that I.

1    Mean the individual Plaintiffs.

2         MR. GRAVER:  I think that -- it's a difficult part

3    too, a little bit.  This is what I was saying at the very, very

4    beginning of the party presentation piece.  Is that when you ask

5    for a categorical facial remedy it's hard when you fall back.

6    Let's figure out ad hoc how to figure out a narrower one.  And

7    again, usually when kept to party presentation principles that's

8    a problem.

9         THE COURT:  But it is aware the TRO -- you know, it

10   gets a little messy with TROs, let's be honest.  And I'll ask

11   you about the schedule for a PI later.  But there's no doubt

12   that you're dealing with a tight record, and often a thin one,

13   although I wouldn't call this thin.  I think both sides have

14   done good job with providing me with information.  But there's

15   really no other way.

16        MR. GRAVER:  I understand.  So I think it's hard to

17   draft it on the fly, but what I can suggest is the touchstone

18   for it.  Is what are -- essentially, what do the Plaintiffs have

19   standing to bring.  And I think it's -- well, it's obviously

20   claims on behalf of their members.  And then the Court should

21   tailor relief accordingly to make sure that those member are not

22   affected but without reaching any further than that.

23        THE COURT:  Okay.  All right.  Well, I'm going to take

24   a break for, I don't know, probably about 15, 20 minutes and

25   come back and rule, and then issue something in writing later.

 1          Before I do, why don't we get it out of the way now.  What

 2   is the thought on a PI?  You were talking about filing that and

 3   I told you that you didn't have to do it on Tuesday night.

 4   What's your thought?

 5          MR. BLOCK:  Your Honor, I think our priority, the PI

 6   obviously needs to be briefed and decided within 28 days because

 7   that's when the TRO, you know, expires, assuming it's extended.

 8   You know, 14 days.

 9          THE COURT:  Yeah.  I mean, that's the question.  I

10   think -- yeah, that's an assumption that it would be extended

11   but I --

12          MR. BLOCK:  Yes.

13          THE COURT:  Anyway.

14          MR. BLOCK:  So if it is 28 -- so either within 14 days

15   or within 28 days.  I think that our preference would be within

16   28 days.  That obviously would allow us to expand on the

17   briefing, to address some of the discussion that came up today.

18   If it was a shorter schedule it might look very similar to the

19   current briefing.

20          THE COURT:  All right.  But the bottom line is you

21   still intend to file for one, and I'll get the Government's view

22   on that later.  I think we'll just talk about the rest of it

23   when I come back.

24          So about 20 minutes I'll be back.  If everyone could try to

25   be back in here by then that would be very helpful.  Obviously

1  the parties will be but I'm talking about the spectators as

2  well.

3       So we are adjourned until about, 3:10 or so.

4            THE CLERK:  All rise.  This Court stands in recess.

5       (RECESS was taken from 2:52-3:20 p.m.)

6            THE COURT:  All right.  First, thank you everybody for

7  their submissions, their arguments.

8       And the unsung hero of everything is always the court

9  reporter, so thank you.  It's not easy to -- when people talk

10 over each other, and then we were getting into it a little bit

11 about some of these issues, and I appreciate everything that

12 everyone here as done to get us here today.

13      Here's what we're going to do.  I'm going to issue this

14 oral ruling.  Then, as I said before, I will obviously docket an

15 order.  And then I intend to issue a memorandum opinion with a

16 little bit more detail.

17      But let me start by saying that I believe that the

18 Plaintiffs have met the standard for a temporary restraining

19 order.  All four factors weigh in favor of enjoining the

20 implementation and enforcement of the particular section of the

21 Executive Order as it pertains to gender-affirming care.

22      First, I find there is a strong likelihood that the

23 Plaintiffs will succeed on the merits of all three claims that

24 are at issue here today.

25      The specific provisions of the order attaches strings to

1    federal funding that Congress did not attach and arguably

2    affirmatively chose not to attach.

3        Plaintiffs make a compelling case that could not be

4    accomplished through Article I is being accomplished through

5    Article II.  This the Constitution does not allow.

6        Further, given that the Court is bound by the decisions in

7    Grimm verse Gloucester County School Board and Kadel verse

8    Folwell, the banning of gender-affirming care for individuals

9    who identify as transgender is subject to intermediate scrutiny.

10       The Kadel court already applied equally justice juris

11   prudence to find that a Government's refusal to cover

12   gender-affirming care runs afoul of equal protection.  To be

13   clear, there is a slightly different set of circumstances at

14   play here.  The Executive is directing federal agencies to

15   withhold funding to institutions that provide gender-affirming

16   care.

17       And while at least in the briefing, we didn't do it as much

18   today, the Defendants attempt to essentially relitigate Kadel,

19   and perhaps for good reason; because they want to focus on the

20   fact that in this case the Government initiated ban, if you

21   will, is on care related primarily to minors not adults, which

22   may open the door to an entirely different conversation.

23       But what nobody can dispute is that Kadel also found that

24   the denial of gender-affirming care violates the Affordable Care

25   Acts nondiscrimination clause which is not subject to balancing

1    tests or weighing of interests.  And I see little difference

2    between Kadel and the gender-affirming care portions of the

3    Executive orders that are challenged here.

4         Second, Plaintiffs will face irreparable harm if the

5    Executive Order is not enjoined.  To establish irreparable harm,

6    the Plaintiff must make a clear showing that it will suffer harm

7    that is neither remote nor speculative but actual and imminent.

8    Additionally, the harm must be irreparable, meaning that it

9    cannot be fully rectified by the final judgment after trial.

10        Also, it should be noted that the prospect of an

11   unconstitutional enforcement supplies the necessary irreparable

12   injury.  That comes out of Air Evac EMS versus McVey, Fourth

13   Circuit case of 2022.  That is because Plaintiffs have shown a

14   strong likelihood of success on their constitutional claims, the

15   irreparable harm factors arguably satisfied.  More so,

16   Plaintiffs have attached unassailable documentation that they

17   are suffering irreparable harm beyond the violation of the

18   separation of powers alone.

19        In another context, the Fourth Circuit has held that the

20   irreparable harm prong is satisfied where a plaintiff suffers

21   from, quote, "Diminished access to high quality healthcare

22   suited to the individual plaintiff's needs," end quote.  That's

23   from Planned Parenthood of South Atlantic versus Baker, 2019

24   case.  I think it was Judge Wilkinson who wrote that opinion.

25        As Plaintiffs point out, quote, from their briefs,

1   "Transgender adolescence and young adults across the country

2   already have lost care because their providers have canceled

3   appointments, refused to fill prescriptions, or even shutdown

4   their gender-affirming medical care programs altogether," end

5   quote, and they have provided documentation to support this.

6        Further, Plaintiffs state, quote, "Families have been

7   forced to watch their children suffer, and medical providers

8   have been compelled to abandon their patients," end quote.  And

9   again, there is documentation to support this in the record.

10        The circumstances in this case does yield no justification

11  to depart from the Fourth Circuit's reasoning in Baker.  As the

12  sudden denial of medical care, quote, "Visits a tangible harm on

13  the health and well-being of the plaintiffs."

14        I also noted the fact that the manner in which this is

15  being implemented by the hospitals is such that it puts some of

16  the patients at further risk by cutting off treatments that

17  haven't started.  Or excuse me, cutting off treatments that have

18  started.

19        Finally, the balance of equities and the public interest

20  weigh in favor of a preliminary injunction.  The Court must

21  balance the significant irreparable harms identified above

22  against the harms that the Government asserts will arise from

23  temporarily enjoining the enforcement of the challenged

24  provisions of the Executive Orders.  Here the balance of

25  equities in the public interests weighs strongly in favor of

issuing a TRO.

As an initial matter, the Court finds that the Government is in no way harmed by the issuance of a TRO which prevents it from enforcing restrictions that are likely to be found unconstitutional.  That comes straight from Leaders of a Beautiful Struggle versus The Baltimore Police Department, Fourth Circuit case in 2021.

And it is quote, "Well established that the public interest favors protecting constitutional rights."  In this case it would be really favors protecting the Constitution because the separation of powers aspects of the Court's ruling.  But further executive orders threat to harm -- these Executive Orders threaten to harm the lives of transgender youth, as well as access to medical care for entire communities if the hospitals decide to continue to provide care but lose significant federal funding.

Also, I'd be remiss if I didn't note that the TRO maintains the status quo.  The Plaintiffs have clearly established that they are entitled to a temporary restraining order and, thus, that motion is granted.

Now as to the scope, I think only a nationwide injunction can provide complete relief to the Plaintiffs who reside in many states.  The injunction applies nationwide to non-parties as well.

A court order should not cause confusion about which

1  companies or which providers are subject to a rule and which are

2  not.  A court order has to be clear and definite.  And with this

3  principle in mind, I find that a piecemeal approach is not

4  appropriate in this case.  Significant confusion would result

5  from preventing agencies from conditioning funding on certain

6  medical institutions while allowing conditional funding to

7  persist as to other medical institutions.

8       And while the TRO is nationwide in scope, it is limited in

9  that it simply preserves the status quo without requiring the

10 agency to take any affirmative action.

11      Additionally, I should note that PFLAG and GLMA are

12 organizational Plaintiffs suing on behalf of their members.

13 "When associations prevail in obtaining injunctive relief it can

14 reasonably be supposed that the remedy, if granted, will inure

15 to the benefit of those members of the association actually

16 injured."  That's a quote from Warth versus Seldin.

17      Here PFLAG has members who, quote, "Currently receive or

18 will soon need to access the medical treatment for gender

19 dysphoria that the Executive Orders speak to prohibit," end

20 quote.

21      Additionally, GLMA includes many health professionals, this

22 is a quote, "Who work in medical institutions receiving grant

23 funding from Defendants HRSA and NIH, as well as other

24 subagencies of Defendant HHS," end quote.  The members of PFLAG

25 and GLMA are located throughout the county.

1      Further, a nationwide injunction against the relevant

2  portions of the Executive Orders is appropriate and necessary

3  because the orders concern a policy of national importance;

4  healthcare to transgender youth, a segment of population, and a

5  potentially even larger segment of the population if a hospital

6  lost funding to deny care to even more people.

7      So for the reasons stated here, and that I will add in an

8  opinion to be issued later, it's ordered that the Plaintiffs'

9  motion for a temporary retraining order at ECF 35 is granted.

10      It's further ordered that Defendants, the U.S. Department

11  of Health and Human Services Acting Director Dorothy Fink;

12  Health Resources and Services Administration Principal Deputy

13  Diana Espinosa; National Institutes of Health and Acting

14  Director Matthew J. Memoli; National Science Foundation and NSF

15  Director Panchanathan; and the subagencies of Defendant HHS,

16  their officers, agents, successors, servants, employees, and

17  attorneys, and other persons who are acting or are in active

18  concert or participation with them are restrained from

19  enforcing, implementing, or applying section 3(g) of the

20  Executive Order 14,682 to enforcing, implementing, or applying

21  section 4 of Executive Order 14,187, or otherwise conditioning

22  or withholding federal funding based on the fact that a

23  healthcare entity or health professional provides

24  gender-affirming medical care to a patient under 19.

25      It is further ordered that Defendants must provide written

1   notice of the Court's temporary restraining order to all
2   agencies to which the Executive Orders were addressed.
3   The written notice shall instruct those agencies that they may
4   not take steps to implement, give effect to, or reinstate under
5   a different name the directives in section 3(g) of the Gender
6   Identity Order, or section 4 of the Denial of Care Order with
7   respect to the disbursement of federal funds under open grants.

8        Shall also instruct those agencies to release any
9   disbursements of funds than were paused due to the Executive
10  Order.

11       It is further ordered that Defendants shall file a status
12  report on or before February 20, 2025 apprising the Court of the
13  status of its compliance with this order, including by providing
14  a copy of the written notice described above.

15       And it is further ordered that the parties shall meet and
16  confer and file a joint status report proposing a preliminary
17  injunction briefing schedule on or before February 18th, 2025.

18       It's further ordered that the security requirement is
19  hereby waived because Defendants will not suffer any cost from
20  the preliminary injunction, and imposing a security requirement
21  would pose a hardship for Plaintiffs.

22       Now this is scheduled to last for 14 days.  Like I said,
23  soon after I'll issue this written order and an opinion that
24  more fully explains the reasons.  And I would ask that if you do
25  wish to extend the TRO you speak with each other about that, and

1    that would probably be factored into the scheduling on the

2    preliminary injunction.

3         Just a question for the Government would be whether there's

4    an intention to appeal the TRO, or if you're going to try to

5    wait or do you need some time to think about that.  I know

6    there's been efforts to appeal in some other areas that maybe

7    haven't gone anywhere because of the nature of the order.

8         I will say the memo opinion I intend to issue will be

9    robust, perhaps more so than some of the others, at least I'm

10   trying to work on it now and that's my intention, but do you

11   have any thoughts on what you're intending to do?

12             MR. GRAVER:  I don't think we can make a commitment

13   either way.

14             THE COURT:  Okay.  All right.  That's fine.

15        All right.  Anything further from the Plaintiffs?

16             MR. BLOCK:  No, Your Honor.

17             THE COURT:  Okay.  Anything further from the Defense?

18             MR. GRAVER:  No, Your Honor.

19             THE COURT:  All right.  And let me just say to the

20   audience who is here today, I really appreciate your engagement,

21   your following the rules, and it continues as you leave the

22   courtroom.

23        Certainly you're welcome to talk about the case and talk

24   about the immediate outcome of this, but I'd ask that you

25   obviously maintain your respect through -- well, really

1    everywhere in life, but most particularly, I don't want this to

2    be a judicial order to wreak havoc around the world.  But just

3    as you're leaving the courthouse that's always important.  And I

4    appreciate everybody's attention here today.

5         Court is adjourned.

6              (The proceedings concluded at 3:32 p.m.)

7

8

9

10

11

12

13

14

15

16

17              CERTIFICATE OF OFFICIAL REPORTER

18         I, Kassandra L. McPherson, Registered Professional
     Reporter, in and for the United States District Court for the
19   District of Maryland, do hereby certify, pursuant to 28 U.S.C. §
     753, that the foregoing is a true and correct transcript of the
20   stenographically-reported proceedings held in the above-entitled
     matter and that the transcript page format is in conformance
21   with the regulations of the Judicial Conference of the United
     States.
22
                        Dated this 16 day of February 2025.
23
                        -S-
24              _____
                        KASSANDRA L. MCPHERSON, RPR
25                      FEDERAL OFFICIAL COURT REPORTER

**1**

**100** [1] - 33:15
**10004** [1] - 1:13
**10005** [1] - 1:16
**120** [1] - 1:15
**125** [1] - 1:13
**13** [1] - 1:7
**14** [3] - 82:8, 82:14, 90:22
**14,168** [1] - 5:7
**14,187** [2] - 6:1, 89:21
**14,682** [1] - 89:20
**15** [1] - 81:24
**1557** [3] - 53:7, 53:11, 53:17
**156** [1] - 66:11
**16** [1] - 92:22
**18** [3] - 57:15, 57:19, 64:8
**18th** [2] - 1:13, 90:17
**19** [12] - 6:18, 7:7, 10:5, 15:23, 27:2, 54:2, 56:16, 57:17, 57:19, 61:17, 64:8, 89:24
**19th** [1] - 1:15
**1:04** [1] - 2:1
**1A** [1] - 1:8

**2**

**20** [3] - 81:24, 82:24, 90:12
**20001** [1] - 1:21
**2019** [1] - 85:23
**2020** [1] - 77:19
**2021** [1] - 87:7
**2022** [1] - 85:13
**2023** [1] - 18:7
**2024** [1] - 18:6
**2025** [6] - 1:7, 5:6, 5:25, 90:12, 90:17, 92:22
**20th** [1] - 5:6
**21201** [1] - 1:24
**28** [5] - 82:6, 82:14, 82:15, 82:16, 92:19
**28th** [1] - 5:25
**29th** [1] - 1:18
**2:52-3:20** [1] - 83:5

**3**

**3(g** [8] - 5:12,

31:16, 56:15, 60:3, 60:11, 61:6, 89:19, 90:5
**3(g)** [1] - 76:8
**35** [1] - 89:9
**36** [1] - 1:23
**3:10** [1] - 83:3
**3:32** [1] - 92:6

**4**

**4** [12] - 21:14, 50:14, 53:24, 54:5, 56:15, 60:3, 60:6, 60:11, 61:5, 61:6, 89:21, 90:6
**4th** [1] - 1:23

**5**

**5** [5] - 5:20, 5:21, 16:3, 53:24, 53:25
**5054** [1] - 24:11
**51** [1] - 1:21
**525** [1] - 1:18

**6**

**60** [1] - 74:19

**7**

**7301** [2] - 5:19, 5:22
**753** [1] - 92:19

**8**

**8:25-cv-00337-BAH** [1] - 1:4

**9**

**9** [1] - 74:17
**90** [1] - 74:16
**911** [1] - 35:20
**94105** [1] - 1:18

**A**

**abandon** [3] - 54:13, 60:24, 86:8
**ability** [5] - 32:20, 38:1, 38:4, 54:14, 60:24
**able** [6] - 17:7,

32:13, 32:22, 32:23, 43:17
**abortion** [1] - 16:23
**above-entitled** [1] - 92:20
**absence** [1] - 74:2
**absent** [1] - 34:14
**absolutely** [3] - 15:11, 44:23, 78:14
**abstract** [7] - 33:5, 37:6, 37:7, 37:8, 51:16, 51:17, 70:6
**ACA** [8] - 8:1, 61:11, 61:13, 65:20, 65:22, 65:25, 70:22
**accelerated** [1] - 3:5
**accept** [2] - 72:21, 73:5
**acceptable** [1] - 3:25
**accepting** [2] - 10:22, 67:14
**access** [4] - 3:13, 85:21, 87:14, 88:18
**accomplish** [3] - 29:9, 32:13, 78:12
**accomplished** [1] - 84:4
**accomplishing** [1] - 18:11
**according** [3] - 6:13, 10:7, 70:25
**accordingly** [1] - 81:21
**achieve** [2] - 5:11, 8:12
**acknowledge** [1] - 72:16
**acknowledges** [1] - 59:4
**acknowledging** [1] - 75:24
**ACLU** [2] - 2:9, 2:13
**act** [1] - 20:11
**Act** [13] - 7:25, 8:1, 16:2, 17:8, 18:6, 18:7, 24:12, 55:10, 55:23, 61:7, 61:10, 61:23, 66:11

**acted** [1] - 7:18
**Acting** [2] - 89:11, 89:13
**acting** [1] - 89:17
**action** [18] - 12:8, 12:12, 13:7, 19:23, 20:4, 25:21, 26:5, 32:21, 46:6, 52:12, 54:11, 56:6, 56:8, 63:6, 65:3, 66:15, 67:20, 88:10
**Action** [1] - 2:4
**actions** [6] - 10:24, 13:6, 22:14, 25:20, 60:15, 65:8
**active** [1] - 89:17
**activities** [1] - 13:11
**activity** [1] - 53:12
**acts** [1] - 8:2
**Acts** [1] - 84:25
**actual** [10] - 15:14, 16:14, 19:3, 33:5, 36:10, 38:25, 39:1, 48:8, 58:1, 85:7
**ad** [1] - 81:6
**add** [5] - 18:17, 30:7, 59:21, 60:13, 89:7
**addiction** [1] - 72:10
**additionally** [3] - 85:8, 88:11, 88:21
**address** [7] - 13:2, 27:13, 32:2, 33:4, 75:7, 76:12, 82:17
**addressed** [1] - 90:2
**addresses** [2] - 56:24, 78:18
**addressing** [1] - 9:21
**adjourned** [2] - 83:3, 92:5
**administration** [3] - 20:20, 28:24, 38:20
**Administration** [3] - 7:3, 11:20, 89:12
**administrative** [3] - 11:25, 20:3, 20:21

**admitted** [1] - 56:13
**admittedly** [3] - 7:12, 55:11, 71:24
**ado** [1] - 5:4
**adolescence** [2] - 64:11, 86:1
**adopted** [1] - 60:25
**adults** [5] - 57:15, 63:17, 64:14, 84:21, 86:1
**Affairs** [1] - 22:24
**affected** [6] - 3:22, 20:3, 31:24, 39:23, 40:5, 81:22
**affects** [1] - 36:14
**affidavits** [1] - 72:22
**affiliated** [1] - 69:24
**affirmatively** [1] - 84:2
**affirming** [39] - 6:17, 7:6, 7:11, 10:4, 10:19, 15:7, 15:23, 16:19, 22:11, 27:1, 29:22, 31:4, 34:16, 38:19, 49:3, 54:1, 55:9, 56:16, 59:2, 60:3, 60:10, 61:6, 63:10, 67:8, 68:9, 71:20, 73:15, 75:16, 75:17, 76:5, 78:18, 83:21, 84:8, 84:12, 84:15, 84:24, 85:2, 86:4, 89:24
**agency** [18] - 5:15, 12:8, 12:12, 13:9, 13:10, 13:23, 16:10, 20:4, 33:16, 41:23, 48:24, 50:2, 52:7, 52:11, 54:2, 56:6, 56:8, 88:10
**agents** [1] - 89:16
**agree** [8] - 23:1, 23:2, 23:11, 31:21, 33:24, 67:15, 74:6, 79:20
**agreeing** [1] - 22:20
**ahead** [3] - 25:2, 27:12, 32:3
**Aid** [1] - 61:18
**aided** [1] - 1:25
**Air** [1] - 85:12
**airport** [2] - 40:21, 40:23
**al** [4] - 1:3, 1:5, 2:4, 2:5
**Alabama** [2] - 57:18, 57:21
**Albaugh** [9] - 19:18, 19:21, 23:25, 24:1, 51:1, 51:3, 51:5,

63:7, 63:8, 63:9, 63:19, 63:21, 64:11, 64:13
**Agencies** [1] - 43:16
**agencies** [44] - 6:5, 6:23, 7:24, 10:2, 15:13, 15:14, 20:2, 20:11, 24:10, 28:9, 28:14, 29:2, 29:4, 29:15, 33:8, 39:8, 41:5, 42:16, 44:21, 46:2, 47:19, 47:20, 47:25, 48:13, 48:15, 48:16, 51:23, 52:8, 53:16, 54:6, 54:11, 56:4, 67:5, 67:19, 69:1, 74:18, 78:7, 78:23, 84:14, 88:5, 90:2, 90:3, 90:8

51:18, 51:20
**allegation** [2] - 7:17, 8:5
**allegations** [1] - 7:22
**allege** [2] - 7:2, 8:3
**alleged** [1] - 7:10
**allow** [4] - 11:10, 37:17, 82:16, 84:5
**allowed** [2] - 3:19, 22:12
**allowing** [2] - 17:13, 88:6
**allows** [1] - 43:3
**alluded** [1] - 57:23
**almost** [5] - 17:24, 30:5, 37:21, 55:2, 79:6
**alone** [1] - 85:18
**alright** [1] - 34:6
**alter** [1] - 17:21
**alternate** [1] - 10:20
**alternative** [3] - 13:4, 13:17, 58:6
**altogether** [1] - 86:4
**amend** [1] - 13:2
**amended** [3] - 12:15, 12:17, 12:24
**Amendment** [3] - 3:15, 16:22, 17:8
**America** [3] - 5:19, 54:19, 54:20
**American** [1] - 1:12
**Americans** [1] - 60:20
**analogies** [1] - 35:18
**analysis** [1] - 57:2
**Angeles** [1] - 50:7
**animus** [9] - 23:20, 23:22, 60:16, 62:3, 62:6, 62:9, 62:19, 62:22, 63:7
**announced** [1] - 32:22
**announcement** [1] - 14:12

**answer** [7] - 12:23, 25:25, 45:14, 57:7, 57:15, 64:16, 77:10
**answered** [1] - 58:22
**answers** [1] - 57:6
**antidiscriminati on** [2] - 7:25, 8:2
**anyway** [2] - 50:25, 82:13
**APA** [4] - 12:15, 12:18, 13:5, 13:18
**apart** [3] - 60:13, 61:2, 61:15
**appeal** [2] - 91:4, 91:6
**appealing** [1] - 14:25
**appear** [1] - 31:4
**applicable** [7] - 6:24, 11:6, 39:6, 39:7, 44:9, 45:2, 65:7
**application** [4] - 30:24, 36:21, 48:11, 48:12
**applications** [3] - 46:11, 47:21, 53:9
**applied** [5] - 12:13, 40:3, 47:24, 62:23, 84:10
**applies** [6] - 46:9, 48:24, 50:15, 51:3, 59:13, 87:23
**apply** [8] - 4:20, 33:7, 35:6, 38:11, 57:5, 70:14, 70:16, 75:1
**applying** [7] - 13:8, 31:15, 36:18, 62:7, 77:25, 89:19, 89:20
**appointments** [3] - 10:12, 35:24, 86:3
**appreciate** [7] - 3:9, 4:8, 27:22, 64:18, 83:11, 91:20, 92:4
**apprising** [1] - 90:12
**approach** [5] -

45:19, 59:12, 59:15, 59:17, 88:3
**appropriate** [30] - 6:6, 10:3, 11:24, 13:15, 20:5, 20:17, 23:1, 23:2, 28:15, 28:17, 34:4, 34:6, 36:3, 44:5, 44:6, 45:18, 45:21, 46:3, 48:13, 54:6, 63:4, 65:5, 76:16, 77:6, 77:20, 78:1, 78:13, 88:4, 89:2
**Appropriations** [1] - 17:8
**appropriations** [1] - 17:6
**approved** [1] - 9:2
**arbitrary** [4] - 13:20, 13:22, 13:23, 23:17
**area** [3] - 31:3, 64:6, 74:16
**areas** [2] - 75:24, 91:6
**arguably** [2] - 84:1, 85:15
**argue** [6] - 4:3, 9:18, 30:3, 30:6, 46:16, 49:6
**argued** [2] - 3:23, 58:13
**arguing** [2] - 17:25, 46:17
**argument** [20] - 14:6, 17:3, 19:6, 21:18, 23:11, 23:14, 26:3, 32:12, 52:9, 53:8, 58:23, 64:19, 65:23, 68:15, 68:25, 70:19, 71:19, 73:5, 77:24, 80:7
**arguments** [8] - 4:3, 9:3, 9:12, 9:15, 33:5, 79:23, 80:19, 83:7
**arise** [1] - 86:22
**arrangements** [1] - 10:20
**Article** [6] - 17:18, 43:20, 52:2,

84:4, 84:5
**artists** [1] - 50:6
**aside** [2] - 28:11, 48:16
**aspect** [4] - 42:23, 57:7, 79:1, 80:6
**aspects** [3] - 13:24, 52:23, 87:11
**assemble** [1] - 67:5
**asserts** [1] - 86:22
**assess** [7] - 5:16, 21:3, 41:23, 43:16, 46:3, 50:3, 51:9
**assigned** [1] - 60:19
**assistance** [3] - 4:14, 53:13, 61:8
**assistant** [1] - 22:24
**associated** [1] - 63:12
**association** [1] - 88:15
**associations** [2] - 7:15, 88:13
**assume** [3] - 48:16, 51:1, 57:17
**assuming** [5] - 5:1, 56:20, 58:25, 67:7, 82:7
**assumption** [1] - 82:10
**Atlantic** [1] - 85:23
**attach** [3] - 17:7, 84:1, 84:2
**attached** [1] - 85:16
**attaches** [1] - 83:25
**attack** [2] - 37:17, 80:5
**attain** [1] - 8:13
**attempt** [4] - 15:17, 18:18, 20:16, 84:18
**attempted** [1] - 18:3
**attempting** [1] - 18:14
**attention** [2] - 18:2, 92:4
**attorney** [1] - 77:13

**attorneys** [1] - 89:17
**audible** [1] - 4:2
**audience** [2] - 3:11, 91:20
**authority** [13] - 5:20, 6:9, 6:11, 7:18, 13:5, 17:12, 19:24, 42:20, 43:1, 58:18, 75:25, 76:3, 77:7
**authorized** [2] - 17:22, 26:6
**authorizes** [2] - 16:11, 77:5
**authorizing** [3] - 15:15, 15:19, 17:5
**Avenue** [1] - 1:21
**avenues** [1] - 34:17
**await** [1] - 25:9
**award** [3] - 12:11, 15:16, 29:7
**awarded** [2] - 29:1, 45:1
**aware** [1] - 81:9
**awfully** [1] - 37:5
**awhile** [1] - 73:22

### B

**backdrop** [1] - 42:16
**bad** [1] - 35:18
**BAH-25-00337** [1] - 2:4
**Baker** [2] - 85:23, 86:11
**balance** [5] - 8:20, 79:9, 86:19, 86:21, 86:24
**balancing** [4] - 55:14, 57:1, 72:20, 84:25
**Baltimore** [3] - 1:8, 1:24, 87:6
**ban** [6] - 7:11, 28:4, 28:5, 74:7, 74:9, 84:20
**banc** [1] - 78:10
**banning** [3] - 10:18, 19:4, 84:8
**barred** [1] - 45:19
**bars** [1] - 31:15
**based** [5] - 12:18, 14:7, 16:12, 60:11, 89:22

**basic** [4] - 62:20, 63:24, 64:1, 74:3
**basis** [13] - 8:7, 29:2, 29:10, 53:15, 55:4, 55:9, 55:15, 56:22, 57:5, 61:3, 70:24
**bear** [1] - 56:7
**beat** [1] - 47:17
**Beautiful** [1] - 87:6
**BEFORE** [1] - 1:10
**beg** [1] - 12:14
**begin** [2] - 9:11, 9:24
**beginning** [1] - 81:4
**behalf** [5] - 2:9, 2:13, 2:16, 81:20, 88:12
**Behalf** [2] - 1:11, 1:19
**behind** [3] - 38:14, 41:1, 50:19
**belief** [1] - 60:20
**believes** [1] - 42:23
**bench** [2] - 53:2, 53:3
**benefit** [4] - 37:16, 37:21, 52:14, 88:15
**best** [4] - 4:5, 9:10, 74:16, 74:20
**better** [2] - 26:15, 58:16
**between** [7] - 65:2, 69:20, 71:16, 80:10, 80:12, 85:2
**beyond** [9] - 16:22, 30:25, 31:20, 31:23, 38:16, 43:4, 50:15, 61:23, 85:17
**biased** [1] - 36:21
**bicameralism** [1] - 7:19
**Biden** [1] - 28:25
**big** [1] - 29:9
**Bill** [2] - 19:13, 19:14
**billion** [1] - 16:3
**bills** [3] - 17:6,

22:25, 23:4
**Bills** [1] - 18:5
**bind** [1] - 80:17
**binding** [6] - 19:21, 24:16, 58:18, 77:4
**Biological** [1] - 5:8
**biological** [2] - 64:10, 68:14
**birth** [4] - 60:19, 63:12, 68:14, 76:14
**bit** [27] - 3:5, 3:13, 8:12, 14:5, 28:2, 28:23, 29:21, 37:18, 47:6, 48:5, 51:2, 51:18, 54:14, 55:3, 55:12, 56:3, 64:2, 64:10, 65:9, 67:18, 68:9, 70:12, 80:18, 81:3, 83:10, 83:16
**blah** [3] - 42:10
**blanket** [2] - 16:3, 42:9
**Block** [6] - 1:17, 2:8, 2:16, 9:3, 9:11, 75:7
**BLOCK** [39] - 1:12, 2:8, 9:20, 9:24, 11:13, 11:18, 12:21, 12:23, 13:21, 14:14, 15:11, 16:7, 17:2, 18:16, 20:1, 21:8, 21:20, 21:25, 23:4, 23:13, 24:4, 24:6, 25:5, 27:3, 27:5, 27:13, 27:16, 27:19, 75:13, 75:19, 76:2, 76:10, 77:16, 78:9, 78:14, 82:5, 82:12, 82:14, 91:16
**blockers** [2] - 68:12, 73:16
**blow** [3] - 29:6, 33:18, 42:17
**board** [5] - 15:20, 16:9, 33:3, 42:9, 42:13
**Board** [1] - 84:7

**Boardman** [1] - 76:13
**bodies** [1] - 65:2
**boilerplate** [4] - 11:4, 11:9, 26:12, 33:21
**bolts** [1] - 36:2
**bone** [1] - 46:3
**books** [1] - 62:25
**Bostock** [4] - 18:18, 61:11, 61:12, 65:24
**Bostock-like** [1] - 65:24
**Boston** [1] - 10:12
**bottom** [1] - 82:20
**bound** [1] - 84:6
**branch** [8] - 3:17, 5:24, 13:11, 13:16, 43:22, 44:8, 52:18
**Brant** [1] - 58:3
**break** [3] - 52:23, 53:1, 81:24
**BRENDAN** [1] - 1:10
**brief** [10] - 7:8, 14:10, 25:19, 54:25, 57:25, 60:16, 64:10, 65:11, 68:4, 76:10
**briefed** [2] - 50:16, 82:6
**briefing** [8] - 38:9, 50:23, 75:9, 80:1, 82:17, 82:19, 84:17, 90:17
**briefs** [2] - 58:4, 85:25
**Bright** [2] - 52:5, 52:13
**bring** [8] - 15:8, 20:4, 20:5, 36:17, 40:6, 56:5, 70:7, 81:19
**Broad** [1] - 1:13
**broad** [3] - 38:21, 46:2, 57:24
**broader** [1] - 55:12
**brought** [2] - 3:2, 23:17
**brush** [1] - 38:21
**bullying** [1] - 72:9
**burden** [4] - 48:5, 59:12, 79:23, 80:18

**but..** [1] - 3:3

**C**

**CA** [1] - 1:18
**canceled** [2] - 10:19, 86:2
**cancelling** [1] - 10:12
**cannot** [9] - 7:6, 22:3, 29:17, 44:7, 53:15, 55:8, 60:22, 70:23, 85:9
**capacity** [1] - 12:25
**capricious** [4] - 13:20, 13:22, 13:23, 23:18
**Care** [13] - 6:3, 7:25, 10:2, 14:20, 16:2, 24:12, 55:10, 55:23, 61:7, 61:10, 61:22, 84:24, 90:6
**care** [94] - 6:17, 6:19, 7:7, 7:11, 10:4, 10:9, 10:17, 10:19, 15:7, 15:23, 16:19, 16:23, 19:5, 21:24, 22:4, 24:13, 26:20, 27:2, 27:8, 29:22, 30:4, 30:9, 30:12, 31:4, 34:17, 35:23, 37:21, 38:19, 39:25, 41:4, 41:7, 49:3, 54:2, 54:8, 54:16, 55:9, 55:11, 56:7, 56:16, 56:24, 57:5, 57:13, 58:4, 58:7, 59:1, 59:2, 59:4, 59:5, 59:6, 59:7, 59:17, 60:1, 60:8, 60:10, 60:23, 61:7, 63:10, 63:20, 64:15, 68:7, 68:8, 68:9, 68:16, 70:2, 70:21, 70:22, 71:20, 72:5, 72:14, 72:17, 73:15, 75:16,

75:17, 76:5, 78:18, 79:5, 83:21, 84:8, 84:12, 84:16, 84:21, 84:24, 85:2, 86:2, 86:4, 86:12, 87:14, 87:15, 89:6, 89:24
**carried** [1] - 20:20
**carries** [1] - 58:8
**carrying** [1] - 13:16
**cart** [1] - 64:21
**carve** [1] - 21:17
**case** [56] - 4:3, 4:6, 7:14, 8:9, 8:23, 8:24, 11:8, 18:8, 18:11, 19:2, 19:10, 19:20, 19:23, 19:25, 20:2, 23:17, 24:6, 24:7, 24:8, 25:17, 25:19, 25:23, 26:1, 28:5, 29:10, 34:23, 36:4, 36:10, 36:15, 40:16, 45:8, 45:9, 47:5, 50:16, 51:5, 59:19, 71:8, 71:22, 76:14, 76:16, 76:23, 77:12, 77:19, 78:9, 79:12, 84:3, 84:20, 85:13, 85:24, 86:10, 87:7, 87:9, 88:4, 91:23
**CASE** [1] - 1:4
**cases** [14] - 18:17, 19:2, 19:3, 19:7, 19:18, 24:1, 25:6, 40:15, 42:21, 46:5, 64:22, 65:1, 65:8, 71:22
**cashes** [1] - 52:15
**casts** [1] - 59:6
**categorical** [7] - 28:6, 30:23, 31:23, 33:3, 66:24, 74:5, 81:5
**category** [3] - 51:20, 73:2, 80:19

**causation** [2] - 25:18, 26:9
**caused** [1] - 27:8
**caution** [1] - 18:17
**cautious** [1] - 67:14
**CDC** [9] - 7:9, 12:1, 12:5, 12:19, 23:15, 30:2, 39:21, 39:24, 39:25
**cease** [2] - 10:17, 30:4
**celebrating** [1] - 11:1
**cell** [1] - 3:19
**certain** [15] - 11:22, 18:4, 23:7, 28:4, 38:17, 42:15, 44:21, 62:12, 62:24, 63:19, 63:21, 67:20, 69:11, 70:18, 88:5
**certainly** [13] - 4:8, 11:15, 14:5, 32:17, 39:21, 57:3, 58:17, 60:7, 61:14, 61:22, 64:6, 78:20, 91:23
**CERTIFICATE** [1] - 92:17
**certify** [1] - 92:19
**cessation** [1] - 49:6
**Chadha** [1] - 24:4
**challenge** [26] - 20:5, 25:10, 26:23, 30:24, 31:23, 32:16, 33:3, 34:24, 35:3, 35:5, 36:21, 38:4, 38:21, 39:4, 40:6, 41:8, 47:22, 47:24, 51:15, 51:17, 56:5, 61:16, 65:22, 65:24, 66:4, 73:25
**challenged** [3] - 74:14, 85:3, 86:23
**challenges** [1] - 35:4
**challenging** [2] - 31:7, 77:12

**change** [9] - 20:14, 22:9, 22:10, 32:20, 32:23, 44:20, 57:1, 57:2, 68:3
**changes** [2] - 18:20, 27:8
**changing** [1] - 41:12
**channels** [1] - 11:24
**chaotic** [1] - 79:6
**characteristics** [1] - 63:11
**charge** [1] - 74:15
**charges** [1] - 28:9
**charging** [1] - 43:21
**Charles** [1] - 1:23
**check** [2] - 27:11, 32:23
**Chemical** [1] - 6:1
**chemical** [2] - 6:7, 29:19
**Chief** [3] - 52:1, 62:6, 66:11
**Children** [3] - 6:1, 6:3, 18:6
**children** [5] - 6:8, 29:20, 71:25, 72:23, 86:7
**Childrens** [4] - 10:8, 10:11, 10:21, 10:22
**choice** [3] - 35:11, 69:12, 70:3
**choices** [1] - 21:1
**choose** [9] - 26:20, 63:14, 68:7, 68:10, 68:11, 68:16, 69:8, 69:9, 69:22
**choosing** [1] - 30:21
**chose** [1] - 84:2
**Circuit** [19] - 11:7, 18:9, 24:7, 24:23, 40:16, 40:25, 45:9, 47:6, 51:5, 55:15, 61:14, 70:23, 77:4, 77:5, 78:10, 79:12, 85:13, 85:19, 87:7
**circuit** [7] - 19:20, 53:18, 53:19, 55:23, 77:17, 78:3, 79:15

circuit's [1] - 77:24

Circuit's [1] - 86:11

circumstance [5] - 32:19, 35:9, 43:18, 46:8, 49:19

circumstances [11] - 35:7, 35:12, 36:3, 38:15, 47:17, 50:19, 51:17, 52:2, 62:24, 84:13, 86:10

cite [4] - 15:18, 15:25, 25:19, 43:21

cited [4] - 13:5, 15:14, 58:4, 71:21

cites [6] - 5:18, 6:9, 14:19, 19:19, 24:8, 43:1

cities [1] - 18:12

citing [1] - 17:11

citizenship [2] - 25:25, 76:14

City [3] - 18:8, 47:4, 47:5

CIVIL [1] - 1:4

Civil [2] - 1:12, 2:4

civility [1] - 47:12

claim [9] - 12:15, 12:18, 13:5, 13:18, 14:2, 23:16, 36:2, 37:5, 65:25

claiming [1] - 19:24

claims [6] - 7:17, 8:16, 37:3, 81:20, 83:23, 85:14

class [1] - 56:22

classify [1] - 57:19

Clause [1] - 61:18

clause [3] - 47:6, 76:7, 84:25

clauses [1] - 7:20

clear [23] - 5:21, 8:23, 14:7, 15:5, 29:16, 29:22, 29:23, 35:22, 40:25, 41:3, 46:22, 47:9, 47:12, 54:10,

55:25, 56:1, 56:20, 61:8, 61:15, 78:22, 84:13, 85:6, 88:2

clear-cut [1] - 47:12

clearer [1] - 33:25

clearly [2] - 76:12, 87:18

CLERK [2] - 2:3, 83:4

clients [3] - 10:17, 10:22, 25:14

Clinton [1] - 17:20

clock [1] - 41:25

clocks [2] - 24:24, 45:9

closer [3] - 17:23, 51:19, 72:24

closure [1] - 11:1

closures [1] - 10:14

clothing [1] - 4:16

co [1] - 2:10

co-counsel [1] - 2:10

Code [1] - 5:20

codify [1] - 22:25

coercing [2] - 55:24, 60:23

coercion [1] - 54:12

colleague [1] - 68:23

collect [3] - 29:9, 46:3, 65:6

colloquial [1] - 80:14

combatting [1] - 66:12

combine [1] - 33:14

coming [5] - 35:19, 38:21, 39:15, 49:16, 63:3

command [13] - 28:13, 30:4, 48:18, 51:8, 52:4, 54:10, 55:22, 62:22, 73:6, 73:8, 73:11, 74:5

commanded [1] - 51:13

commanding [1] - 49:6

commands [1] - 58:24

Commerce [1] - 25:19

commitment [1] - 91:12

common [2] - 47:2, 79:17

communications [1] - 15:13

communities [1] - 87:14

community [1] - 56:21

companies [1] - 88:1

compare [1] - 43:24

compatible [1] - 18:22

compelled [1] - 86:8

compelling [2] - 76:22, 84:3

complaint [5] - 12:16, 12:17, 12:24, 13:2, 40:14

complaints [1] - 4:17

complete [2] - 76:18, 87:22

completely [8] - 3:22, 3:25, 4:10, 12:11, 13:15, 17:6, 34:17, 76:6

compliance [2] - 26:14, 90:13

comply [3] - 14:23, 69:10, 76:17

Computer [1] - 1:25

Computer-aided [1] - 1:25

concede [1] - 74:23

conceivable [2] - 38:6, 48:12

conceive [1] - 51:16

concepts [1] - 18:21

concern [2] - 32:15, 89:3

concerned [2] - 25:24, 76:1

concerns [2] - 32:2, 78:19

concert [1] - 89:18

concertized [1] - 33:5

concluded [1] - 92:6

concrete [4] - 39:1, 46:7, 63:5, 65:7

concurrence [2] - 76:22, 77:8

condition [2] - 32:18, 61:9

conditional [1] - 88:6

conditioning [2] - 88:5, 89:21

conditions [17] - 5:16, 16:12, 17:7, 17:9, 20:14, 22:5, 22:9, 24:25, 31:18, 33:6, 35:9, 41:23, 42:12, 42:15, 50:3, 69:10, 69:20

conduct [4] - 5:23, 69:3, 69:11, 78:2

confer [1] - 90:16

conference [1] - 14:15

Conference [1] - 92:21

confine [2] - 36:15, 39:22

confines [1] - 36:10

conflict [4] - 7:24, 14:1, 53:17, 56:1

conflicts [4] - 12:5, 24:11, 24:14, 25:8

conform [1] - 78:2

conformance [1] - 92:20

confrontile [1] - 51:16

confusion [3] - 79:4, 87:25, 88:4

Congress [21] - 7:21, 16:16, 17:4, 17:6, 17:9, 17:17, 17:22, 18:2, 18:3, 18:4, 18:9, 18:14, 18:15, 18:24, 19:13, 19:14, 21:19, 23:5,

25:8, 37:1, 84:1

Congress's [3] - 24:14, 30:14, 36:25

Congressional [1] - 16:21

congressional [3] - 17:12, 19:23, 56:1

connection [1] - 5:1

consent [1] - 64:11

consequence [1] - 20:22

consequences [1] - 10:6

consider [4] - 13:24, 13:25, 16:13, 49:13

considered [1] - 18:10

consistent [20] - 11:5, 28:10, 28:11, 29:1, 29:2, 42:7, 44:6, 44:8, 45:1, 45:2, 45:19, 45:23, 48:13, 51:6, 51:25, 60:19, 62:12, 68:13, 69:3

Constitution [5] - 5:18, 6:10, 43:2, 84:5, 87:10

constitution [2] - 66:7, 66:9

constitutional [5] - 23:3, 23:5, 23:19, 85:14, 87:9

construe [1] - 13:17

contained [1] - 46:6

contemplated [1] - 64:4

contend [1] - 6:20

contending [1] - 46:12

context [9] - 11:18, 30:21, 30:25, 63:8, 63:9, 64:24, 75:14, 76:4, 85:19

continuance [1] - 60:1

continue [3] - 15:6, 17:1,

87:15

continued [1] - 59:25

continues [1] - 91:21

continuing [1] - 27:1

contract [1] - 19:20

contrary [2] - 13:21, 77:8

control [3] - 17:13, 77:18, 79:13

controlling [2] - 53:20, 55:22

controls [3] - 54:23, 61:9, 61:12

controversy [2] - 36:11, 36:15

conventional [1] - 48:3

conversation [6] - 56:3, 60:4, 61:19, 67:2, 67:7, 84:22

conversations [1] - 3:7

convertized [2] - 51:14, 73:24

cool [1] - 28:13

coordination [1] - 41:17

copy [1] - 90:14

core [2] - 23:23, 52:2

corners [2] - 43:23, 46:6

correct [7] - 33:15, 46:19, 50:11, 50:15, 59:19, 60:18, 92:19

correctly [2] - 24:19, 57:1

cost [2] - 45:20, 90:19

costs [1] - 29:7

couch [1] - 33:10

counsel [4] - 2:7, 2:10, 53:8, 53:21

countries [1] - 63:1

country [6] - 46:15, 57:22, 75:22, 77:2, 77:13, 86:1

county [1] - 88:25

**County** [7] - 18:8, 40:16, 40:19, 41:2, 47:5, 55:5, 84:7
**County's** [1] - 47:4
**couple** [4] - 3:18, 42:14, 56:25, 73:14
**coupled** [2] - 54:8, 74:17
**course** [9] - 13:5, 13:9, 13:23, 14:25, 15:16, 19:5, 47:4, 63:6, 69:3
**court** [16] - 19:8, 36:19, 39:6, 51:10, 52:9, 56:14, 58:3, 62:7, 74:9, 78:10, 83:8, 84:10, 87:25, 88:2, 92:5
**COURT** [146] - 1:1, 2:11, 2:14, 2:17, 2:21, 2:24, 3:1, 4:24, 9:23, 11:11, 11:15, 12:14, 12:22, 13:19, 14:4, 15:5, 15:24, 17:1, 17:23, 19:17, 21:2, 21:11, 21:21, 22:20, 23:6, 23:22, 24:5, 24:16, 26:17, 27:4, 27:10, 27:15, 27:17, 27:20, 27:24, 28:15, 28:19, 29:12, 30:2, 31:2, 31:6, 31:11, 32:1, 32:5, 32:8, 32:10, 33:9, 33:24, 34:6, 34:12, 35:15, 35:17, 36:23, 37:7, 37:11, 39:14, 40:8, 40:12, 40:18, 40:23, 41:14, 42:8, 42:19, 43:6, 43:9, 44:3, 44:11, 44:15, 45:3, 46:13, 46:20, 48:19, 48:22, 49:2,

49:5, 49:22, 49:25, 50:14, 50:24, 52:5, 52:20, 52:22, 52:25, 53:18, 55:1, 56:19, 57:17, 58:10, 58:12, 58:15, 58:20, 59:24, 61:11, 61:25, 62:2, 62:14, 62:18, 63:8, 64:5, 64:8, 64:13, 65:10, 65:13, 65:15, 65:18, 66:18, 67:1, 67:6, 67:21, 67:24, 68:3, 68:20, 68:23, 69:7, 69:13, 69:23, 70:19, 71:5, 71:18, 72:4, 73:3, 74:21, 75:4, 75:9, 75:17, 75:21, 76:9, 77:12, 78:5, 78:12, 78:15, 78:25, 79:8, 79:19, 80:5, 80:24, 81:9, 81:23, 82:9, 82:13, 82:20, 83:6, 91:14, 91:17, 91:19, 92:25
**Court** [22] - 2:3, 2:5, 3:16, 13:15, 13:17, 14:23, 19:3, 26:5, 31:22, 36:13, 47:23, 48:9, 49:17, 57:3, 77:10, 81:20, 83:4, 84:6, 86:20, 87:2, 90:12, 92:18
**court's** [2] - 52:7, 63:25
**Court's** [3] - 29:5, 87:11, 90:1
**courthouse** [1] - 92:3
**Courtroom** [1] - 1:8
**courtroom** [6] - 3:12, 4:1, 4:9, 4:13, 4:19, 91:22
**courts** [3] - 45:24,

52:6, 58:1
**cover** [3] - 68:1, 77:3, 84:11
**covered** [1] - 80:21
**create** [1] - 54:14
**created** [2] - 54:11, 54:12
**credible** [2] - 11:22, 39:5
**credibly** [2] - 30:3, 49:6
**crisis** [1] - 20:10
**criteria** [2] - 15:16, 16:19
**criterion** [1] - 16:16
**cross** [1] - 22:19
**cross-subsidize** [1] - 22:19
**CSOs** [1] - 4:16
**curious** [2] - 12:17, 59:7
**current** [1] - 82:19
**cut** [10] - 9:19, 11:24, 15:20, 26:20, 26:21, 35:2, 41:7, 42:6, 45:6, 47:12
**cut-off** [1] - 15:20
**cutting** [4] - 12:3, 21:3, 86:16, 86:17

## D

**D.C** [3] - 1:21, 10:12, 19:20
**dad** [1] - 67:24
**dangerous** [1] - 72:17
**Dated** [1] - 92:22
**days** [9] - 74:16, 74:19, 79:18, 82:6, 82:8, 82:14, 82:15, 82:16, 90:22
**de** [2] - 26:8, 77:2
**dead** [1] - 47:17
**deal** [2] - 40:2, 65:7
**dealing** [6] - 38:5, 48:1, 50:20, 62:10, 74:8, 81:12
**dealt** [1] - 25:2
**debate** [2] - 19:14, 29:24
**debated** [1] - 72:2
**decide** [5] - 4:2,

8:11, 44:13, 47:14, 87:15
**decided** [6] - 19:9, 19:11, 47:23, 57:3, 65:16, 82:6
**decision** [4] - 29:5, 46:17, 63:20, 63:22
**decisions** [1] - 84:6
**declaration** [3] - 10:7, 13:1, 15:21
**declarations** [1] - 64:20
**declares** [1] - 5:13
**decorum** [1] - 4:8
**deem** [1] - 66:12
**defect** [1] - 33:4
**Defendant** [3] - 7:2, 88:24, 89:15
**Defendants** [13] - 1:6, 1:19, 2:23, 2:25, 6:20, 77:22, 77:25, 84:18, 88:23, 89:10, 89:25, 90:11, 90:19
**Defending** [5] - 5:7, 21:12, 31:16, 41:21, 50:1
**Defense** [2] - 1:15, 91:17
**defer** [1] - 19:7
**deference** [1] - 52:8
**defiance** [1] - 19:12
**definite** [1] - 88:2
**definition** [1] - 57:21
**definitions** [1] - 29:22
**Dekker** [3] - 58:3, 58:10
**delegated** [2] - 13:9, 17:16
**delegates** [1] - 16:13
**deliberative** [1] - 59:15
**demand** [1] - 23:7
**democratic** [6] - 18:25, 19:7, 19:9, 19:10, 19:13, 19:15,

**Denial** [4] - 6:3, 10:1, 14:20, 90:6
**denial** [3] - 58:5, 84:24, 86:12
**denied** [1] - 60:9
**deny** [3] - 55:8, 62:15, 89:6
**depart** [1] - 86:11
**Department** [6] - 25:18, 48:25, 49:1, 49:2, 87:6, 89:10
**Deputy** [1] - 89:12
**deputy** [1] - 5:3
**describe** [1] - 79:2
**described** [3] - 62:15, 72:22, 90:14
**describes** [1] - 21:14
**describing** [2] - 35:5, 42:14
**design** [1] - 78:8
**desire** [1] - 44:21
**desired** [1] - 15:9
**despite** [1] - 4:4
**detail** [2] - 25:17, 83:16
**details** [2] - 66:17, 68:9
**determine** [2] - 47:9, 52:10
**develop** [3] - 29:10, 37:17, 46:4
**developing** [1] - 26:25
**development** [1] - 52:3
**develops** [2] - 48:25, 63:11
**Diana** [1] - 89:13
**dictated** [1] - 72:11
**differ** [1] - 64:25
**difference** [5] - 66:23, 80:9, 80:10, 80:12, 85:1
**different** [19] - 38:7, 38:10, 39:10, 40:7, 42:11, 43:12, 43:13, 43:14, 46:11, 47:14, 49:18, 63:1, 63:18, 75:2, 80:15, 84:13,

84:22, 90:5
**differently** [2] - 44:15, 66:24
**difficult** [6] - 3:13, 35:17, 71:23, 72:21, 79:1, 81:2
**digest** [1] - 75:10
**Diminished** [1] - 85:21
**direct** [5] - 7:24, 39:8, 41:12, 42:5, 64:1
**directed** [2] - 34:15, 40:19
**directing** [4] - 22:14, 31:17, 37:1, 84:14
**direction** [1] - 33:8
**directions** [2] - 20:9, 37:2
**directive** [8] - 7:10, 28:8, 31:15, 33:18, 40:20, 46:2, 62:12, 73:19
**directives** [4] - 23:9, 46:14, 73:23, 90:5
**directly** [4] - 11:7, 44:1, 44:3, 44:4
**Director** [3] - 89:11, 89:14, 89:15
**director** [1] - 41:17
**directors** [1] - 78:7
**directs** [4] - 5:15, 6:5, 6:14, 48:13
**disadvantaged** [1] - 54:20
**disagree** [6] - 42:3, 44:11, 47:18, 55:6, 67:15, 70:9
**disagreeing** [2] - 29:14, 44:16
**disagreements** [1] - 65:1
**disastrous** [1] - 20:22
**disbursement** [1] - 90:7
**disbursements** [1] - 90:9
**discrete** [4] - 46:5, 51:8, 52:4
**discretion** [2] -

16:13, 51:13
**discriminate** [3] -
53:15, 69:16,
70:23
**discriminating** [3]
- 8:6, 61:9,
70:25
**discrimination** [5]
- 7:22, 54:25,
55:3, 55:4,
55:24
**discriminatory** [2]
- 38:12, 68:5
**discuss** [1] -
45:12
**discussed** [1] -
70:11
**discussion** [6] -
45:9, 57:3, 63:4,
74:1, 76:10,
82:17
**disingenuous** [1]
- 30:5
**dispute** [6] - 8:24,
36:10, 39:1,
51:14, 73:24,
84:23
**disputing** [1] -
72:8
**disregard** [1] -
14:17
**distinct** [1] - 54:5
**distinction** [3] -
70:24, 71:1,
71:16
**distinctions** [1] -
71:14
**distinguish** [3] -
19:21, 19:25,
53:24
**distinguishes** [2]
- 19:2, 20:12
**distinguishing**
[2] - 24:1, 69:20
**district** [1] - 77:23
**DISTRICT** [2] -
1:1, 1:1
**District** [5] - 3:16,
14:23, 92:18,
92:19
**dive** [1] - 45:11
**DIVISION** [1] - 1:2
**DNEA** [1] - 75:20
**docket** [1] - 83:14
**documentation**
[3] - 85:16, 86:5,
86:9
**documents** [2] -
36:7, 73:23
**Doe** [2] - 57:16,

61:13
**Donald** [1] - 2:5
**DONALD** [1] - 1:5
**done** [8] - 3:7,
10:17, 15:19,
27:7, 55:9,
63:14, 81:14,
83:12
**door** [3] - 4:11,
66:16, 84:22
**Dorothy** [1] -
89:11
**doubt** [5] - 10:23,
12:6, 52:14,
59:6, 81:11
**doubts** [1] - 59:3
**down** [9] - 3:2,
4:12, 23:15,
27:22, 39:11,
46:25, 48:6,
72:15, 75:6
**Dr** [1] - 10:7
**draft** [1] - 81:17
**drew** [1] - 18:2
**drip** [1] - 60:16
**drug** [1] - 72:10
**due** [1] - 90:9
**during** [1] - 65:23
**Dylan** [1] - 57:16
**dynamic** [3] -
38:12, 40:7,
67:18
**dysphoria** [2] -
58:7, 88:19

## E

**easier** [1] - 9:18
**easiest** [1] - 48:14
**easy** [5] - 3:6,
28:6, 33:21,
47:9, 83:9
**ECF** [1] - 89:9
**EDELSTEIN** [2] -
1:17, 2:15
**Edelstein** [1] -
2:16
**education** [5] -
6:7, 10:4, 21:15,
29:19, 54:7
**Education** [2] -
1:15, 49:1
**effect** [9] - 10:16,
25:13, 25:20,
30:9, 61:1,
61:17, 72:7,
77:3, 90:4
**effective** [2] -
58:5, 58:6
**effectively** [1] -

45:5
**effects** [9] -
10:24, 14:8,
25:14, 26:13,
32:17, 33:2,
38:24, 56:9,
61:1
**effectuate** [1] -
44:21
**effort** [2] - 3:10,
73:8
**efforts** [2] - 4:8,
91:6
**either** [9] - 6:4,
13:18, 15:12,
16:1, 24:21,
42:1, 61:5,
82:14, 91:13
**eliminates** [1] -
12:6
**elsewhere** [2] -
10:12, 10:13
**email** [22] - 7:5,
12:19, 14:11,
14:12, 14:14,
14:16, 21:10,
29:25, 30:2,
34:1, 34:7,
34:10, 34:12,
35:6, 37:15,
37:18, 37:24,
37:25, 39:16,
39:21, 39:22,
39:23
**emails** [8] - 34:1,
34:13, 38:5,
40:1, 40:2,
46:14, 47:20,
48:17
**emphasize** [3] -
41:10, 62:21,
67:17
**emphasizing** [1] -
71:13
**employees** [5] -
5:23, 17:13,
23:9, 43:3,
89:16
**EMS** [1] - 85:12
**en** [1] - 78:9
**enact** [2] - 17:3,
37:13
**enacted** [1] - 17:9
**enacting** [2] - 7:5,
16:21
**enacts** [1] - 42:22
**end** [15] - 9:14,
10:9, 12:6, 12:8,
33:21, 40:24,
46:1, 54:1, 54:8,

57:22, 85:22,
86:4, 86:8,
88:19, 88:24
**ending** [1] - 75:3
**Endowment** [1] -
50:5
**ends** [2] - 32:13,
59:1
**enforced** [1] -
59:9
**enforcement** [14]
- 25:9, 25:10,
35:3, 35:4, 35:5,
35:13, 39:4,
39:5, 40:6, 61:5,
73:25, 83:20,
85:11, 86:23
**enforcing** [4] -
31:15, 87:4,
89:19, 89:20
**engage** [2] -
55:24, 58:21
**engaged** [1] -
70:18
**engagement** [1] -
91:20
**England** [1] -
66:21
**enjoin** [2] - 48:6,
79:14
**enjoined** [1] -
85:5
**enjoining** [3] -
56:14, 83:19,
86:23
**Ensure** [2] -
21:12, 21:14
**ensure** [10] - 5:16,
6:6, 10:3, 21:3,
29:18, 41:24,
50:3, 54:6, 54:8,
73:9
**entire** [5] - 20:8,
20:23, 37:19,
57:22, 87:14
**entirely** [4] - 8:10,
23:1, 68:18,
84:22
**entities** [4] -
32:24, 36:7,
56:5, 75:15
**entitled** [5] - 5:7,
6:1, 56:21,
87:19, 92:20
**entity** [5] - 8:24,
15:22, 60:9,
76:4, 89:23
**enumerable** [2] -
39:9, 42:12
**envision** [1] -

16:18
**EO** [15] - 30:19,
31:16, 32:12,
32:16, 35:12,
36:17, 38:15,
42:4, 42:16,
42:19, 48:18,
48:24, 52:16,
53:9, 74:13
**EOs** [6] - 36:14,
39:8, 40:3,
46:11, 51:7,
51:20
**EPA** [1] - 23:16
**equal** [11] - 8:6,
9:5, 52:22,
55:13, 56:19,
65:21, 65:25,
66:5, 71:18,
72:20, 84:12
**equally** [1] - 84:10
**equitable** [1] -
13:14
**equities** [3] -
8:20, 86:19,
86:25
**eradicating** [1] -
5:12
**erase** [1] - 60:21
**erases** [1] - 60:21
**escape** [1] - 10:18
**especially** [7] -
23:13, 23:20,
25:11, 29:4,
30:19, 43:24,
76:16
**Espinosa** [1] -
89:13
**ESQUIRE** [6] -
1:12, 1:14, 1:17,
1:20, 1:22, 1:23
**essence** [1] - 16:5
**essentially** [27] -
4:25, 5:12, 7:11,
7:12, 7:20, 8:6,
13:19, 19:22,
24:20, 29:15,
32:12, 36:25,
37:19, 40:21,
45:23, 46:10,
47:1, 52:3,
52:17, 63:12,
67:19, 69:20,
71:12, 73:16,
78:12, 81:18,
84:18
**establish** [3] -
8:14, 8:15, 85:5
**established** [2] -
87:8, 87:18

**et** [4] - 1:3, 1:5,
2:4, 2:5
**Europe** [1] - 63:1
**Evac** [1] - 85:12
**evade** [1] - 11:10
**evading** [1] -
32:14
**event** [2] - 71:10,
71:24
**events** [1] - 32:20
**everywhere** [2] -
37:20, 92:1
**evidence** [8] -
18:13, 18:19,
18:22, 24:13,
57:23, 58:2,
58:6, 65:3
**exact** [3] - 28:13,
35:12, 35:21
**exactly** [4] -
35:20, 37:12,
51:11, 51:12
**example** [10] -
22:21, 22:24,
23:14, 25:6,
48:14, 48:22,
49:25, 68:10,
69:14, 70:22
**examples** [2] -
38:17, 38:23
**except** [4] - 17:12,
29:24, 37:15,
63:8
**excess** [1] - 7:18
**exclusively** [1] -
31:21
**excuse** [2] - 77:4,
86:17
**executed** [1] -
16:8
**executive** [9] -
13:16, 28:9,
29:2, 29:4, 43:3,
48:24, 52:18,
60:15, 87:12
**Executive** [53] -
5:6, 5:23, 5:25,
6:12, 6:20, 8:3,
8:5, 10:15, 11:4,
11:10, 11:17,
11:19, 12:5,
13:6, 15:13,
18:11, 18:13,
19:16, 19:22,
20:8, 23:16,
24:14, 24:18,
24:20, 28:7,
28:8, 29:6,
34:25, 36:22,
42:23, 43:2,

43:3, 43:22,
44:8, 48:1, 48:2,
54:10, 56:13,
60:2, 66:19,
67:7, 83:21,
84:14, 85:3,
85:5, 86:24,
87:12, 88:19,
89:2, 89:20,
89:21, 90:2,
90:9
**exercising** [1] -
3:14
**exhibition** [1] -
50:6
**exist** [1] - 62:16
**existing** [1] -
50:20
**exists** [1] - 62:16
**expand** [1] -
82:16
**experience** [1] -
58:9
**expert** [1] - 51:23,
58:2
**expires** [1] - 82:7
**explain** [4] -
25:17, 55:18,
75:1, 80:1
**explaining** [1] -
46:10
**explains** [2] -
66:12, 90:24
**explicit** [1] - 53:11
**exploration** [1] -
61:5
**explore** [8] -
28:20, 45:5,
53:16, 53:23,
54:3, 54:4,
62:11, 67:20
**exploring** [2] -
43:22, 53:9
**express** [1] -
16:15
**extend** [1] - 90:25
**extended** [2] -
82:7, 82:10
**extent** [9] - 6:24,
13:10, 24:10,
24:17, 34:10,
49:19, 71:7,
73:23, 77:24
**external** [1] -
67:18
**extraordinary** [3]
- 79:17, 79:20,
79:22
**extreme** [1] -
72:23

**extremely** [1] -
72:18
**Extremism** [1] -
5:8

**F**

**face** [2] - 42:10,
85:4
**facial** [12] - 30:24,
31:23, 32:7,
33:3, 34:25,
36:21, 38:21,
39:10, 51:15,
51:17, 66:3,
81:5
**facially** [2] - 11:9,
25:7
**facilities** [1] -
38:17
**fact** [19] - 13:25,
18:2, 18:9,
18:18, 18:24,
22:5, 27:5, 27:8,
32:16, 39:9,
46:17, 59:6,
63:16, 74:23,
75:11, 77:25,
84:20, 86:14,
89:22
**facto** [2] - 26:8,
77:2
**factor** [1] - 73:10
**factored** [2] -
57:8, 91:1
**factors** [10] - 8:14,
8:25, 55:15,
59:9, 63:23,
72:20, 79:2,
79:3, 83:19,
85:15
**facts** [5] - 29:9,
35:6, 43:16,
46:3, 74:4
**fair** [2] - 15:24,
32:8
**fairly** [1] - 11:16
**fall** [3] - 9:13,
51:20, 81:5
**false** [1] - 60:20
**familiar** [1] -
40:22
**Families** [1] - 86:6
**fantastic** [1] -
3:15
**far** [5] - 18:10,
27:7, 37:3, 60:5,
65:22
**FARBER** [2] -
1:22, 2:22

**Farber** [1] - 2:23
**fatal** [1] - 66:4
**fault** [1] - 39:15
**favor** [3] - 83:19,
86:20, 86:25
**favorite** [1] -
18:17
**favors** [3] - 8:21,
87:9, 87:10
**fear** [4] - 11:23,
26:3, 26:7, 39:5
**February** [3] -
90:12, 90:17,
92:22
**FEBRUARY** [1] -
1:7
**fed** [1] - 42:14
**federal** [34] - 6:5,
6:7, 6:15, 6:21,
10:2, 10:4,
16:23, 21:14,
22:3, 22:18,
27:1, 28:25,
29:16, 29:18,
30:14, 31:16,
33:7, 33:18,
35:7, 35:8, 39:9,
43:12, 45:24,
50:1, 51:21,
51:22, 53:12,
61:8, 75:15,
84:1, 84:14,
87:15, 89:22,
90:7
**Federal** [3] - 5:9,
5:13, 41:21
**FEDERAL** [1] -
92:25
**feelings** [2] - 4:5,
4:6
**fell** [2] - 26:22,
39:11
**few** [1] - 41:9
**fight** [1] - 36:8
**figure** [6] - 33:11,
43:17, 57:18,
69:17, 81:6
**file** [2] - 20:17,
36:4, 82:21,
90:11, 90:16
**filed** [1] - 7:9
**filing** [1] - 82:2
**fill** [1] - 86:3
**filming** [1] - 3:20
**Final** [1] - 12:7
**final** [3] - 12:12,
24:20, 85:9
**finally** [5] - 4:24,
8:5, 86:19
**financial** [2] -

53:13, 61:8
**fine** [5] - 3:22,
3:25, 4:11, 76:6,
91:14
**Fink** [1] - 89:11
**fire** [1] - 35:21
**first** [16] - 3:4,
8:15, 12:23,
15:15, 21:25,
41:10, 57:12,
60:7, 64:17,
67:17, 73:1,
73:2, 77:17,
77:21, 83:6,
83:22
**First** [1] - 3:15
**flag** [4] - 30:17,
31:1, 49:15,
50:24
**flagged** [1] -
27:23
**flagging** [1] -
31:13
**flatly** [1] - 42:8
**flights** [1] - 40:19
**flooding** [1] - 3:12
**Floor** [4] - 1:13,
1:15, 1:18, 1:23
**floor's** [1] - 53:5
**flush** [1] - 52:18
**fly** [3] - 40:21,
40:24, 81:17
**flying** [1] - 75:22
**focus** [3] - 38:9,
38:23, 84:19
**focused** [1] -
31:21
**fodder** [2] - 35:3,
73:25
**folks** [1] - 3:11
**follow** [10] -
14:12, 16:5,
20:17, 22:7,
29:15, 41:16,
53:4, 65:6,
77:20, 77:21
**follow-along** [2] -
77:20, 77:21
**follow-up** [1] -
14:12
**followed** [1] - 7:9
**following** [3] -
10:10, 20:21,
91:21
**Folwell** [1] - 84:8
**FOR** [1] - 1:1
**force** [2] - 32:11,
64:18
**forced** [1] - 86:7
**forego** [1] - 69:10

**foregoing** [1] -
92:19
**foremost** [1] - 3:4
**foreseeable** [1] -
56:9
**forget** [1] - 27:17
**form** [1] - 59:4
**formal** [3] - 32:21,
64:12, 69:5
**format** [1] - 92:20
**forth** [6] - 37:14,
45:7, 56:2,
57:25, 59:18,
60:15
**forward** [1] - 40:6
**Foundation** [1] -
89:14
**four** [4] - 8:14,
43:23, 46:6,
83:19
**fours** [1] - 57:13
**Fourth** [13] - 11:7,
24:7, 24:23,
45:9, 55:15,
70:23, 77:4,
78:10, 85:12,
85:19, 86:11,
87:7
**fourth** [1] - 8:22
**fraction** [1] -
47:20
**Francisco** [5] -
1:18, 18:8, 24:7,
47:5, 78:3
**frankly** [1] - 79:1
**free** [2] - 4:7, 4:18
**freer** [1] - 50:17
**freeze** [2] - 28:6,
33:22
**freezes** [1] - 43:25
**frequently** [1] -
18:10
**fresh** [1] - 47:9
**friend** [5] - 28:3,
35:2, 39:3,
42:14, 79:10
**friend's** [5] -
30:18, 31:21,
32:11, 33:15,
64:19
**friends** [5] -
36:20, 47:23,
48:10, 68:18,
71:13
**front** [2] - 3:14,
65:25
**frowning** [1] -
44:13
**full** [3] - 48:6,
48:20

**fully** [4] - 22:17,
58:22, 85:9,
90:24
**function** [1] - 7:19
**fund** [2] - 22:1,
49:3
**Fund** [1] - 1:15
**fundamental** [6] -
30:16, 31:13,
31:25, 32:7,
52:19, 66:23
**fundamentally** [3]
- 19:1, 40:7,
43:18
**funded** [1] - 12:10
**funding** [38] -
6:21, 15:22,
16:3, 16:5, 17:7,
17:25, 20:23,
22:16, 26:19,
26:21, 28:6,
30:14, 33:10,
33:12, 33:22,
34:7, 35:2,
37:20, 39:18,
41:4, 41:8, 42:6,
49:7, 50:9,
53:13, 54:17,
60:8, 67:8, 74:8,
84:1, 84:15,
87:16, 88:5,
88:6, 88:23,
89:6, 89:22
**funds** [30] - 5:13,
5:17, 6:19, 7:6,
12:4, 15:21,
16:12, 16:20,
16:23, 16:24,
20:21, 21:4,
21:13, 22:3,
22:17, 27:1,
29:16, 31:16,
37:1, 41:22,
41:24, 45:4,
45:6, 50:2, 50:4,
75:15, 76:4,
90:7, 90:9
**future** [3] - 34:20,
63:13, 63:17

**G**

**gather** [1] - 43:16
**gears** [1] - 68:3
**Gender** [9] - 5:7,
5:9, 5:13, 5:18,
14:20, 21:12,
50:1, 60:12,
90:5
**gender** [62] - 5:12,

5:14, 5:15, 5:17, 6:17, 6:18, 6:22, 7:6, 7:11, 10:4, 10:19, 12:10, 15:7, 15:23, 16:19, 21:4, 21:13, 22:1, 22:11, 27:1, 29:17, 29:22, 31:4, 31:17, 34:16, 38:19, 41:22, 41:24, 45:6, 49:3, 50:2, 50:4, 54:1, 55:4, 55:9, 56:16, 58:7, 59:2, 60:3, 60:10, 60:19, 61:6, 63:10, 67:8, 68:9, 70:24, 71:20, 73:15, 75:16, 75:17, 76:5, 78:18, 83:21, 84:8, 84:12, 84:15, 84:24, 85:2, 86:4, 88:18, 89:24

**gender-affirming** [39] - 6:17, 7:6, 7:11, 10:4, 10:19, 15:7, 15:23, 16:19, 22:11, 27:1, 29:22, 31:4, 34:16, 38:19, 49:3, 54:1, 55:9, 56:16, 59:2, 60:3, 60:10, 61:6, 63:10, 67:8, 68:9, 71:20, 73:15, 75:16, 75:17, 76:5, 78:18, 83:21, 84:8, 84:12, 84:15, 84:24, 85:2, 86:4, 89:24

**general** [7] - 11:20, 28:8, 29:8, 39:19, 47:7, 50:17, 62:12

**generally** [4] - 4:16, 5:9, 6:2, 9:19

**generals** [1] - 77:13

**Ginsberg** [1] - 52:1

**gist** [2] - 37:2, 37:4

**given** [3] - 27:6, 55:19, 84:6

**GLMA** [4] - 76:19, 88:11, 88:21, 88:25

**Gloucester** [2] - 55:5, 84:7

**goal** [8] - 28:9, 43:22, 44:6, 45:20, 52:17, 53:10, 72:21, 73:9

**goals** [5] - 18:11, 29:1, 37:13, 45:1, 59:6

**gonna** [2] - 32:7, 46:25

**GONZALEZ** [14] - 1:14, 2:12, 53:6, 53:19, 55:21, 57:10, 57:20, 58:11, 58:13, 58:17, 59:11, 60:1, 61:12, 62:1

**Gonzalez** [3] - 2:10, 2:13, 9:4

**GONZALEZ-PAGAN** [14] - 1:14, 2:12, 53:6, 53:19, 55:21, 57:10, 57:20, 58:11, 58:13, 58:17, 59:11, 60:1, 61:12, 62:1

**Gonzalez-Pagan** [3] - 2:10, 2:13, 9:4

**Googling** [1] - 3:8

**government** [13] - 7:6, 8:24, 9:7, 13:12, 26:2, 38:13, 41:1, 41:2, 50:8, 50:17, 51:22, 52:12, 64:2

**Government** [33] - 2:18, 3:17, 5:9, 10:25, 11:3, 12:10, 14:5, 14:10, 14:25, 15:18, 15:24, 16:16, 19:19, 20:24, 21:16, 23:8, 23:15, 25:3, 25:21, 26:18, 30:21,

48:25, 50:5, 56:25, 58:21, 60:22, 71:10, 76:15, 80:5, 84:20, 86:22, 87:2, 91:3

**Government's** [6] - 14:10, 47:8, 59:12, 69:22, 82:21, 84:11

**government's** [2] - 26:1, 26:3

**governmental** [5] - 32:19, 46:6, 65:3, 66:13, 66:15

**governments** [2] - 66:12, 66:16

**Governor** [1] - 10:15

**grab** [1] - 31:9

**grant** [32] - 5:16, 12:3, 15:16, 15:18, 17:5, 17:9, 21:3, 21:12, 30:20, 31:18, 33:6, 33:7, 34:7, 34:18, 35:9, 35:10, 39:3, 39:7, 41:23, 41:24, 42:12, 48:25, 50:3, 50:4, 53:14, 69:9, 69:10, 70:15, 75:20, 88:22

**granted** [4] - 8:19, 87:20, 88:14, 89:9

**grantee** [4] - 5:16, 21:3, 41:23, 50:3

**granting** [1] - 13:14

**grants** [31] - 6:7, 6:15, 10:4, 13:12, 14:19, 15:15, 15:17, 15:21, 16:17, 16:21, 21:15, 28:25, 29:7, 29:19, 38:6, 38:8, 38:18, 39:9, 40:5, 40:8, 42:10, 43:11, 43:12, 43:14, 44:25, 49:19, 50:20, 54:7, 75:14, 90:7

**granularity** [1] - 39:17

**grappled** [1] - 63:25

**Graver** [3] - 2:19, 27:21, 62:2

**GRAVER** [89] - 1:20, 2:19, 27:22, 27:25, 28:17, 28:20, 30:1, 30:15, 31:5, 31:9, 31:12, 32:3, 32:6, 32:9, 32:11, 33:13, 34:3, 34:9, 34:22, 35:16, 36:5, 37:4, 37:10, 38:3, 39:21, 40:10, 40:17, 40:22, 41:9, 42:3, 42:9, 43:5, 43:7, 43:10, 44:4, 44:14, 44:24, 45:14, 46:19, 47:16, 48:20, 48:23, 49:4, 49:15, 49:23, 50:11, 50:15, 51:4, 52:11, 52:21, 52:24, 62:5, 62:17, 62:20, 63:24, 64:7, 64:9, 64:16, 65:12, 65:14, 65:17, 66:2, 66:22, 67:3, 67:11, 67:23, 67:25, 68:17, 68:22, 68:24, 69:9, 69:19, 70:4, 71:2, 71:6, 72:3, 72:25, 73:21, 74:24, 75:8, 78:20, 79:7, 79:9, 79:21, 80:9, 81:2, 81:16, 91:12, 91:18

**great** [1] - 49:9

**green** [1] - 47:1

**Gregory** [1] - 66:12

**Grimm** [2] - 55:5, 84:7

**ground** [6] - 3:18, 29:10, 32:23, 33:2, 62:24,

63:5

**grounding** [1] - 71:8

**group** [1] - 57:24

**guess** [6] - 12:14, 33:20, 37:24, 43:19, 73:9, 73:18

**guidance** [3] - 36:7, 37:12, 73:23

**gun** [1] - 25:15

**gut** [1] - 72:12

**gut-wrenching** [1] - 72:12

**guys** [1] - 33:20

## H

**halt** [2] - 12:4, 73:12

**halting** [1] - 11:21

**hand** [3] - 27:18, 50:18, 51:8

**handful** [1] - 48:7

**handle** [2] - 9:8, 51:24

**handling** [2] - 9:3, 9:4

**hands** [1] - 55:3

**haphazardly** [1] - 7:13

**happy** [3] - 13:4, 54:23, 75:10

**hard** [11] - 3:8, 30:11, 45:17, 45:20, 54:18, 62:13, 63:5, 70:4, 72:19, 81:5, 81:16

**harder** [1] - 63:14

**hardship** [1] - 90:21

**harm** [14] - 8:18, 47:11, 56:12, 58:5, 85:4, 85:5, 85:6, 85:8, 85:15, 85:17, 85:20, 86:12, 87:12, 87:13

**harmed** [2] - 25:15, 87:3

**harms** [3] - 56:7, 86:21, 86:22

**harp** [1] - 45:16

**harping** [1] - 71:9

**harps** [1] - 53:22

**HARRY** [1] - 1:20

**Harry** [1] - 2:19

**Harvard** [1] - 29:5

**havoc** [3] - 54:11, 54:12, 92:2

**Hawaii** [1] - 62:8

**HB10075** [1] - 18:5

**HB1276** [1] - 18:6

**head** [2] - 4:6, 25:16

**Health** [5] - 7:2, 8:1, 89:11, 89:12, 89:13

**health** [6] - 53:12, 54:14, 79:5, 86:13, 88:21, 89:23

**Healthcare** [1] - 60:11

**healthcare** [9] - 53:25, 54:21, 61:17, 72:12, 85:21, 89:4, 89:23

**hear** [2] - 31:2, 78:15

**heard** [1] - 73:19

**hearing** [3] - 2:6, 26:18, 37:9

**HEARING** [1] - 1:9

**heavy** [1] - 80:18

**heightened** [1] - 75:1

**held** [3] - 85:19, 92:20

**help** [1] - 4:21

**helpful** [2] - 27:25, 82:25

**helps** [1] - 66:5

**hereby** [2] - 90:19, 92:19

**hero** [1] - 83:8

**HHS** [5] - 13:11, 24:12, 74:15, 88:24, 89:15

**hi** [2] - 2:19, 2:25

**HIAS** [17] - 11:8, 24:6, 24:8, 24:16, 24:17, 45:8, 45:11, 45:14, 45:17, 45:22, 46:4, 46:8, 46:20, 51:4, 51:9

**high** [3] - 38:10, 71:24, 85:21

**higher** [3] - 61:2, 70:12, 72:9

**himself** [1] - 56:10

**hind** [1] - 64:23

hoc [1] - 81:6
hold [3] - 22:16, 58:1, 73:4
holding [1] - 25:15
holds [1] - 45:19
honest [1] - 81:10
Honor [44] - 2:8, 2:12, 2:15, 2:19, 2:22, 9:20, 10:1, 11:13, 12:23, 13:4, 14:2, 16:7, 17:12, 18:16, 20:1, 21:25, 27:3, 27:19, 33:13, 36:5, 36:16, 41:13, 44:24, 49:4, 49:20, 53:6, 53:7, 53:21, 54:23, 55:21, 57:11, 58:11, 59:19, 60:13, 60:18, 61:4, 61:19, 62:1, 64:21, 67:3, 75:13, 82:5, 91:16, 91:18
HONORABLE [1] - 1:10
hope [1] - 11:15
hormone [1] - 68:11
hormones [1] - 73:16
horribly [1] - 72:16
horse [2] - 47:17, 64:21
hospital [6] - 20:22, 21:1, 22:3, 22:7, 22:11, 89:5
Hospital [3] - 10:8, 10:21, 10:22
hospital's [1] - 25:16
Hospitals [1] - 10:11
hospitals [22] - 6:16, 8:4, 10:13, 10:16, 11:2, 11:22, 21:22, 25:13, 26:25, 27:6, 27:7, 27:9, 29:23, 35:25, 46:15, 54:12, 55:24, 68:6, 69:23, 70:2,

86:15, 87:14
host [2] - 39:13, 72:9
hostage [1] - 22:16
hotly [1] - 72:1
hours [1] - 10:8
house [1] - 35:19
HRSA [9] - 7:3, 12:1, 12:19, 14:11, 14:18, 21:9, 30:2, 54:17, 88:23
huge [2] - 50:23, 65:2
human [1] - 58:8
Human [1] - 89:11
Humanities [1] - 50:6
HURSON - 1:10
Hyde [2] - 16:22, 17:7
hyper [1] - 70:6
hypothetical [4] - 29:13, 42:16, 44:19, 44:25
hysterectomies [1] - 68:10

**I**

ICE [2] - 26:1, 40:21
idea [8] - 12:16, 33:23, 34:12, 35:16, 47:7, 53:22, 62:11, 78:22
identified [2] - 75:5, 86:21
identifies [2] - 4:16, 44:5
identify [4] - 39:18, 39:19, 48:7, 84:9
identifying [1] - 42:14
identity [6] - 8:7, 55:4, 60:19, 60:20, 60:21, 70:24
Identity [5] - 5:10, 5:13, 5:18, 14:20, 90:6
Ideology [3] - 5:8, 21:12, 50:1
ideology [17] - 5:12, 5:14, 5:15, 5:17, 6:22,

12:10, 21:4, 21:13, 22:1, 29:17, 31:17, 34:16, 41:22, 41:25, 45:6, 50:2, 50:4
ignore [1] - 32:9
ignores [1] - 44:23
ignoring [1] - 30:6
II [5] - 17:18, 43:20, 52:2, 84:5
illegal [1] - 42:8
Imagine [1] - 28:25
imagine [8] - 32:19, 32:21, 42:4, 44:25, 46:11, 46:14, 62:23, 70:17
immediacy [1] - 41:11
immediate [14] - 10:6, 10:24, 14:8, 15:1, 26:14, 30:4, 42:1, 42:2, 42:3, 42:4, 58:24, 61:16, 73:11, 91:24
immediately [24] - 7:3, 7:4, 10:16, 11:24, 12:4, 12:11, 20:11, 28:15, 28:19, 28:20, 29:17, 30:12, 30:14, 34:1, 34:4, 41:15, 41:18, 42:6, 45:1, 45:4, 54:9, 57:10, 59:1, 72:5
Immediately [2] - 6:6, 10:2
immigrants [2] - 25:24, 26:4
imminent [1] - 85:7
impact [2] - 12:17, 77:14
impacted [1] - 7:14
implement [6] - 6:23, 7:24, 11:12, 20:2, 43:17, 90:4
implementation [3] - 48:2, 50:13, 83:20

implemented [6] - 7:4, 11:5, 39:12, 45:13, 46:24, 86:15
implementing [5] - 28:9, 31:15, 71:11, 89:19, 89:20
implicate [1] - 55:16
implicit [1] - 21:21
implied [1] - 16:15
implying [1] - 21:5
importance [1] - 89:3
important [11] - 9:14, 11:18, 12:2, 13:24, 25:23, 50:22, 66:10, 67:12, 70:10, 78:21, 92:3
importantly [1] - 30:13
imported [1] - 76:7
importing [2] - 64:23, 67:4
impose [2] - 19:11, 42:15
imposing [3] - 16:16, 19:12, 90:20
imposition [1] - 24:24
impossible [2] - 21:1, 35:11
improvision [1] - 54:1
IN [1] - 1:1
in-line [1] - 26:22
INA [1] - 51:12
inappropriate [1] - 78:10
Inc [3] - 1:3, 1:15, 2:4
include [1] - 78:6
included [1] - 59:20
includes [3] - 17:5, 65:22, 88:21
including [2] - 5:19, 90:13
inconsistent [1] - 13:7
incorrect [1]

26:4
incredibly [1] - 16:25
indicates [1] - 59:15
indicating [1] - 4:11
individual [3] - 12:25, 81:1, 85:22
individuals [3] - 80:1, 80:2, 84:8
ineffective [1] - 66:13
inexplicable [3] - 62:8, 62:22, 63:6
inform [1] - 74:14
information [1] - 81:14
initial [3] - 14:18, 74:21, 87:2
initiate [2] - 16:10, 26:21
initiated [1] - 84:20
initiating [1] - 12:3
initiatives [2] - 30:22, 50:18
inject [1] - 57:20
injunction [23] - 8:22, 14:23, 15:1, 15:2, 67:4, 74:18, 76:11, 76:14, 76:17, 76:20, 76:24, 77:2, 77:21, 78:4, 78:11, 80:16, 86:20, 87:21, 87:23, 89:1, 90:17, 90:20, 91:2
injunctions [2] - 77:5, 77:20
injunctive [2] - 59:22, 88:13
injured [1] - 88:16
injury [1] - 85:12
innovations [1] - 54:15
inquired [1] - 9:7
inserted [1] - 17:14
inside [1] - 4:6
instance [10] - 38:6, 38:11, 41:2, 46:1, 47:10, 48:1, 48:7, 59:24,

70:20
instances [4] - 35:1, 36:14, 36:16, 48:7
instead [2] - 6:23, 28:13
instituted [1] - 57:13
Institutes [1] - 89:13
institution [7] - 6:21, 7:13, 38:18, 54:7, 70:17
institution's [1] - 21:14
institutional [1] - 80:6
institutions [19] - 6:6, 6:16, 7:5, 8:4, 10:3, 29:18, 38:8, 38:25, 39:2, 60:23, 69:1, 70:21, 79:25, 80:3, 80:20, 84:15, 88:6, 88:7, 88:22
instruct [3] - 10:2, 90:3, 90:8
instructed [1] - 10:16
instructing [1] - 22:22, 44:21
instruction [2] - 53:22, 68:19
instructs [1] - 6:23
insurance [1] - 55:12
intend [4] - 53:1, 82:21, 83:15, 91:8
intended [9] - 10:23, 26:13, 26:16, 30:9, 30:12, 30:13, 54:17, 61:17, 72:6
intending [1] - 91:11
intent [4] - 43:23, 46:21, 46:23, 47:8
intention [4] - 53:3, 75:13, 91:4, 91:10
intentional [1] - 41:13
interest [4] - 8:22,

66:13, 86:19, 87:8
**interested** [2] - 23:24, 78:17
**interests** [3] - 59:18, 85:1, 86:25
**interfering** [1] - 24:12
**intermediary** [1] - 40:13
**intermediate** [4] - 56:21, 57:8, 59:10, 84:9
**internal** [1] - 67:18
**internal/external** [2] - 68:2, 71:15
**internally** [1] - 78:23
**interpreted** [1] - 78:2
**intervention** [1] - 18:24
**intimidated** [2] - 4:18, 4:21
**intricacies** [1] - 59:17
**intuition** [3] - 34:23, 69:19, 79:11
**inure** [1] - 88:14
**inverting** [1] - 48:5
**investigating** [1] - 15:8
**involve** [2] - 39:9, 65:1
**Iraq** [2] - 25:6, 78:9
**irreparable** [9] - 8:18, 85:4, 85:5, 85:8, 85:11, 85:15, 85:17, 85:20, 86:21
**Island** [1] - 14:24
**issuance** [2] - 60:2, 87:3
**issue** [36] - 3:23, 16:13, 23:14, 25:18, 26:23, 28:2, 29:15, 30:10, 31:22, 32:15, 33:22, 35:7, 35:14, 36:12, 36:18, 36:20, 40:13, 40:23, 47:13, 47:21, 50:25, 51:11, 55:13,

56:20, 58:25, 63:21, 75:5, 77:20, 78:11, 80:8, 81:25, 83:13, 83:15, 83:24, 90:23, 91:8
**issued** [10] - 5:6, 5:25, 10:1, 11:20, 12:1, 28:23, 47:20, 76:13, 89:8
**Issues** [2] - 9:21, 9:24
**issues** [6] - 4:17, 9:9, 35:4, 47:9, 77:11, 83:11
**issuing** [2] - 13:12, 87:1
**item** [1] - 17:24
**itself** [4] - 11:8, 30:22, 55:8, 60:18

**J**

**January** [2] - 5:6, 5:25
**Jenner** [2] - 1:17, 2:16
**job** [5] - 30:14, 49:9, 52:7, 54:25, 81:14
**joint** [1] - 90:16
**joints** [1] - 64:3
**Jones** [1] - 1:20
**JOSHUA** [1] - 1:12
**Joshua** [1] - 2:8
**jot** [1] - 33:16
**Judge** [6] - 52:1, 62:6, 66:11, 76:13, 76:22, 85:24
**judgment** [1] - 85:9
**judicial** [5] - 11:10, 32:14, 32:25, 46:8, 92:2
**Judicial** [1] - 92:21
**juggling** [1] - 29:21
**jump** [5] - 31:9, 31:19, 32:3, 40:13, 45:24
**juris** [1] - 84:10
**Justice** [2] - 76:22, 76:25

**justice** [6] - 29:1, 43:11, 44:19, 45:1, 77:9, 84:10
**Justiciability** [2] - 9:22, 9:25
**justiciability** [1] - 47:15
**justiciable** [1] - 39:1
**justification** [2] - 66:16, 86:10
**justifications** [2] - 57:23, 57:25
**justify** [1] - 59:12

**K**

**Kadel** [25] - 53:20, 54:23, 55:1, 55:3, 55:8, 56:20, 57:6, 58:22, 59:13, 61:9, 61:13, 65:16, 65:20, 66:1, 66:4, 66:11, 66:14, 66:16, 70:11, 74:6, 84:7, 84:10, 84:18, 84:23, 85:2
**Kassandra** [1] - 92:18
**KASSANDRA** [1] - 92:24
**Kavanaugh** [1] - 76:25
**Kavanaugh's** [1] - 76:22
**keep** [4] - 4:5, 38:21, 39:14, 70:5
**keeps** [1] - 41:11
**kept** [1] - 81:7
**key** [12] - 28:11, 28:17, 33:1, 33:20, 34:9, 36:9, 40:1, 40:3, 41:9, 45:16, 48:4, 71:8
**keywords** [1] - 54:8
**kick** [2] - 51:23, 52:18
**kind** [15] - 42:5, 43:12, 49:20, 51:6, 51:14, 55:18, 63:17, 64:23, 68:19, 68:25, 69:9,

69:21, 73:21, 74:5, 79:17
**King** [3] - 40:16, 40:19, 41:2
**knocking** [1] - 39:11

**L**

**L.A** [2] - 10:21, 10:22
**labor** [3] - 19:19, 42:21, 42:22
**lack** [2] - 59:14
**Lambda** [1] - 1:15
**language** [6] - 11:16, 41:15, 42:1, 49:10, 73:19, 75:25
**laptops** [1] - 5:1
**large** [1] - 50:25
**larger** [1] - 89:5
**last** [5] - 8:25, 14:15, 28:24, 47:16, 90:22
**late** [1] - 63:21
**Laughter** [1] - 4:23
**Laura** [1] - 2:15
**LAURA** [1] - 1:17
**law** [34] - 6:24, 8:23, 11:6, 11:12, 11:25, 13:20, 13:21, 16:5, 28:10, 28:11, 28:13, 29:2, 29:15, 33:16, 35:6, 39:7, 41:16, 42:7, 43:16, 44:7, 44:9, 45:2, 45:19, 46:4, 48:11, 48:12, 48:14, 51:25, 55:7, 62:12, 65:7, 69:4, 73:14, 78:2
**lawful** [6] - 22:21, 29:14, 36:15, 36:22, 36:24, 48:12
**lawfully** [1] - 66:17
**Lawrence** [1] - 57:16
**laws** [14] - 5:18, 9:6, 10:18, 17:19, 17:21, 19:3, 19:5, 23:10, 26:2,

33:7, 33:19, 35:8, 43:14, 51:22
**Laws** [1] - 6:10
**lawsuit** [3] - 20:5, 76:3
**lawyers** [2] - 4:4, 4:20
**layer** [1] - 14:4
**lead** [1] - 53:10
**Leaders** [1] - 87:5
**leads** [1] - 26:17
**learned** [1] - 7:8
**least** [17] - 17:25, 20:24, 21:22, 23:10, 23:12, 29:23, 31:14, 33:14, 34:11, 37:2, 45:18, 62:11, 64:23, 66:7, 74:12, 84:17, 91:9
**leave** [2] - 4:10, 91:21
**leaving** [1] - 92:3
**left** [2] - 11:21, 66:16
**legal** [9] - 29:3, 31:24, 38:7, 39:10, 42:11, 42:17, 50:9, 64:14, 79:3
**Legal** [1] - 1:15
**legally** [1] - 26:4
**legislation** [2] - 17:4, 18:10
**legislative** [2] - 7:19, 18:19
**Legislative** [1] - 22:24
**legislature** [1] - 19:4
**legislatures** [1] - 65:2
**legitimacy** [1] - 19:16
**legitimate** [2] - 59:4, 66:13
**lengthy** [1] - 65:1
**less** [4] - 44:3, 44:4, 78:20, 79:19
**letter** [1] - 12:20
**level** [5] - 28:2, 29:9, 38:10, 70:13, 71:24
**level-set** [1] - 28:2
**Liberties** [1] - 1:12
**life** [1] - 92:1

**light** [1] - 43:7
**lighted** [1] - 47:1
**likelihood** [2] - 83:22, 85:14
**likely** [6] - 8:15, 8:17, 9:10, 14:21, 15:4, 87:4
**limitation** [2] - 75:18, 78:18
**limitations** [2] - 50:23, 78:22
**limited** [2] - 16:24, 88:8
**line** [4] - 17:24, 26:22, 70:22, 82:20
**lion** [1] - 47:19
**Lisa** [1] - 44:12
**list** [1] - 54:3
**listened** [1] - 58:2
**literally** [2] - 36:2, 55:10
**litigation** [1] - 26:21
**lives** [1] - 87:13
**LLP** [1] - 1:17
**localities** [1] - 24:21
**located** [3] - 77:22, 77:25, 88:25
**location** [1] - 35:21
**Loe** [1] - 57:16
**logic** [2] - 70:11, 74:6
**logistics** [1] - 8:12
**look** [15] - 3:3, 16:14, 28:13, 30:9, 36:1, 44:22, 49:4, 51:9, 58:1, 66:18, 66:19, 73:10, 76:22, 80:24, 82:18
**looked** [1] - 58:2
**looking** [4] - 22:22, 40:15, 44:12, 71:9
**looks** [1] - 28:7
**Loper** [2] - 52:5, 52:13
**Los** [1] - 50:6
**lose** [7] - 21:5, 21:23, 39:18, 41:4, 47:22, 71:4, 87:15
**loses** [1] - 41:7

losing [2] - 56:6, 56:7
lost [3] - 16:4, 86:2, 89:6
Louisiana [1] - 1:21
love [2] - 34:13, 67:21
lower [2] - 13:16, 62:7
lucid [1] - 55:25

## M

main [2] - 51:6, 53:17
maintain [2] - 4:8, 91:25
maintains [1] - 87:17
majority [3] - 57:21, 62:24
Malpractice [1] - 18:7
managing [1] - 23:9
mandate [1] - 56:1
manner [6] - 9:16, 45:5, 58:23, 59:8, 73:12, 86:14
Market [1] - 1:18
markets [1] - 32:23
marshal [1] - 66:15
marshalled [1] - 80:20
Marshals [2] - 4:15, 4:19
MARYLAND [1] - 1:1
Maryland [4] - 1:8, 3:16, 10:18, 92:19
massive [1] - 51:22
material [1] - 23:8
matter [19] - 2:3, 2:5, 16:6, 16:14, 26:6, 26:10, 33:19, 42:10, 42:17, 53:13, 53:14, 64:12, 69:12, 76:17, 77:23, 87:2, 92:20
mattered [1] - 26:7

matters [2] - 16:1, 26:12
Matthew [1] - 89:14
Mauj [1] - 61:13
McPherson [1] - 92:18
MCPHERSON [1] - 92:24
McVey [1] - 85:12
MD [1] - 1:24
mean [25] - 14:11, 16:1, 21:18, 22:20, 24:17, 29:12, 29:24, 31:2, 34:16, 41:16, 45:16, 48:20, 48:23, 50:11, 50:21, 52:6, 55:1, 62:5, 65:10, 67:1, 68:1, 77:12, 79:1, 81:1, 82:9
meaning [3] - 18:20, 74:15, 85:8
meaningful [2] - 49:24, 80:12
meaningfully [1] - 39:12
means [6] - 13:15, 18:25, 22:10, 29:22, 36:21, 52:10
meant [1] - 40:10
measure [1] - 42:15
measures [1] - 63:2
meat [1] - 46:3
Medicaid [2] - 20:15, 22:6
Medical [1] - 18:7
medical [45] - 6:15, 6:16, 6:17, 10:9, 15:23, 16:19, 19:4, 22:4, 24:13, 28:4, 30:25, 31:1, 31:20, 38:8, 38:16, 38:25, 39:2, 40:11, 49:18, 50:16, 50:21, 54:2, 54:6, 56:16, 57:5, 58:7, 60:3, 60:10, 61:7, 70:17, 75:16, 76:5, 79:24,

86:4, 86:7, 86:12, 87:14, 88:6, 88:7, 88:18, 88:22, 89:24
medically [1] - 6:17
Medicare [5] - 20:15, 22:6, 22:8, 22:10, 22:12
medicine [2] - 30:20, 71:16
meet [3] - 56:11, 79:22, 90:15
meeting [1] - 72:12
meetings [1] - 3:8
meets [1] - 76:20
member [2] - 13:1, 81:21
members [12] - 31:24, 77:1, 77:3, 80:3, 80:15, 80:21, 81:20, 88:12, 88:15, 88:17, 88:24
membership [7] - 77:1, 77:6, 79:3, 79:24, 80:6, 80:7, 80:8
memo [2] - 14:21, 91:8
Memoli [1] - 89:14
memorandum [1] - 83:15
mention [1] - 74:13
mentioned [6] - 17:8, 22:5, 51:5, 64:9, 64:19, 79:10
mentioning [2] - 39:4, 71:15
merge [1] - 8:25
merits [2] - 8:16, 83:23
message [2] - 14:17, 41:3
messages [2] - 30:21, 50:18
messy [1] - 81:10
met [1] - 83:18
middle [3] - 59:5, 71:3, 72:15
might [14] - 11:13, 12:14, 14:15, 21:9, 36:16, 37:16, 38:19,

40:3, 43:17, 48:8, 49:16, 62:3, 64:25, 82:18
million [3] - 43:13, 46:11
mind [2] - 52:17, 88:3
minor [1] - 57:19
minority [2] - 20:25, 54:13
minors [8] - 7:11, 15:7, 16:20, 31:4, 56:24, 59:13, 64:3, 84:21
Minors [1] - 18:6
minutes [2] - 81:24, 82:24
minutia [1] - 50:20
misinterpreted [2] - 73:11, 73:18
mismatch [1] - 75:1
missed [2] - 18:2, 29:13
missing [1] - 55:20
Molissa [1] - 2:22
MOLISSA [1] - 1:22
moment [3] - 30:23, 32:9, 56:17
Mona [1] - 44:12
money [3] - 17:22, 38:13, 50:19
month [1] - 50:7
morning [3] - 2:8, 2:12, 22:22
most [2] - 66:10, 92:1
mostly [1] - 71:25
motion [5] - 7:1, 9:1, 87:20, 89:9
motions [2] - 2:6, 76:15
MOTIONS [1] - 1:9
motivated [1] - 23:20
move [4] - 9:12, 32:22, 49:12, 73:17
moved [1] - 61:21
must [6] - 12:4, 29:17, 85:6,

85:8, 86:20, 89:25
Mutilation [2] - 6:2, 18:5
mutilation [2] - 6:8, 29:20

## N

N.W [1] - 1:21
name [1] - 90:5
named [1] - 7:14
Nardone [1] - 2:25
NARDONE [2] - 1:23, 2:25
narrow [1] - 73:25
narrower [1] - 81:6
narrowing [1] - 38:25
nation [2] - 7:12, 80:15
National [3] - 50:5, 89:13, 89:14
national [2] - 80:7, 89:3
nationwide [17] - 28:4, 28:5, 37:19, 76:11, 76:13, 76:19, 76:21, 77:3, 78:25, 79:14, 79:16, 80:14, 80:16, 87:21, 87:23, 88:8, 89:1
nature [6] - 32:15, 47:22, 53:14, 60:16, 66:3, 91:7
necessarily [9] - 32:24, 37:16, 47:11, 52:7, 52:15, 58:24, 70:15, 75:10, 77:18
necessary [6] - 6:17, 15:3, 32:17, 59:2, 85:11, 89:2
need [14] - 4:10, 4:14, 15:3, 20:24, 23:21, 25:9, 36:22, 43:21, 48:5, 61:20, 71:11, 80:21, 88:18, 91:5

needed [3] - 26:8, 56:17, 59:22
needs [3] - 57:7, 82:6, 85:22
never [2] - 9:7, 26:21
New [5] - 1:13, 1:16, 10:13, 17:20, 24:6
new [2] - 10:22, 38:18
next [3] - 50:7, 74:19, 74:20
nice [6] - 2:11, 2:14, 2:17, 2:21, 2:24, 3:1
NICOLE [1] - 1:23
Nicole [1] - 2:25
night [3] - 3:7, 10:6, 82:3
NIH [1] - 88:23
Ninth [7] - 18:9, 40:15, 40:25, 47:5, 51:5, 61:14, 79:11
NO [1] - 1:4
nobody [2] - 37:15, 84:23
non [2] - 61:9, 87:23
non-discriminating [1] - 61:9
non-parties [1] - 87:23
nondiscretionary [1] - 33:22
nondiscrimination [1] - 84:25
none [3] - 27:11, 50:16, 73:17
nonmembers [1] - 80:20
nonparties [1] - 80:17
normal [3] - 3:22, 3:25, 20:3
NORTHERN [1] - 1:2
note [6] - 14:10, 14:18, 18:17, 18:18, 87:17, 88:11
noted [5] - 10:1, 17:12, 24:9, 85:10, 86:14
notes [2] - 1:25, 5:1
nothing [7] - 4:21, 13:25, 14:6,

30:20, 33:17, 58:24, 71:15
notice [16] - 10:8, 12:1, 12:6, 12:21, 13:24, 14:18, 20:17, 34:1, 37:15, 37:19, 39:16, 90:1, 90:3, 90:14
noticed [2] - 24:23, 78:5
notices [3] - 10:25, 12:2, 13:12
noting [2] - 10:15, 61:20
notion [1] - 54:22
November [1] - 58:13
NSF [1] - 89:14
nukes [1] - 37:19
number [4] - 2:4, 18:5, 72:2, 72:10
nuts [2] - 36:2, 69:16
NY [2] - 1:13, 1:16

**O**

object [1] - 13:18
objection [2] - 34:22, 39:10
objectionable [1] - 74:22
objective [1] - 5:11
objectives [1] - 22:25
obtain [1] - 48:10
obtaining [1] - 88:13
obviously [12] - 3:5, 19:20, 19:23, 26:25, 42:21, 79:13, 81:19, 82:6, 82:16, 82:25, 83:14, 91:25
occurred [1] - 59:15
odd [2] - 64:22, 67:4
OF [2] - 1:1, 92:17
offer [3] - 34:3, 34:25, 69:6
officers [1] - 89:16
OFFICIAL [2] -

92:17, 92:25
officials [2] - 13:16, 32:19
often [3] - 42:22, 77:19, 81:12
old [1] - 63:19
olds [1] - 57:16
Omar [1] - 2:12
OMAR [1] - 1:14
OMB [4] - 11:20, 14:21, 29:17, 41:18
Omnibus [1] - 17:8
on-point [2] - 11:7, 24:2
once [2] - 9:14, 66:11
one [51] - 3:19, 4:5, 6:4, 7:17, 7:23, 8:13, 8:16, 8:23, 11:13, 12:16, 14:9, 14:21, 18:1, 18:17, 19:1, 19:19, 21:6, 21:24, 24:21, 30:15, 36:12, 39:11, 40:15, 40:18, 41:7, 44:19, 45:10, 46:1, 46:24, 48:7, 50:22, 51:7, 61:20, 61:22, 63:25, 64:25, 67:22, 69:16, 70:7, 71:15, 72:8, 77:8, 77:21, 79:2, 80:8, 81:6, 81:12, 82:21
one's [1] - 26:19
ones [3] - 24:3, 51:24, 61:21
ones' [1] - 60:19
open [5] - 4:11, 50:7, 66:16, 84:22, 90:7
opinion [8] - 25:1, 53:4, 62:7, 83:15, 85:24, 89:8, 90:23, 91:8
opportunity [2] - 20:4, 73:16
opposed [2] - 56:24, 57:19
opposite [2] - 19:10, 48:8
opposition [2] -

15:18, 62:14
options [2] - 53:23, 54:3
oral [2] - 65:23, 83:14
Order [37] - 5:7, 5:10, 5:13, 5:18, 6:1, 6:3, 6:12, 10:2, 10:15, 11:4, 11:19, 18:11, 18:14, 19:16, 19:22, 20:9, 24:14, 24:18, 28:7, 28:8, 29:6, 34:25, 36:22, 48:1, 48:2, 50:1, 56:13, 60:11, 60:12, 67:7, 83:21, 85:5, 89:20, 89:21, 90:6, 90:10
order [116] - 5:11, 5:15, 5:21, 6:5, 6:9, 7:1, 7:5, 8:11, 8:13, 9:16, 10:6, 10:18, 10:22, 10:23, 11:8, 11:11, 14:8, 16:8, 16:9, 20:2, 20:11, 20:12, 20:13, 21:2, 22:1, 22:2, 22:5, 22:7, 22:13, 22:21, 25:7, 26:12, 26:13, 28:12, 30:7, 31:10, 31:14, 32:2, 33:9, 33:14, 37:23, 41:12, 41:14, 41:20, 41:21, 43:8, 44:5, 44:18, 44:25, 46:7, 46:22, 46:24, 47:3, 47:9, 48:10, 48:13, 49:4, 49:17, 50:12, 50:13, 53:25, 55:16, 55:24, 55:25, 56:10, 56:14, 56:17, 56:23, 57:22, 58:23, 59:1, 59:4, 59:8, 60:5, 60:6, 60:14, 60:18, 60:25, 62:11, 62:14, 62:23, 63:7, 63:16,

64:24, 67:8, 67:13, 67:19, 67:25, 68:1, 70:25, 71:10, 71:23, 72:4, 75:3, 75:5, 76:8, 77:3, 78:6, 78:24, 83:15, 83:19, 83:25, 87:19, 87:25, 88:2, 89:9, 90:1, 90:13, 90:23, 91:7, 92:2
order's [1] - 22:14
ordered [7] - 23:15, 89:8, 89:10, 89:25, 90:11, 90:15, 90:18
ordering [1] - 11:23
orders [21] - 7:4, 7:23, 7:24, 13:8, 13:17, 14:1, 14:20, 21:22, 23:7, 23:23, 25:12, 28:2, 29:16, 30:8, 30:12, 30:13, 61:16, 66:18, 85:3, 87:12, 89:3
Orders [15] - 6:20, 8:3, 8:6, 11:17, 12:5, 13:6, 15:13, 42:23, 43:2, 60:2, 86:24, 87:12, 88:19, 89:2, 90:2
ordinance [1] - 40:20
organization [2] - 77:1, 77:7
organizational [1] - 88:12
organizations [1] - 76:19
original [1] - 24:3
ostensibly [1] - 13:25
otherwise [4] - 30:6, 54:13, 60:24, 89:21
ought [1] - 49:11
outbursts [1] - 4:2
outcome [2] - 72:22, 91:24
outset [1] - 53:2

outside [3] - 3:20, 4:7, 11:24
overall [1] - 44:16
overarching [1] - 64:16
overbroad [3] - 70:20, 75:12, 78:21
overlapping [2] - 43:14, 51:22
overlook [1] - 51:10
overnight [2] - 28:4, 28:12
overrule [1] - 19:8
overruled [1] - 58:10
oversight [1] - 25:4
own [10] - 7:10, 7:20, 8:2, 16:2, 16:20, 16:24, 17:13, 23:9, 38:13, 50:19

**P**

p.m [3] - 2:1, 83:5, 92:6
PAGAN [14] - 1:14, 2:12, 53:6, 53:19, 55:21, 57:10, 57:20, 58:11, 58:13, 58:17, 59:11, 60:1, 61:12, 62:1
Pagan [3] - 2:10, 2:13, 9:4
page [1] - 92:20
pages [2] - 17:9
pamphlets [1] - 23:8
Panchanathan [1] - 89:15
paper [1] - 3:2
papers [2] - 4:3, 72:11
paragraph [3] - 20:10, 20:12, 60:7
paragraphs [1] - 42:6
parallel [1] - 28:21
paraphrase [1] - 42:6
paraphrasing [3] - 28:23, 65:15, 68:5

Parenthood [1] - 85:23
parents [1] - 72:13
parse [1] - 21:6
part [17] - 25:23, 29:13, 36:9, 43:19, 48:21, 51:12, 63:25, 66:6, 66:10, 67:4, 70:4, 70:8, 78:24, 79:25, 80:3, 80:23, 81:2
participate [2] - 22:7, 80:21
participation [4] - 20:15, 22:6, 22:10, 89:18
particular [8] - 19:24, 21:17, 27:9, 39:2, 53:10, 54:17, 80:25, 83:20
particularly [10] - 50:24, 53:18, 53:19, 65:20, 72:17, 73:15, 76:21, 77:6, 78:1, 92:1
parties [12] - 25:15, 25:21, 35:13, 36:17, 56:10, 76:18, 79:15, 80:12, 80:17, 83:1, 87:23, 90:15
parts [5] - 54:19, 54:20, 67:13, 74:12, 74:13
party [6] - 8:25, 32:6, 80:11, 80:13, 81:4, 81:7
pass [3] - 18:4, 18:6, 18:7
passed [6] - 18:19, 18:20, 18:25, 19:3, 25:8, 40:20
past [3] - 29:6, 33:18, 49:18
patient [1] - 89:24
patients [6] - 6:17, 21:1, 54:15, 68:12, 86:8, 86:16
patterns [1] - 39:9
pause [3] - 11:20, 14:21, 66:7

**paused** [1] - 90:9
**payments** [2] - 11:21, 11:23
**pending** [2] - 2:3, 58:14
**penny** [1] - 22:18
**people** [23] - 3:11, 3:14, 3:24, 7:7, 10:5, 15:23, 18:4, 20:3, 20:16, 22:17, 27:2, 28:22, 39:23, 54:2, 54:21, 56:6, 56:16, 57:24, 60:23, 61:17, 64:19, 83:9, 89:6
**per** [2] - 58:23, 69:2
**peradventure** [1] - 61:23
**percent** [1] - 33:15
**percentage** [1] - 72:2
**perfect** [1] - 43:7
**perfectly** [1] - 45:22
**performing** [2] - 38:8, 38:19
**perhaps** [5] - 33:25, 69:23, 71:16, 84:19, 91:9
**permanently** [1] - 12:11
**permits** [1] - 5:22
**permitted** [2] - 3:21, 6:24
**pernicious** [1] - 25:12
**persist** [1] - 88:7
**person** [1] - 63:15
**personal** [1] - 3:24
**persons** [1] - 89:17
**perspective** [2] - 69:22, 71:10
**persuasive** [2] - 58:18, 79:23
**pertain** [1] - 57:24
**pertaining** [1] - 61:22
**pertains** [5] - 23:11, 56:15, 60:2, 61:6, 83:21
**perverse** [2] -

54:12, 54:22
**PFLAG** [8] - 1:3, 2:4, 13:1, 76:19, 80:7, 88:11, 88:17, 88:24
**phase** [1] - 49:18
**phone** [2] - 10:11, 35:23
**phones** [1] - 3:19
**phonetic** [1] - 61:13
**PHSA** [1] - 8:1
**PI** [3] - 81:11, 82:2, 82:5
**pick** [2] - 3:6, 22:23
**picture** [1] - 29:9
**piece** [13] - 12:9, 28:11, 28:17, 33:20, 40:4, 49:15, 50:23, 66:7, 68:2, 75:23, 79:10, 81:4
**piecemeal** [1] - 88:3
**pieces** [1] - 41:10
**pitting** [2] - 20:25, 54:20
**place** [2] - 15:15, 36:25
**places** [2] - 64:13, 79:5
**placing** [1] - 60:22
**plain** [1] - 22:2
**plainly** [1] - 11:9
**plaintiff** [2] - 12:24, 85:20
**Plaintiff** [3] - 38:3, 41:6, 85:6
**plaintiff's** [1] - 85:22
**plaintiffs** [3] - 65:2, 84:3, 86:13
**Plaintiffs** [38] - 1:3, 1:11, 2:7, 2:9, 2:13, 2:16, 6:13, 7:2, 7:9, 7:10, 7:14, 7:15, 8:3, 8:13, 10:10, 35:22, 47:13, 52:9, 56:11, 64:14, 65:19, 70:25, 79:4, 80:25, 81:1, 81:18, 83:18, 83:23, 85:4, 85:13, 85:16,

85:25, 86:6, 87:18, 87:22, 88:12, 90:21, 91:15
**Plaintiffs'** [3] - 7:17, 9:1, 89:8
**Planned** [1] - 85:23
**play** [5] - 35:8, 60:17, 64:3, 67:22, 84:14
**plays** [1] - 67:24
**pleadings** [1] - 6:14
**plenty** [1] - 71:21
**plowed** [1] - 24:2
**plus** [1] - 49:13
**podium** [1] - 9:18
**Pogue** [2] - 10:7, 76:23
**point** [60] - 11:7, 11:15, 15:12, 16:3, 18:1, 24:2, 27:10, 30:17, 30:18, 31:13, 31:19, 33:1, 33:11, 34:9, 34:18, 39:6, 40:1, 44:16, 45:16, 47:16, 48:4, 49:12, 49:22, 49:24, 50:12, 50:22, 51:4, 51:6, 52:16, 58:19, 59:21, 59:22, 60:6, 61:13, 62:3, 62:5, 62:6, 63:24, 64:1, 66:25, 67:12, 69:5, 70:7, 71:2, 71:4, 71:6, 71:8, 72:13, 72:25, 73:5, 73:21, 74:2, 74:3, 74:22, 75:23, 76:2, 79:21, 80:10, 85:25
**pointed** [1] - 72:6
**pointing** [2] - 11:4, 41:16
**points** [4] - 30:15, 34:3, 56:25, 79:9
**police** [1] - 43:3
**Police** [1] - 87:6
**policies** [3] - 15:8, 43:13, 46:4
**policy** [26] - 6:24, 17:14, 28:8,

28:21, 29:8, 29:10, 32:22, 37:13, 43:22, 44:6, 44:20, 44:21, 45:20, 46:2, 51:8, 51:11, 52:3, 54:1, 62:12, 62:22, 63:5, 65:6, 65:7, 66:25, 67:20, 89:3
**political** [1] - 59:16
**population** [8] - 54:13, 61:2, 62:16, 72:8, 72:18, 72:24, 89:4, 89:5
**populations** [1] - 54:18
**portions** [4] - 22:21, 76:7, 85:2, 89:2
**portrayed** [1] - 41:13
**portraying** [1] - 28:3
**pose** [1] - 90:21
**posit** [2] - 60:4, 61:4
**position** [5] - 30:10, 34:21, 55:20, 59:16, 71:3
**possible** [3] - 13:2, 54:24, 69:2
**posture** [2] - 66:4, 74:1
**potential** [1] - 15:8
**potentially** [3] - 50:10, 53:1, 89:5
**poverty** [1] - 72:9
**power** [6] - 13:9, 17:3, 17:16, 17:19, 17:21, 24:22
**Power** [2] - 23:11, 23:13
**powers** [4] - 9:4, 19:15, 85:18, 87:11
**Powers** [4] - 9:12, 17:3, 37:3, 37:4
**practice** [1] - 21:15
**practices** [1] -

74:16
**pre** [8] - 35:3, 35:4, 35:5, 35:13, 39:4, 40:6, 52:5, 73:25
**pre-enforcement** [7] - 35:3, 35:4, 35:5, 35:13, 39:4, 40:6, 73:25
**pre-Loper** [1] - 52:5
**precedent** [6] - 11:7, 53:20, 55:22, 58:19, 77:5, 77:24
**precisely** [1] - 11:25
**precluded** [1] - 16:16
**predictable** [2] - 25:20, 26:13
**preference** [2] - 6:24, 82:15
**preferences** [3] - 5:16, 41:24, 50:3
**preliminary** [5] - 59:22, 86:20, 90:16, 90:20, 91:2
**prerogative** [1] - 52:2
**Prescribes** [1] - 5:22
**prescriptions** [1] - 86:3
**presence** [1] - 31:8
**present** [5] - 8:10, 62:21, 66:10, 79:15, 79:16
**presentation** [3] - 32:6, 81:4, 81:7
**presentment** [1] - 7:20
**preserve** [1] - 59:23
**preserves** [1] - 88:9
**President** [41] - 5:6, 5:21, 5:22, 5:25, 6:10, 6:11, 6:14, 7:18, 10:1, 11:23, 17:5, 17:10, 17:13, 17:14, 17:16, 17:19, 17:20, 17:21, 19:12,

19:24, 19:25, 22:18, 28:10, 28:25, 32:21, 33:17, 36:25, 37:13, 42:22, 43:1, 43:21, 44:7, 46:2, 47:25, 51:19, 56:10, 56:13, 72:6, 75:24, 78:6, 78:11
**President's** [10] - 6:23, 7:18, 11:1, 13:6, 13:8, 14:1, 15:9, 22:25, 26:15, 42:20
**press** [6] - 4:24, 4:25, 11:1, 26:15, 30:7, 31:24
**pressing** [5] - 31:22, 32:16, 36:20, 38:4, 49:20
**presumably** [2] - 20:15, 63:10
**pretty** [5] - 18:13, 35:18, 56:20, 64:17, 66:24
**prevail** [3] - 61:20, 61:21, 88:13
**preventing** [1] - 88:5
**prevents** [1] - 87:3
**previous** [1] - 14:17
**primarily** [2] - 18:23, 84:21
**Principal** [1] - 89:12
**principle** [1] - 88:3
**principles** [1] - 81:7
**priorities** [1] - 17:14
**priority** [2] - 54:1, 82:5
**privacy** [1] - 26:2
**private** [3] - 22:17, 35:13, 36:7
**problem** [7] - 13:24, 23:5, 32:15, 42:18, 66:14, 70:1, 81:8
**problematic** [1] -

22:23
procedure [1] - 21:17
procedures [6] - 16:11, 20:18, 20:21, 28:4, 30:25, 38:9
proceed [1] - 12:25
proceedings [3] - 4:25, 92:6, 92:20
proceeds [1] - 60:21
process [9] - 12:3, 15:7, 19:7, 19:9, 19:11, 19:13, 20:16, 72:12, 75:3
processes [1] - 20:3
Professional [1] - 92:18
professional [1] - 89:23
professionals [1] - 88:21
program [3] - 22:8, 22:12, 53:12
programs [7] - 12:10, 15:22, 30:20, 33:6, 39:19, 42:12, 86:4
prohibit [1] - 88:19
prohibiting [2] - 26:2, 26:5
prohibits [2] - 16:23, 24:12
promote [11] - 5:14, 5:17, 21:4, 21:13, 29:17, 31:17, 41:22, 41:24, 45:5, 50:2, 50:4
promotes [1] - 6:22
promoting [1] - 34:15
prompt [1] - 26:14
promulgated [2] - 5:21, 6:11
prong [1] - 85:20
pronounced [1] - 34:15
pronouncement [1] - 44:20
proof [1] - 26:15

proper [2] - 20:21, 34:24
properly [1] - 59:18
proposals [1] - 18:19
propose [2] - 19:13, 22:25
proposed [11] - 18:4, 31:14, 35:1, 44:17, 50:13, 60:5, 60:6, 67:13, 68:1, 76:8, 78:5
proposing [2] - 23:4, 90:16
proposition [1] - 45:11
prospect [1] - 85:10
protect [1] - 59:7
protected [1] - 56:22
Protecting [4] - 6:1, 6:3, 18:6, 48:24
protecting [4] - 30:19, 71:25, 87:9, 87:10
protection [13] - 8:6, 9:5, 15:3, 52:23, 55:14, 56:19, 65:21, 65:25, 66:5, 71:19, 72:20, 72:21, 84:12
Protection [1] - 61:18
provide [26] - 6:16, 16:19, 16:23, 22:3, 22:16, 22:17, 27:1, 28:1, 37:21, 39:17, 41:4, 53:3, 54:16, 68:7, 68:10, 68:16, 69:25, 70:2, 70:21, 70:22, 75:15, 76:18, 84:15, 87:15, 87:22, 89:25
provided [3] - 16:2, 68:11, 86:5
providers [8] - 40:5, 40:8, 40:11, 69:1, 72:12, 86:2, 86:7, 88:1

provides [8] - 6:22, 15:2, 15:22, 22:11, 54:7, 54:14, 76:5, 89:23
providing [8] - 10:9, 15:6, 26:20, 30:4, 34:16, 60:10, 81:14, 90:13
provision [5] - 19:4, 19:20, 43:2, 56:15, 70:13
provisions [13] - 8:2, 20:13, 23:6, 23:19, 24:13, 30:24, 31:6, 31:7, 36:23, 36:24, 47:21, 83:25, 86:24
prudence [1] - 84:11
puberty [3] - 63:11, 68:12, 73:15
Public [1] - 8:1
public [5] - 8:22, 14:12, 86:19, 86:25, 87:8
published [1] - 7:4
purport [2] - 6:21, 13:8
purpose [3] - 6:18, 24:14, 68:13
purposes [7] - 2:6, 15:17, 16:21, 62:21, 66:11, 67:6, 73:6
pursuant [2] - 15:14, 92:19
pursue [1] - 80:2
pushed [1] - 72:24
pushing [2] - 51:15, 71:12
put [8] - 30:22, 35:10, 46:2, 47:23, 48:16, 50:11, 60:14, 72:23
puts [3] - 19:22, 64:21, 86:15
putting [3] - 21:1, 28:10, 34:4

**Q**

qualifying [1] - 49:11
quality [1] - 85:21
quasi [1] - 56:22
quasi-protected [1] - 56:22
questioning [1] - 6:4
questions [8] - 9:19, 14:3, 23:22, 27:11, 27:23, 47:12, 60:20, 77:10
quick [1] - 31:10
quite [1] - 70:14
quo [4] - 59:23, 59:24, 87:18, 88:9
quote [21] - 6:5, 6:9, 6:13, 6:25, 10:2, 12:7, 30:8, 46:21, 85:21, 85:22, 85:25, 86:5, 86:6, 86:8, 86:12, 87:8, 88:16, 88:17, 88:20, 88:22, 88:24
quote/unquote [1] - 18:12
quoting [2] - 21:9, 21:11

**R**

race [1] - 29:2
racial [4] - 29:1, 43:11, 44:18, 45:1
raise [1] - 27:18
raised [3] - 12:16, 71:19, 78:19
raises [1] - 26:22
rapidly [1] - 26:24
ratcheting [1] - 16:4
rate [1] - 72:9
rather [2] - 37:25, 42:1
rational [2] - 16:20, 57:5
rattling [1] - 35:11
re [1] - 25:10
re-enforcement [1] - 25:10
reach [5] - 54:15, 54:18, 78:24, 80:19

reaches [5] - 30:25, 31:23, 49:17, 49:18, 57:15
reaching [3] - 31:4, 60:5, 81:22
reaction [1] - 4:1
reactions [1] - 4:2
read [13] - 33:13, 33:14, 35:11, 40:13, 45:18, 45:21, 52:17, 67:15, 67:19, 73:1, 74:3, 74:12, 78:23
reading [20] - 22:4, 22:13, 22:14, 23:8, 33:14, 43:8, 44:15, 49:16, 52:19, 55:1, 62:11, 62:15, 64:24, 66:23, 66:24, 67:13, 68:15, 69:17, 70:9, 74:5
readings [1] - 75:2
ready [1] - 46:7
real [7] - 32:17, 32:20, 33:2, 36:14, 38:24, 44:19, 59:3
real-world [2] - 32:17, 33:2
reality [4] - 11:3, 30:6, 44:23, 64:10
realize [1] - 43:12
really [18] - 3:9, 7:16, 12:16, 23:24, 26:10, 33:25, 51:21, 59:3, 59:6, 70:4, 71:22, 72:11, 72:18, 80:5, 81:15, 87:10, 91:20, 91:25
reason [9] - 5:2, 8:9, 15:4, 20:10, 38:20, 42:11, 43:19, 71:9, 84:19
reasonably [2] - 22:15, 88:14
reasoning [1] - 86:11
reasons [6] - 13:13, 14:19,

32:6, 32:7, 89:7, 90:24
receipt [1] - 61:8
receive [3] - 26:25, 36:7, 88:17
received [3] - 10:11, 35:23, 72:5
receives [1] - 53:12
receiving [12] - 6:7, 7:6, 10:3, 21:14, 21:22, 22:3, 29:18, 54:7, 59:5, 68:13, 79:5, 88:22
receptive [1] - 37:14
recess [1] - 83:4
RECESS [1] - 83:5
recipient [4] - 34:7, 34:8, 34:18, 35:10
recipients [5] - 35:5, 40:9, 40:10, 59:7, 73:15
recognized [1] - 52:1
record [11] - 2:7, 14:7, 26:24, 65:6, 66:14, 67:5, 70:5, 74:2, 74:10, 81:12, 86:9
recording [1] - 3:20
records [3] - 10:11, 65:1, 67:21
rectified [1] - 85:9
redressability [1] - 25:22
redressable [1] - 26:11
redressed [1] - 56:14
refer [2] - 5:9, 38:11
reference [1] - 18:9
referenced [1] - 6:22
references [2] - 41:17, 65:24
referencing [2] - 44:18, 76:8

**reflect** [1] - 45:23
**reflects** [1] - 59:8
**refugee** [1] - 24:19
**refusal** [1] - 84:11
**refused** [1] - 86:3
**regarding** [1] - 19:19
**regardless** [9] - 3:9, 6:18, 11:17, 45:20, 59:1, 59:5, 59:11, 64:5, 73:12
**regards** [2] - 60:5, 60:6
**regimes** [2] - 38:7, 39:10
**Registered** [1] - 92:18
**regretting** [1] - 71:25
**regular** [1] - 16:11
**regulate** [1] - 66:17
**regulated** [5] - 32:24, 36:6, 39:24, 56:4
**regulations** [3] - 5:23, 15:8, 92:21
**regulator** [2] - 39:22, 39:24
**reinstate** [1] - 90:4
**rejected** [2] - 18:10, 54:22
**relate** [4] - 7:22, 30:19, 66:3, 70:13
**related** [3] - 6:19, 80:4, 84:21
**relates** [4] - 17:2, 45:17, 45:21, 70:7
**relating** [1] - 65:4
**relationship** [1] - 16:20
**release** [4] - 11:1, 26:15, 30:7, 90:8
**relevant** [2] - 35:8, 89:1
**relief** [24] - 8:18, 13:14, 32:7, 34:25, 35:13, 39:11, 48:10, 49:23, 50:8, 50:22, 59:23, 67:12, 70:8, 71:7, 75:12,

76:18, 76:20, 79:16, 80:2, 80:11, 80:13, 81:21, 87:22, 88:13
**Relief** [3] - 9:22, 27:14, 30:18
**religiously** [1] - 69:24
**relitigate** [1] - 84:18
**relitigating** [1] - 79:10
**remaining** [1] - 12:9
**remedies** [1] - 20:6
**remedy** [2] - 81:5, 88:14
**remember** [3] - 24:19, 24:22, 73:13
**remiss** [1] - 87:17
**remnant** [1] - 12:9
**remote** [1] - 85:7
**removal** [1] - 23:7
**removed** [1] - 10:24
**removes** [1] - 33:23
**repeatedly** [1] - 18:3
**reply** [4] - 7:8, 10:8, 24:9, 57:25
**report** [3] - 74:19, 90:12, 90:16
**reported** [1] - 92:20
**reporter** [1] - 83:9
**REPORTER** [2] - 92:17, 92:25
**Reporter** [1] - 92:18
**represented** [1] - 7:15
**request** [1] - 70:20
**requested** [2] - 9:2, 75:12
**require** [1] - 8:3
**required** [1] - 59:10
**requirement** [3] - 12:13, 90:18, 90:20
**requirements** [1] - 56:12
**requiring** [1] - 88:9

**rescind** [2] - 17:21, 34:13
**rescinded** [7] - 14:11, 14:22, 34:10, 37:25, 40:1, 40:2, 48:17
**rescinding** [1] - 34:12
**rescission** [1] - 15:5
**research** [13] - 6:7, 6:15, 10:4, 21:15, 29:19, 38:12, 52:3, 54:7, 54:14, 70:14, 70:18, 71:17, 74:16
**resettlement** [1] - 24:19
**reside** [1] - 87:22
**Resources** [2] - 7:2, 89:12
**respect** [9] - 47:19, 56:19, 64:2, 71:18, 72:20, 79:2, 79:15, 90:7, 91:25
**respond** [3] - 9:11, 51:3, 62:4
**responded** [1] - 10:14
**responding** [2] - 16:8, 46:15
**responds** [1] - 11:3
**response** [10] - 6:25, 9:8, 26:1, 33:10, 47:2, 57:24, 58:24, 64:1, 68:6, 68:25
**responses** [1] - 57:10
**responsibility** [1] - 18:23
**rest** [1] - 82:22
**restaurant** [1] - 69:15
**Restoring** [1] - 5:8
**restrained** [1] - 89:18
**restraining** [7] - 7:1, 8:11, 8:13, 56:17, 83:18, 87:19, 90:1
**restriction** [3] - 69:21, 74:7,

74:8
**restrictions** [4] - 19:11, 19:12, 62:25, 87:4
**result** [5] - 7:10, 15:9, 25:13, 25:20, 88:4
**retraining** [1] - 89:9
**return** [1] - 74:16
**reveal** [1] - 60:16
**reveals** [1] - 37:5
**review** [6] - 11:10, 13:23, 32:14, 32:25, 46:8, 47:2
**reviewability** [1] - 45:25
**reviewed** [1] - 48:3
**Rhode** [1] - 14:24
**rid** [1] - 29:7
**rightfully** [1] - 31:8
**rights** [2] - 3:15, 87:9
**ripe** [4] - 12:7, 25:10, 26:11, 56:5
**ripeness** [1] - 36:8
**rise** [1] - 83:4
**risk** [6] - 54:13, 58:8, 60:23, 60:24, 72:23, 86:16
**road** [1] - 38:11
**robust** [1] - 91:9
**roll** [1] - 73:8
**rolled** [1] - 73:14
**room** [4] - 4:24, 35:19, 49:16, 58:20
**rooted** [1] - 42:23
**RPR** [1] - 92:24
**rule** [4] - 53:1, 53:3, 81:25, 88:1
**rulemaking** [4] - 16:10, 20:16, 20:17, 37:9
**rules** [4] - 3:19, 22:6, 38:10, 91:21
**ruling** [2] - 83:14, 87:11
**run** [3] - 23:10, 45:15, 79:24
**running** [1] - 33:8
**runs** [3] - 28:14,

30:19, 84:12
**rural** [1] - 54:19

## S

**saber** [1] - 35:11
**saber-rattling** [1] - 35:11
**safe** [1] - 71:20
**safety** [1] - 73:9
**San** [5] - 1:18, 18:8, 24:7, 47:5, 78:3
**sanctuary** [1] - 18:12
**satisfied** [3] - 25:21, 85:15, 85:20
**savings** [1] - 47:6
**saw** [2] - 16:2, 57:2
**scattershot** [1] - 35:14
**scenario** [3] - 17:24, 26:19, 41:6
**schedule** [3] - 81:11, 82:18, 90:17
**scheduled** [1] - 90:22
**scheduling** [1] - 91:1
**scheme** [2] - 17:15, 35:7
**schemes** [1] - 55:12
**School** [1] - 84:7
**schools** [1] - 6:16
**Science** [1] - 89:14
**Scope** [3] - 9:22, 27:14, 30:18
**scope** [15] - 49:23, 50:21, 67:12, 70:8, 75:4, 76:11, 76:16, 76:20, 78:16, 78:17, 80:21, 87:21, 88:8
**scratching** [1] - 70:5
**scrutiny** [7] - 56:22, 57:8, 59:10, 61:2, 64:23, 75:2, 84:9
**se** [1] - 69:2
**Seattle** [2] -

77:14, 79:12
**second** [9] - 3:3, 3:22, 7:22, 8:17, 9:12, 22:2, 71:23, 80:19, 85:4
**secretaries** [1] - 78:7
**secretary** [1] - 74:15
**section** [37] - 5:12, 5:19, 5:22, 21:11, 21:13, 24:11, 31:16, 41:20, 42:20, 50:1, 50:14, 53:7, 53:11, 53:17, 53:24, 53:25, 54:5, 56:15, 60:3, 60:6, 60:11, 61:5, 61:6, 65:20, 68:4, 74:17, 83:20, 89:19, 89:21, 90:5, 90:6
**sector** [1] - 36:7
**security** [3] - 4:19, 90:18, 90:20
**see** [29] - 2:11, 2:14, 2:17, 2:21, 2:24, 3:1, 11:13, 15:25, 16:15, 23:5, 23:20, 27:11, 29:24, 34:19, 36:6, 42:12, 42:13, 42:19, 42:20, 48:17, 49:22, 51:12, 55:16, 62:24, 69:23, 70:10, 75:23, 79:25, 85:1
**seeing** [1] - 41:25
**seek** [1] - 35:13
**seeking** [4] - 15:1, 20:8, 48:10, 78:4
**seem** [6] - 24:23, 25:1, 37:8, 52:8, 55:16, 79:5
**segment** [2] - 89:4, 89:5
**segues** [1] - 14:2
**seizing** [1] - 49:10
**Seldin** [1] - 88:16
**send** [4] - 37:15, 37:18, 37:19
**senders** [2] -

39:15, 39:16
**sending** [1] - 7:5
**sense** [4] - 43:7,
43:20, 47:2,
80:14
**sent** [3] - 10:8,
10:25, 48:16
**sentence** [1] -
26:12
**separate** [3] -
60:13, 61:15,
75:19
**separately** [1] -
61:2
**separation** [4] -
9:4, 19:15,
85:18, 87:11
**Separation** [6] -
9:11, 17:3,
23:11, 23:13,
37:2, 37:4
**separations** [1] -
10:10
**serious** [1] - 49:5
**servants** [1] -
89:16
**serve** [3] - 60:24,
69:14, 69:16
**Services** [4] - 7:3,
8:1, 89:11,
89:12
**set** [8] - 28:2,
37:13, 50:7,
56:2, 57:25,
59:18, 60:15,
84:13
**sets** [1] - 53:25
**setting** [1] - 63:6
**settled** [3] -
13:15, 27:21,
49:20
**several** [3] -
14:19, 65:10,
65:23
**sex** [11] - 8:8,
53:15, 54:24,
55:5, 55:10,
55:15, 56:23,
60:19, 63:11,
63:12, 68:14
**shall** [12] - 5:13,
5:15, 21:3,
31:17, 41:22,
41:23, 50:2,
50:3, 90:3, 90:8,
90:11, 90:15
**share** [1] - 47:19
**shifting** [1] - 48:4
**shoehorning** [1] -
34:23

**shorter** [1] - 82:18
**show** [2] - 8:17,
8:20
**showing** [2] -
26:10, 85:6
**shown** [3] - 17:6,
26:7, 85:13
**shut** [1] - 72:14
**shutdown** [1] -
86:3
**side** [8] - 3:9,
16:1, 19:6,
30:23, 34:5,
47:15, 53:9,
53:21
**sides** [2] - 71:21,
81:13
**sight** [1] - 47:22
**signed** [3] - 17:4,
17:10, 77:8
**significant** [5] -
16:22, 80:7,
86:21, 87:15,
88:4
**silly** [2] - 55:18,
63:17
**similar** [3] - 36:6,
64:17, 82:18
**simply** [6] - 11:16,
15:7, 15:22,
40:25, 44:7,
88:9
**simulcast** [1] -
4:25
**single** [1] - 48:11
**sit** [1] - 75:6
**situation** [3] -
28:21, 35:22,
65:21
**Skrmetti** [9] -
19:2, 57:2,
57:14, 62:7,
65:22, 72:1,
73:2, 73:13,
74:4
**slightly** [2] -
57:14, 84:13
**smiling** [1] -
44:13
**smoke** [1] - 35:18
**Snyder** [1] - 61:14
**socioeconomic**
[1] - 54:19
**solo** [1] - 77:8
**solutions** [2] -
44:9, 65:6
**someone** [1] -
22:13
**sometime** [1] -
14:14

**somewhat** [1] -
71:3
**soon** [3] - 13:2,
88:18, 90:23
**sorry** [2] - 27:13,
40:10
**sort** [34] - 7:12,
9:3, 11:9, 16:4,
21:17, 23:24,
24:2, 24:3,
24:18, 24:22,
28:21, 38:12,
43:3, 43:11,
43:19, 43:20,
43:25, 44:20,
45:24, 47:1,
47:11, 58:7,
63:17, 64:25,
66:23, 70:20,
71:2, 71:6,
72:19, 73:8,
73:24, 74:25,
75:1
**sorts** [2] - 20:9,
49:18
**sounds** [3] -
12:12, 47:8,
63:17
**South** [2] - 1:23,
85:23
**space** [9] - 25:1,
31:20, 38:16,
50:21, 50:22,
62:25, 66:17,
72:16
**spaces** [1] - 39:13
**speaking** [1] -
41:20
**speaks** [3] - 21:2,
25:5, 39:19
**specific** [13] -
15:16, 15:17,
15:25, 16:6,
24:17, 25:9,
39:19, 65:3,
66:14, 73:23,
80:11, 80:13,
83:25
**specifically** [5] -
7:23, 41:21,
46:20, 53:8,
76:25
**specificity** [1] -
43:6
**spectators** [1] -
83:1
**spectrum** [3] -
45:24, 46:1,
51:7
**speculative** [1] -

85:7
**speech** [1] - 32:22
**spend** [1] - 17:22
**spent** [1] - 37:1
**spite** [1] - 61:1
**splays** [1] - 64:24
**split** [1] - 9:2
**splitting** [1] - 9:7
**spoken** [1] - 53:9
**sponsored** [1] -
50:6
**spot** [1] - 33:15
**spread** [1] - 7:12
**staff** [2] - 4:15,
10:9
**stake** [1] - 3:23
**stand** [1] - 45:11
**standalone** [1] -
70:14
**standard** [7] -
11:16, 23:12,
39:3, 42:11,
47:11, 62:21,
83:18
**standards** [1] -
39:5
**standing** [4] -
61:16, 80:2,
80:6, 81:19
**stands** [1] - 83:4
**Stanley** [1] -
56:12
**start** [12] - 9:17,
28:1, 28:20,
31:1, 53:7, 53:8,
62:3, 66:8,
71:11, 72:14,
78:23, 83:17
**started** [3] -
61:19, 86:17,
86:18
**starting** [3] - 2:7,
28:22, 75:3
**state** [6] - 10:18,
19:4, 57:18,
76:23, 77:1,
86:6
**state-wide** [1] -
76:23
**statement** [2] -
11:4, 11:10
**STATES** [1] - 1:1
**states** [5] - 24:21,
57:13, 57:18,
62:25, 87:23
**States** [7] - 2:20,
5:19, 5:20, 6:10,
78:6, 92:18,
92:21
**statistically** [1] -

72:8
**status** [8] - 14:15,
59:23, 59:24,
87:18, 88:9,
90:11, 90:13,
90:16
**statute** [12] - 13:9,
15:14, 15:18,
16:11, 16:12,
16:14, 18:20,
26:5, 42:24,
46:25, 52:13,
66:8
**statutes** [12] -
7:25, 15:16,
17:5, 17:12,
19:24, 25:8,
42:15, 43:25,
70:8, 70:9,
70:11, 70:15
**statutory** [2] - 9:5,
17:14
**stay** [1] - 76:15
**stayed** [1] - 76:23
**stays** [1] - 15:1
**stenographicall
y** [1] - 92:20
**stenographicall
y-reported** [1] -
92:20
**stenotype** [1] -
1:25
**step** [4] - 19:8,
36:12, 40:14,
64:25
**steps** [19] - 6:6,
10:3, 28:16,
28:17, 29:18,
34:4, 34:7,
41:18, 41:19,
44:6, 45:18,
45:21, 48:13,
54:6, 63:4, 65:5,
74:20, 90:4
**still** [7] - 13:1,
16:24, 26:5,
58:14, 58:17,
80:12, 82:21
**stop** [20] - 13:16,
21:23, 26:20,
27:8, 28:12,
30:3, 30:12,
30:14, 34:8,
34:15, 34:16,
34:19, 35:25,
36:17, 39:17,
50:9, 63:10,
67:8, 72:5
**stopped** [1] - 30:9
**Stopping** [1] -

18:5
**stopping** [4] -
35:23, 35:24,
59:5
**straight** [1] - 87:5
**stream** [2] - 16:6,
53:13
**streams** [3] -
15:25, 33:12,
39:18
**Street** [4] - 1:13,
1:15, 1:18, 1:23
**strengthen** [1] -
52:8
**stretch** [1] - 47:15
**stretches** [2] -
31:20, 38:15
**strike** [1] - 48:6
**strikes** [2] -
26:17, 64:25
**strings** [2] -
19:22, 83:25
**stripped** [1] - 6:15
**strong** [4] - 18:13,
30:5, 83:22,
85:14
**strongly** [1] -
86:25
**Struggle** [1] -
87:6
**struggling** [4] -
33:25, 49:7,
49:8, 62:18
**stuck** [1] - 65:18
**studies** [3] - 26:7,
66:20, 71:21
**studying** [2] -
34:17, 59:14
**stuff** [3] - 32:24,
33:21, 75:20
**sub** [1] - 54:11
**sub-agencies** [1]
- 54:11
**subagencies** [2] -
88:24, 89:15
**subject** [3] - 84:9,
84:25, 88:1
**submissions** [1] -
83:7
**subordinates** [1]
- 52:18
**subset** [3] - 38:6,
40:3, 54:21
**subsetting** [1] -
40:2
**subsidize** [4] -
22:19, 30:22,
50:18, 69:22
**subsidizing** [1] -
38:11

substance [1] - 23:3
succeed [2] - 8:16, 83:23
succeeded [1] - 18:15
success [1] - 85:14
successors [1] - 89:16
sudden [1] - 86:12
suffer [4] - 8:17, 85:6, 86:7, 90:19
suffering [2] - 47:13, 85:17
suffers [1] - 85:20
sufficient [3] - 32:18, 36:8, 66:15
sufficiently [1] - 46:7
suggest [1] - 81:17
suicide [1] - 72:9
suing [1] - 88:12
suit [1] - 7:9
Suite [1] - 1:18
suited [1] - 85:22
suits [2] - 36:17, 75:19
supplies [1] - 85:11
support [3] - 14:7, 86:5, 86:9
supported [1] - 22:4
suppose [2] - 46:16, 47:18
supposed [9] - 7:21, 18:14, 39:20, 51:23, 79:16, 79:22, 80:18, 88:14
Supreme [4] - 19:2, 26:5, 29:4, 57:3
surgery [2] - 22:11, 22:17
Surgical [1] - 6:2
surgical [3] - 6:8, 29:19, 37:18
survive [1] - 61:7
Sutton's [1] - 62:6
sweeping [1] - 16:25
sweeps [1] - 38:22
switch [1] - 52:24

swoop [1] - 39:12
system [2] - 19:14, 24:20

**T**

tailor [3] - 32:1, 81:21
tailored [4] - 59:18, 63:7, 65:3, 71:12
talks [2] - 25:19, 77:19
tangible [1] - 86:12
targeted [2] - 25:25, 47:24
targets [2] - 63:16, 63:17
technical [1] - 69:11
technically [2] - 69:6, 69:7
temporarily [4] - 14:22, 20:23, 56:14, 86:23
temporary [8] - 6:25, 8:11, 8:13, 56:17, 83:18, 87:19, 89:9, 90:1
ten [1] - 42:6
tend [1] - 9:13
Tennessee [1] - 74:7
term [1] - 45:18
terminated [3] - 12:11, 14:19, 60:9
terminating [1] - 13:12
termination [2] - 10:25, 14:18
terms [15] - 16:2, 17:2, 21:2, 26:10, 33:6, 35:8, 36:21, 39:7, 39:19, 42:12, 49:11, 59:3, 63:3, 67:17, 76:11
terrorizing [2] - 25:13, 25:14
test [1] - 57:8
testimony [2] - 8:10, 58:3
tests [1] - 85:1
text [6] - 11:8, 12:2, 22:2, 22:13, 28:11,

46:21
texts [1] - 34:13
THE [149] - 1:1, 1:1, 1:10, 2:3, 2:11, 2:14, 2:17, 2:21, 2:24, 3:1, 4:24, 9:23, 11:11, 11:15, 12:14, 12:22, 13:19, 14:4, 15:5, 15:24, 17:1, 17:23, 19:17, 21:2, 21:11, 21:21, 22:20, 23:6, 23:22, 24:5, 24:16, 26:17, 27:4, 27:10, 27:15, 27:17, 27:20, 27:24, 28:15, 28:19, 29:12, 30:2, 31:2, 31:6, 31:11, 32:1, 32:5, 32:8, 32:10, 33:9, 33:24, 34:6, 34:12, 35:15, 35:17, 36:23, 37:7, 37:11, 39:14, 40:8, 40:12, 40:18, 40:23, 41:14, 42:8, 42:19, 43:6, 43:9, 44:3, 44:11, 44:15, 45:3, 46:13, 46:20, 48:19, 48:22, 49:2, 49:5, 49:22, 49:25, 50:14, 50:24, 52:5, 52:20, 52:22, 52:25, 53:18, 55:1, 56:19, 57:17, 58:10, 58:12, 58:15, 58:20, 59:24, 61:11, 61:25, 62:2, 62:14, 62:18, 63:8, 64:5, 64:8, 64:13, 65:10, 65:13, 65:15, 65:18, 66:18, 67:1, 67:6, 67:21, 67:24, 68:3, 68:20, 68:23, 69:7, 69:13, 69:23, 70:19, 71:5,

71:18, 72:4, 73:3, 74:21, 75:4, 75:9, 75:17, 75:21, 76:9, 77:12, 78:5, 78:12, 78:15, 78:25, 79:8, 79:19, 80:5, 80:24, 81:9, 81:23, 82:9, 82:13, 82:20, 83:4, 83:6, 91:14, 91:17, 91:19
theme [1] - 51:14
themselves [2] - 38:5, 74:18
theories [2] - 31:24, 61:20
therapy [1] - 68:11
thereabouts [1] - 14:16
they've [2] - 15:19, 20:20
thin [2] - 81:12, 81:13
thinking [6] - 35:18, 52:6, 63:3, 63:9, 71:7, 78:23
thinks [1] - 36:16
third [7] - 3:16, 7:22, 8:20, 25:14, 25:21, 56:9, 60:7
thoughts [1] - 91:11
threat [6] - 11:22, 20:19, 27:6, 27:8, 39:5, 87:12
threaten [1] - 87:13
threatens [1] - 37:20
three [2] - 7:16, 83:23
threshold [2] - 30:16, 30:17
Threshold [2] - 9:21, 9:24
throughout [1] - 88:25
throw [2] - 38:13, 50:19
thrust [1] - 74:5
THURSDAY [1] - 1:7
tie [1] - 55:3

tight [1] - 81:12
Title [1] - 5:19
tittle [1] - 33:16
today [17] - 3:10, 3:23, 3:24, 7:16, 8:9, 12:18, 38:2, 44:23, 59:22, 76:1, 77:15, 82:17, 83:12, 83:24, 84:18, 91:20, 92:4
today's [1] - 61:19
together [1] - 60:14
ton [1] - 42:21
took [2] - 24:20, 80:8
totally [5] - 31:8, 34:20, 37:14, 47:14, 69:16
touchstone [1] - 81:17
tough [1] - 74:11
touted [1] - 56:10
towards [6] - 28:14, 30:19, 33:8, 44:6, 47:24, 79:24
traceability [1] - 25:22
traceable [1] - 56:12
tract [1] - 3:5
traditional [1] - 73:24
trans [1] - 50:6
transcript [2] - 92:19, 92:20
transcription [1] - 1:25
Transgender [1] - 86:1
transgender [5] - 8:7, 56:21, 84:9, 87:13, 89:4
transition [3] - 6:18, 63:13, 72:1
Transportation [2] - 49:1, 49:3
traveled [1] - 10:18
treatment [9] - 6:22, 21:7, 31:1, 67:8, 70:13, 71:17, 73:12, 73:13, 88:18
treatments [6] - 49:7, 58:6, 66:13, 70:18,

86:16, 86:17
trial [2] - 58:2, 85:9
tried [3] - 10:20, 18:15, 27:22
TRO [18] - 20:8, 23:14, 23:21, 30:18, 30:23, 31:15, 59:22, 61:22, 75:14, 80:22, 81:9, 82:7, 87:1, 87:3, 87:17, 88:8, 90:25, 91:4
TROs [1] - 81:10
troubled [1] - 24:24
true [7] - 25:11, 42:25, 60:16, 64:6, 69:6, 69:7, 92:19
Trump [12] - 2:5, 5:6, 5:25, 6:14, 10:1, 18:8, 22:18, 25:6, 32:22, 33:17, 62:8, 78:9
TRUMP [1] - 1:5
trust [1] - 4:4
Truth [1] - 5:8
try [3] - 8:9, 82:24, 91:4
trying [11] - 21:17, 22:22, 39:22, 44:12, 51:6, 57:18, 57:20, 69:13, 69:17, 75:1, 91:10
Tuesday [1] - 82:3
turn [1] - 46:25
tweak [1] - 44:24
two [14] - 8:25, 18:21, 30:15, 30:24, 34:3, 47:21, 48:16, 48:21, 55:12, 57:10, 63:25, 72:25, 74:13, 78:16
type [5] - 39:2, 53:12, 56:5, 68:7, 68:8
types [1] - 78:17

**U**

U.S [4] - 3:16, 4:15, 4:19, 89:10
U.S.C [2] - 5:22,

92:19
**ultimately** [2] - 53:11, 59:12
**ultra** [3] - 7:17, 7:23, 14:2
**unassailable** [1] - 85:16
**uncomfortable** [3] - 4:14, 4:18, 4:21
**unconstitutional** [3] - 19:6, 85:11, 87:5
**under** [26] - 6:18, 7:7, 10:5, 12:10, 13:23, 15:23, 19:24, 23:12, 27:2, 36:3, 52:13, 54:2, 55:12, 56:16, 59:10, 59:13, 60:3, 61:12, 61:17, 61:18, 61:21, 72:20, 74:6, 89:24, 90:4, 90:7
**underline** [1] - 20:8
**underscore** [1] - 41:11
**understandable** [1] - 11:22
**understood** [2] - 18:23, 68:18
**undocumented** [2] - 25:24, 26:4
**unemployment** [1] - 72:10
**unfortunately** [1] - 3:12
**unilateral** [1] - 19:16
**unilaterally** [1] - 6:14
**Union** [1] - 1:12
**United** [7] - 2:20, 5:19, 5:20, 6:10, 78:6, 92:18, 92:21
**UNITED** [1] - 1:1
**universe** [5] - 39:1, 39:23, 53:16, 61:4, 66:20
**unlawful** [6] - 11:9, 13:16, 20:9, 44:7, 48:8, 69:2
**unless** [1] - 14:2
**unpack** [1] - 66:8

**unsung** [1] - 83:8
**up** [15] - 3:6, 9:2, 9:8, 9:14, 14:12, 16:4, 25:1, 27:21, 35:10, 52:9, 57:14, 64:17, 65:6, 70:7, 82:17
**upended** [1] - 24:18
**upside** [1] - 46:25
**US** [1] - 12:10
**uses** [1] - 45:4
**usurping** [1] - 7:19

**V**

**vague** [2] - 16:2, 44:20
**vaguely** [1] - 40:22
**valid** [1] - 58:19
**various** [5] - 27:23, 59:9, 78:7, 79:4, 79:5
**verse** [3] - 55:5, 84:7
**versus** [16] - 2:4, 17:20, 18:8, 25:6, 50:19, 52:3, 62:8, 64:11, 67:18, 69:21, 75:3, 78:9, 85:12, 85:23, 87:6, 88:16
**vested** [2] - 6:9, 42:20
**vestige** [1] - 12:9
**veto** [1] - 24:22
**view** [9] - 23:10, 30:11, 36:3, 47:1, 59:2, 71:20, 73:12, 77:15, 82:21
**views** [1] - 45:5
**violate** [3] - 8:4, 8:6, 53:16
**violates** [3] - 13:20, 55:10, 84:24
**violating** [2] - 7:19, 11:12
**violation** [2] - 9:5, 85:17
**vires** [3] - 7:17, 7:23, 14:2
**Virginia** [2] - 10:15, 10:17

**virtue** [1] - 35:4
**Visits** [1] - 86:12
**voiced** [1] - 55:19
**vs** [1] - 1:4
**vulnerable** [5] - 20:25, 54:13, 54:18, 72:18, 72:23

**W**

**wait** [6] - 27:14, 35:20, 37:9, 37:12, 47:7, 91:5
**waited** [1] - 37:15
**waiting** [1] - 56:7
**waived** [1] - 90:19
**walk** [3] - 31:11, 54:24, 68:24
**Walker** [1] - 77:19
**Wall** [1] - 1:15
**wall** [2] - 34:19, 41:1
**wants** [7] - 13:17, 16:10, 19:13, 30:22, 38:13, 38:20, 50:18
**warning** [1] - 7:5
**warrants** [1] - 61:2
**Warth** [1] - 88:16
**Washington** [1] - 1:21
**watch** [1] - 86:7
**watching** [1] - 3:24
**water** [1] - 58:1
**ways** [6] - 23:8, 44:1, 44:12, 44:22, 54:24, 63:16
**wean** [1] - 73:16
**wearing** [1] - 4:16
**websites** [1] - 23:15
**week** [1] - 14:15
**weigh** [2] - 83:19, 86:20
**weighing** [2] - 59:9, 85:1
**weighs** [1] - 86:25
**welcome** [4] - 3:11, 3:15, 9:17, 91:23
**welfare** [1] - 20:25
**well-being** [1] - 86:13
**well-settled** [1] - 13:15

**Whitman** [1] - 77:19
**Whitman-Walker** [1] - 77:19
**whole** [5] - 39:9, 39:12, 52:16, 59:22, 72:9
**wide** [1] - 76:23
**Wilkinson** [1] - 85:24
**wish** [1] - 90:25
**wished** [1] - 12:25
**wishes** [1] - 37:13
**withdrawn** [1] - 14:23
**withheld** [1] - 15:21
**withhold** [5] - 6:21, 16:12, 20:20, 60:9, 84:15
**withholding** [3] - 75:14, 76:4, 89:22
**witnesses** [1] - 8:10
**women** [1] - 69:14
**Women** [6] - 5:7, 21:12, 31:16, 41:21, 48:24, 50:1
**wondering** [1] - 16:1
**word** [4] - 23:2, 30:5, 41:18, 45:4
**words** [1] - 41:14
**works** [2] - 19:15, 34:14
**world** [10] - 16:18, 32:17, 32:20, 33:2, 36:14, 38:24, 42:21, 42:22, 43:20, 92:2
**worried** [1] - 39:2
**worry** [1] - 73:3
**wreak** [1] - 92:2
**wrenching** [1] - 72:12
**write** [3] - 27:22, 28:6, 44:1
**writes** [1] - 37:23
**writing** [3] - 3:7, 34:19, 81:25
**writing's** [1] - 41:1
**written** [7] - 53:3, 65:11, 78:24, 89:25, 90:3,

90:14, 90:23
**wrongly** [1] - 65:16
**wrote** [4] - 65:13, 68:21, 68:23, 85:24

**Y**

**yanked** [1] - 20:23
**year** [2] - 16:4, 57:15
**years** [1] - 73:14
**yield** [1] - 86:10
**York** [5] - 1:13, 1:16, 10:13, 17:20, 24:6
**young** [3] - 57:15, 63:15, 86:1
**Youngstown** [3] - 17:18, 24:2, 24:4
**youth** [4] - 57:7, 63:10, 63:16, 87:13, 89:4

**Z**

**zeros** [1] - 16:4

**§**

**§** [1] - 92:19