**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

NATIONAL ASSOCIATION OF
DIVERSITY OFFICERS IN HIGHER
EDUCATION, *et al.*,

    *Plaintiffs*,

  v.

DONALD J. TRUMP, *et al.*,

    *Defendants*

Case No. 1:25-cv-00333-ABA

**MEMORANDUM OPINION**

Among the executive orders the President issued on the first two days of the administration were orders that (1) directed all executive agencies to "terminate . . . 'equity-related' grants or contracts" (the "Termination Provision"), (2) directed all executive agencies to "include in every contract or grant award" a certification, enforceable through the False Claims Act, that the contractor and grantee "does not operate any programs *promoting DEI* that violate any applicable Federal anti-discrimination laws" (the "Certification Provision"), and (3) directing the Attorney General to take "appropriate measures to encourage the private sector to end illegal discrimination and preferences, including DEI," to "deter" such "programs or principles," and to "identify . . . potential civil compliance investigations" to accomplish such "deter[rence]" (the "Enforcement Threat Provision") (collectively, the "Challenged Provisions").[1]

---

[1] Exec. Order No. 14,151, *Ending Radical and Wasteful Government DEI Programs and Preferencing*, Executive Order of January 20, 2025, 90 Fed. Reg. 8339, 8339 (Jan. 29,

The term "DEI," of course, is shorthand for "diversity, equity, and inclusion." And ensuring equity, diversity, and inclusion has long been a goal, and at least in some contexts arguably a requirement, of federal anti-discrimination law. But the administration has declared "DEI" to be henceforth "illegal," has announced it will be terminating all "'equity-related' grants or contracts"—whatever the administration might decide that means—and has made "practitioners" of what the government considers "DEI" the targets of a "strategic enforcement plan." J20 Order § 2; J21 Order § 4. But the Challenged Orders do not define any of the operative terms, such as "DEI," "equity-related," "promoting DEI," "illegal DEI," "illegal DEI and DEIA[2] policies," or "illegal discrimination or preferences," J20 Order §§ 1-2; J21 Order §§ 1-4—let alone identify the types of programs or policies the administration considers "illegal."

According to a recent case, "approximately 20% of the nation's labor force works for a federal contractor." *Kentucky v. Biden*, 57 F.4th 545, 548 (6th Cir. 2023). The Termination Provision leaves those contractors and their employees, plus any other recipients of federal grants, with no idea whether the administration will deem their contracts or grants, or work they are doing, or speech they are engaged in, to be "equity-related." And the J21 Order leaves the private sector at a loss for whether the administration will deem a particular policy, program, discussion, announcement, etc. to be among the "preferences, mandates, policies, programs, and activities" the

---

2025) ("J20 Order"); Exec. Order No. 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, Executive Order of January 21, 2025, 90 Fed. Reg. 8633, 8634-35 (Jan. 31, 2025) ("J21 Order") (collectively, the "Orders" or "Challenged Orders") (emphasis added).

[2] The J20 defines this phrase as "diversity, equity, inclusion, and accessibility." J20 Order § 2(a).

administration now deems "illegal." J21 Order §§ 2, 4(b)(iii). Plaintiffs, who have easily established their standing to bring this case and irreparable harm, have shown they are likely to prove the Termination and Enforcement Threat Provisions are unconstitutionally vague on their face.

But it is not just the vagueness of the Challenged Provisions that renders them unconstitutional. There is a label for government action that seeks to "deter . . . principles," J21 Order § 4(b)(iii), that the government disagrees with: "restrict[ion]" of "expression because of its message, its ideas, its subject matter, or its content.'" *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). And the most "blatant" and "egregious form of content discrimination" is viewpoint discrimination. *Id.* at 168-69. The Certification and Enforcement Threat Provisions squarely, unconstitutionally, "abridge[] the freedom of speech." U.S. Const. amend. I.

A "President's duties are of 'unrivaled gravity and breadth.'" *Trump v. United States*, 603 U.S. 593, 607 (2024) (quoting *Trump v. Vance*, 591 U.S. 786, 800 (2020)). And the Constitution "vest[s] the President with 'supervisory and policy responsibilities of utmost discretion and sensitivity.'" *Id.* (quoting *Nixon v. Fitzgerald*, 457 U.S. 731, 750 (1982). But "a President does not 'stand exempt from the general provisions of the constitution.'" *Id.* at 612 (quoting *United States v. Burr,* 25 F. Cas. 30, 34 (No. 14,692d) (C.C.D. Va. 1807)). The preliminary injunction factors weigh in favor of issuing a preliminary injunction against the Termination Provision, the Certification Provision, and part of the Enforcement Threat Provision.

## I.    BACKGROUND

### A.    The Challenged Executive Orders

As noted above, President Trump issued the two executive orders at issue on January 20 and 21, 2025. *See* J20 Order; J21 Order. The J20 Order focuses on activities and programs within the federal government, including "Equity Action Plans" that were required of executive agencies during President Biden's administration. *See* J20 Order §§ 1-2 (citing Exec. Order No. 13,985, 86 Fed. Reg. 7009 (Jan. 25, 2021)). The J21 Order focuses on "ending illegal preferences and discrimination," both within the federal government and in the private sector. J21 Order §§ 1-4.

Plaintiffs do not contend that the two Challenged Orders are unconstitutional in their entirety; Plaintiffs challenge one specific provision of the J20 Order and two specific provisions of the J21 Order, detailed below. Other aspects of the Challenged Orders, such as a direction to assess the operational impact and cost of President Biden's DEI, DEIA, and "environmental justice" programs and policies, J20 Order § 2(b)(iii), and ordering the Director of the Office of Management and Budget (OMB) to "[e]xcise references to DEI and DEIA principles" from federal acquisition and contracting procedures, J21 Order § 3(c)(ii), are not at issue here. Each order also contains a severability clause, stating that if any provision of the order is held to be invalid, "the remainder of this order . . . shall not be effected." J20 Order § 3; J21 Order § 6.

#### 1.    Termination Provision

The first provision that Plaintiffs challenge is Section 2(b)(i) of the J20 Order, the Termination Provision. That provision provides, in pertinent part, as follows:

> Each agency, department, or commission head, in
> consultation with the Attorney General, the Director of OMB,
> and the Director of OPM, as appropriate, shall take the
> following actions within sixty days of this order: (i) terminate,
> to the maximum extent allowed by law, all . . . "equity-related"
> grants or contracts.

J20 Order § 2(b)(i). That provision is in the context of Section 2 of the J20 Order, which

directs the OMB director, "assisted by the Attorney General and the Director of the

Office of Personnel Management," to "coordinate the termination of all discriminatory

programs, including illegal DEI and 'diversity, equity, inclusion, and accessibility'

(DEIA) mandates, policies, programs, preferences, and activities in the Federal

Government, under whatever name they appear." J20 Order § 2(a).

Plaintiffs bring two discrete claims against the Termination Provision. First,

Plaintiffs contend the provision violates the Spending Clause of the United States

Constitution. ECF No. 1 ¶¶ 154-62 ("Count One") (citing U.S. Const. art. I, §§ 1, 8). They

assert that neither the President nor executive branch officials have authority under the

Constitution to unilaterally terminate "'equity-related' grants and contracts," absent

express statutory authority. *Id.* ¶ 159. Second, Plaintiffs argue that the provision is

unconstitutionally vague in violation of the Fifth Amendment's Due Process Clause. *Id.*

¶¶ 163-70 ("Count Two"). Plaintiffs further note that key terms—including "DEI,"

"DEIA," "equity," and "equity-related"—are undefined in the order. *Id.* ¶ 167. As a result,

Plaintiffs contend, they are "left to guess" not only "whether their federal grants or

contracts will be terminated," but also how to conform their policies, programs, and

speech to the vague, undefined, and unspecified directive that "equity-related" grants

will be terminated. *Id.* ¶¶ 168.

### 2.    Certification Provision

The next provision Plaintiffs challenge is Section 3(b)(iv) of the J21 Order, the Certification Provision. That provision provides as follows:

> (iv) The head of each agency shall include in every contract or grant award:
>
>> (A) A term requiring the contractual counterparty or grant recipient to agree that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code; and
>>
>> (B) A term requiring such counterparty or recipient to certify that it does not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws.

J21 Order § 3(b).

The reference to 31 U.S.C. § 3729(b)(4) refers to the False Claims Act. Under the False Claims Act, a person who, for example, "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government" is "liable to the United States Government for a civil penalty . . . plus 3 times the amount of damages which the Government sustains because of the act of that person." 31 U.S.C. § 3729(a)(1)(G). That means the Certification Provision is attempting to use the False Claims Act to enforce the government's notion of what it means to "promot[e] DEI" in a way that "violate[s] any applicable Federal anti-discrimination laws."

Plaintiffs bring two distinct claims against the Certification Provision.

First, Plaintiffs allege the Certification Provision violates the Free Speech Clause of the First Amendment. ECF No. 1 ¶¶ 193-201 ("Count Five"). They argue the provision

"impermissibly restricts Plaintiffs['] constitutionally protected speech based on its content and viewpoint." *Id.* ¶ 195. They also claim that the provision fails to define the terms including "programs promoting DEI" and fails to explain "why such programs might violate anti-discrimination laws." *Id.* Specifically, they argue that "Plaintiffs are chilled from expressing or participating in anything that might draw the ire of the President or his administration when it comes to DEI" and that "[t]hrough this provision, President Trump brandishes the threat of [False Claims Act] enforcement to quiet federal contractors' and grantees' dissenting views." *Id.* ¶¶ 197, 199.

Second, Plaintiffs contend the Certification Provision violates separation of powers principles. *Id.* ¶¶ 202-10 ("Count Six"). Plaintiffs contend the executive branch has "no authority to dictate government spending or place conditions on the spending power that is vested in the legislative branch." *Id.* ¶ 204. Plaintiffs contend Congress cannot delegate its power under the Spending Clause and, in any event, did not "delegate any spending power to the President with respect to the particular federal programs and funds at issue here." *Id.* ¶ 209.

### 3. Enforcement Threat Provision

The third and final provision Plaintiffs challenge is Section 4(b)(iii) of the J21 Order, the Enforcement Threat Provision. That provision directs the Attorney General as follows:

> (b) To further inform and advise me so that my Administration may formulate appropriate and effective civil-rights policy, the Attorney General, within 120 days of this order, in consultation with the heads of relevant agencies and in coordination with the Director of OMB, shall submit a report to the Assistant to the President for Domestic Policy containing recommendations for enforcing Federal civil-rights laws and taking other appropriate measures to

> encourage the private sector to end illegal discrimination and preferences, including DEI. The report shall contain a proposed strategic enforcement plan identifying
>
> . . .
>
> (iii) A plan of specific steps or measures to deter DEI programs or principles (whether specifically denominated "DEI" or otherwise) that constitute illegal discrimination or preferences. As a part of this plan, each agency shall identify up to nine potential civil compliance investigations of publicly traded corporations, large non-profit corporations or associations, foundations with assets of 500 million dollars or more, State and local bar and medical associations, and institutions of higher education with endowments over 1 billion dollars[.]

J21 Order § 4. That provision is followed by a directive that the Attorney General's "proposed strategic enforcement plan" also identify "[o]ther strategies to encourage the private sector to end illegal DEI discrimination and preferences and comply with all Federal civil-rights laws." *Id.* § 4(b)(iv).

Plaintiffs the National Association of Diversity Officers in Higher Education ("NADOHE") and the American Association of University Professors ("AAUP") bring two claims against the Enforcement Threat Provision. First, Plaintiffs allege the Enforcement Threat Provision is unconstitutionally vague. ECF No. 1 ¶¶ 171-82 ("Count Three"). That claim is based on the alleged inherent vagueness of terms such as "illegal DEI discrimination and preferences," J21 Order § 4(b)(iv), or "[p]romoting 'diversity,'" *id.* § 3(b)(ii), or "illegal DEI and DEIA policies," *id.* § 1, or what types of "DEI programs or principles" the new administration considers "illegal" and is seeking to "deter," *id.* § 4(b)(iii).

And second, Plaintiffs allege the Enforcement Threat Provision violates the Free Speech Clause of the First Amendment. ECF No. 1 ¶¶ 183-92 ("Count Four"). They contend the threat of "civil compliance investigations," J21 Order, § 4(b)(iii), "impermissibly restricts the exercise of NADOHE's and AAUP's constitutionally protected speech based on its content and viewpoint." ECF No. 1 ¶ 185. Plaintiffs note that the provision specifically states that it seeks to "deter DEI programs or principles (whether specifically denominated 'DEI' or otherwise)" and that the threat of private sector enforcement actions in furtherance of that deterrence constitutes content- and viewpoint-discriminatory restriction of speech, including that of some of NADOHE's institutional members. *Id.* ¶¶ 185-86.

### 4.    Implementation of the J20 and J21 Executive Orders

Since the issuance of the Orders, several steps have been taken by the executive branch to implement, among other portions of the Orders, the Challenged Provisions.

On January 22, 2025, a day after the J21 Order was issued, the White House released a fact sheet titled "President Donald J. Trump Protects Civil Rights and Merit-Based Opportunity by Ending Illegal DEI." ECF No. 27-19 at 3.[3] The fact sheet calls the J21 Order "the most important federal civil rights measure in decades," and states that the J21 Order "expands individual opportunity by terminating radical DEI preferencing in federal contracting and directing federal agencies to relentlessly combat private sector discrimination." *Id.* It describes the J21 Order as terminating DEI discrimination "in federal contracting and spending." *Id.* The fact sheet describes the Certification

---

[3] For clarity and consistency, the Court has cited to the ECF document numbers and pagination. Thus, when the ECF pagination and the parties' pagination differ, the Court's citation is to the ECF page number.

Provision to "require[] simple and unmistakable affirmation that contractors will not engage in illegal discrimination, including illegal DEI," and the Enforcement Threat Provision to "direct[] all departments and agencies to take strong action to end private sector DEI discrimination, including civil compliance investigations." *Id.* The fact sheet ends by reiterating the goal of a "colorblind and competence-based workplace," and blaming DEI for "intergroup hostility and authoritarianism" as well as for amplifying "prejudicial hostility" and exacerbating "interpersonal conflict." *Id.* at 4.

Also on January 22, 2025, the Department of Labor ("DOL") distributed a memorandum directing grantees to "cease all award activities related to [DEI or DEIA] under their federal awards." ECF No. 27-11 at 3; *accord* ECF No. 27-10 at 2. On January 28, 2025, Under Secretary of Defense Steven J. Morani issued a memorandum to the Department of Defense, instructing contracting officers to "cancel or amend solicitations and terminate or partially terminate existing contracts . . . and contract-like instruments . . . that contain diversity, equity, and inclusion (DEI) and diversity, equity, inclusion, and accessibility (DEIA) requirements." ECF No. 27-15 at 2.

On January 29, 2025, the Centers for Disease Control and Prevention ("CDC") sent a letter to grant recipients that states that grantees "must immediately terminate, to the maximum extent, all programs, personnel, activities, or contracts promoting 'diversity, equity, and inclusion' (DEI) at every level and activity, regardless of [their] location or the citizenship of employees or contractors, that are supported with funds from this award." ECF No. 27-13 at 2. The letter goes on to say that "[a]ny vestige, remnant, or re-named piece of any DEI programs funded by the U.S. government under this award are immediately, completely, and permanently terminated." *Id.*

On February 5, 2025, Attorney General Pamela Bondi issued a memorandum for all Department of Justice ("DOJ") employees with the subject line "ELIMINATING INTERNAL DISCRIMINATORY PRACTICES." ECF No. 27-14 at 2. The memorandum states, in relevant part, that pursuant to the directives in the J21 Order, each component of DOJ must submit a report to the Office of the Attorney General by March 15, 2025: "[c]onfirming the termination, to the maximum extent allowed by law, of . . . all 'equity-related' grants or contracts"; "[i]dentifying federal contractors . . . and grantees who have provided DEI training or DEI training materials to agency or department employees since January 20, 2021"; and "[i]dentifying federal grantees who received federal funding to provide or advance DEI, DEIA, or 'environmental justice' programs, services, or activities since January 20, 2021." *Id.* at 3. In preparing these reports, the memorandum advises that DOJ components "shall pay particular attention to ending references to DEI or DEIA in . . . training and programs, including references to 'unconscious bias,' 'cultural sensitivity,' [and] 'inclusive leadership.'" *Id.* at 3-4.

Also on February 5, 2025, the Attorney General issued a separate memorandum to all DOJ employees with the subject line "ENDING ILLEGAL DEI AND DEIA DISCRIMINATION AND PREFERENCES." ECF No. 27-21 at 2. The memorandum states, in relevant part, that pursuant to the directives in the J21 Order, the DOJ Civil Rights Division "will investigate, eliminate, and penalize illegal DEI and DEIA preferences, mandates, policies, programs, and activities in the private sector and in educational institutions that receive federal funds." *Id.* The memorandum requires the Civil Rights Division and the Office of Legal Policy to jointly submit a report to the Associate Attorney General by March 1, 2025 with "recommendations for enforcing federal civil-rights laws and taking other appropriate measures to encourage the private

sector to end illegal discrimination and preferences, including policies related to DEI and DEIA." *Id.* The memorandum states that the joint report should address, among other things, a "plan including specific steps to deter the use of DEI and DEIA programs or principles that constitute illegal discrimination or preferences," as well as "[o]ther strategies to end illegal DEI and DEIA discrimination and preferences and to comply with all federal civil-rights laws." *Id.* at 3.

On February 7, 2025, a Bluesky post stated that a "non-government business that contracts with the federal government" received a notice demanding that the contractor certify that it "does not operate any programs promoting Diversity, Equity, and Inclusion that violate any applicable Federal anti-discrimination laws." ECF No. 27-20 at 2. On February 10, 2025, according to an announcement from the so-called Department of Government Efficiency, the Department of Education terminated "29 training grants for diversity, equity and inclusion that total $101 million." ECF No. 27-17 at 3. One of the canceled grants was using funding to train teachers to "help students understand / interrogate the complex histories involved in oppression, and help students recognize areas of privilege and power on an individual and collective basis." *Id.*

Also on February 7, 2025, the Occupational Safety and Health Administration ("OSHA") removed a list of publications from its website, including publications such as "A Road Map for Healthcare Facilities (Workplace Violence)," "Improve Tracking of Workplace Injuries and Illnesses Fact Sheet," "Guidelines for Nursing Homes: Ergonomics for the Prevention of Musculoskeletal Disorders," and "OSHA Best Practices for Hospital-Based First Receivers." ECF No. 39-14 at 2. OSHA further advised

its staff that "[i]f [they] have wallet cards that include language, or can be interpreted [*sic*], on DEIA or gender ideology, please dispose of them as well." *Id.*

On February 11, 2025, Brendan Carr, Chairman of the Federal Communications Commission ("FCC"), sent a letter to the CEO of Comcast Corporation regarding "Comcast and NBCUniversal's Promotion of DEI." ECF No. 39-7 at 1. Carr wrote in the letter that he was "concerned that Comcast and NBCUniversal may be promoting invidious forms of DEI in a manner that does not comply with FCC regulations." *Id.* As examples, Carr pointed to Comcast stating on its website that promoting DEI is "a core value of [their] business," as well as having a "DEI infrastructure." *Id.* Carr noted that "[d]espite the emergence of DEI initiatives in recent years, these forms of discrimination have long been condemned by America's civil rights laws." *Id.* Carr broadly stated that the FCC's goal is to "ensure that every entity the FCC regulates complies with the civil rights protections enshrined in the Communications Act and the agency's EEO rules, including by shutting down any programs that promote invidious forms of DEI discrimination." *Id.* at 2.

Around February 12, 2025, the National Endowment for the Arts ("NEA") released new rules requiring grant applicants to agree not to "operate any programs promoting 'diversity, equity, and inclusion' (DEI) that violate any applicable Federal anti-discrimination laws, in accordance with [the J21 Order]." ECF No. 39-8 at 11. The rules go on to state that "[t]he United States has the right to seek judicial or administrative enforcement of this assurance." *Id.* at 12.

### B.    Plaintiffs

This action has been brought by four plaintiffs that contend their rights are violated by various aspects of the Orders: NADOHE, AAUP, Restaurant Opportunities

Centers United ("ROC United"), and the Mayor and City Council of Baltimore, Maryland ("Baltimore").

NADOHE is an "association for chief diversity officers and professionals with over 2,200 members," including "diversity, equity, inclusion, and accessibility professionals who work at institutions of higher education, as well as institutions of higher education themselves." ECF No. 1 ¶ 18. Many of NADOHE's members receive grants and contracts from the federal government; some offer education programs and degrees "in diversity, equity, and inclusion leadership and similar subject matters"; and some of NADOHE's members are institutions of higher education that have endowments exceeding $1 billion (a threshold invoked in the Enforcement Threat Provision). *Id.*

AAUP "is a membership association and labor union of faculty and academic professionals." *Id.* ¶ 19. "Many AAUP members are employees of institutions of higher learning" and "AAUP is committed to advancing academic freedom and shared governance, defining fundamental professional values and standards for higher education, promoting the economic security of academic workers, and ensuring higher education's contribution to the common good." *Id.*

ROC United "is a national membership organization of thousands of restaurant workers across the United States." *Id.* ¶ 20. The mission of ROC United, which receives grants from the federal government, "is to improve restaurant workers' lives by building worker power and uniting workers of various backgrounds around shared goals and values, including racial and gender equity." *Id.*

Baltimore "is a municipal corporation" organized under the Maryland Constitution and "the largest city in Maryland and the thirtieth largest city in the United

States." *Id.* ¶ 21. As explained below, Baltimore "is both a contractor and grantee of the federal government." *Id.* ¶ 128.

### C.    Procedural History

On February 3, 2025, Plaintiffs filed this lawsuit against President Trump, the Attorney General, and various other agencies and agency heads, sued in their official capacities. ECF No. 1 ¶¶ 22-44. Plaintiffs claim that certain provisions in the Orders violate the Spending Clause of Article I of the U.S. Constitution, *id.* ¶¶ 154-62, the Fifth Amendment, *id.* ¶¶ 163-82, the First Amendment, *id.* ¶¶ 183-201, and separation of powers, *id.* ¶¶ 202-10. Plaintiffs seek declaratory and injunctive relief. *Id.* at 41-42. Specifically, Counts One and Two allege that the Termination Provision in the J20 Order violates the Spending Clause and the Fifth Amendment. *Id.* ¶¶ 154-70. Counts Three and Four allege that the Enforcement Threat Provision of the J21 Order violates the Fifth Amendment and the First Amendment. *Id.* ¶¶ 171-92. And Counts Five and Six allege that the Certification Provision of the J21 Order violates the First Amendment and the separation of powers. *Id.* ¶¶ 193-210.

On February 13, 2025, Plaintiffs filed a motion for a temporary restraining order and/or preliminary injunction. ECF No. 27. The government opposed the motion. ECF No. 35. Plaintiffs filed a reply. ECF No. 39. The Court held a hearing on Plaintiffs' motion on February 19, 2025.

## II.    PRELIMINARY INJUNCTION STANDARD

To obtain a preliminary injunction, Plaintiffs must establish four factors: (1) that they are likely to succeed on the merits; (2) that they are likely to suffer irreparable harm absent relief; (3) that the balance of equities favors them; and (4) that an injunction is in the public interest. *Frazier v. Prince George's Cnty.*, 86 F.4th 537, 543

(4th Cir. 2023) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). The balance of equities and the public interest factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Plaintiffs must demonstrate all four factors to obtain relief. *Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342, 347 (4th Cir. 2009), *vacated on other grounds*, 559 U.S. 1089 (2010). And a preliminary injunction, being an "extraordinary remedy," may "only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22 (citing *Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997)).

## III.    LIKELIHOOD OF SUCCESS ON THE MERITS

### A.    Standing/Ripeness

#### 1.    Standing

Before addressing Plaintiffs' allegations, the Court must determine whether Plaintiffs have shown sufficient likelihood that they have standing under Article III of the Constitution to bring this action, that is, that Plaintiffs have "a 'personal stake' in the dispute." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 379 (2024) (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021)).

##### a)    *Legal standards*

"[T]he doctrine of standing identifies disputes appropriate for judicial resolution." *Cooksey v. Futrell*, 721 F.3d 226, 234 (4th Cir. 2013) (quoting *Miller v. Brown*, 462 F.3d 312, 316 (4th Cir. 2006)). A plaintiff establishes standing to bring a case by establishing three elements:

> First, the plaintiff must have suffered an injury in fact that is both concrete and particularized and actual or imminent, not conjectural or hypothetical. Second, the plaintiff's injury must be fairly traceable to the challenged action of the defendant, meaning that there must be a causal connection between the

> injury and the conduct complained of. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Dep't of Educ. v. Brown*, 600 U.S. 551, 561 (2023) (cleaned up, quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). "The second and third standing requirements—causation and redressability—are often 'flip sides of the same coin'" in that "[i]f a defendant's action causes an injury, enjoining the action or awarding damages for the action will typically redress that injury." *Food & Drug Admin.*, 602 U.S. at 380-81 (quoting *Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 288 (2008)). Thus, "the two key questions in most standing disputes are injury in fact and causation." *Id.* at 381. The Supreme Court has also stated that standing is "usually easy to establish" where "Government regulations . . . require or forbid some action by the plaintiff" because plaintiffs in such circumstances "almost invariably satisfy both the injury in fact and causation requirements." *Id.* at 382.

When plaintiffs "seek declaratory and injunctive relief, they must establish an ongoing or future injury in fact." *Kenny v. Wilson*, 885 F.3d 280, 287 (4th Cir. 2018) (citing *O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974)). When plaintiffs allege fear of *future* injury, they can show "a sufficiently imminent injury in fact if plaintiffs allege 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'" *Id.* at 288 (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)). A credible threat of future enforcement exists "so long as the threat is not 'imaginary or wholly speculative,' 'chimerical,' or 'wholly conjectural.'" *Id.* (internal citations omitted) (quoting *Babbitt*, 442 U.S. at 302; *Steffel v. Thompson*, 415 U.S. 452, 459 (1974); and *Golden v. Zwickler*, 394 U.S. 103, 109 (1969)).

For First Amendment claims, however, standing requirements "are somewhat relaxed." *Cooksey*, 721 F.3d at 235.

> Even where a First Amendment challenge could be brought by one actually engaged in protected activity, there is a possibility that, rather than risk punishment for his conduct in challenging the statute, he will refrain from engaging further in the protected activity. Society as a whole then would be the loser. Thus, when there is a danger of chilling free speech, the concern that constitutional adjudication be avoided whenever possible may be outweighed by society's interest in having the statute challenged.

*Id.* (quoting *Sec'y of State of Md. v. Joseph H. Munson Co., Inc.*, 467 U.S. 947, 956, (1984)). "The leniency of First Amendment standing manifests itself most commonly in the doctrine's first element: injury-in-fact," which is "commonly satisfied by a sufficient showing of 'self-censorship, which occurs when a claimant is chilled from exercising h[is] right to free expression.'" *Id.* (alteration in original) (quoting *Benham v. City of Charlotte*, 635 F.3d 129, 135 (4th Cir. 2011)). Thus, "to demonstrate injury in fact, it is sufficient to show that one's First Amendment activities have been chilled" as long as the chilling effect is objectively reasonable and not subjective or speculative. *Id.* (quoting *Benham*, 635 F.3d at 135).

When an organization is alleging harm, it may establish standing based on its own injury or based on its members' injuries, the latter of which is called representational or associational standing. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023). To establish representational standing, "an organization must demonstrate that '(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted

nor the relief requested requires the participation of individual members in the lawsuit.'" *Id.* (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)). An organization need only "make specific allegations establishing that at least one identified member had suffered or would suffer harm." *S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013) (emphasis omitted) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009)).

### b) *Defendants' arguments as to standing*

In discussing standing, Defendants raise their arguments generally rather than through the lens of each of the three Challenged Provisions.

First, contrary to Defendants' argument, Plaintiffs have adequately identified, albeit anonymously, specific affected members who would individually have standing. This argument goes to whether NADOHE and AAUP have representational standing. Defendants do not suggest that such a means of identification is improper, and instead argue that "without knowing the . . . specific features of the grants or contracts at issue . . . Defendants and the Court cannot evaluate whether such contracts or grants have features allowing them to be terminated consistent with the law." ECF No. 35 at 10 n.1. For the reasons stated below, the Court disagrees, as much of the analysis revolves around Plaintiffs' reasonable fears and chilling of speech, rather than the specifics of the grants. Defendants do not challenge the other two prongs of the representational standing test.[4]

---

[4] NADOHE has also adequately shown standing on its own behalf because the government action at issue "directly affected and interfered with [its] core business activities." *Food & Drug Admin.*, 602 U.S. at 395; *see also* ECF No. 27-23 ¶¶ 9, 26, 39-

Second, Defendants contend that ROC and Baltimore fail to identify an injury-in-fact because they do not identify imminent disruption to any particular contract and instead merely speculate that they may see reductions based on future agency actions. ECF No. 35 at 11. As discussed below, these Plaintiffs have alleged sufficient actual or imminent injury for standing purposes for all relevant provisions.

Third, Defendants argue that Plaintiffs have failed to allege injury that is "fairly traceable to the challenged action." *Brown*, 600 U.S. at 561 (quoting *Lujan*, 504 U.S. at 560). Defendants assert that the Orders did not terminate any particular grant or program, but merely provided policy directives to federal agencies. They claim that "[a]ny alleged future harm necessarily depends on future action by federal agencies that plaintiffs have not adequately alleged has occurred and impacted them." ECF No. 35 at 11 (citing *Louisiana v. Biden*, 64 F.4th 674, 681 (5th Cir. 2023) and *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1254 (11th Cir. 2020)). Below, the Court will discuss how each Plaintiff has adequately shown cognizable injuries-in-fact that are traceable to the three Challenged Provisions.

### c)    *The Termination Provision*

Each Plaintiff has shown at least one adequately imminent and concrete injury-in-fact in connection with the Termination Provision. As stated above, that provision instructs "[e]ach agency, department, or commission head, in consultation with the Attorney General, the Director of OMB, and the Director of OPM" to "terminate, to the

---

42, 44-46, ECF No. 39-3 ¶ 8 (discussing the threats to NADOHE's core missions and its continued existence). But given the representational standing, the Court need not further address NADOHE's individual standing.

maximum extent allowed by law, . . . all . . . 'equity-related' grants or contracts" within 60 days. J20 Order § 2(b)(i).

NADOHE asserts that Individual Member A, "who provides services to a university as a consultant, has had contracts terminated by the university client because the J20 Order threatens the termination of the grant funding from the National Science Foundation ["NSF"] that funded Individual Member A's contract." ECF No. 27-23 ¶ 33. NADOHE further alleges that this same member has "lost her salary and any discretionary funds when all of her contracts 'c[a]me to an abrupt halt and contracting for future work . . . evaporated.'" ECF No. 39-3 ¶ 6 (alteration in original). NADOHE also alleges that Institutional Member A, "in light of the J20 Order, cancelled a conference on alternate models of education at [Historically Black Colleges and Universities] because the program was funded in part by a grant from the Department of Labor" and that panel participants "had been barred from participation by their own organizations on account of the J20 Order." ECF No. 27-23 ¶ 22.

AAUP has a member who is a professor at a Virginia university with an NSF grant regarding "Gender Equity in STEM [Science, Technology, Engineering and Mathematics] Academic Professions" "to research potential disparities affecting women in science." ECF No. 39-2 ¶ 4. After requesting travel accommodations to a conference as a part of their grant work, "the professor received an email on February 6, 2025, from their Program Officer with NSF notifying them that the NSF employee 'cannot make the determination' regarding the travel until it is determined that 'the activity is aligned with the administration's executive orders.'" *Id.* Another AAUP member who is a professor at the University of Texas at Austin stated that "on January 29, 2025, the university's Office of Sponsored Projects received an e-mail 'stop work order'" regarding

a National Academy of Sciences ("NAS") subaward. *Id.* ¶ 6. The member's project at issue was "focused on equity of access to crucial services and goods." *Id.* The email provided that NAS "is hereby issuing University of Texas at Austin this notice of Termination for Convenience effective as of the date of this letter for all work associated with the above referenced Subaward" because "NAS has determined to take certain actions with respect to federally funded contracts following the issuance of the" J20 and J21 Orders. *Id.* A third AAUP member is a professor at the University of Connecticut and "works on a project to broaden diversity" in the STEM workforce that is funded by NSF. *Id.* ¶ 7. "On January 31, 2025, this member received an email from the Principal Investigator—the faculty member in charge—of that project 'to pause project activities until we receive further guidance from NSF . . . .'" *Id.*

On January 22, 2025, ROC United "received e-mail notices from DOL's Women's Bureau and OSHA to 'cease all activities related to "diversity, equity, and inclusion" (DEI) or "diversity, equity, inclusion, and accessibility" (DEIA) under their federal awards, consistent with the requirements of . . .' the J20 Order and a related anti-DEIA order signed by President Trump on January 21, 2025." ECF No. 27-25 ¶ 26. "In addition, OSHA instructed ROC United to: 'effective immediately! Cease collecting and reporting trainees DEI information,'" *id.* ¶ 29, which caused ROC United to stop work on projects funded by two federal grants. *Id.* ¶¶ 30-31.

Baltimore received a January 29, 2025 letter from the U.S. Department of Health and Human Services that demanded that Baltimore "immediately terminate" all activities "promoting 'diversity, equity, and inclusion'" "that are supported with funds from [a CDC] award" in light of the Orders. ECF No. 27-13 at 2. Baltimore also received an email on February 14, 2025 "from AmeriCorps informing [it] that three of [its]

AmeriCorps grants had been flagged for review" because they contained words like "Diversity," "Equity," "Equity Action Plan," and "DEI" as well as "Environmental Justice" and "Climate Change." ECF No. 39-4 ¶¶ 4-8. The email asserted that by February 19, 2025, Baltimore must either "(1) Certify that the awards, using proscribed language, 'compl[y] with all administration Executive Orders and do[] not include any activities that promote DEI activities'; (2) Stop providing noncompliant services . . . ; or (3) Forgo this AmeriCorps funding altogether." *Id.* ¶ 11.

These are all concrete actual injuries suffered by Plaintiffs and their members. Moreover, the injuries are directly traceable to the Orders. It is also likely that Plaintiffs' injuries will be redressed by a favorable decision. Therefore, all four Plaintiffs have standing to challenge the Termination Clause.

### d)    *The Certification and Enforcement Threat Provisions*

The Court will address the Certification and Enforcement Threat Provisions together as they both implicate First Amendment concerns and are therefore subject to the more lenient standing standard under which each Plaintiff must merely "show that one's First Amendment activities have been" objectively and reasonably chilled. *Cooksey*, 721 F.3d at 235 (quoting *Benham*, 635 F.3d at 135).

All four Plaintiffs have met the lower bar to establish injury-in-fact for the Certification Provision, as have NADOHE and AAUP regarding the Enforcement Threat Provision (as they are the only Plaintiffs challenging that provision, *see* ECF No. 1 ¶¶ 172, 184).

NADOHE asserts that its Institutional Members B through G have been forced to stop certain "curricular programs or requirements" because they fear "adverse

consequences from federal agencies" in light of the Certification Provision. ECF No. 27-23 ¶ 29. Similarly, Institutional Member H of NADOHE fears the dictates of the Enforcement Threat Provision because it is an institution of higher education with an endowment over $1 billion and is concerned that its protected speech will be penalized and fears it "may be targeted for investigation but lack[s] clarity about how to avoid the financial, reputational, and organizational costs of such an investigation." *Id*. ¶ 31.

Likewise, AAUP and its members fear that their activities, including appointing standing committees such as "the Committee on Historically Black Institutions and Scholars of Color" and "the Committee on Gender and Sexuality in the Academic Profession," run afoul of the directives in the Executive Orders. ECF No. 27-24 ¶ 28. AAUP's members also "fear they may have to limit how they choose to participate in DEIA programs in order to meet the certification requirements and to avoid facing penalties under the FCA [False Claims Act] or be unable to sign the certification requirement and lose their funding altogether." *Id*. ¶ 31. AAUP further asserts that several members "work at institutions of higher education with endowments exceeding 1 billion dollars" "whose teaching or research focuses on topics related to diversity or equity" and who "fear that their work . . . might endanger their own institutions and lead to adverse employment consequences" under the Enforcement Threat Provision. *Id*. ¶ 40.

As stated above, Baltimore received emails on February 14, 2025 from AmeriCorps providing that Baltimore was required to certify by February 19, 2025 either that three grants complied with the Orders, to stop providing noncompliant services and initiate an amendment to the award, or to forgo funding. ECF No. 39-4 ¶¶ 4-8, 11; ECF No. 39-10 at 2. Baltimore asserts that it "fears it may have to abandon its

lawful efforts and speech related to diversity, equity, inclusion, and accessibility, or else lose federal funds that support the City's valuable programs." ECF No. 27-26 ¶ 35; *see also id.* ¶¶ 37-42 (listing specific activities Baltimore fears fall under the Orders).

ROC United asserts that it "ha[s] no way of doing [its] work and living out [its] mission without speaking about ending occupational segregation and building career ladders for workers who have historically been denied opportunities," and "fear [it] may have to stop addressing racial and gender equity to avoid financial and other penalties by the federal government. Or if [it] decline[s] to certify, [it] risk[s] losing all federal funding." ECF No. 27-25 ¶¶ 38, 40.

Plaintiffs have adequately shown that they are injured by these provisions because they reasonably expect that they will be forced to either restrict their legal activities and expression that are arguably related to DEI, or forgo federal funding altogether.

The causation and redressability requirements are also met. In all cases, these objectively reasonable fears arise from the vague language in the Orders, and can be redressed by a favorable decision. *See Food & Drug Admin.*, 602 U.S. at 382 (providing that "standing is usually easy to establish" where "Government regulations . . . require or forbid some action by the plaintiff" because the plaintiffs in such circumstances "almost invariably satisfy both the injury in fact and causation requirements"). Enjoining Defendants from imposing the Certification and Enforcement Threat Provisions will prevent the chilling effects that flow from those provisions.

### 2.    Ripeness

Like standing, as a threshold matter, Plaintiffs must also establish that their claims are ripe. *Wild Va. v. Council on Envtl. Quality*, 56 F.4th 281, 293 (4th Cir. 2022).

"While standing involves 'the question . . . of *who* may sue,' ripeness involves '*when* they [may] sue.'" *Id.* (alterations in original) (quoting *South Carolina v. United States*, 912 F.3d 720, 730 (4th Cir. 2019)). In reviewing ripeness, courts consider "(1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Id.* (quoting *Deal v. Mercer Cty. Bd. of Educ.*, 911 F.3d 183, 191 (4th Cir. 2018)). "A claim should be dismissed as unripe if the plaintiff has not yet suffered injury and any future impact 'remains wholly speculative'" while "[a] case is fit for judicial decision when the issues are purely legal and when the action in controversy is final and not dependent on future uncertainties." *Id.* (quoting *Doe v. Va. Dep't of State Police*, 713 F.3d 745, 758 (4th Cir. 2013)).

Defendants argue a lack of ripeness as to all claims generally, rather than in connection with the First and Fifth Amendment claims separately. Ripeness in connection with the Fifth Amendment claims is discussed below in section III.C.2. As with standing, "ripeness requirements are also relaxed in First Amendment cases." *Cooksey*, 721 F.3d at 240. "First Amendment rights . . . are particularly apt to be found ripe for immediate protection, because of the fear of irretrievable loss. In a wide variety of settings, courts have found First Amendment claims ripe, often commenting directly on the special need to protect against any inhibiting chill." *Id.* (omission in original) (quoting *New Mexicans for Bill Richardson v. Gonzales*, 64 F.3d 1495, 1500 (10th Cir. 1995)). Standing and ripeness are "viewed through the same lens" in this context and are "inextricably linked." *Id.*

Defendants' arguments focus on the contention that because Plaintiffs do not know whether their contracts or grants will be terminated or, if so, on what basis, that

Plaintiffs' claims are unripe and purely speculative. Defendants assert that Plaintiffs' claims

> are contingent upon several layers of future actions that are not only hypothetical but also contradictory: Plaintiffs' claims assume that agencies will not only take actions that will directly impact Plaintiffs but will do so both in service of the [Orders'] directive to deprioritize DEI *and* in violation of the [Orders'] directive to stay within the confines of the law.

ECF No. 35 at 13. However, as discussed above with respect to standing, regarding their First Amendment claims Plaintiffs have adequately shown that their speech has been and will continue to be chilled in light of the Challenged Orders based both on actions currently being taken by Defendants and based on Plaintiffs' reasonable fears. The First Amendment claims are fit for judicial decision and Plaintiffs have convinced the Court that significant hardship would occur without a decision. Thus, Plaintiffs' First Amendment Claims are ripe.

### B. Plaintiff's Claims and the Relevant Legal Standards

As explained above, Plaintiffs assert that the Challenged Provisions violate the First Amendment (free speech), the Fifth Amendment (due process vagueness), and separation of powers (including the spending clause of the Constitution, art. I, § 1, 8). As explained below, Plaintiffs have established entitlement to a preliminary injunction on their First and Fifth Amendment claims. The Court need not and does not reach whether Plaintiffs have also shown a likelihood of success on the merits on their separation of powers claims. This section III.B describes the applicable legal standards. The Court applies these standards to Plaintiffs' claims in subsequent sections.

### 1.     First Amendment Claims (Counts 4 & 5)

As noted above, Counts 4 and 5 of Plaintiffs' complaints arise under the First Amendment. In Count 4, Plaintiffs allege that by purporting to "deter DEI programs or principles (whether specifically denominated 'DEI' or otherwise)," and threatening to bring enforcement against perceived violators of the undefined standards, the Enforcement Threat Provision is a content-based and viewpoint-discriminatory restriction on protected speech that has the effect of "penaliz[ing] the protected speech of NADOHE's institutional members," ECF No. 1 ¶ 186, and otherwise infringing upon Plaintiffs' free-speech rights protected by the First Amendment, *id*. ¶¶ 189, 191. As for Count 5, which addresses the Certification Provision, Plaintiffs distill their First Amendment claim as follows:

> This Certification Provision—contained in an executive order characterizing DEIA as "illegal" and "violat[ions of] the text and spirit of our longstanding Federal civil-rights laws, *id*. § 1—is designed to chill federal contractors' and grantees' speech related to diversity, equity, inclusion, and accessibility. Through this provision, President Trump brandishes the threat of FCA enforcement to quiet federal contractors' and grantees' dissenting views.

ECF No. 1 ¶ 197.

Plaintiffs contend the chilling effect of those executive order provisions is exacerbated by the vagueness of the orders' key terms. *See, e.g*., ECF No. ¶ 198 ("The President does not define any of the key terms of these prohibitions. It is not clear what 'so-called "diversity, equity, and inclusion" (DEI)' means, *see* J21 Order, § 1; nor does it provide any guidance on how such programs or initiatives can be considered to 'violate the text and spirit of our longstanding Federal civil-rights laws.' *Id*."); *id*. ¶ 199 ("As a

result, Plaintiffs are chilled from expressing or participating in anything that might draw the ire of the President or his administration when it comes to DEI.").

For the reasons discussed later in this opinion, the Court concludes that Plaintiffs have shown a likelihood of success on the merits of Counts 4 and 5. This section describes the basic legal framework applicable to Plaintiffs' First Amendment claim. The Enforcement Threat Provision targets private persons, companies and organizations unrelated to whether they are government contractors or grantees, and thus the Court begins with an overview of the framework for claims asserting facial challenges against content-based and viewpoint-discriminatory restrictions on protected speech. The Termination Provision and Certification Provision target government contractors and grantees; the Court addresses the First Amendment standards to those contexts below.[5]

### a)    Content and viewpoint discrimination

The First Amendment prohibits the enactment of laws "abridging the freedom of speech." U.S. Const., amend. I. "The First Amendment generally prevents government from proscribing speech, . . . or even expressive conduct, . . . because of disapproval of the ideas expressed." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992) (citing *Cantwell v. Connecticut*, 310 U.S. 296, 309-311 (1940), and *Texas v. Johnson*, 491 U.S. 397, 412, 414 (1989)). In other words, "a government . . . 'has no power to restrict expression because of its message, its ideas, its subject matter, or its content.'" *Reed v.*

---

[5] None of the Plaintiffs or their members are government employees, and the relief Plaintiffs seek does not extend to government employees. Different standards may pertain to claims brought by government employees. *See, e.g.*, *Garcetti v. Ceballos*, 547 U.S. 410 (2006).

*Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015) (quoting *Police Dept. of Chicago v. Mosley*, 408 U.S. 92, 95 (1972)).

"Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Id.* (citing *R.A.V.*, 505 U.S. at 395; *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 115, 118 (1991)). "Deciding whether a particular regulation is content based or content neutral is not always a simple task." *Turner Broadcasting Sys., Inc. v. F.C.C.*, 512 U.S. 622, 642 (1994). The "principal inquiry in determining content neutrality . . . is whether the government has adopted a regulation of speech because of [agreement or] disagreement with the message it conveys." *Ward v. Rock Against Racism,* 491 U.S. 781, 791 (1989). "This commonsense meaning of the phrase 'content based' requires a court to consider whether a regulation of speech 'on its face' draws distinctions based on the message a speaker conveys." *Reed*, 576 U.S. at 163 (quoting *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 565-66 (2011)). "Some facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose. Both are distinctions drawn based on the message a speaker conveys, and, therefore, are subject to strict scrutiny." *Id.* at 163-64. Moreover, "it is well established that '[t]he First Amendment's hostility to content-based regulation extends not only to restrictions on particular viewpoints, but also to prohibition of public discussion of an entire topic.'" *Id.* at 169 (quoting *Consolidated Edison Co. of N.Y. v. Public Serv. Comm'n of N. Y.*, 447 U.S. 530, 537 (1980)).

Whether a government action is "content based" does not (at least generally) turn on motivation. "A law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech." *Id.* at 165 (citing *Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 429 (1993)); *see also Turner,* 512 U.S. at 642 (holding that although "a content-based purpose may be sufficient in certain circumstances to show that a regulation is content based, it is not necessary").

One form of "content-based" speech regulation is "[g]overnment discrimination among viewpoints." *Reed*, 576 U.S. at 168 (quoting *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)). Viewpoint discrimination means "the regulation of speech based on 'the specific motivating ideology or the opinion or perspective of the speaker.'" *Id.* (quoting *Rosenberger*, 515 U.S. at 829). Both content-based and viewpoint-based regulation are subject to strict scrutiny. *Boos v. Barry*, 485 U.S. 312, 320 (1988); *Rosenberger*, 515 U.S. at 829. But the most "blatant" and "egregious form of content discrimination" is viewpoint discrimination. *Reed*, 576 U.S. at 168-69 (quoting *Rosenberger*, 515 U.S. at 829); *see also id.* at 174 (Alito, J., concurring) ("Content-based laws merit [strict scrutiny] protection because they present, albeit sometimes in a subtler form, the same dangers as laws that regulate speech based on viewpoint."). Similarly, where legislation or executive action regulates speech depending on the "identity of the speaker," such "[s]peech restrictions" are subject to strict scrutiny because they "are all too often simply a means to control content." *Id.* at 170 (quoting *Citizens United v. Federal Election Comm'n*, 558 U.S. 310, 340 (2010)); *see also id.* ("'[L]aws favoring some speakers over others demand strict scrutiny when the legislature's speaker preference reflects a content preference'")

31

(quoting *Turner*, 512 U.S. at 658); *Rosenberger*, 515 U.S. at 829 ("The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction.").

Finding a statute "viewpoint discriminatory" is "all but dispositive" in a First Amendment challenge, at least outside the context of government employees or contractors (which is discussed below). *Sorrell*, 564 U.S. at 571. "The State may not burden the speech of others in order to tilt public debate in a preferred direction." *Id*. at 578-79.

A content-based restriction on speech is subject to strict scrutiny, meaning such restrictions are "presumptively unconstitutional and may be justified only if the government proves that [it is] narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163. "[R]egulations that are *unrelated* to the content of speech are subject to an intermediate level of scrutiny . . . because in most cases they pose a less substantial risk of excising certain ideas or viewpoints from the public dialogue." *Turner,* 512 U.S. at 642 (emphasis added).

### b)    *Federal grantees and contractors*

A number of the organizational Plaintiffs' members are government contractors and grantees. As discussed above, the Certification Provision applies to "Federal contractors and subcontractors." J21 Order, § 3(b)(iii). And although the Enforcement Threat Provision applies to the entire "private sector," that includes government contractors and grantees. Plaintiffs have asserted facial First Amendment challenges to both the Certification Provision (Count 5) and Enforcement Threat Provision (Count 4). In addition, with respect to the Termination Provision, although Plaintiffs have not asserted a standalone First Amendment claim, their Fifth

Amendment due process claim (Count 2) turns in part on the applicability of the First Amendment to recipients of "equity-related" grants or contracts. That is because the applicable void-for-vagueness standard depends in part on whether "a vague statute abuts upon sensitive areas of basic First Amendment Freedoms." *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972) (cleaned up); *see also, e.g.*, *Holder v. Humanitarian Law Project*, 561 U.S. 1, 19 (2010) ("[W]hen a statute 'interferes with the right of free speech or of association, a more stringent vagueness test should apply.") (quoting *Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982)); *Sessions v. Dimaya*, 584 U.S. 148, 183 (2018) (Gorsuch, J., concurring) ("[A] 'stringent vagueness test' should apply to at least some civil laws—those abridging basic First Amendment freedoms."). Thus, the question whether Plaintiffs have shown a likelihood of success on Count Five—and to some extent Count Four—implicates the law applicable to whether, and to what extent, the government may lawfully restrict speech by government contractors and grantees.

The First Amendment does restrain, in certain ways, the government's right to restrict government contractors' and grantees' free speech rights. This context sits at the intersection of several strands of First Amendment doctrine. And thus, as this case proceeds, the applicability of particular aspects of the doctrine may differ depending on which particular claims, which subsets of Plaintiffs or their members, and which Challenged Provisions, are at issue. But at this preliminary stage, when the question presented is whether Plaintiffs have shown a likelihood that they will succeed on the merits of their First Amendment claims, the following principles are salient.

"[W]hen individuals enter into government employment or contracts, they accept certain restrictions on their freedom as part of the deal." *Fulton v. City of Philadelphia,*

*Pennsylvania*, 593 U.S. 522, 535 (2021). "The government needs to be free to terminate both employees and contractors for poor performance, to improve the efficiency, efficacy, and responsiveness of service to the public, and to prevent the appearance of corruption." *Board of Cnty. Com'rs, Wabaunsee Cnty., Kan. v. Umbehr*, 518 U.S. 668, 674 (1996) ("*Wabaunsee County*"). "And, absent contractual, statutory, or constitutional restriction, the government is entitled to terminate them for no reason at all." *Id.* In other words, "the First Amendment does not create property or tenure rights, and does not guarantee absolute freedom of speech." *Id.* at 675.

But government contractors, and government grantees, retain First Amendment rights in two important, and relevant, ways.

First, when the government funds a program or activity, although the government may "define the limits of the government spending program"—*i.e.*, "specify the activities Congress wants to subsidize"—the First Amendment prohibits the government from "seek[ing] to leverage funding to regulate speech outside the contours of the program itself." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214-15 (2013) ("*AID*"). In *AID*, the Supreme Court held that Congress's policy requirement in the Leadership Act, which required organizations that receive funding under the Act to have a policy expressly opposing prostitution, "demand[ed] that funding recipients adopt—as their own—the Government's view on an issue of public concern," thereby affecting "protected conduct outside the scope of the federally funded program." *Id.* at 217-18 (quoting *Rust v. Sullivan*, 500 U.S. 173, 197 (1991)). The "line" between "conditions that define the limits of the government spending program" and "conditions that seek to leverage funding to regulate speech outside the contours of the program itself" is not always "clear" because "the definition of a particular program can

34

always be manipulated to subsume the challenged condition." *Id.* at 215-16. Thus, although the government may "cho[ose] to fund one activity to the exclusion of another," at least so long as in doing so it is not "discriminat[ing] on the basis of viewpoint," *Rust*, 500 U.S. at 193, and "a legislature's [or, presumably, executive's] decision not to subsidize the exercise of a fundamental right does not infringe that right," *Regan v. Taxation with Representation of Wash*, 461 U.S. 540, 549 (1983), attempts to limit the scope of a grant or contract can also be subject to First Amendment scrutiny, "lest the First Amendment be reduced to a simple semantic exercise." *AID*, 570 U.S. at 215 (quoting *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 547 (2001)).

Second, the government may not terminate government contracts "*because of* the[] [contractors' or grantees'] speech on matters of public concern." *Wabaunsee County*, 518 U.S. at 675. After all, under the "unconstitutional conditions" doctrine, "the government 'may not deny a benefit to a person on a basis that infringes his constitutionally protected . . . freedom of speech' even if he has no entitlement to that benefit." *Id.* at 674 (quoting *Perry v. Sindermann,* 408 U.S. 593, 597 (1972)).

At least with respect to a government contractor, to prevail on a claim that the government has unconstitutionally infringed its free speech rights, it "must prove that the conduct at issue was constitutionally protected, and that it was a substantial or motivating factor in the termination." *Id.* at 675. "If the [contractor] discharges that burden, the government can escape liability by showing that it would have taken the same action even in the absence of the protected conduct." *Id.* "And even termination because of protected speech may be justified when legitimate countervailing government interests are sufficiently strong." *Id.* That is because government contractors' "First Amendment rights depend on the 'balance between the interests of

the [contractor], in commenting upon matters of public concern and the interest of the [government], as an employer, in promoting the efficiency of the public services it performs through its [contractors]." *Id.* at 676 (quoting *Pickering v. Board of Ed. of Twp. High Sch. Dist. 205, Will Cnty.,* 391 U.S. 563, 568 (1968)); *see also id.* at 677-78 (explaining that "*Mt. Healthy* [*City Bd. of Ed. v. Doyle,* 429 U.S. 274 (1977)] assures the government's ability to terminate contracts so long as it does not do so in retaliation for protected First Amendment activity. *Pickering* requires a fact-sensitive and deferential weighing of the government's legitimate interests."). In short, the government does not have "*carte blanche* to terminate independent contractors for exercising First Amendment rights." *Id.* at 679.[6]

### 2.    Fifth Amendment Vagueness Claims (Counts 2 & 3)

The Fifth Amendment to the U.S. Constitution guarantees that "[n]o person shall be . . . deprived of life, liberty, or property without due process of law." U.S. Const. amend. V. "[C]larity in regulation is essential to the protections provided by the Due Process Clause of the Fifth Amendment." *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) (citing *United States v. Williams*, 553 U.S. 285, 304 (2008)). "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned*, 408 U.S. at 108; *see also Williams*, 553

---

[6] For purposes of preliminary injunctive relief, for the reasons explained below, Plaintiffs have shown a likelihood of success on the merits of their First Amendment claims as to contractors and grantees—the latter in part because of application of the test set forth in *AID,* 570 U.S. at 206). The Court need not and does not decide whether (or to what extent) the *Pickering* burden-shifting and balancing components of the *Wabaunsee County* analysis apply to government grantees, as opposed to contractors.

U.S. at 304 (describing vagueness doctrine as "an outgrowth . . . of the Due Process Clause of the Fifth Amendment.").

There are "at least two connected but discrete" due process concerns that underlie the void for vagueness doctrine. *Fox Television*, 567 U.S. at 253.

First, due process requires that parties "know what is required of them so they may act accordingly." *Id.*; *see also Grayned*, 408 U.S. at 108 ("Vague laws may trap the innocent by not providing fair warning."). "Perhaps the most basic of due process's customary protections is the demand of fair notice." *Sessions v. Dimaya*, 584 U.S. 148, 177 (2018) (Gorsuch, J., concurring). "[V]oid for vagueness doctrine, at least properly conceived, serves as a faithful expression of ancient due process and separation of powers principles the framers recognized as vital to ordered liberty under our Constitution." *Id.* at 176. "Without an assurance that the laws supply fair notice, so much else of the Constitution risks becoming only a 'parchment barrier' against arbitrary power." *Id.* at 181 (citing The Federalist No. 48, p. 308 (C. Rossiter ed. 1961) (J. Madison)).

Second, clear guidance ensures that "those enforcing the law do not act in an arbitrary or discriminatory way." *Fox Television*, 567 U.S. at 253 (citing *Grayned*, 408 U.S. at 108-09). The void-for-vagueness doctrine also is a "corollary" of separation-of-powers principles; "[i]f the legislature could set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, it would substitute the judicial for the legislative department." *Sessions*, 584 U.S. at 156 (cleaned up) (quoting *Kolender v. Lawson*, 461 U.S. 352, 357-58 (1983)).

The vagueness doctrine analysis is not uniform across all case types. "[T]he degree of vagueness that the Constitution [allows] depends in part on the nature of the

enactment." *Id.* at 156 (quoting *Hoffman Estates*, 455 U.S. at 498). For example, the Supreme Court has "expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe." *Id.* at 156 (quoting *Hoffman Estates*, 455 U.S. at 498-99). By comparison, when the government awards "selective subsidies," there is some tolerance for vagueness because "the consequences of imprecision are not constitutionally severe." *See Nat'l Endowmt. for the Arts v. Finley*, 524 U.S. 569, 589 (1998). But the requirement to avoid vagueness is particularly high when a law "threatens to inhibit the exercise of constitutionally protected rights." *Hoffman Estates*, 455 U.S. at 499. "If, for example, the law interferes with the right of free speech or of association, a more stringent vagueness test should apply." *Id.* Indeed, "[p]recision of regulation must be the touchstone in an area so closely touching our most precious freedoms." *NAACP v. Button*, 371 U.S. 415, 438 (1963); *see also Reno v. ACLU*, 521 U.S. 844, 871-72 (1997) (explaining that "vagueness" of "content-based regulation of speech" raises "special First Amendment concerns because of [their] obvious chilling effect on free speech").

### C.    Termination Provision

#### 1.    Fifth Amendment vagueness claim

Plaintiffs have shown a likelihood of success on their claim that the Termination Provision is void for vagueness under the Fifth Amendment for two main reasons. First, the vagueness of the term "'equity-related' grants or contracts" invites arbitrary and discriminatory enforcement. Second, the vagueness of the term offers insufficient notice

to current grantees about whether and how they can adapt their conduct to avoid termination of their grants or contracts.[7]

### a)    *Potential for arbitrary enforcement*

One of the primary rationales of the void-for-vagueness doctrine is the importance of preventing "arbitrary and discriminatory enforcement." *Grayned*, 408 U.S. at 108. "[I]f arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to [those enforcing the law] for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Id.* at 108-09 (footnote omitted). Such vague laws "to some extent, substitute the judicial for the legislative department of government." *Kolender*, 461 U.S. at 358 n.7 (internal quotation marks omitted). "Nor is the worry only that vague laws risk allowing judges to assume legislative power." *Sessions*, 584 U.S. at 182 (Gorsuch, J., concurring). "Vague laws also threaten to transfer legislative power to police and prosecutors, leaving to them the job of shaping a vague statute's [or, as here, executive order's] contours through their enforcement decisions." *Id.* (citing *Grayned*, 408 U.S. at 108-09).

Here, the very real possibility of arbitrary and discriminatory enforcement—both between and within executive agencies—is rooted in the vagueness of the term "'equity-related' grants or contracts."

---

[7] Although many vagueness challenges take place within the statutory context, the same principles apply in the consideration of executive orders. *See, e.g.*, *Humanitarian Law Project v. U.S. Treasury Dep't*, 578 F.3d 1133, 1146-47 (9th Cir. 2012) (relying upon principles and case law relied upon in statutory vagueness cases to analyze the vagueness of an executive order).

First, the term "equity" itself is broad. Although much of the J20 Order relates to DEI and DEIA, "equity" is a concept that transcends issues of diversity, inclusion, and accessibility. It also extends beyond areas addressed by anti-discrimination efforts and civil rights laws. *Cf.* J20 Order § 1 (stating that a purpose of the Order is to address "illegal and immoral discrimination programs"). Is "equity" limited to one part of the acronym "DEI" or "DEIA"? Is it meant as an umbrella term or synonym for some or all of the concepts encompassed by those acronyms? Given the J21 Order's rejection of at least one executive order that offers a definition for the term "equity," should agency leaders assume that the applicable definition is something materially different from that one? *See* J20 Order § 1 (citing Executive Order 13985, 86 Fed. Reg. 7009, Jan. 25, 2021). Does the meaning of "equity" extend beyond DEI/DEIA?

To say the least, the lack of clarity on these and other questions makes unavoidable that agency decisionmakers will "shap[e] a vague [order's] contours though their enforcement decisions." *Sessions*, 584 U.S. at 182 (Gorsuch, J., concurring). The meaning of the word "equity" is unclear to a degree that risks arbitrary and discriminatory enforcement, particularly absent any definitions or other guidance to clarify the meaning of the term.

Even more so, the modifier "related" adds an impermissible layer of vagueness. It is wholly unclear how strong or how tenuous a grant or contract must "relate[]" to the topic of "equity" to be subject to termination. In one of Plaintiffs' exhibits, it appears that the only basis for "clarification" about "whether . . . [the] program is using Federal funds to promote or provide services out of compliance of the recent Executive Orders" is the fact that a narrative associated with the grant award includes the terms

"diversity," "equity," "equity action plan,"[8] and "DEI."[9] ECF No. 39-10 at 1. This evidence suggests that at least one executive agency appears to be, at minimum, considering that a program *might* be "equity-related" simply because the word "equity" appears in a grant narrative. Plaintiffs have amply established a likelihood that they will succeed in proving that the Termination Provision invites arbitrary and discriminatory enforcement over billions of dollars in government funding.

### b)    Notice

Another key rationale for the void-for-vagueness doctrine is the principle that "[v]ague laws may trap the innocent by not providing fair warning." *Grayned*, 408 U.S. at 108. "[B]ecause we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Id.* at 108-09.

Here, the vagueness of the Termination Provision leaves current grant recipients and contractual counterparts unsure about what activities are prohibited under the J20

---

[8] As the J20 Order notes, the previous administration had directed agencies to create and periodically update "Equity Action Plans." J20 Order § 1 ("[p]ursuant to Executive Order 13985 and follow-on orders, nearly every Federal agency and entity submitted 'Equity Action Plans'"); *see also* Executive Order 14091, 88 Fed. Reg. 10825, Feb. 22, 2023 (directing agency heads to create and maintain Equity Action Plans). It is therefore likely that some grants and contracts include one or multiple references to the term "equity action plan" in relation to agency activities at the time, whether or not the grants themselves could fairly be considered "equity-related."

[9] The email in this exhibit did not explicitly indicate that the inquiry was tied to a grant termination decision. *See* ECF No. 39-10 at 1-2. However, one of the three options offered in the email is for the recipient to "relinquish [their] award." *Id.* at 2. The other two options are to (1) self-certify that the grant activities are consistent with the executive orders "and do[] not include any activities that promote DEI activities," or (2) "stop providing [] services [non-compliant with the executive orders] . . . immediately." *Id.* at 1-2.

Order. Specifically, these individuals and organizations have no reasonable way to know what, if anything, they can do to bring their grants into compliance such that they are not considered "equity-related."

The possibilities are almost endless, and many are pernicious. If an elementary school receives Department of Education funding for technology access, and a teacher uses a computer to teach the history of Jim Crow laws, does that risk the grant being deemed "equity-related" and the school being stripped of funding? If a road-construction grant is used to fill potholes in a low-income neighborhood instead of a wealthy neighborhood, does that render it "equity-related"? If a university grant helps fund the salary of a staff person who then helps teach college students about sexual harassment and the language of consent, would the funding for that person's salary be stripped as "equity-related"? If a business with a grant from the Small Business Administration conducts a recruiting session at a historically Black college or university, could the business be stripped of the grant on that basis?

It appears from the record that at least one federal agency is giving grantees some time to "[s]top providing [non-compliant] services in your program/project immediately." ECF No. 39-10 at 2. It is unknown whether other agencies will offer an opportunity to adapt grant or contract activities at all, or whether the agencies will unilaterally assess whether to terminate the grant or contract without giving the grantee or contractor the opportunity to revise its program. But with the mandatory deadline to terminate these grants and contracts just weeks away, *see* J20 Order § 2(b) (stating that grants and contracts must be terminated "within sixty days of this order"), the time is also ticking for grantees and contractors to take action to preserve their grants and contracts, should they have such an option and should they choose to do so. The

Termination Provision fails to provide current grantees with notice about "what is prohibited, so that [they] may act accordingly." *Grayned*, 408 U.S. at 108. Thus, Plaintiffs have also demonstrated a likelihood of success on their Fifth Amendment vagueness claim based on a lack of notice.[10]

### 2. Plaintiffs may facially challenge the Termination Provision for vagueness

Defendants' primary argument as to Plaintiffs' vagueness challenge to the Termination Provision is that the claim is "categorically unripe" because "a facial vagueness challenge cannot arise under the Due Process Clause." ECF No. 35 at 5 (citing *United States v. Sun*, 278 F.3d 302, 309 (4th Cir. 2002)). Defendants maintain that to bring a facial challenge, Plaintiffs must show that the Termination Provision cannot give notice to *any* person to whom it applies. *See* ECF 35 at 3-4.

The barrier to a facial challenge for vagueness, however, is not as absolute as the government contends. Plaintiffs may bring their vagueness claim notwithstanding the possibility that a very narrow subset of grantees could be on notice that their grants are subject to termination pursuant to the J20 Order. The Supreme Court in *Johnson v. United States* clarified that "although statements in some of our opinions could be read to suggest otherwise, our *holdings* squarely contradict the theory that a vague provision is constitutional merely because there is *some conduct* that clearly falls within the provision's grasp." 576 U.S. 591, 602 (2015) (second emphasis added); *see also Kolbe v.*

---

[10] Defendants have also argued that Plaintiffs have not shown a likelihood of success on the merits of their Fifth Amendment claim as to the Termination Provision because it is not "clear" whether Plaintiffs have a "property interest" sufficient to give rise to due process protections at all. ECF No. 35 at 22-23. But as Plaintiffs explain, that is not the law. *See* ECF No. 39 at 6; *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 576-77 (1972) (collecting cases).

*Hogan*, 849 F.3d 114, 148 n.19 (2017) (en banc) (acknowledging this language from *Johnson* and rejecting appellees' argument that appellant must show that "no set of circumstances exists" under which the law would be valid to bring a facial challenge) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).

Here, the possibility that some small number of grants could "clearly fall[] within the provision's grasp," *Johnson*, 576 U.S. at 602, does not preclude a facial challenge to the vagueness of this provision. That is, perhaps a "person of ordinary intelligence" could understand that a theoretical "All About Equity Grant" with a stated mission of "fostering equity in all activities" may be considered an "'equity-related' grant" subject to the Termination Provision. *Cf. Grayned*, 408 U.S. at 109 ("[W]e insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly"). But the existence of an obvious application does not preclude a facial vagueness challenge. Just as the mere possibility that a grocer could charge a thousand dollars for a pound of sugar does not preclude a facial challenge to a law barring charging an "unjust or unreasonable rate" for necessaries, *Johnson*, 576 U.S. at 602-03 (citing *United States v. L. Cohen Grocery Co.*, 255 U.S. 81, 89 (1921)), the mere possibility that some government grants might fit squarely within the definition of "equity-related" does not forestall the Court's review of the otherwise broad and vague term as it applies to government grants and contracts generally.[11]

---

[11] Because Plaintiffs have shown a likelihood of success on the merits with respect to Count Two, their void-for-vagueness challenge to the Termination Provision, the Court need not decide whether Plaintiffs have *also* shown a likelihood of success on the merits on Count One, their Spending Clause claim as to the Termination Provision. The Court does not decide one way or the other whether Plaintiffs are likely to succeed on the merits of Count One.

### D.    Certification Provision

Section III.B.1.b above describes the First Amendment standards as they apply to federal contractors and grantees. Applying those standards to the Certification Provision, § 3(b)(iv) of the J21 Order, Plaintiffs are likely to succeed on their claim that it violates the First Amendment because on its face it constitutes a content-based restriction on the speech rights of federal contractors and grantees, and further because such restriction expands to all of those contractors' and grantees work, whether funded by the government or not. J21 Order § 3(b)(iv)(B) (requiring certification that any "counterparty or recipient" certify that "it does not operate *any* programs promoting DEI that violate any applicable Federal anti-discrimination laws") (emphasis added); *id.* § 3(b)(iv)(A) (requiring certification by every "contractual counterparty or grant recipient" of materiality with respect to "its compliance *in all respects* with all applicable Federal anti-discrimination laws") (emphasis added).

The language of the Certification Provision makes clear that the sole purpose of the provision, regardless of the individualized implementation by executive agencies, is for federal contractors and grantees to confirm under threat of perjury and False Claims Act liability that they do not operate any programs promoting DEI that the government might contend violate federal anti-discrimination laws. J21 Order § 3(b)(iv). This is precisely a "condition[] that seek[s] to leverage funding to regulate speech outside the contours of the program itself." *AID*, 570 U.S. at 214-15. There is no language in the Certification Provision that restricts the certification to be specifically about the use of DEI using federal funding received by the government; the express language of the Certification Provision demands that federal contractors and grantees essentially certify that there is no "DEI" (whatever the executive branch decides that means) in *any* aspect

of their functioning, regardless of whether the DEI-related activities occur outside the scope of the federal funding.

The executive branch's ongoing implementation of the Certification Provision confirms that the plain language of the Executive Order means what it says. The White House's fact sheet released on January 22, 2025 states that the Certification Provision "requires simple and unmistakable affirmation that contractors will not engage in illegal discrimination, including illegal DEI." ECF No. 27-19 at 3. On February 7, 2025, a federal contractor received a notice demanding that it certify that it "does not operate any programs promoting Diversity, Equity, and Inclusion that violate any applicable Federal anti-discrimination laws." ECF No. 27-20 at 2. On February 12, 2025, the NEA released language for compliance requiring grant applicants to agree not to "operate any programs promoting [DEI] that violate any applicable Federal anti-discrimination laws, in accordance with the [J21 Order]." ECF No. 39-8 at 11. These examples all point to the conclusion that the clear purpose, and clear effect, of the Certification Provision is to restrict speech related to topics such as equity, inclusion, and diversity that also falls outside the scope of the federal funding.

Defendants' main response is that "Plaintiffs have no First Amendment right to violate federal antidiscrimination laws in the first place" and that if Plaintiffs do not wish to sign such a certification, "they may forgo contracting with the Government or receiving federal funds." ECF No. 35 at 16-17. Indeed, when the Court asked the government during the hearing a series of questions regarding hypothetical implementation of DEI by federal contractors and grantees, the government refused to even attempt to clarify what the Certification Provision means, or whether these hypothetical scenarios are legal. The government merely reiterated that promoting DEI

can be unlawful and that there is uncertainty about whether programs or policies that are sometimes referred to as "DEI" are lawful after the Supreme Court's decision in *Students for Fair Admission*. And the government did not dispute that the Certification Provision is being applied to current federal grantees and contractors that have already received and relied on federal funding, not just future federal grantees and contractors.

Because even the government does not know what constitutes DEI-related speech that violates federal anti-discrimination laws, Plaintiffs have easily shown a likelihood that they will prevail in proving that the Certification Provision operates as a content-based prior restraint on their speech, and likely will also prevail in showing that the Certification operates as a facially viewpoint-discriminatory order as well. The speech-chilling effect of the Certification Provision is particularly obvious given the vagueness of the J20 and J21 orders, as discussed in sections III.C and III.E.2. Plaintiffs, their members, and other federal contractors and grantees have shown they are unable to know which of their DEI programs (if any) violate federal anti-discrimination laws, and are highly likely to chill their own speech—to self-censor, and reasonably so—because of the Certification Provision. Indeed, the Certification Provision was likely designed to induce, and certainly has been shown to have the effect of inducing, federal contractors and grantees to apply an overinclusive definition of illegal DEI to avoid risking liability. This is exactly what *AID* prohibits—the government leveraging its funding to restrict federal contractors and grantees from otherwise exercising their First Amendment rights outside the scope of the federal funding.

Defendants lastly make the argument that the Certification Provision is merely a "directive" from the President, and that agencies need not include such certification provisions "verbatim" but rather "in substance." ECF No. 35 at 18. That argument is

incompatible with the plain text of the Certification Provision, and the evidentiary record of how agencies are already implementing it. There is no language in the Certification Provision suggesting that agencies have discretion in deciding how narrow or broad the scope of the Certification Provision should be, or suggesting that agencies should restrict the certification to only apply to the use of federal funds. The express language of the Certification Provisions requires federal contractors and grantees to agree (or at the very least, prepare to agree) to not operate any programs promoting DEI that they might guess the government might contend violate anti-discrimination laws.

Defendants separately argue that "the Certification Provision falls within the Executive's authority to fund its policy priorities." ECF No. 35 at 17 (citing *Rust*, 500 U.S. at 193). This is wholly unresponsive because, as the Supreme Court has held in both *Rust* and *AID*, the Executive's authority to fund its policy priorities is still subject to the First Amendment, particularly where it seeks to encroach on protected speech made *outside* the scope of the federal funding, as the Certification Provision does.

Finally, in addition to showing that Defendants have violated the holding in *AID*, Plaintiffs have also shown a likelihood of success on the merits in showing that the Certification Provision unconstitutionally restricts, and retaliates against, contractors' and grantees' free speech rights even within the scope of the pertinent programs. As discussed above, although the government may "cho[ose] to fund one activity to the exclusion of another," *Rust*, 500 U.S. at 193, and may "define the limits of the government spending program," *AID*, 570 U.S. at 214, it may not punish government contractors or grantees "*because of* their speech on matters of public concern." *Wabaunsee County*, 518 U.S. at 675. And whether attempts to do so violate the First Amendment then turn on a "balance between the interests of the [contractor], in

48

commenting upon matters of public concern and the interest of the [government], as an employer, in promoting the efficiency of the public services it performs through its [contractors]." *Id.* at 676. Plaintiffs have shown a likelihood of success on this aspect of their First Amendment claim with respect to the Certification Provision as well. Plaintiffs have clearly shown that, if they refuse to comply with the Certification Provision and are unable to receive federal funding directly as a result for noncompliance, their First Amendment protected speech is "a substantial or motivating factor in the termination." *Id.* at 675.

Therefore, Plaintiffs have shown a likelihood of success on the merits as to Count Five of the complaint.[12]

### E.    Enforcement Threat Provision

The final challenged provision is the Enforcement Threat Provision, which directs the Attorney General to, among other things, take "appropriate measures to encourage the private sector to end illegal discrimination and preferences, including DEI," to "deter" such "programs or principles," and to "identify . . . potential civil compliance investigations" to accomplish such "deter[rence]." J21 Order § 4(b)(iii).

### 1.    First Amendment Free Speech Claim (Count Four)

Plaintiffs are likely to succeed on their claim that the Enforcement Threat Provision, § 4(b)(iii) of the J21 Order, violates the First Amendment, because it

---

[12] Because Plaintiffs have shown a likelihood of success on the merits with respect to Count Five, their First Amendment challenge to the Certification Provision, the Court need not decide whether Plaintiffs have *also* shown a likelihood of success on the merits on Count Six, their separation-of-powers claim as to the Certification Provision. The Court does not decide one way or the other whether Plaintiffs are likely to succeed on the merits of Count Six.

threatens to initiate *enforcement actions* against Plaintiffs (in the form of civil compliance investigations) for engaging in protected speech. *See Moody v. NetChoice*, 603 U.S. 707, 743-44 (2024) (holding that, for a facial First Amendment challenge, plaintiffs must show that the law at issue "prohibits a substantial amount of protected speech relative to its plainly legitimate sweep") (quoting *United States v. Hansen*, 599 U.S. 762, 770 (2023).[13]

The Enforcement Threat Provision applies broadly to the private sector; therefore, unlike with the other provisions, the analysis is based on pure private speech regulated by the First Amendment as opposed to the speech of federal contractors or grantees. *See* § III.B, *supra*. Plaintiffs have shown a likelihood of success on the merits of their claim that the Enforcement Threat Provision, which threatens to bring enforcement against perceived violators of undefined standards, is, on its face, an unlawful viewpoint-based restriction on protected speech. The Enforcement Threat Provision *expressly* focuses on "deter[ring] DEI programs or principles that constitute illegal discrimination or preferences" and "encourag[ing] the private sector to end illegal discrimination and preferences, including DEI," without, for example, a similar restriction on *anti*-DEI principles that may also be in violation of existing federal anti-discrimination laws. J21 Order § 4(b). That is textbook viewpoint-based discrimination. The government's threat of enforcement is not just targeted towards enforcement of

---

[13] The Court does not reach this same conclusion with respect to the investigative portion of the Enforcement Threat Provision to the extent it is merely a directive from the President to the Attorney General to identify "[a] plan of specific steps or measures to deter DEI programs or principles . . . that constitute illegal discrimination or preferences." J21 Order § 4(b)(iii). The Court denies Plaintiffs' request to enjoin that aspect of the Enforcement Threat Provision.

federal law. Rather, the provision expressly targets, and threatens, the expression of views supportive of equity, diversity and inclusion—a "particular view[] taken by speakers." *Rosenberger*, 515 U.S. at 829.

The government's conduct and subsequent communications pursuant to the J21 Order confirm this to be the case. The White House's fact sheet released a day after the J21 Order was issued claims, for example, that "radical DEI has dangerously tainted many of our critical businesses and influential institutions." ECF No. 27-19 at 4. It further states that "many corporations use DEI . . . ignoring the fact that DEI's foundational rhetoric and ideas foster intergroup hostility and authoritarianism," and that "DEI creates and then amplifies prejudicial hostility and exacerbates interpersonal conflict." *Id*. Similarly, in the Attorney General's February 5, 2025 memorandum to internal DOJ employees regarding the interpretation of the J21 Order as to its directives to remove references to DEI or DEIA within the executive branch, she specifically states that the DOJ components should pay particular attention to ending references to DEI or DEIA "including references to 'unconscious bias,' 'cultural sensitivity,' [and] 'inclusive leadership[.]'" ECF No. 27-14 at 3-4.

The White House and Attorney General have made clear, through their ongoing implementation of various aspects of the J21 Order, that viewpoints and speech considered to be in favor of or supportive of DEI or DEIA are viewpoints the government wishes to punish and, apparently, attempt to extinguish. And, as the Supreme Court has made clear time and time again, the government cannot rely on the "threat of invoking legal sanctions and other means of coercion" to suppress disfavored speech. *Bantam Books v. Sullivan*, 372 U.S. 58, 67 (1963); *Nat'l Rifle Assoc. of America v. Vullo*, 602 U.S. 175, 189 (2024).

51

Plaintiffs have also shown a likelihood of success that, regardless of the viewpoint discrimination baked into the Enforcement Threat Provision, it is also a *content*-based restriction on protected speech that would not pass the high bar of strict scrutiny. As explained above, a content-based restriction on protected speech is presumptively unconstitutional and will only be justified if the government's restriction is narrowly tailored to serve a compelling interest. *See* § III.B, *supra*. Like in *Reed*, here the speech being regulated is determined "based on the message [the] speaker conveys," 576 U.S. at 163, *i.e.*, whether the speech promotes principles of inclusion, equity, and diversity. That is clear based on the face of the J21 Order, and hammered home by the egregiously content-based actions taken by various agencies pursuant to the J21 Order.

Defendants' only real attempt at a defense on the merits is to point to language in the Enforcement Threat Provision that the "strategic enforcement plan" to combat "DEI" in the "private sector" and "deter DEI programs or principles (whether specifically denominated 'DEI' or otherwise) that constitute illegal discrimination or preferences" is limited to "*illegal* discrimination or preferences." J21 Order, § 4(b)(iii) (emphasis added). In other words, Defendants contend that all they are threatening is to target non-compliance with existing federal anti-discrimination law, and that the Enforcement Threat Provision "does not target a First Amendment right to begin with" because "Plaintiffs have no First Amendment right to engage in 'illegal discrimination.'" ECF No. 35 at 19. But, as explained above, *see* § III.E.1, *supra*, the J21 Order offers no guidance or notice of what the government now considers "illegal" DEI. And more importantly, the Fourth Circuit has already held, in *HIAS, Inc. v. Trump*, that a "purely theoretical savings clause" like this one, "with no method or standard for invoking it," and where application of it "would undermine" the substantive provisions of the

Executive Orders, does not "immunize [the Executive Order] from scrutiny." 985 F.3d 309, 325 (4th Cir. 2021).

Defendants further argue that "Plaintiffs' allegation of 'chilled' speech is wholly subjective because it relies on the unfavored presumption that the Government will execute the [Orders'] directive in bad faith and ignore its own declaration to only target illegal conduct." ECF No. 35 at 19. Defendants cite to *Ali v. Hogan* to support this proposition, but that case held that the plaintiff "does not allege an intention to engage in any activity that could be construed to fall within the purview of the Executive Order," and so the plaintiff there was unable to allege a credible fear of chilled speech. 496 F. Supp. 3d 917, 930 (D. Md. 2020), *aff'd as modified*, 26 F.4th 587 (4th Cir. 2022). Here, not only have Plaintiffs shown many ways in which they have historically engaged in protected speech on diversity-related topics that the executive branch has now suggested is unlawful. Defendants also still do not respond to the baseline contention that the Enforcement Threat Provision is *facially* unconstitutional as a viewpoint- and content-based restriction on speech. Plaintiffs have shown they face "a 'credible threat' that the policy will be enforced against them." *Abbott v. Pastides*, 900 F.3d 160, 176 (4th Cir. 2018).

Therefore, Plaintiffs have shown a likelihood of success on the merits as to Count IV of the complaint.

### 2.    Due Process Vagueness Claim (Count 3)

Plaintiffs have also shown a likelihood of success on the merits of their facial due process vagueness challenge to the Enforcement Threat Provision.

Defendants have rescinded swaths of existing executive branch guidance on what the executive branch considers the federal civil rights laws to require, prohibit, or allow.

*See* J21 Order §§ 2, 3 (ordering executive agencies to terminate all "discriminatory and illegal" guidance and regulations and revoking four executive orders). Yet neither the J20 nor the J21 Order gives guidance on what the new administration considers to constitute "illegal DEI discrimination and preferences," *id.* § 4(b)(iv), or "[p]romoting 'diversity,'" *id.* § 3(b)(ii), or "illegal DEI and DEIA policies," *id.* § 1, or what types of "DEI programs or principles" the new administration considers "illegal" and is seeking to "deter," *id.* § 4(b)(iii). The due process clause of the Fifth Amendment requires that "prohibitions" on conduct be "clearly defined." *Grayned*, 408 U.S. at 108. That is especially the case where "the law interferes with the right of free speech." *Hoffman Estates*, 455 U.S. at 499. As explained above, Plaintiffs have shown a likelihood of success on the merits of both of their First Amendment Claims: Count Five as to the Certification Provision and Count Four as to the Enforcement Threat Provision. Accordingly, the "more stringent vagueness test," *id.*, applies in this context.

"Vague laws invite arbitrary power." *Sessions*, 584 U.S. at 175 (Gorsuch, J., concurring). And Plaintiffs here have shown substantial evidence of the risks of such arbitrariness here. By threatening the "private sector" with enforcement actions, J21 Order § 4, based on those vague, undefined standards, the Enforcement Threat Provision is facially unconstitutional under the due process clause of the Fifth Amendment.

The harm to constitutionally protected notice interests caused by the newly announced "prohibitions," *Grayned*, 408 U.S. at 108, is further exacerbated by the interaction between the Enforcement Threat Provision and the Certification Provision. The Certification Provision states that not only are government contractors (and grantees, insofar as they are required to aver to such certifications too) in a position to

have to guess whether they are in compliance with the administration's as-yet-unpromulgated guidance on what constitutes, for example, "illegal . . . DEI," J21 Order § 4(b)(iii), they are nevertheless being threatened with False Claims Act liability if they miss the mark. Such escalation of consequences dramatically raises the stakes, and by extension dramatically expands the degree of injury to interests protected by the Fifth Amendment. *See Sessions*, 584 U.S. at 184 (Gorsuch, J., concurring) ("[T]oday's civil laws regularly impose penalties far more severe than those found in many criminal statutes.").

Plaintiffs have shown a likelihood of success on the merits of Count 3.

## IV.    IRREPARABLE HARM

Each Plaintiff alleges that failure to enjoin the conduct at issue will cause irreparable harm. A plaintiff seeking a preliminary injunction "must demonstrate a likelihood of irreparable injury—not just a possibility—in order to obtain preliminary relief," in other words "that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 21. "To establish irreparable harm, the movant must make a 'clear showing' that it will suffer harm that is 'neither remote nor speculative, but actual and imminent.'" *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197, 216 (4th Cir. 2019) (quoting *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991)). Irreparable means the injury "cannot be fully rectified by the final judgment after trial." *Id.* (quoting *Stuller, Inc. v. Steak N Shake Enters.*, 695 F.3d 676, 680 (7th Cir. 2012)).

A "prospect of an unconstitutional enforcement 'supplies the necessary irreparable injury.'" *Air Evac EMS, Inc. v. McVey*, 37 F.4th 89, 103 (4th Cir. 2022) (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381-82 (1992)). Relatedly,

where a plaintiff has shown a strong likelihood of success on a constitutional claim, irreparable harm has been established. *See Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) ("It has long been established that the loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'") (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

Here, Plaintiffs allege four types of irreparable harm from the challenged Executive Order provisions: threat of loss of funds, uncertainty regarding future operations, loss of reputation, and chilled speech. The Court agrees that Plaintiffs have adequately shown a sufficient likelihood of irreparable harm.

First, as stated above, Plaintiffs have adequately shown a likelihood of success on their constitutional claims, and thus irreparable injury. *Mills*, 571 F.3d at 1312; *Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021) ("Because there is a likely constitutional violation, the irreparable harm factor is satisfied."). This is also why Defendants' contention that regulatory uncertainty is not irreparable harm is incorrect: here the uncertainty is sufficient to likely *create* constitutional violations such as chilled protected speech, which provides the requisite irreparable harm. Defendants assert that because the Orders only prohibit "illegal" conduct, Plaintiffs' claims of chilled speech are objectively unreasonable because they assume Defendants will enforce the Executive Orders against constitutional conduct and in bad faith. But as discussed above, the problem is not that Plaintiffs assume Defendants will enforce the Orders in bad faith, but rather that the Challenged Provisions strip Plaintiffs of the ability to know what the government might now consider lawful or unlawful. There have been 60 years of statutes, regulations, and case law developed since the Civil Rights Act of 1964. The Challenged Provisions strip away much of the prior executive branch guidance, and then

56

threaten the loss or condition the receipt of federal funds, and also threaten civil enforcement actions—some backed by the possibility of treble damages—for violations. And in so doing, they threaten to punish prior expressions of protected speech, and chill future expressions of protected speech.

Second, while Defendants allege that Plaintiffs' economic injuries are not irreparable, they acknowledge that economic injuries severe enough to threaten Plaintiffs' existence, if shown, are irreparable. ECF No. 35 at 26 (asserting that "[a]ny such financial loss must 'threaten[] the very existence of the [Plaintiffs'] business[es].'") (quoting *Packard Elevator v. ICC*, 782 F.2d 112, 115 (8th Cir. 1986)). Plaintiffs have shown that the Challenged Provisions threaten the livelihoods of numerous of Plaintiffs' members and NADOHE's existence. ECF No. 27-23 ¶¶ 26, 44-46 (NADOHE declaration that the Challenged Provisions "will lead to the eradication of critical support for students, staff, and faculty on campuses of higher education; the elimination of many of [their] members' jobs; and will ultimately threaten NADOHE's existence" and expecting severe loss of members and revenue based on past experiences); ECF No. 27-24 ¶ 21-25 (AAUP detailing its members' expected losses); ECF No. 27-25 ¶¶ 35 (ROC United asserting that because of the Challenged Provisions, it "will operate at a deficit to continue to fulfill its mission until its funds are depleted"); ECF No. 27-26 ¶ 30 (Baltimore asserting that the uncertainty arising from the Orders will "likely reduce support for other programs or shutter some altogether—just to sustain certain critical municipal functions").

Similarly, while economic damages are often ultimately recoverable in litigation, and thus not irreparable harm, if those damages are *not* recoverable, they can amount to irreparable injury. *Mountain Valley Pipeline*, 915 F.3d at 218. In light of Defendants'

sovereign immunity, monetary recovery in this case is likely to be precluded. *See Mayor & City Council of Balt. v. Azar*, 392 F. Supp. 3d 602, 618 (D. Md. 2019) (providing that "[s]hould Baltimore City lose Title X funding . . . the lost funds could not be recovered should it ultimately succeed with this litigation, because HHS enjoys sovereign immunity that precludes monetary recovery") (citing *Mountain Valley Pipeline*, 915 F.3d at 217-18). Thus, the Court concludes that Plaintiffs have adequately established the necessary irreparable harm.

## V.     BALANCE OF THE EQUITIES AND PUBLIC INTEREST

The final two factors are the balance of the equities and the public interest. The balance of the equities and the public interest "merge when the Government is the opposing party." *Miranda v. Garland*, 34 F.4th 338, 365 (4th Cir. 2022) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). To balance the equities, the Court considers "the relative harms to the applicant and respondent, as well as the interests of the public at large." *Barnes v. E-Sys., Inc. Grp. Hosp. Med. & Surgical Ins. Plan*, 501 U.S. 1301, 1305 (1991) (Scalia, J., in chambers) (quoting *Rostker v. Goldberg*, 448 U.S. 1306, 1308 (1980) (Brennan, J., in chambers)).

Plaintiffs contend that injunctive relief is necessary to prevent further harm and that "[d]elayed remedy would be akin to 'shut[ting] the stable door after the horse has bolted.'" ECF No. 27-1 at 33-34 (quoting *Juliana v. United States*, 947 F.3d 1159, 1181 (9th Cir. 2020) (Staton, J., dissenting)). Plaintiffs also assert that "[s]wift elimination of infringement on free speech rights is decidedly in the public interest." *Id.* at 34 (citing *Nat'l Pub. Radio, Inc. v. Klavans*, 560 F. Supp. 3d 916, 929 (D. Md. 2021)).

On the other hand, Defendants assert that, because Plaintiffs' First Amendment claims fail on the merits, an injunction is not in the public interest. ECF No. 35 at 28.

Defendants also argue that "there is no question that eradicating discrimination is in the interest of the public," *id.* (citing *Students for Fair Admissions*, 600 U.S. at 206), and that they will be injured because an injunction "would effectively disable almost a dozen federal agencies, as well as the President himself, from implementing the President's priorities consistent with their legal authorities." *Id.* 28-29 (citing *Maryland v. King*, 567 U.S. 1301, 1303 (2012)).

As discussed above, Plaintiffs have made a strong showing that they are likely to succeed on the merits of the facial challenges to the Termination Provision, the Certification Provision, and, in part, the Enforcement Threat Provision. And Plaintiffs have also made a strong showing that they, their members, and similarly situated government contractors, grantees, and members of the private sector are suffering substantial current and imminent irreparable harm. As Plaintiffs put it, "[e]fforts to foster inclusion have been widespread and uncontroversially legal for decades." ECF No. 39 at 9. Plaintiffs' irreparable harms include widespread chilling of unquestionably protected speech, chilling that is unquestionably attributable to the Challenged Provisions.

The government contends that even if Plaintiffs have shown a likelihood of success on the merits, and even if Plaintiffs are suffering irreparable harm, the government's interest in immediately imposing a new, not-yet-promulgated interpretation of what it considers "eradicating discrimination," ECF No. 35 at 28, outweighs the merits of Plaintiffs' claims and the irreparable harm they are suffering. The government is free to promulgate regulations, take litigating positions, propose legislation, or any number of other steps, so long as they are consistent with statutes and the Constitution. The core problem here is that, as explained above, Plaintiffs have

shown that the specific Challenged Provisions infringe on core constitutional protections, and that the status quo must be maintained while Plaintiffs and the government litigate the claims asserted in this case. The balance of equities tips strongly in Plaintiffs' favor.

## VI.    SCOPE OF PRELIMINARY INJUNCTION

Having determined that Plaintiffs are entitled to a preliminary injunction, the Court must determine its proper scope. "District courts have broad discretion to craft remedies based on the circumstances of a case, but likewise must ensure that 'a preliminary injunction is no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs.'" *HIAS*, 985 F.3d at 326 (quoting *Roe v. Dep't of Def.*, 947 F.3d 207, 231 (4th Cir. 2020)).

For the reasons explained above, Plaintiffs have amply shown they are entitled to a preliminary injunction that protects them, and their members, from the substantial, irreparable harms they have shown are being caused by the Challenged Provisions and Defendants' conduct pursuant to those provisions. The question remains whether the preliminary injunction should also apply to non-parties. This is sometimes referred to as presenting whether the injunction should be "nationwide," but that is a misnomer; here, Plaintiffs themselves are national organizations, and so the injunction would be "nationwide" in any event. The relevant question is whether, in light of the claims and Plaintiffs' showing of likelihood of success on the merits, including similarly situated non-parties within the scope of an injunction would be appropriate.

Here, Plaintiffs have made that showing. "A district court may issue a nationwide injunction so long as the court 'mold[s] its decree to meet the exigencies of the particular case.'" *HIAS*, 985 F.3d at 326 (alteration in original) (quoting *Trump v. Int'l*

*Refugee Assistance Project*, 582 U.S. 571, 580 (2017)). An injunction that extends to non-parties may be particularly "appropriate" where, as here, "the government relies on a 'categorical policy,' and when the facts would not require different relief for others similarly situated to the plaintiffs." *Id.* (quoting *Roe*, 947 F.3d at 231). Moreover, "[o]nce a constitutional violation is found, a federal court is required to tailor the scope of the remedy to fit the nature and extent of the constitutional violation." *Hills v. Gautreaux*, 425 U.S. 284, 293-94 (1976) (citations and internal quotation marks omitted). "[W]here a law is unconstitutional on its face, and not simply in its application to certain plaintiffs, a nationwide injunction is appropriate." *Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 539 (N.D. Cal. 2017) (citing *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) ("[T]he scope of injunctive relief is dictated by the extent of the violation established, not by the geographical extent of the plaintiff.")).

In *HIAS*, the Fourth Circuit affirmed an injunction that extended to non-parties similarly situated to the plaintiffs in that case where "[t]he refugee resettlement program by its nature impacts refugees assigned to all nine resettlement agencies, which place refugees throughout the country," and where "[e]njoining the Order and Notice only as to the plaintiff resettlement agencies would cause inequitable treatment of refugees and undermine the very national consistency that the Refugee Act is designed to protect." 985 F.3d at 326-27. Analogous circumstances apply here, where, as explained above, the Termination and Enforcement Threat Provisions are unconstitutionally vague as to *all* contractors and grantees who are subject to them, and the Certification and Enforcement Threat Provisions are content- and viewpoint-based restrictions that chill speech as to anyone the government might conceivably choose to accuse of engaging in speech about "equity" or "diversity" or "DEI," or the other topics

the J20 and J21 Orders cite—or as the Attorney General cites, for example, "unconscious bias," "cultural sensitivity" or "inclusive leadership." ECF No. 27-14 at 3-4.

As noted above, for prudential and separation-of-powers reasons, the Court will not enjoin the Attorney General from preparing the report pursuant to the J21 Order, or engaging in investigation. But otherwise, Plaintiffs have shown they are entitled to an injunction as to the Termination, Certification and Enforcement Threat Provisions, whether as applied to Plaintiffs or to others.

## VII.    BOND

Defendants have requested that "any injunctive relief accompany a bond under [Federal Rule of Civil Procedure] 65(c)." ECF No. 35 at 32. Defendants have not proposed a precise amount for bond, but note that "preliminary relief would potentially mandate that the Executive spend money that may not be recouped once distributed." *Id.* Plaintiffs oppose this request, because the bond amount Defendants seem to forecast they would request would be an enormous financial barrier and "Defendants point to no example of a court ordering a bond in analogous circumstances." ECF No. 39 at 17.

Federal Rule of Civil Procedure 65(c) states, in relevant part: "The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Although the rule is "mandatory and unambiguous," *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 (4th Cir. 1999), the Fourth Circuit has acknowledged that "where the circumstances warrant it, the court may fix the amount of the bond accordingly" and noting that "[i]n some circumstances, a nominal bond may suffice." *Id.* at 421 n.3 (cleaned up); *see also Pashby v. Delia*, 709 F.3d 307, 332 (4th Cir. 2013) ("[T]he district

court retains the discretion to set the bond amount as it sees fit *or waive* the security requirement.") (emphasis added).

In addition, courts in other circuits have frequently waived the bond requirement in cases where a fundamental constitutional right is at stake. *See, e.g.*, *Honeyfund.com, Inc. v. DeSantis*, 622 F. Supp. 3d 1159, 1186 (N.D. Fla. 2022) (waiving the bond requirement under Rule 65(c) because the "unlawful impact on Plaintiffs' First Amendment rights weighs against requiring a bond"); *Thomas v. Andino*, 613 F. Supp. 926, 956 (D.S.C. 2020) (waiving bond in a voting rights case); *Nat. Res. Def. Council, Inc. v. Morton*, 337 F. Supp. 167, 168 (D.D.C. 1971) (noting that courts have held that security is not necessary where the effect would deny plaintiffs the right to judicial review of administrative action) (citing cases).

Here, because the Plaintiffs seek to protect their First and Fifth Amendment rights, and because a bond of the size Defendants appear to seek would essentially forestall Plaintiffs' access to judicial review, the Court will set a nominal bond of zero dollars under Rule 65(c).

## VIII.  CONCLUSION

For the foregoing reasons, Plaintiffs' motion for a preliminary injunction is granted in part and denied in part. Their motion for a temporary restraining order is denied as moot. A separate preliminary injunction order follows.


Date:  February 21, 2025               _____/s/_____
                                       Adam B. Abelson
                                       United States District Judge